UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| GILBERT P. HYATT,<br><br>Plaintiff,<br><br>v.<br><br>JOSEPH MATAL,<br><br>Defendant. | Civil Action No. 05-2310 (RCL) |

**Plaintiff Gilbert P. Hyatt's**
**<u>Proposed Findings of Fact and Conclusions of Law</u>**

Mark W. DeLaquil (D.C. Bar. No. 493545)
Jason F. Hoffman (D.C. Bar No. 985166)
Paul M. Levine (D.C. Bar No. 999320)
Baker & Hostetler LLP
1050 Connecticut Ave., N.W., Suite 1100
Washington, D.C. 20036
(202) 861-1500
mdelaquil@bakerlaw.com

*Attorneys for Plaintiff Gilbert P. Hyatt*

**Table of Contents**

I. Proposed Findings of Fact ................................................................................1

   A. The Parties ................................................................................................1

   B. The '211 Application Prosecution History Before the PTO .............................2

   C. Procedural History ....................................................................................4

   D. The Merits Trial........................................................................................5

   E. The '211 Application.................................................................................6

      1. The Image Processing System ...........................................................8

      2. The Disclosure Is Described In A "Top-Down" Structure.................15

   F. The Disclosure Provides Adequate Written Description Support For The Image Information and The Types Of Images Used In The Contested Claims.....................................................................................................25

      1. Background Images..........................................................................27

      2. 3D Perspective Images .....................................................................28

      3. Textured Images ..............................................................................32

      4. Graphic Images ...............................................................................34

      5. Video Images ..................................................................................36

      6. Irregular and Cropped Images...........................................................37

      7. Alphanumeric Images......................................................................39

      8. Database Images..............................................................................40

      9. Data Compressed and Data Decompressed Images ...........................41

      10. Data Compressed and Data Decompressed Video Images .................44

   G. The Disclosure Provides Adequate Written Description Support For Overlay of Images And Their Implementation....................................................45

   H. The Disclosure Provides Adequate Written Description for the Multiplexer/Demultiplexer ......................................................................49

  1. The Disclosure Provides Adequate Written Description For The Multichannel Mux/Demux Circuitry ............................................. 52

  2. Dr. Castleman's Testimony About The Mux/Demux Is Not Credible ......................................................................................... 60

I. Adequate Written Description Support Exists For The Use of "Windows" In The Disclosure ................................................................ 64

  1. The Disclosure Describes "Window" As A Portion of Image Memory Scanned Out for Display ........................................... 65

  2. Neither The Disclosure Nor The Claims Describe Or Claim A Graphical User Interface ............................................................ 76

  3. Dr. Castleman Erroneously Construes "Window" By Disregarding The Disclosure .................................................. 80

J. The Disclosure Describes "Menu" As An On-Screen Display of Options Presented To A User For Selection ................................................ 85

K. The Disclosure Describes "Icon" As A Small Image Displayed On A Screen To Represent An Object ........................................................ 91

L. The Claims of the '211 Application Have Adequate Written Description Support .................................................................................................. 93

  1. Figure 1A (Simplified) ................................................................ 96

  2. Claim 131 ..................................................................................... 97

  3. The Disclosure Provides Adequate Written Description Support For The Window Claims ............................................................ 101

  4. The Disclosure Provides Adequate Written Description Support For The "Menu" Claims ........................................................... 130

  5. The Disclosure Provides Adequate Written Description Support For The "Icon" Claims ............................................................... 138

  6. The Disclosure Provides Adequate Written Description Support For The "Making A Product" Claims ................................... 140

  7. Dr. Castleman's Testimony On Written Description Is Unreliable And Not Credible ................................................................... 142

M. Ultimate Findings On Written Description .................................... 145

II.     Proposed Conclusions Of Law ..................................................................146

        A.     Legal Framework For Review Of Patents In Section 145 Actions ...............146

               1.     Written Description .................................................................147

               2.     Claim Construction .................................................................149

               3.     Procedural Framework For Examination And Administrative
                      Review .....................................................................................151

               4.     Judicial Review Of Patentability Determinations ...............................153

        B.     Legal Conclusions Regarding The '211 Application .......................................156

III.    Conclusion ..............................................................................................158

# Claims Index

Claim 131 ...................................................................................................................97

Claim 134 .................................................................................................................131

Claim 139 .................................................................................................................101

Claim 151 .................................................................................................................107

Claim 156 .................................................................................................................102

Claim 159 .................................................................................................................140

Claim 172 .................................................................................................................130

Claim 175 .................................................................................................................108

Claim 194 .................................................................................................................105

Claim 196 .................................................................................................................103

Claim 199 .................................................................................................................131

Claim 202 .................................................................................................................104

Claim 210 .................................................................................................................108

Claim 236 .................................................................................................................139

Claim 250 .................................................................................................................135

Claim 252 .................................................................................................................103

Claim 266 .................................................................................................................125

Claim 268 .................................................................................................................133

Claim 271 .................................................................................................................135

Claim 274 .................................................................................................................128

Claim 276 .................................................................................................................113

Claim 282 .................................................................................................................127

Claim 287 .................................................................................................................114

Claim 290 .................................................................................................................128

Claim 298 .................................................................................................................127

Claim 306 .................................................................................................................129

Claim 314 .................................................................................................................127

Claim 316 .................................................................................................................135

Claim 322 .................................................................................................................129

Claim 375 .................................................................................................136

Claim 381 .................................................................................................133

Claim 385 .................................................................................................132

Claim 390 .................................................................................................132

Claim 394 .................................................................................................133

Claim 399 .................................................................................................110

Claim 405 .................................................................................................110

Claim 410 .................................................................................................106

Claim 415 .................................................................................................138

Claim 420 .................................................................................................111

Claim 424 .................................................................................................136

Claim 428 .................................................................................................115

Claim 434 .................................................................................................114

Claim 439 .................................................................................................114

Claim 443 .................................................................................................117

Claim 449 .................................................................................................138

Claim 454 .................................................................................................123

Claim 459 .................................................................................................137

Claim 463 .................................................................................................121

Claim 467 .................................................................................................120

Claim 472 .................................................................................................137

Claim 477 .................................................................................................124

Claim 482 .................................................................................................121

Claim 487 .................................................................................................124

Claim 491 .................................................................................................124

Claim 496 .................................................................................................121

Claim 500 .................................................................................................111

Claim 501 .................................................................................................125

Claim 502 .................................................................................................115

Claim 503 .................................................................................................134

Claim 504 .................................................................................................116

Claim 505 ...................................................................................................116

Claim 508 ...................................................................................................134

Claim 509 ...................................................................................................137

Claim 510 ...................................................................................................140

Claim 511 ...................................................................................................111

Claim 512 ...................................................................................................112

Claim 513 ...................................................................................................112

Plaintiff Gilbert P. Hyatt respectfully submits these proposed findings of fact and conclusions of law following the Court's bench trial of December 4–6, 2017 and January 18–19, 2018, on the issue of whether Mr. Hyatt is entitled to a patent pursuant to 35 U.S.C. § 145 from Defendant, Joseph P. Matal, who performs the functions and duties of the Director of the United States Patent and Trademark Office ( hereinafter the "PTO") on the 08/457,211 application (Hyatt Docket No. 708) (the "'211 application"). At issue is whether certain of Mr. Hyatt's claims, the rejections of which were affirmed by the Board of Patent Appeals and Interferences, satisfied the written description requirement, 35 U.S.C. § 112.

For the reasons stated below, the Court finds that Mr. Hyatt is entitled to a patent on claims 126, 131, 132, 134, 135, 139, 151, 152, 156, 157, 159, 160, 168, 169, 172–177, 194–197, 199, 200, 202, 210, 211, 221, 222, 235–237, 238, 250–256, 267–269, 271–273, 275–277, 283, 285, 287–289, 291, 299, 307, 315–318, 323, 329, 331, 332, 334–336, 338, 340, 341, 343–346, 348–358, 360–367, 369, 375, 377, 379–386, 388–391, 393–395, 398, 399, 401–406, 408–411, 413–421, 423–425, 427, 428, 430, 432–440, 442, 443, 445, 447–450, 452–455, 457–464, 466–478, 480–488, 490–492, 494–505, and 508–513. The Court authorizes the Director of the PTO to issue a patent for these claims.

## I.      Proposed Findings of Fact

### A.      The Parties

1.      Plaintiff Gilbert P. Hyatt is a prolific inventor who has received about 75 issued patents and is the named inventor of the '211 application. *E.g.*, Trial Tr. 37:16–38:16 (Dec. 4, 2017 AM Session); PTX-4.08143–8146.

2.      Joseph P. Matal performs the functions and duties of the Director of the PTO, which is the federal agency responsible for examining patent applications and for granting U.S. patents. 35 U.S.C. § 1 *et seq.*

**B.      The '211 Application Prosecution History Before the PTO**

3.      Mr. Hyatt filed the '211 application on June 1, 1995. PTX-4.08143–8146. The '211 application is a continuation application of the 07/289,355 application, filed December 22, 1988, which is a continuation application of the 06/663,094 application, filed October 19, 1984. PTX-4.07555; PTX-4.08143; Trial Tr. 15:2–10 (Dec. 5, 2017 PM Session) (Hyatt).

4.      The '211 application and the other applications in the same "700 family" are supported, by among other things, a specification of 606 pages of text and 65 pages of drawings, found at PTX-4.07488–8139 (the "Disclosure"), along with videos and other documents provided to the PTO pursuant to its Disclosure Document Program. *See* PTX-332, 200A, 200B; Trial Tr. 47:24–48:2 (Dec. 4, 2017 AM Session); Trial Tr. 13:15–23, 35:2–6 (Dec. 4, 2017 PM Session); *infra* ¶¶ 41-43.

5.      On September 22, 1995, the PTO rejected the '211 application's claims in a non-final Office Action. PTX-4.06719. The PTO rejected the claims in a final Office Action dated July 31, 1996. PTX-4.06622. Mr. Hyatt, using the GATT-related transitional rules provided in 37 C.F.R. § 1.129(a) ("Rule 129(a)"), petitioned to file an amendment, the effective equivalent of a continuing application, on March 25, 1997.[1] PTX-4.06587–6589. The PTO issued a non-final Office Action rejecting the claims, as amended, on August 3,

---

[1] 37 C.F.R. § 1.129 allowed an applicant to pay a fee similar to the regular U.S. filing fee to file an amendment that the PTO was to consider. In other words, what would have been filed as a separate continuation application, pre-GATT, was instead is filed as an amendment in the existing application.

1998. PTX-4.06053–6054. The PTO entered a final rejection of the claims on August 27, 1999. PTX-4.06373. The examiner allowed no claims. *See* PTX-4.05414–5623 at 5420 (Supp. Appeal Brief); PTX-4.04737–4906 at 4740 (Examiner's Answer).

6.      Mr. Hyatt timely noticed his appeal to the Board of Patent Appeals and Interferences (the "Board") on February 28, 2000. PTX-4.05737. He filed his Appeal Brief before the Board on August 28, 2000. PTX-4.04965. The PTO filed its Examiner's Answer before the Board on August 21, 2001. PTX-4.04737. Mr. Hyatt filed his Reply Brief before the Board on October 22, 2001. PTX-4.04142.

7.      The Board rendered its initial decision on May 31, 2005. PTX-4.00048. Mr. Hyatt sought rehearing on August 10, 2005. PTX-4.00044. On September 21, 2005, the Board rendered its decision on Mr. Hyatt's request for rehearing, denying all requests to reverse the rejections. PTX-4.00011–26, 24.

8.      In the appeal, 290 claims were at issue. *See* PTX-4.00048. A copy of the claims on appeal was submitted into evidence as Defendant's Exhibit 2003 (DX2003).

9.      The Board reversed numerous grounds of rejection found by the examiner of the '211 claims. The Board reversed rejections of claims 125, 126, 128–132, 134, 135, 139, 151, 152, 156, 157, 159, 160, 167–177, 194–197, 199–200, 202, 210, 211, 220–222, 234–238, 250–256, 266–269, 271–277, 279, 280, 282–285, 287–291, 298, 299, 306, 307, 314–323, 329–332, 334–336, 338–341, 343–346, 348–371, 373–377, 379–386, 388–391, 393–395, 397–406, 408–411, 413–421, 423–425, 427–430, 432–440, 442–445, 447–450, 452–455, 457–464, 466–478, 480–488, 490–492, and 494–522 for lack of enablement under 35 U.S.C. § 112(1); and reversed rejections of claims 125–136, 139, 156–161, 167–174, 194–202, 210, 211, 220–222,

234–238, 250–257, 266–291, 298, 299, 306, 307, 314–323, 329–332, 335, 336, 338–340, 343–346, and 348–522 for obviousness under 35 U.S.C. § 103. *See* PTX-004.00103–104.

10.     The Board affirmed the rejections of the other claims it considered, including written description rejections under 35 U.S.C. § 112, ¶ 1 for claims 125–136, 139, 151–153, 156–161, 167–177, 194–202, 210, 211, 220–222, 234–238, 250–257, 266–291, 298, 299, 306, 307, 3144–323, 329–332, 334–336, 338–341, 343–346, and 348–522. PTX-4.00103–104; PTX-4.00024.

11.     Despite reversing certain grounds of rejection for certain claims, the Board ultimately affirmed the rejection of all pending claims on at least one ground of rejection. *See* PTX-4.00103–104; PTX-4.00024; *compare* ECF No. 3 ¶ 19 (Compl.),[2] *with* ECF No. 123 ¶ 19 (Second Am. Answer) (admitting that all claims stood rejected by the PTO).

## C.     Procedural History

12.     On November 18, 2005, Mr. Hyatt timely brought this action pursuant to 35 U.S.C. § 145 to obtain a patent.

13.     The parties conducted limited discovery and then cross-moved for summary judgment. The Court found that genuine disputes of material fact precluded summary judgment and required trial with respect to all claims. ECF No. 75.

14.     Subsequently, the PTO moved to dismiss this and three other Section 145 actions for prosecution laches, ECF No. 81. After the court found that genuine disputes of material fact required denying those motions, ECF No. 116, the PTO amended its answers on leave of the Court to assert prosecution laches as an affirmative defense, ECF Nos. 119,

---

[2] Unless otherwise noted, all references to the ECF docket are to No. 05-cv-2310.

123. After discovery and a bench trial, the Court granted judgment on partial findings in favor of Mr. Hyatt on the issue of prosecution laches. Minute Order (Oct. 16, 2017).

15.     The PTO argued in this litigation that Mr. Hyatt's claims were obvious in light of prior art references such as the Apple Operating System. *E.g.*, PTX-805.00356–358 (Castleman expert report that graphical user interface features were known in prior art prior to 1984); *see also* PTO Mot. for Sum. J., ECF No. 50, at 9 (Apr. 15, 2013). However, the PTO abandoned all of its prior art arguments and claim rejections prior to trial. *See* Pretrial Hr'g Tr. 9:20–23 (Nov. 28, 2017).

**D.     The Merits Trial**

16.     The merits trial in this action followed on December 4–6, 2017 and January 18–19, 2018. The parties presented evidence regarding written description for claims 131, 134, 139, 151, 156, 159, 172, 175, 196, 199, 202, 210, 236, 250, 252, 266, 268, 271, 274, 276, 282, 287, 290, 298, 306, 314, 316, 322, 375, 381, 385, 390, 394, 399, 405, 410, 415, 420, 424, 428, 434, 439, 443, 449, 454, 459, 463, 467, 472, 477, 482, 487, 491, 496, 500, 501, 502, 503, 504, 505, 508, 509, 510, 511, 512, and 513. Evidence in the administrative file history record was also submitted on the "making a product" claims. *See infra* ¶ 504.

17.     Mr. Hyatt and an expert, Bradford Hite, testified for Plaintiff in his case-in-chief and on rebuttal. Kenneth Castleman, Ph.D., testified for the Defendant in its case-in-chief. The parties also introduced a number of exhibits into evidence. ECF Nos. 225, 226.

18.     The parties also designated testimony from the trial in No. 09-cv-1872 that would apply in the current trial. ECF Nos. 219, 220.

E.     The '211 Application

19.     Mr. Hyatt is the inventor of the '211 Application. He obtained Bachelor's and

Master's degrees in electrical engineering and has worked at Boeing, North American

Aviation, Hughes Aircraft, and Teledyne on aeronautical and computer projects. Mr. Hyatt

also worked in management at Teledyne supervising 10 to 15 engineers. Trial Tr. 21:8–26:4

(Nov. 13, 2017 AM Session) (09-1872) (Hyatt).

20.     Mr. Hyatt was a hands-on engineer who designed and built his inventions

with the hope of bringing them to market. Trial Tr. 29:16–24, 30:3–4 (Nov. 13, 2017 AM

Session) (09-1872) (Hyatt). In order for Mr. Hyatt to commercialize and bring his inventions

to market, he needed venture capital financing. Trial Tr. 30:4–6 (Nov. 13, 2017 AM

Session) (09-1872) (Hyatt); Trial Tr. 31:8–11 (Dec. 4, 2017 PM Session) (Hyatt testimony

that he hope to bring the image processing system to market if he could obtain funding).

Venture capitalists, in turn, required patents to ensure that the inventions, and their

investments in commercializing and bringing them to market, would be protected. Trial Tr.

30:6–7 (Nov. 13, 2017 AM Session) (09-1872) (Hyatt). In addition, Mr. Hyatt built certain

embodiments of his inventions to demonstrate that they performed in the manner he had

described. Trial Tr. 30:11–13 (Nov. 13, 2017 AM Session) (09-1872) (Hyatt).

21.     Mr. Hyatt ultimately received about 75 patents across a range of different

technologies. Trial Tr. 30:16–18 (Nov. 13, 2017 AM Session) (09-1872) (Hyatt).

Technologies covered by Mr. Hyatt's patents include computer designs, illumination control

systems, and industrial control systems. Trial Tr. 31:5–10 (Nov. 13, 2017 AM Session) (09-

1872) (Hyatt). Many of Mr. Hyatt's patents for inventions have been widely licensed for use

in products such as digital cameras, keyboards, typewriters, and cellular telephones by

manufacturers such as Sony, Canon, Nikon, Sharp, Fujitsu, Toshiba, Philips, and Panasonic. Trial Tr. 29:16–33:24 (Nov. 13, 2017 AM Session) (09-1872) (Hyatt); Trial Tr. 28:10–30:01 (Dec. 4, 2017 AM Session) (citing PTX-910 at slides 2–5 that illustrate patent markings on products that licensed Mr. Hyatt's patents).

22.     Mr. Hite has a Bachelor's of Science and Master's Degree in Electrical Engineering from California State Northridge. For the past 23 years, he has worked as an electrical engineer for ITT Corporation (including as a technical lead on certain projects), Magellan Systems, Raytheon, Curtis-Wright, Lear Astronics, MiniMed, RoundTrip Technologies, SiRF, Quallion LLC, Paylon Medical, ASML, and Neural Analytics. Trial Tr. 32:25–49:5 (Nov. 14, 2017 AM Session) (09-1872) (Hite).

23.     During the course of his career, Mr. Hite has worked on complex electrical engineering projects involving missile defense radars, flight control systems, the Global Positioning System ("GPS") for consumer and military applications, glucose meters and insulin pumps for diabetics and cancer pain-management, long-distance tracking, battery modules for military aircraft and space applications (including work on a Boeing rocket project that transported payloads to space), avionics computers, and Doppler radar imaging for concussions in football. For example, Mr. Hite helped develop a Doppler targeting processor to protect U.S. Navy ships against missile strikes, air traffic control radars for the U.S. Air Force, and a device to block the detonation of Improvised Electronic Devices ("IEDs"). *Id.*

24.     Mr. Hite has extensive experience with memory systems and image processing. While at ITT around 1984, Mr. Hite worked on graphical displays for equipment that interfaced with external control devices like keyboards and contributed

computer code for that project. During his second stint at ITT starting in 1987, Mr. Hite

worked on image processors and various types of memory architectures for a Navy missile

defense project. During his tenure at Magellan, Mr. Hite worked on dot-matrix LCD

displays that would scan out images, using a block of "RAM" memory to do so. At

MiniMed, Mr. Hite's work included a graphical interface with RAM memory organization,

and Mr. Hite wrote software to test and operate the display. *Id.*

25.     Mr. Hite was qualified without objection as an expert in application-specific

processors, including memory and image processing. Trial Tr. 49:2–6 (Nov. 14, 2017 AM

Session) (09-1872) (Hite).

26.     Dr. Castleman testified for the PTO. He holds Bachelor's, Master's, and

doctorate degrees in electrical engineering. During his career, he worked for NASA and

Perceptive Systems Inc. (later purchased by IRIS International, which changed the name of

the company to Advanced Digital Imaging Research). Dr. Castleman has taught image

processing courses and authored and edited text books on image processing. Dr. Castleman

was qualified as an expert, without objection, in the subject matters of digital imaging, video

processing, and the memory design and architecture of such systems. Trial Tr. 18:5–28:19

(Nov. 15, 2017 PM Session) (09-1872) (Castleman).

1.     The Image Processing System

27.     Mr. Hyatt began work in the image processing field in the early 1960s,

implementing display systems for aerospace and industrial automation products. Trial Tr.

30:6–10 (Dec. 4, 2017 AM Session) (Hyatt). He continued his work in image processing at

Micro Computer, Inc., where he developed an advanced image processing system that he

called the "digital videonic system" that never reached market. Trial Tr. 31:3–10 (Dec. 4, 2017 AM Session) (Hyatt).

28.     Mr. Hyatt continued his work in image processing throughout the 1970s, but was frustrated by the state of the technology because image processing systems were very expensive and would not operate in real time, preventing the operator from interacting with continuous images. Trial Tr. 31:18–23 (Dec. 4, 2017 AM Session) (Hyatt).

29.     In the late 1970s and early 1980s, Mr. Hyatt made a breakthrough in image processing by applying incremental processing technology to make image processing cheaper and faster. Trial Tr. 31:24–32:9, 34:5–10 (Dec. 4, 2017 AM Session) (Hyatt).

30.     In the early 1960s, Mr. Hyatt had pioneered the use of incremental processing in the aerospace industry and subsequently received patents on using such technology in transform processing. Trial Tr. 33:25–34:7 (Dec. 4, 2017 AM Session) (Hyatt).

31.     Displays in the early 1980s employed an array of pixels and conventional image processing systems of the time used matrix transforms to transform each pixel for display. Trial Tr. 34:11–14 (Dec. 4, 2017 AM Session) (Hyatt). This was a highly computation-intensive processing operation that required expensive computers and limited real time operation. Trial Tr. 34:14–17 (Dec. 4, 2017 AM Session) (Hyatt).

32.     In contrast, incremental processing used the incrementing or updating of a small set of image parameters implemented with a few simple memory address counters to transform the images. This innovation allowed an image processing system to operate in real time with much lower computational complexity because it required only a few simple incremental additions per image rather than processing intensive matrix multiplications on a pixel-by-pixel basis. Trial Tr. 34:18–24 (Dec. 4, 2017 AM Session) (Hyatt); *see also* PTX-

9

4.07611–7614, 7647 (describing Figs. 1O and 2H and computing row address and pixel

address data based on image window slope and step size parameters); *id.* at 7647, 7652–755,

7676–7680 (describing row address and pixel address generators); *id.* at 7652–755, 7676–

7680, 7687, 7737–7738 (describing access to the first image information and the scanout of

transformed image information). This innovation also reduced the cost of processing. Trial

Tr. 35:10–11 (Dec. 4, 2017 AM Session) (Hyatt).

33.     The specification describes the few parameters per image used in incremental

processing in detail, such as

> In view of the above, one method for implementing geometric processing is to
> define the scanline start point XIP1, YIP1 and the slopes. The ratio of the X-
> slope and Y-slope, both for row and pixel processing, defines the angle of the
> scanlines and consequently the rotation of the window. The vector magnitude
> of the X-slope and Y-slope, both for row and pixel processing, defines the
> sampling step size of the scanlines and consequently the expansion and
> compression of the window. The magnitude of XIP1, YIP1 defines the
> position of the window and consequently the translation of the window.

PTX-4.07644; *see also id.* at 7643.

34.     Using these technological innovations, Mr. Hyatt developed a geometric

transform processor that operated at very high speed, was very simple, and would be

inexpensive to manufacture. Trial Tr. 32:3–6 (Dec. 4, 2017 AM Session) (Hyatt). Mr. Hyatt

implemented an experimental system that proved the concept of the incremental geometric

processor and demonstrated that his processor transformed images at high speed and low

cost. Trial Tr. 32:12–16 (Dec. 4, 2017 AM Session) (Hyatt).

35.     Mr. Hyatt filed Disclosure Documents, as a precursor to filing patent

applications, in the early 1980s, as he continued his work. Trial Tr. 32:18–20 (Dec. 4, 2017

AM Session) (Hyatt). The Disclosure Documents including video tapes were filed under,

and complied with, the PTO's Disclosure Document program requirements. Mr. Hyatt

incorporated by reference and described those Disclosure Documents in the Disclosure (*see* PTX-4.07699–7703, 8128–8129), making them part of the record before the PTO.

36.    The Disclosure "is generally directed to improved image processing systems, and, in particular, provides improvements in memory, processor, software, and control architectures and in software and hardware designs." PTX-4.07557 ("Summary of the Invention").

37.    Among other things, the Disclosure describes "an image processing system capable of geometrically manipulating a highly detailed image in true real time; such as for simultaneous rotation, translation, expansion, compression, 3D perspective, and warping at a 30-times per second update rate."  PTX-4.07569. The image processing system "can be implemented in a range of configurations, including an image processing subsystem and an image processing system." *Id.* As described in conjunction with Figure 1A, one such "configuration is a multiple channel high resolution image processor." *Id.*

38.    The use of "windows" (the construction of which is contested) is fundamental to the claims of the '211 application. The use of windows is described in the Summary of the Invention in conjunction with "using a window implementation" as a means of "geometric process[ing]." PTX-4.07557. It is described in the "Brief Description of the Drawings" in conjunction with Figure 1K, which shows "an image processing window arrangement," PTX-4.07558, and "Fig[ure] 2, comprising Fig[ures] 2A to 2M," which "describes an image processor configuration with window diagrams …." PTX-4.07559. The Disclosure describes the "[a]dvantages" that "are derived from conceptual features, such as a window having multiple geometric processing operations." PTX-4.07620. In total, the term "window" is mentioned 268 times in the Disclosure.

39.     One feature of the Disclsoure was the ability for the operator to overlay

images or other information. As described in the Disclosure, "[o]verlays can include

combinations of processed images and graphic polygons." PTX-4.07939. Those graphic

overlays can include "[c]ursors, crosshairs, sights, and other such graphic symbols [as] can

be used to identify selected portions of images." *Id.* Likewise, "[a]lphanumerics can be used

for annotating images." *Id.* The Disclsoure can implement overlays in multiple ways,

including through the use of multiple channels of image processors:

> Images can be overlayed together in the same image plane; where occulting is
> then fixed and motion therebetween is then fixed. Images can be overlayed in
> different planes of the same image processor; where occulting is selectable,
> such in accordance with occulting priorities assigned to each plane, and
> motion therebetween is fixed. Images can be overlayed in different planes of
> different image processors; where occulting is selectable, such in accordance
> with occulting priorities assigned to each plane, and motion therebetween is
> controllable, such as in accordance with independent image processors
> controlling different images. Image overlays and graphic overlays can be
> mixed together; such as in the same image plane, in different image planes of
> the same image processor, and in different image planes of different image
> processors.

PTX-4.07939.

40.     Mr. Hyatt built and reduced to practice an operational breadboard

experimental system of certain embodiments described in the Disclosure, consisting of

multiple circuit boards, each containing many integrated circuit chips; these included a

rectangular circuit board with multiple memory chips and a square circuit board with

multiple control logic circuit chips. Mr. Hyatt needed to build an experimental system to

demonstrate to potential investors the proof-of-concept for his inventions. Trial Tr. 41:9–

44:18, 46:17–47:1 (Nov. 13, 2017 AM Session) (09-1872); PTX-903 (rectangular circuit

board); PTX-902 (square circuit board); PTX-332 (video of experimental system). The

experimental system consisted of an S-100 bus computer that performed the supervisory

processor functions in conjunction with software and eight-inch floppy disks and drives that interfaced with the computer via a direct memory access ("DMA") controller, thereby serving as disk memories. PTX-4.07849.

      41.      Mr. Hyatt also created videotapes of the experimental system hardware and the experimental system in operation in 1984 which he narrated by himself during filming:



PTX-200B at 00:06; *see also* PTX-200A; PTX-332; Trial Tr. 38:24–39:17, 40:24–41:1 (Dec. 4, 2017 AM Session) (Hyatt).

      42.      Mr. Hyatt produced to the PTO three video tapes in a separate Disclosure Document and each expressly being incorporated by reference into the Disclosure (PTX-4.07699–7703). The PTO was supposed to retain those three video tapes indefinitely, and portions thereof were presented at trial. Trial Tr. 39:4–8 (Dec. 4, 2017 AM Session) (Hyatt).

13

43.     Mr. Hyatt used the Disclosure Documents (including the videos) to document work on the disclosed system in lieu of an inventor's notebook. Trial Tr. 40:6–10 (Dec. 4, 2017 AM Session) (Hyatt). These videos describe Mr. Hyatt operating and interacting with the experimental system by operating the joysticks to translate, rotate, and expand/compress the images on the screen (while he narrated the operations). Trial Tr. 43:15–20 (Dec. 4, 2017 AM Session) (Hyatt); *see also* PTX-200B; Trial Tr. 40:24–41:1 (Dec. 4, 2017 AM Session) (Hyatt).

44.     The Court finds that Mr. Hyatt built and demonstrated a significant part of the disclosed inventions with the experimental system and he described the experimental system in detail in the Disclosure.

45.     The invention disclosed in the Disclosure was not limited to the experimental system, but instead disclosed several other embodiments as well. Trial Tr. 29:7–11 (Dec. 5, 2017 PM Session) (Hyatt).

46.     For example, the Disclosure describes multiple display applications, including without limitation moving map display applications, informational database applications, high-definition television applications, special effects applications, remotely piloted vehicle applications, digital video camera applications, landscape architecture applications, video photograph applications, flight simulator applications, traffic accident simulator applications, train simulator applications, helicopter training simulator applications, large image applications, image processing workstation application, and arcade game applications. PTX-4.07486 (Disclosure table of contents); *see also* PTX-4.07992–8044. The Disclosure also describes non-display applications, including without limitation pattern

recognition applications. PTX-4.07486 (Disclosure table of contents); *see also* PTX-4.08045–8053.

2.    The Disclosure Is Described In A "Top-Down" Structure

47.    The Disclosure describes the system in a "top-down" structure to provide progressive levels of detail throughout the Disclosure for "the present invention" described in Figure 1A. PTX-4.07558; *see also* Trial Tr. 50:12–21 (Dec. 4, 2017 AM Session) (Hyatt testimony explaining progression of top-down approach); *see generally* Trial Tr. 45:9–59:22 (Dec. 4, 2017 AM Session); Trial Tr. 4:7–24:23 (Dec. 4, 2017 PM Session) (Hyatt testimony providing top-down description of Disclosure). The top-down approach is a well-known method of structuring technical documents, with a top-level figure that is supplemented with other figures providing additional detail and (in this instance) with very detailed schematic diagrams that can be used to construct the experimental system. Trial Tr. 44:20–45:5 (Nov. 13, 2017 AM Session) (Hyatt) (09-1872). These figures show the interconnections between the described components. Trial Tr. 46:1–3 (Nov. 13, 2017 AM Session) (Hyatt) (09-1872).

48.    All of the elements and circuits shown in the figures and described in the Disclosure are interconnected together through the interconnections shown in the figures, the interconnections described in the specification, and the top-down structure described in the figures and described the specification. *See* PTX-4.0788–7552. The specification is long in large part because it describes in detail the components and the interconnections that are shown in the figures in text form, *see, e.g.*, PTX-4.07853–7871, such as the component and pin "U22E-15" (pin 15 in integrated circuit U22E) and the interconnection thereto shown in the figure, PTX-4.07865 ("NAND-gate U18E-6 generates a one clock period negative pulse when the resynchronized line sync signal CLSR1 U22E-12 is high and when the delayed

resynchronized line sync signal CLSR2 U22E-15 is still low, indicative of the first clock period of the resynchronized line sync signal."). *See* Trial Tr. 29:19–31:15 (Dec. 4, 2017 PM Session) (explaining extent of described material in Disclosure).

49.     Mr. Hyatt used the top-down structure as a matter of good engineering practice in the course of his professional work, including in managing and communicating with other engineers and in preparing many of his patent application disclosures. *See* Trial Tr. 48:19–50:2 (Nov. 13, 2017 AM Session) (09-1872) (Hyatt)  This top-down structure is used to teach the invention to one skilled in the art and was a typical way for Mr. Hyatt to convey information that he used throughout the course of his career as an engineer. Trial Tr. 44:20–46:3 (Nov. 13, 2017 AM Session) (09-1872) (Hyatt).

50.     The top-down structure of the Disclosure can be visualized as a pyramid, with the overall system at the top level and increasing levels of detail in each lower level:



16

Trial Tr. 29:13–31:11 (Dec. 4, 2017 PM Session) (Hyatt); *see also* PTX-910 at Slide 32; PTX-4.07558–7563 (Brief Description of the Drawings).

51.     The top-down structure of the Disclosure starts at the top level of the pyramid with a general description of the system in a top-level block diagram, Figure 1A:



Trial Tr. 50:16–18 (Dec. 4, 2017 AM Session) (Hyatt).

52.     Figure 1A is a top-level block diagram that it incorporates the other features described in the other figures and in the text. *See* Trial Tr. 32:3–34:20 (Dec. 4, 2017 PM Session). It describes the end-to-end, top-down figure for the image processing system in a multichannel embodiment, with a plurality of geometric modules for processing multiple images simultaneously in real time. *See* Trial Tr. 29:24–30:1 (Dec. 4, 2017 PM Session) (Hyatt). As described in the Disclosure:

> The block diagram shown in Fig 1A illustrates the modular expandability of the system of the present invention, shown in greater detail in Figs 1B to 1G. A plurality of geometric modules 110A to 110B can be configured in parallel channel form, such as for multiple overlays. The geometrically processed images can be combined with a geometric multiplexer /demultiplexer/combiner 110D. Multiplexing selects a particular geometric processed image channel for subsequent processing. Processing includes

17

overlaying, adding, subtracting, and otherwise selecting and combining of images. For example, many channels of geometrically processed images 110C can be overlayed with occulting priorities. Also, a pair of images can be selected for arithmetic processing, such as for adding together.

The processed and combined images can be demultiplexed with element 110D to route the appropriate images to the appropriate spatial modules 110E to 110F and for feedback to the geometric modules along path 110H. The spatial modules 110G can be implemented in parallel form for processing the images routed thereto. A spatial multiplexer and demultiplexer 110I can be used to multiplex and demultiplex the spatially processed images from spatial modules 110G for outputting.

A plurality of input sources of images 110J and a plurality of output devices for images 110K can be accommodated….

Multiplexer/demultiplexer modules 110D, 110N, and 110Q can be implemented to multiplex a plurality of channels into one channel and then ·to demultiplex that one channel into a plurality of channels. Each multiplexer associated with a channel can be replicated a plurality of times to multiplex a plurality of channels into each single channel. The multiplex signals associated with the plurality of multiplexed channels can then be demultiplexed, permitting routing of any one of a plurality of multiplexer input channels to any one of a plurality of multiplexer output channels. Tri-state multiplexers can be used to multiplex a plurality of channels into a single channel, such as using 74LS365 multiplexer circuits. Parallel fanout and gating networks can be used for demultiplexing. Other types of multiplexers and demultiplexers are well-known and can be used for the multiplexer/demultiplexer modules .

A supervisory processor 110R provides supervisory operations; such as receiving external commands 110S for configuring the system….

PTX-4.07570–7572.

53.     As shown in Figure 1A, the Disclosure describes "feed forward" and "feed

backward" of image information flow which progresses to output devices shown as block

110K in Figure 1A. Trial Tr. 50:22–51:25 (Dec. 4, 2017 AM Session) (citing PTX-4.07671);

*see also, e.g.*, PTX-4.07570 (describing "feedback to the geometric modules along path 110H);

PTX-4.7576 ("Alternatively, video output signals…can be feedback to the input

interface…."); PTX-4.07724 (describing "feed forward and feed back spatial filtering").

18

54.     The Disclosure describes a number of output devices, such as pattern
recognition processors, artificial intelligence processors, memories, and display monitors.
*See, e.g.*, PTX-4.07575–7576 ("Digitally processed image information can be routed directly
to digital devices 113K to 113L, such as a pattern recognition processor or artificial
intelligence processor …."); PTX-4.0717 (describing output devices); PTX-4.07623 ("The
geometrically preprocessed image in image memory …can be used for pattern
recognition ….") PTX-4.08049 (describing pattern recognition application).

55.     The details encompassed by Figure 1A were also recited in the Modular
Configurations Features Table that "described the features and functions and the elements
that are in [the] blocks" of Figure 1A. Trial Tr. 33:6–13 (Dec. 4, 2017 PM Session) (Hyatt);
*see also* PTX-4.07579–7583 (Modular Configurations Features Table). Those features are
then described in more detail "in the text portion of the [D]isclosure." Trial Tr. 33:14–20
(Dec. 4, 2017 PM Session) (Hyatt).

56.     Beneath the top-level block diagram of Figure 1A are other high-level block
diagrams, such as Figures 1C, 1D, and 6A. Trial Tr. 30:2–8 (Dec. 4, 2017 PM Session)
(Hyatt). These figures further describe the elements of the Disclosure that comprise the
blocks of Figure 1A. Trial Tr. 30:2–4 (Dec. 4, 2017 PM Session) (Hyatt). The Disclosure
then progresses to the most detailed lower levels disclosing detailed schematic wiring
diagrams. Trial Tr. 50:18–21 (Dec. 4, 2017 AM Session) (Hyatt).

57.     Figure 1D shows a geometric module from Figure 1A in a more detailed
single channel block diagram form with the supervisory processor controlling the geometric
module and describing the interconnections with the input image interface and the output
image interface:



Figure 1D also shows the image memory in conjunction with the geometric processor in the geometric module. Trial Tr. 52:1–24 (Dec. 4, 2017 AM Session) (Hyatt). Image information flow from a database 110L or from the supervisory processor 110R to an image memory in geometric modules 110C is transformed and scanned out for processing and display. Trial Tr. 53:4–15 (Dec. 4, 2017 AM Session) (Hyatt); *see also* Trial Tr. at 48:17–22 (Dec. 4, 2017 AM Session) (Hyatt explaining image memory flow via Figure 1A); Trial Tr. 58:16–25 (Dec. 4, 2017 PM Session) (Hyatt testifying regarding how database memory flows into image memory before it is transformed and scanned out to display).

58.    Figure 1C shows another view of the system described in the Disclosure operating as a single channel:



Trial Tr. 53:16–24 (Dec. 4, 2017 AM Session) (Hyatt) (citing PTX-4.07490).

59.    Windows are illustrated in the next level of the top-down format of the

Disclosure through geometric diagrams, which show in great detail the geometrically

transformed windows Trial Tr. 30:9–17 (Dec. 4, 2017 PM Session) (Hyatt). The Disclosure

has six subsections dedicated to window geometry describing the mathematics of windows,

the implementation the windows in Disclosure, and a detailed description of the window

figures. Trial Tr. 25:16–19 (Dec. 4, 2017 PM Session) (Hyatt).

60.    Figure 1K (PTX-4.07496) illustrates the windows structure (viewport) with

image memory:



Trial Tr. 54:22–55:1 (Dec. 4, 2017 AM Session) (Hyatt). Figure 1K shows one embodiment

of the Disclosure, with a rotated square window of image memory superimposed on a

plurality of mosaic frames that are seamlessly patched together so that the window can have

more room to move before it comes to an edge of image memory. Trial Tr. 54:22–55:12

(Dec. 4, 2017 AM Session) (Hyatt) (citing PTX-4.07495). The window in Figure 1K is

shown as a square that is illustrative of windows having other shapes. Trial Tr. 55:23–56:5

(Dec. 4, 2017 AM Session) (Hyatt) (citing PTX-4.07495).

61.     Windows are also addressed in Figure 2A (PTX-4.07499):



Figure 2A shows a window image superimposed on a buffer memory image superimposed on a database memory image. Trial Tr. 57:25–58:22 (Dec. 4, 2017 AM Session) (Hyatt) (citing PTX-4.07499). The memories are shown overlaid in Figure 2A for illustrative purposes, with Figure 2A representing them as smaller or larger based on their relative sizes. *See* Trial Tr. 58:18–59:14 (Dec. 4, 2017 AM Session) (Hyatt). The database memory can store a large image such as thousands of miles of mapping. Trial Tr. 58:6–10 (Dec. 4, 2017 AM Session) (Hyatt). Image information from the database memory can be loaded into the buffer memory to provide higher speed output for the image memory, where the image information in the image memory can be processed (such as for rotation and 3D perspective) and then being scanned out of image memory and displayed. Trial Tr. 58:11–17 (Dec. 4, 2017 AM Session) (Hyatt). In this way, the system can display seamless motion across thousands of miles of terrain even though the image memory contained only a small portion of the whole terrain. Trial Tr. 59:7–14 (Dec. 4, 2017 AM Session) (Hyatt).

62.     Windows are shown in other aspects of the top-down Disclosure as well.

Figure 2B shows a window as a portion of image memory being incrementally processed.

Trial Tr. 6:8–7:2 (Dec. 4, 2017 PM Session) (Hyatt). Figure 2E shows window geometry for

rotation and translation incremental processing. Trial Tr. 9:2–18 (Dec. 4, 2017 PM Session)

(Hyatt). Figures 2A through 2G show window geometry for selecting image information

from a portion of image memory to be displayed. PTX-4.07499–7505.

63.     At another level, the top-down structure of the Disclosure shows flow

diagrams with textual descriptions of operation of geometric processor configurations Trial

Tr. 30:18–21 (Dec. 4, 2017 PM Session) (Hyatt). For example, Figure 1O is a flow diagram

for the graphics processor:



This is another more-detailed level in the top-down structure. Trial Tr. 54:6–21 (Dec. 4,

2017 AM Session) (Hyatt) (citing PTX-4.07497).

64.     The Disclosure's top-down structure includes yet more detailed block

diagrams, such as Figure 2I, which describes in detailed block-diagram format an

incremental transform processor. Trial Tr. 12:6–12 (Dec. 4, 2017 PM Session) (Hyatt)

(citing PTX-4.07507). Likewise, Figure 2L is a block diagram that shows the scaling of the

23

registers used in the incremental processing. Trial Tr. 13:24–14:15 (Dec. 4, 2017 PM
Session) (Hyatt) (citing PTX-4.07508).

65.     Figure 6P shows one group of the registers used in incremental processing in
great detail in schematic form down to the actual wires and actual integrated circuit chips,
describing how the Disclosure used counter circuitry to incrementally perform complex
matrix transforms rapidly and inexpensively. Trial Tr. 14:16–15:5 (Dec. 4, 2017 PM
Session) (Hyatt) (citing PTX-4.07530). The Disclosure includes many other detailed
schematics, including Figure 6T, which demonstrate a television application of the image
processing system. Trial Tr. 15:6–16:7 (Dec. 4, 2017 PM Session) (Hyatt) (citing PTX-
4.07534).

66.     The top-down structure of the Disclosure also describes the software
(including the source code that actually ran on the computer with detailed annotations
describing how the software operates) to operate the experimental system, including
software for calibrating joysticks, creating menus, creating the initial conditions of the
geometric processor, and loading image memory. Trial Tr. 18:20–19:23, 24:8–19 (Dec. 4,
2017 PM Session) (Hyatt); *see also* Trial Tr. 31:1–3 (Dec. 4, 2017 PM Session) (Hyatt); PTX-
4.08097–8127. Software programs were written in BASIC, a software language that was
commonly known and used by electrical engineers in the 1980s. Trial Tr. 62:25–63:6 (Nov.
13 AM Session) (09-1872) (Hyatt).

67.     Mr. Hyatt disclosed the details of the experimental system that he built to
demonstrate operation of the disclosed system, including describing the specific circuitry
(circuits and interconnections) in the breadboard system. Trial Tr. 16:23–18:12 (Dec. 4,
2017 PM Session) (Hyatt).

24

68.     The Court finds that each figure and its related text adequately describes interconnections for each of the blocks, elements, and components illustrated therein. The Court also finds that the Disclosure adequately describes interconnections between all of the figures in a top-down configuration where each figure provides more detail for higher level figures up to the top level figure (Figure 1A) (as illustrated in PTX-910 at slide 32).

### F.     The Disclosure Provides Adequate Written Description Support For The Image Information and The Types Of Images Used In The Contested Claims

69.     The Disclosure describes numerous types of images, including (but not limited to) background images, 3D perspective images, textured images, graphic images, video images, irregular images, alphanumeric images, database images, data compressed and decompressed images, and data compressed and decompressed video images.

70.     Dr. Castleman did not testify that any of these types of images lack adequate written description support.

71.     Mr. Hyatt testified regarding a number of different types of images including background images, overlaid textured images, overlaid solid (non-textured) images, and icons in a freeze frame from the video of PTX-200B at 7 minutes and 45 seconds:



As Mr. Hyatt testified:

> [Q.] In reference to here, which color is the background image?
>
> A. The blue color is the background image. The four outer images are textured images that I created with a load program. The two single-colored images are as such, single-colored images and non-textured. The square in the center is what we might call an icon. And I positioned that in the center image memory because, as I transformed the images, I would have visual information on where the images were, but I wouldn't know where the center of image memory was for my testing purposes. So I put an icon at the center of image memory to identify that location and that I could keep track of it.

Trial Tr. 66:6–18 (Dec. 4, 2017 PM Session).

72.     As discussed in more detail below, Mr. Hyatt and Mr. Hite testified regarding other image types that are described in the Disclosure. Based on their testimony and the evidence of record, the Court finds that the Disclosure provides adequate written description for background images, 3D perspective images, textured images, graphic images, video images, irregular images, alphanumeric images and characters, database images, data compressed and decompressed images, and data compressed and data decompressed video images. In contrast, Dr. Castleman did not testify that the Disclosure lacked adequate written description support for background images, textured images, graphic images, video images, irregular images, alphanumeric images and characters, database images, data compressed and decompressed images, and/or data compressed and data decompressed video images.

1.    Background Images

73.    Mr. Hyatt testified that a "background image is essentially the lowest priority image that everything else occults." Trial Tr. 45:15–20 (Dec. 4, 2017 PM Session); *see also* Trial. Tr. 62:8–63:8 (Dec. 5, 2017 PM Session) (Hite testimony that a background has other images placed "on top of" it in the foreground) (referencing PTX-912 at slides 16–17).[3]

74.    Mr. Hyatt testified that background images are described repeatedly in the Disclosure, including without limitation on: (1) PTX-4.07941 (describing how a textured overlay can be "overlayed with a background image"); (2) PTX-4.07956 (describing how an image can be processed separately and overlayed on a background image); (3) PTX-4.08024 (describing how a helicopter simulator application can be implemented with an image processor "providing a background image and with various overlays placed thereon"); (4) PTX-4.08025 (describing how a "background image can have textured mountains, hills, waterways, buildings,…meadows ….trees, buildings, and ground vehicles" overlayed on top of it). *See generally* Trial Tr. 45:13–47:1 (Dec. 4, 2017 PM Session) (Hyatt testimony describing background images from Disclosure); *see also* PTX-4.07944–7953, 7995, 8020, 8041–8044 (describing background images).

75.    Mr. Hite testified that written description support for a background image is found at PTX-4.08013, which describes how "[a]n image can be constructed by selection of a background image and overlaying objects on the image." Trial Tr. 69:21–70:3 (Dec. 5, 2017 PM Session); *see also* Trial Tr. 70:4–17 (Dec. 5, 2017 PM Session) (Hite testimony describing additional written support for background images found at PTX-4.0824).

---

[3] PTX-912 is the PowerPoint presentation used in Mr. Hite's testimony. Plaintiff incorporates the citations to the underlying exhibits used in a particular page of PTX-912 when cited herein.

76.     Dr. Castleman did not testify that the Disclosure lacked adequate written description support for background images.

77.     The Court finds that the Disclosure provides adequate written description support for background images.

### 2.     3D Perspective Images

78.     "3D perspective is a[n] important feature of the claims. The windows are, in many of the claims, are limited to 3D perspective claims, which I believes is a very novel concept in the field even in the present day. 3D perspective is a spectacular feature for visualizing images." Trial Tr. 60:18–61:4 (Dec. 4, 2017 PM Session). Mr. Hyatt testified how the Disclosure describes 3D perspective images:

> [I]f I make the incremental step size larger at the top of the window, and smaller at the bottom of the window, I create very simply a very complex function. And that complex function is 3D perspective. And what it appears as on the screen is the making the steps size at the top of the window larger compresses the mountains in the background, which would be at the top of the window.
>
> And by making the steps size smaller at the bottom of the window makes the image at the bottom of the window much bigger. So that it looks like compressed mountains at the top of the window and enlarged trees in the foreground with continuous variable compression as we go into the background.
>
> As you see in a scene from human vision in a real world environment that is 3D perspective, and that is how I implemented [3D perspective], very simply with a window.

Trial Tr. 56:11–57:1 (Dec. 4, 2017 AM Session); *see also* Trial Tr. 7:3–21 (Dec. 4, 2017 PM Session) (Hyatt testifying how Figure 2B (PTX-4.07500) relates to 3D perspective images); Trial Tr. 10:19–12:5 (Dec. 4, 2017 PM Session) (Hyatt testifying regarding Figure 2H, PTX-4.07506) ("[W]hen you implement 3D perspective with my window, you not only get compression of the imagery but you also get compression of the velocities so that you get

this, if I could use the word again, this spectacular effect of moving through the environment, seeing the features at the distance compressed and moving very slowly, and the features in the foreground expanded and moving fast."); *id.* at 12:22–13:2; Trial Tr. 297:19–298:4 (Jan. 19, 2018) (Hyatt testifying regarding Figure 2I (PTX-4.07507) that adding another set of registers to modify slope registers is how to create 3D perspective images with the experimental system); PTX-4.07685 (Disclosure describing that adding another set of registers to modify slope registers is how to create 3D perspective images with the experimental system).

79.     The Disclosure describes 3D perspective images at PTX-4.07643: "3D-perspective and warping can be implanted by varying the slope or step size across the window. Setting the step size to vary on a scanline-by-scanline basis from the top of the image to the bottom of the image provides 3D-perspective caused by rotations of the image about the X-axis to tilt the top of the window backward into the third dimension." *See also* Trial Tr. 61:5–62:1 (Dec. 4, 2017 PM Session) (Hyatt testimony regarding PTX-4.07643); PTX-4.07579 (modular configuration table referencing 3D perspective); Trial Tr. 287:13–288:21 (Jan. 19, 2018) (Hyatt testimony regarding PTX-4.07579 and explaining how 3D perspective images are described as part of Figure 1A); PTX-4.07588, 7590, 7594, 7616, 7623, 7628–7630, 7681, 7683, 7994–7995, 8004, 8009–8010, 8021, 8025–8026, 8034, 8040–8044 (describing uses and implementation of 3D perspective images).

80.     Mr. Hite testified that the Disclosure describes 3D perspective images at: (1) PTX-4.07941, which discloses that textured overlays "can be independently processed for geometric operations including…3D-perspective"; and (2) PTX-4.08026, which discloses (in conjunction with the helicopter training simulator application) that "motion of the

helicopter causes relative motion of the tree image and the occulted background image and object images behind the tree in accordance with 3D-perspective considerations." Trial Tr. 70:18–71:14 (Dec. 5, 2017 PM Session); *see also* Trial Tr. 7:9–19 (Dec. 6, 2017 PM Session) (Hite) (citing PTX-4.07999–8000) ("3D perspective provides range-related compression consistent with 3D perspectives."). Mr. Hite testified that the 3D perspective window would be located in the geometric processor in Figure 1A before presentation to the geometric mux/demux. *See, e.g.*, Trial Tr. 24:14–19 (Dec. 6, 2017 AM Session) (citing PTX-912 at slide 62).

81.     Mr. Hyatt provided additional testimony about how the 3D images in the Disclosure were described.[4] At PTX-4.07685, the Disclosure provides that

> In the experimental system, the address generators on logic board BL1 (Figs 6O to 6R) can be upgraded to provide warping capability. This can be performed with the addition of delta-slope registers and adders for iteratively adding delta-slope parameters into the slope parameters to change the slope parameters. The delta-slope parameters can be a constant for the particular problem and need not be updated every frame. However, the slope registers may need to be updated each frame, either by outputting from the computer or by loading from a slope buffer register that is pre-loaded by the computer. Also, the pixel slope registers may have slope buffer registers that are loaded once per frame by the supervisory process for reloading the pixel slope registers each line.

Mr. Hyatt testified that this section explains how to implement 3D perspective by adding "a couple of registers and adders." Trial Tr. 289:8–18 (Jan. 19, 2018); *see also* Trial Tr. 290:1–291:19 (Jan. 19, 2018) (Hyatt testimony regarding PTX-4.07685 (testifying that adding registers and adders in the disclosed system provides "a very novel technology…with very little circuitry and with very little computational burden ….."); Trial Tr. 292:2–293:2 (Jan. 19,

---

[4] That Mr. Hyatt did so in rebuttal should not be considered an admission of any kind that the evidence presented in the case in chief was somehow insufficient.

2018) (Hyatt testimony, regarding PTX-4.07685–07686, that minimal changes to the experimental system by adding address registers and adders creates 3D perspective images).

82.     Dr. Castleman opined that 3D perspective images were known in the art in 1971. *See* Trial Tr. 126:5–129:5 (Jan. 18, 2018) (testifying that "the technique of 3D projection was well known as early as 1971"). Dr. Castleman, however, failed to testify that 3D perspective images were not described in the Disclosure.

83.     Mr. Hyatt testified that "a slight addition of circuitry [to his experimental system] and a slight amount of initial condition processing which only needs to be done once a frame" creates a "spectacular" effect of a "moving image that tilts back into the background as if it's a 3D video of a moving image with full 3D perspective capability," even with a single photograph. Trial Tr. 293:3–294:15 (Jan. 19, 2018) (citing PTX-4.07686). That slight addition can be seen in Figure 6Q (PTX-4.07531) by adding "another set of adders and registers at the bottom [of Figure 6Q] so that the—but only to the row—address counters here because those are the only ones that the perspective applies to." Trial Tr. 294:20–296:17 (Jan. 19, 2018).

84.     Dr. Castleman also testified that 3D imagery required multiple channels. Trial Tr. 141:15–142:4 (Jan. 18, 2018). Dr. Castleman did not provide any technical explanation for why a multiple channel system was required for 3D perspective imagery. And Mr. Hyatt testified that his 3D perspective imagery only needed a single channel system by adopting his "very simple circuitry." Trial Tr. 287:6–12 (Jan. 19, 2018); *id.* at 297:19–298:4 (Jan. 19, 2018) ("This is full 3D perspective capability for each image and for each channel.... [I]t is implemented on a single channel. It is described as being implemented on a single channel which was the experimental system here. And I've disclosed how to upgrade the single

31

channel experimental system to have this 3D perspective capability without adding any other channels."). Mr. Hyatt testified that this embodiment led to "spectacular" results. *E.g.*, Trial Tr. 291:16-19 (Jan. 19, 2018).

85.     The Court therefore finds that Dr. Castleman's testimony regarding 3D perspective imagery is not credible. Contrary to Dr. Castleman's testimony, Mr. Hyatt described a novel way to provide 3D perspective imagery that can operate on a single channel. Dr. Castleman has offered nothing to show otherwise.

86.     Moreover, as discussed in paragraphs 143–157, the Disclosure adequately discloses image processing through multiple channels, so even if Dr. Castleman were correct that multiple channels are required, his testimony would not support a finding that the Disclosure fails to describe adequately creating 3D perspective imagery.

87.     Based on the above, the Court finds that the Disclosure provides adequate written description support for 3D perspective images and for the implementation of 3D perspective images on a single channel of the image processor.

3.     Textured Images

88.     Mr. Hyatt testified that a "textured image" is described in the Disclosure:

> Textured images are what we generally see in natural features, and we'll see textured images in the videos. I synthesized them, overlaid them, and incrementally transformed them. The texture is—in contrast to a graphic system, the texture adds a lot of life to the picture, to the image, but it's difficult to do on a graphic system. So that's a important difference between a graphics system and an image processing system.

Trial Tr. 49:22–50:9 (citing PTX-4.07944, which discloses "[o]verlays between textured images that are geometrically processed independently of each other").

89.     Mr. Hyatt testified about textured images in reference to one of the videos he provided the PTO pursuant to its Disclosure Document Program:



PTX-332 at 47:15; Trial Tr. 36:19–23 (Dec. 4, 2017 AM Session). Mr. Hyatt testified that "[t]he feather is a pretty good example of texturing. It has color variations throughout." Trial Tr. 51:6–15 (Dec. 4, 2017 PM Session) (testifying about PTX-332).

90.     Additional written description support for textured images is found at PTX-4.08025, which describes how "[m]ultiple high detail overlays can be provided; yielding a textured background image with overlayed textured objects, such as trees…. For example, the background image can have textured mountains …. A group of textured images; such as trees, buildings, and ground vehicles; can be overlayed on the background …." *See also* Trial Tr. 50:10–23 (Dec. 4, 2017 PM Session) (Hyatt testimony regarding PTX-4.08025); PTX-4.07684, 7941–7944, 7956, 7998 (describing textured images).

91.     Mr. Hite also testified that there was adequate written description support for textured images. He testified that such support is found at PTX-4.08024, which described a simulation in which "a helicopter can approach very close to textured objects, such as trees

33

and buildings, while higher flying aircraft may not need close-up simulation of highly textured objects." *See* Trial Tr. 33:22–34:7 (Dec. 6, 2017 AM Session) (Hite testimony regarding PTX-4.08024).

92.     Dr. Castleman did not testify that the Disclosure lacked adequate written description support for textured images.

93.     The Court therefore finds that the Disclosure provides adequate written description support for textured images.

4.      Graphic Images

94.     Mr. Hyatt testified that

[a] graphic image is one that is typically made up by vectors or edges, and the edges usually enclose a surface called a polygon, or a [s]quare is a four-sided rectangular polygon, for example, but other polygons are less regular than that. And then the surface is often filled with a color, and the surfaces are then often put together to create more complex objects.

So graphics is different somewhat from image processing which are often considered to be processing of picture-type images.

Trial Tr. 53:19–54:10 (Dec. 4, 2017 PM Session) (Hyatt) (citing PTX-4.07711) ("The address generators can be used to generate graphic vectors and windows.... [T]he BASIC PROGRAM LISTING LD.ASC herein has been used to load graphic vectors into image memory.").

95.     An example of a graphic image was shown in PTX-200A at 13:01:



*See also* Trial Tr. 54:22–55:8 (Dec. 4, 2017 PM) (Hyatt testifying this is a graphic image).

96.     Mr. Hyatt also testified that written description support for graphic images could be found in the Disclosure at PTX-4.07942, which describes how "[g]raphic overlays can be implemented in various forms with the system of the present invention. A graphic overlay can be geometrically processed ....Geometrically processed graphic overlays can be rotated, translated, expanded, compressed, [and] warped ...." Trial Tr. 55:16–24 (Dec. 4, 2017 PM Session). Mr. Hyatt testified that further support can be found at PTX-4.07939, which provides that "[g]raphic overlays can be adapted for different applications" and include "graphic polygons." Trial Tr. 55:25–57:4 (Dec. 4, 2017 PM Session) (testifying that graphic images can be used to assist user identify selected portions of images); *see generally* PTX-4.07709–7713 (section of Disclosure describing generation of graphics); *see also* PTX-4.07942–7943, 7955, 7998, 8098 (describing graphic images).

97.     Mr. Hite testified that written description support for graphic images could be found at PTX-4.07939, which describes that "graphic images can be used for symbols and polygon images overlayed thereon" and that "[g]raphic overlays can be adapted for different applications…." Trial Tr. 16:3–24 (Dec. 6, 2017 AM Session).

98.     Dr. Castleman did not testify that the Disclosure lacked adequate written description support for graphic images.

99.     Based on the above, the Court finds that the Disclosure provides adequate written description support for graphic images.

5.     Video Images

100.    Mr. Hyatt testified that

> A video image is like a television image, it's moving because there are many frames that facilitate the motion. And my system was able to accept these video[] images, transform them frame by frame and display them using the window, the image processing window and the imagery previously as…discussed. That applies to video images also.

Trial Tr. 64:6–12 (Dec. 4, 2017 PM Session) (citing PTX-4.07578) (modular configuration features table describing video image capability); *see also* Trial Tr. 64:16–19 (Dec. 4, 2017 PM Session) (Hyatt testimony regarding PTX-4.07583, which describes video images).

101.    Mr. Hyatt testified that further support for video images is found on PTX-4.07955, which provides that "[o]verlays can be dynamically moving video images, such as real time video images from a video camera or video disk…." Trial Tr. 64:20–65:7 (Dec. 4, 2017 PM Session) (testifying that Disclosure describes real time video images as 30 frames per second and that, "[a]s the videos came in at 30 frames a second, we would load them into image memory and transform them, window them, and output them to the display so that we would have, for example, television signals coming in, being transformed to

geometrically transformed video images then outputting them"). *See generally* PTX-4.08011–8012 (describing Digital Video Camera Application).

102.    Mr. Hite testified that written description support for video images is found at PTX-4.08008, which describes how "[a] video camera in the [remotely piloted vehicle ("RPV")] can provide video images…. These images can be processed or pre-processed in the RPV, can be communicated to the ground station, and can be processed or post-processed on the ground." Further support was found at PTX-4.07997–7998, which describes how the moving map display can be stored in a database, "such as a video disk or video tape database, and can be fetched and displayed" and that those video images can be translated, rotated, expanded, compressed, and have 3-D perspective. *See* Trial Tr. 21:23–23:4 (Jan. 18, 2018).

103.    Dr. Castleman (on direct examination) conceded that the Disclosure "describes an image processing system which can process an image in realtime, that is to say at video rates, and it can perform geometric-type processing on it, which includes translation and rotation and scaling of the image." Trial Tr. 107:7–13 (Jan. 18, 2018).

104.    Accordingly, the Court finds that the Disclosure provides adequate written description support for video images.

### 6.    Irregular and Cropped Images

105.    Mr. Hyatt testified that an irregular image is

[S]omething like the feather in the hat or the outline of the tree. Those are the external outlines mentioned here. It can also be cropped to internal features, the spaces between the leaves, so you can see the background.

What cropping means is essentially cutting out the portions of the figure that are really spaces so that the tree is cropped to the irregular outline so you can see the mountains in the background where the leaves don't exist, and that you can see the mountains in the background where, in between the leaves, for the irregular internal crop features.

Trial. Tr. 52:3–19 (Dec. 4, 2017 PM Session) (citing PTX-4.05781) (Modular Configuration

Features Table that references "cropping" for "irregular external outline" and "irregular

internal features").

106.   Mr. Hyatt testified that written description support for irregular and cropped

images is found at PTX-4.07953, which states that the overlaying configuration described in

the Disclosure

> permits individual cropping of an image, such as with an irregular shaped
> image; compressing a cropped image to a desired size; rotating a cropped
> image to the desired orientation, and translating a cropped image to the
> desired position. [Joystick controls could]…provide continuous dynamic
> cropped overlays moving relative to each other and relative to the
> background. Also, continuous cropping can be provided …."

Trial Tr. 52:20–53:18 (Dec. 4, 2017 PM Session); *see also* Trial Tr. 75:5–76:1 (Dec. 4, 2017

PM Session) (citing PTX-4.07941 ("Textured overlays can be cropped to irregular external

and internal features.")); PTX-4.07946–7947 ("An image to be overlayed on a background

need not be a regular shaped image…but may be an irregular shaped image…." and

describing other irregular images); PTX-4.07953, 7955.

107.   Mr. Hite testified that written description for irregular and cropped images

could be found at PTX-4.8025–8026, which describes how "[t]he tree image can be

automatically cropped to an irregular external profile" and "can be automatically cropped to

an internal pattern." Trial Tr. 30:24–11 (Dec. 6, 2017 AM Session); *see also* Trial Tr. 60:13–

20 (Dec. 5, 2017 PM Session) (Hite testimony that "cropping" leads to "irregular pattern"

for images) (citing PTX-4.08024); *id.* at 64:5–17 (Dec. 5, 2017 PM Session) (citing PTX-

4.08026–8026) (similar Hite testimony regarding irregular images). Further support can be

found at PTX-4.07941, which describes how images can be "cropped to irregular external

38

and even internal features" and how "[t]extured overlays can be cropped to irregular external and internal features." Trial Tr. 31:12–25 (Dec. 6, 2017 AM Session) (Hite).

108.    Dr. Castleman did not testify that the Disclosure lacked adequate written description support for irregular and cropped images.

109.    Therefore, the Court finds that the Disclosure provides adequate written description for irregular and cropped images.

### 7.    Alphanumeric Images

110.    An alphanumeric, according to Mr. Hyatt, is "alphabetical characters, words, and numerics, numbers, that we provide the capability to overlay alphanumerics on the other images for various purposes such as notes for the user, symbols, things of that nature." Trial Tr. 47:9–22 (Dec. 4, 2017 PM Session) (citing PTX-4.07608). That section of the Disclosure (PTX-4.07608) describes how "overlays including vectors, points, alphanumerics, and symbols can be generated in input memory 132B in memory map form." Additional support for alphanumerics is found at PTX-4.8000, which describes how "[s]ymbolic images can be overlayed on the pictorial image. Symbols can include…alphanumeric legends" and how "[a]lphanumerics can be overlayed for characterizing pictorial features and providing supplementary information." *See also* Trial Tr. 48:12–49:10 (Dec. 4, 2017 PM Session) (Hyatt testimony regarding PTX-4.8000); PTX-4.07963 ("[t]he primitives can include…alphanumerics").

111.    Mr. Hite testified that written description support for alphanumerics is disclosed at PTX-4.07943, which describes "alphanumeric characters" as "[an]other feature" in the context of "[g]raphic overlays," Trial Tr. 42:1–11 (Dec. 6, 2017 AM Session), and PTX-4.04739, which describes how "[a]lphanumerics can be used for annotating

images," Trial Tr. 42:12–15 (Dec. 6, 2017 AM Session). *See also* Trial Tr. 48:6–11 (Dec. 6, 2017 AM Session) (Hite).

112.    Dr. Castleman did not testify that the Disclosure lacked adequate written description support for alphanumeric images.

113.    Accordingly, the Court finds that the Disclosure provides adequate written description support for alphanumeric characters and images.

### 8.    Database Images

114.    The Disclosure adequately describes images obtained from database memory ("database images"). The Disclosure comprises "a whole section on databases," Trial Tr. 17:10–18:8 (Dec. 6, 2017 PM Session) (Hite); *see generally* PTX-4.07960–7991 ("Database Memory" and implantations/uses thereof).

115.    For example, the Disclosure adequately describes the use of "an image window over potentially an enormous database image such as a thousand miles of mapping." Trial Tr. 58:6–10 (Dec. 4, 2017 AM Session) (Hyatt testimony regarding Figure 2A, PTX-4.07499). In this moving map display, Mr. Hyatt disclosed methods of having "thousands of miles of maps in the database, and to load them into the image memory and have the window move through the image memory to the edge and wrap around in a seamless manner." *Id.*; *see also* Trial Tr. 4:8–5:10 (Dec. 6, 2017 PM Session) (citing PTX-4.07997) (Hite testimony that moving map display application would store images in database). These database features could be used for a range of applications described in the Disclosure, including the informational database application, see PTX-4.08003; Trial Tr. 42:25–43:14 (Dec. 4, 2017 PM Session) (Hyatt), and the landscape architecture application, *see* PTX-4.08013–8014; Trial Tr. 44:1–17 (Dec. 4, 2017 PM Session) (Hyatt).

116.    The Disclosure adequately describes that "database memory 120A [can] load images into image memory 120D." PTX-4.07584; *see also* Trial Tr. 57:5–58:4 (Dec. 4, 2017 PM Session) (Hyatt testimony regarding PTX-4.07584 that a database memory is located at the input side of Figure 1A and loads images into image memory that can be geometrically processed, scanned out, and displayed); PTX-4.07591 ("Database memory 131B can be implemented to contain large amounts of high detail information in memory map form, which can be selectively accessed for loading into image memory 131D."); PTX-4.07962 ("Images can be implemented in different ways….the actual image details can be stored in the database and can be accessed to display the real world environment ….image primitives can be stored in the database and can be accessed and overlayed to display …."); Trial Tr. 58:5–25 (Dec. 4, 2017 PM Session) (Hyatt testimony regarding PTX-4.07951–7962); Trial Tr. 8:12–23 (Dec. 5, 2017 AM Session) (explaining how database memory is transferred into image memory, referencing Figure 2A, PTX-4.07499).

117.    Dr. Castleman did not testify that the Disclosure lacked adequate written description support for database images.

118.    Therefore, the Court finds that the Disclosure provides adequate written description for database images.

### 9.    Data Compressed and Data Decompressed Images

119.    "[D]ata compressed and decompressed" images are described in the Disclosure. Trial Tr. 28:24–29:3 (Dec. 4, 2017 PM Session) (Hyatt). A part of the large database section of the Disclosure is specifically devoted to data compression and decompression. *See generally* PTX-047988–7991 ("Database Data Compression"); Trial Tr. 28:24–29:3 (Dec. 4, 2017 PM Session) (Hyatt testimony that Disclosure has "a whole

subsection on data compression which also includes in it data decompression."); PTX-4.08008 (describing use of data compression and data decompression with Remotely Piloted Vehicle Application).

120.    The section of the Disclosure specifically addressing data compression describes how "[t]he amount of storage in the database for a particular image can be reduced by storing compressed image data. The system can be implemented to decompress the image for image processing and display." PTX-4.07988. Testifying about this part of the Disclosure, Mr. Hyatt stated that

> Basically information, particularly digital information, has a lot of redundancies, and data compression is used to take many of the redundancies out of the information so it requires less storage capacity when it is stored in data-compressed form.
>
> Then when you access data-compressed information from a database memory, you need to decompress it in order to put the full image information back in, otherwise it would not be recognizable. So it is compressed for efficient storage, and it is decompressed for proper processing and display.

Trial Tr. 59:1–17 (Dec. 4, 2017 PM Session); *see also* Trial Tr. 5:13–23 (Jan. 18, 2018) (Hite testimony that data decompressed image "represents a database where the image information would be stored in a compressed format with the intention of reducing the memory needs to contain a large amount of information….[t]he geometric processor would serve to decompress the information and have an image in each of their respective image memories.") (citing PTX-912 at slide 304).

121.    The Disclosure further describes data compression and data decompression in the context of images:

Images can be stored in the database in compressed or in non-compressed form. Storage in compressed form reduces the memory requirements and involves de-compression to restore the image. Storage in non-compressed form requires greater storage capacity, but does not need de-compression. For example, compressed image storage can be used for application having significant database constrains, such as avionic applications, and non-compressed image storage can be used for applications without significant database constrains, such as ground based simulation applications.

PTX-4.07962–7963; *see also* Trial Tr. 59:18–23 (Dec. 4, 2017 PM Session) (Hyatt testimony regarding this Disclosure section); PTX-4.08006 ("High definition television (HDTV) involves significant data compression. This can be achieved by reducing the amount of redundant information communication.").

122.    Mr. Hite testified that data compressed/decompressed images are described in PTX-4.07999, which states that "[t]he moving map display can be implanted with geometric manipulation of map images from a database" and that "the image processor processes static map images accessed from the database." The Disclosure also describes that "[u]tilization of database memory can be enhanced by storing compressed information and then decompressing the information, such as with an incremental processor, to obtain decompressed image information for image processing." PTX-4.08000. *See* Trial Tr. 17:10–18:8 (Dec. 6, 2017 PM Session) (Hite testimony regarding these two sections). Mr. Hite also testified that data compressed images would be found in "Image Source" (Block 110J) in simplified Figure 1A. Trial Tr. 18:13–20 (Dec. 6, 2017 PM Session) (citing PTX-912 at slide 186); *accord, e.g.*, Trial Tr. 8:9–9:11 (Jan. 18, 2018) (Hite testimony about how Disclosure adequately describes handling of data compressed and decompressed images) (citing PTX-912 at slide 307).

123.    Dr. Castleman did not testify that the Disclosure lacked adequate written description support for data compressed or data decompressed images.

124.    The Court therefore finds that the Disclosure provides adequate written description support for data compressed and data decompressed images.

### 10.    Data Compressed and Data Decompressed Video Images

125.    Another type of data compressed and data decompressed images is data compressed video images and data decompressed video images. Mr. Hite testified that written description support for data compressed and decompressed video images can be found at PTX-4.08008, which describes that

> a video camera in the RPV [Remotely Piloted Vehicle] can provide video images …. These images can be pre-processed in the RPV and can be communicated to the ground station, and can be processed or post-processed on the ground

> Pre-processing in the RPV can perform various functions. Pre-processing permits *data compression* to improve communication bandwidth requirements….

> Ground processing provides for data decompression to reconstruct images transmitted in compressed form.

Trial Tr. 26:5–27:1 (Jan. 18, 2018) (emphasis added).[5]

126.    Dr. Castleman did not testify that the Disclosure lacked adequate written description support for data compressed video images or data decompressed video images.

127.    The Court finds that the Disclosure provides adequate written description support for data compressed video images and data decompressed video images.

---

[5] During this testimony and the portion cited in paragraphs 102 and 402, Mr. Hite referenced PTX-07945 during his testimony although the page on the screen (PTX-912 at slide 349) is found at PTX-4.08008. *See also* Trial Tr. 20:6-17 (Jan. 18, 2018) (Hite citing PTX-4.08008).

**G.** **The Disclosure Provides Adequate Written Description Support For Overlay of Images And Their Implementation**

128.    The Disclosures describes overlaying, overlapping, and occulting of images. A freeze frame from one of Mr. Hyatt's videos illustrates these concepts:



PTX-332 at 1:05:56. The two green images overlap at their intersection, both green images are overlaid on the top of a blue background, and the light green portion of the lower left image has an occulting priority over the dark green portion of the upper right image. Trial Tr. 68:4–69:10 (Dec. 4, 2017 PM Session) (Hyatt).

129.    "Overlay" is the placing of one image on top of another image. *See, e.g.*, Trial Tr. 36:15–20 (Dec. 4, 2017 PM Session) (Hyatt); Trial Tr. 59:16–20 (Dec. 5, 2017 PM Session) (Hite). A synonym for overlay is "superimposed." Trial Tr. 45:21–46:6 (Dec. 4,

2017 PM Session) (Hyatt); *see also* PTX-4.07945, 7956. "[O]verlays can be translated,

rotated, and otherwise processed" with the image." PTX-4.07608, 7956.

130.    The Disclosure contains at 20-page section describing overlays of images. *See*

PTX-4.07939–7959. The Disclosure, at PTX-4.07939, describes the implementation of

overlays:

> Overlays can be implemented in various ways. Images can be overlayed
> together in the same image plane; where occulting is then fixed and motion
> therebetween is then fixed. Images can be overlayed in different planes of the
> same image processor; where occulting is selectable, such in accordance with
> occulting priorities assigned to each plane, and motion therebetween is fixed.
> Images can be overlayed in different planes of different image processors;
> where occulting is selectable, such in accordance with occulting priorities
> assigned to each plane, and motion therebetween is controllable, such as in
> accordance with independent image processors controlling different images.
> Image overlays and graphic overlays can be mixed together; such as in the
> same image plane, in different image planes of the same image processor, and
> in different image planes of different image processors.

*See also* Trial Tr. 76:2–18 (Dec. 4, 2017 PM Session) (Hyatt testimony regarding

PTX-4.07939); Trial Tr. 4:18–5:12 (Dec. 6, 2017 AM Session) (Hite testimony about

PTX-4.07939).

131.    "'[O]cculting'" describes "which [thing] is on top of what other thing" so that

one image obscures another image. Trial Tr. 36:12–14, 71:3–10 (Dec. 4, 2017 PM Session)

(Hyatt). Priorities can be established for occulting, so as to control which of multiple images

have precedence and will obscure other images—in other words, which images will be on

top of other images. Trial Tr. 36:15–20, 50:10–23, 71:11–23 (Dec. 4, 2017 PM Session)

(Hyatt). Occulting and priorities for occulting are described throughout the Disclosure. *E.g.*,

PTX-4.07570, 7577, 7581, 7939, 7941, 7945, 7948, 7951, 8014, 8019, 8026, 8041; *see also*

Trial Tr. 5:13–7:1 (Dec. 6, 2017 AM Session) (Hite testimony on PTX-4.07945 and 7577);

Trial Tr. 9:22–10:20 (Dec. 6, 2017 AM Session) (Hite testimony about occulting and PTX-

46

4.07941 ("A tree image can be…occulting…more remote objects, and be[] occulted by

portions of near[er] objects.")).

132.    "Overlapping" describes exactly what it is—one image is in front of a portion

of another image. *See* Trial Tr. 68:14–21 (Dec. 5, 2017 PM Session) (citing PTX-912 at slide

24) (Hite); *see also* Trial Tr. 9:14–22 (Dec. 6, 2017 AM Session) (Hite) ("The application

describes overlapping as occulting portions of other objects."); Trial Tr. 16:25–17:6 (Dec. 6,

2017 AM Session) (Hite) (same); Trial Tr. 23:13–17 (Dec. 6, 2017 AM Session) (Hite

testimony that "occulting is synonymous with overlap[ping]").

133.    The Disclosure also adequately describes "destructive" and "nondestructive"

overlaying images: "These overlays can be loaded destructively over the processed image,

effectively erasing the information contained thereunder, or nondestructive[ly] by loading

output memory map bit planes for overlays." PTX-4.07608. Another term for a destructive

overlay is a permanent overlay. PTX-4.07292 ("Graphic overlays can be written over an

image in image memory to provide a permanent overlay."). Mr. Hyatt explained during his

testimony:

> [B]ecause I only had a single channel, I overlaid the two squares on the
> background, and the two squares occulted the background, and the one
> square occulted the corner of the second square, so that those are permanent
> because the overlaying of the squares erased -- replaced the information of the
> background, for example. This is what we called "destructive overlaying," in
> contrast to the nondestructive overlaying where we have different channels
> and present different images in the different channels, and each channel is
> kept pristine and not destructively overlaid until they get to the combiner
> module. The combiner module then does the overlaying on an overlaying
> priority basis and outputs to the display.

Trial Tr. 72:19–73:15 (Dec. 4, 2017 PM Session); *accord* Trial Tr. 23:17–24:2 (Dec. 5, 2017

AM Session) (Hyatt); Trial Tr. 7:2–8:1, 60:3–10 (Dec. 6, 2017 AM Session) (Hite).

134.    Different types of images that can be overlaid are adequately described in the Disclosure, including but not limited to: (1) textured overlays, PTX-4.07941; (2) graphic overlays, PTX-4.07942; (3) "pictorial features, annotation symbols, imaginary pathways," and other images, PTX-4.07940; (4) irregular images, PTX-4.07946; (5) "symbolic images" such as "navigational symbols," "topographical lines, checkpoint identification, and alphanumeric legends," PTX-4.08000; and (6) processed images, PTX-4.07939.

135.    The Disclosure also adequately describes the use of overlays with a number of applications, including (but not limited to) ground-based simulation applications, PTX-4.07963, the moving map display application, PTX-4.07997, the landscape architecture application, PTX-4.08013, the flight simulator application, PTX-4.08019, and the helicopter training simulator application, PTX-4.08024.

136.    Dr. Castleman did not opine or testify that the Disclosure lacked adequate written description support for overlaying, occulting, and/or overlapping of images. In fact, Dr. Castleman conceded that the Disclosure "describes a situation where images can be overlaid in different planes of different image processors where occulting priorities are assigned to each plane, and motion between them is controllable" in its "description of the multichannel processor." Trial Tr. 279:10–19 (Jan. 19, 2018).

137.    The Court therefore finds that the Disclosure provides adequate written description support for overlays (including destructive and non-destructive overlays), occulting, and overlapping of images.

### H.     The Disclosure Provides Adequate Written Description for the Multiplexer/Demultiplexer

138.     The Disclosure describes a multi-channel system. In his testimony describing Figure 1A (PTX-4.07488, discussed above at paragraphs 51–53), Mr. Hyatt explained that the Disclosure "has parallel processing, in that there are multiple geometric modules, for example, that operate in parallel on different images for subsequent overlapping and displaying." Trial Tr. 46:15–18 (Dec. 4, 2017 AM Session). This was done by using a multiplexer/demultiplexer (*e.g.*, block 110D from Figure 1A, PTX-4.07488).



139.     The Disclosure describes the use of multiple separate geometric modules and a multiplexer/demultiplexer (otherwise known as a "mux/demux") routed to multiple separate spatial modules (see dashed lines 110C and 110G):

> A plurality of geometric modules 110A to 110B can be configured in parallel channel form, such as for multiple overlays. The geometrically processed images can be combined with a geometric multiplexer/ demultiplexer/ combiner 110D. Multiplexing selects a particular geometric processed image channel for subsequent processing. Processing includes overlaying, adding, subtracting, and otherwise selecting and combining of images. For example, many channel of geometrically processed images 110C can be overlayed with occulting priorities….

PTX-4.07570; *see also* Trial Tr. 35:7–36:4 (Dec. 4, 2017 PM Session) (Hyatt testimony about PTX-4.07570, which provides that Figure 1A has "a plurality of geometric modules that can

be configured in parallel channel form…and which facilitate multiple overlays …."); PTX-

4.07939 ("Images can be overlayed in different planes of different image processors.").

140.     In his testimony regarding this section of the Disclosure, Mr. Hyatt explained,

> We can have multiple overlays. They can be of various types, and they overlay together with the separate and occulting priorities to define which ones overlay which other ones for distance considerations and the like.
>
> They have already been transformed because the multiplex or combiner which this is describing is after the image processor. So these images are scanned out of image memory with a window into the combiner, and then overlaid in the combiner with occulting priorities, and then scanned to the display for display purposes.

Trial Tr. 67:5–21 (Dec. 4, 2017 PM Session); *see also* Trial Tr. 76:2–18 (Dec. 4, 2017 PM

Session) (Hyatt testimony that the Disclosure "describe[s] implementing multiple channels

of geometric transforms and multiple channel[s] with their own separate image memories so

that the overlaying would be in different planes…could be processed separately before being

overlaid with occulting priorities.") (citing PTX-4.07939).

141.     The Disclosure describes multiple ways to implement overlays:

> In a flag controlled occulting configuration, a plurality of flag bits can be implemented for each pixel word to encode priorities between overlays. In such a configuration, a 2-bit flag permits determining priorities between 3-overlay image pixels on a background image pixel. Similarly, a 3-bit flag permits determining priorities between 7-overlay image pixels on a background image pixel.
>
> In a wired priority configuration, hardwiring selects channel priorities relative therebetween by wiring channels to input boards, with selection of jumpers, and other wiring techniques.
>
> In a programmable priority configuration, selection of channel priorities relative therebetween is performed by a programmable priority word that controls the priority combining logic.

PTX-4.07951–7952. Mr. Hyatt explained these different methods, as well:

There are various methods of implementing the overlaying and occulting to inform an artisan that these were considered in the written description. I identified them and briefly described them, but they're well-known techniques that an artisan would regularly recognize.

A flag is a digital code that identifies the occulting priorities; wired priority is the same digital code, but it's hardwired rather than programmable; and then the programmable priorities gives more flexibility to readjust the occulting priorities.

Trial Tr. 77:19–78:11 (Dec. 4, 2017 PM Session); *see also* Trial Tr. 305:8–306:18 (Jan. 19, 2018) (Hyatt testimony explaining how the Disclosure describes hardwired configurations to establish occulting priorities) (citing PTX-4.07592); *id.* at 306:10–307:15 (Hyatt testimony explaining how Disclosure describes programmable configurations to establish occulting priorities) (citing PTX-4.07592); *id.* at 307:19–308:20 (Hyatt testimony explaining how the Disclosure describes flag controlled configurations to establish occulting priorities via use of the "LS365 decoder") (citing PTX-4.07591–7592).

142.    However, Dr. Castleman testified that it "would be a considerable design challenge" to build the multiplexer/demultiplexer (otherwise known as the "mux/demux"), contending that the mux/demux would have to make decisions about overlay priorities in approximately a hundred nanoseconds. *See* Trial Tr. 136:10–138:1 (Jan. 18, 2018). Dr. Castleman also testified that the Disclosure had only Figure 1C and "about a page and a half of guidance" in building the mux/demux, so that the "one of skill in the art" could not build the mux/demux and one of skill in the art would not be convinced Mr. Hyatt possessed the mux/demux at the time of the application. *See* Trial Tr. 138:9–139:24 (Jan. 18, 2018). Dr. Castleman pointed to DX2002.469–470 and DX2002.472–473 (which correspond to PTX-4.07948–7949 and 7951–7952, respectively) and Figure 1G as the only

locations where the mux/demux was supposedly described. Trial Tr. 141:2–14 (Jan. 18, 2018).

> 1.   The Disclosure Provides Adequate Written Description For The Multichannel Mux/Demux Circuitry

143.   Mr. Hite testified that he does not agree with Dr. Castleman's opinion: "No, I don't, as to the difficulty of the design. And I believe the specification discloses how to approach it. And a skilled artisan at the time would realize how to expand that to the number of channels." Trial Tr. 315:11–23 (Jan. 19, 2018); *see also* Trial Tr. 298:5–22 (Jan. 19, 2018) (Hyatt testimony that mux/demux "is a very, very simple mux/demux circuit").

144.   Mr. Hite identified a number of sections of the Disclosure where the mux/demux was described as having multi-channel functionality. One section of the Disclosure is PTX-4.07571:

> Multiplexer/demultiplexer modules 110D, 110N, and 110Q can be implemented to multiplex a plurality of channels into one channel and then to demultiplex that one channel into a plurality of channels. Each multiplexer associated with a channel can be replicated a plurality of times to multiplex a plurality of channels into each single channel. The multiplex signals associated with the plurality of multiplexed channels can then be demultiplexed, permitting routing of any one of a plurality of multiplexer input channels to any one of a plurality of multiplexer output channels. Tri-state multiplexers can be used to multiplex a plurality of channels into a single channel, such as using 74LS365 multiplexer circuits. Parallel fanout and gating networks can be used for demultiplexing. Other types of multiplexers and demultiplexers are well-known and can be used for the multiplexer/demultiplexer modules.

Dr. Castleman did not address this section in his testimony. But, as Mr. Hite testified, "this section is specifically in the general description of the disclosure. So it's one of the first things you'd see." Trial Tr. 315:25–316:17 (Jan. 19, 2018); *see also* Trial Tr. 299:6–19 (Jan. 19, 2018) (Hyatt testimony that PTX-4.07571 describes use of 74LS365 multiplexers to establish "occulting priorities" for pixel streams).

145.    Mr. Hite also testified about how the mux/demux operates: "the supervisory processor can command the geometric modules for essentially overlay rotation, overlay and background translation, expansion and compression. And then the occulting priorities would be sent to the geometric mux/demux combiner, which would perform the item 21E2D, which would be [] occulting priorities for each overlay." Trial Tr. 6:10–7:1 (Dec. 6, 2017 AM Session) (citing PTX-4.07577). Mr. Hite also testified about PTX-4.07570, calling it "a more technical description of exactly what the geometric mux/demux combiner [is and the] function it performs." Trial Tr. 8:2–17(Dec. 6, 2017 AM Session) ("What this says is that the geometric mux/demux combiner takes the output from multiple geometric modules and performs the function of an overlay."); *see also* PTX-4.07570 ("The geometrically processed images can be combined with a geometric multiplexer/demultiplexer/combiner 110D.… [M]any channels of geometrically processed images 110C can be overlaid with occulting priorities.").

146.    The Disclosure specifically describes how to construct the mux/demux circuit using the 74LS365 multiplexer circuit, beginning as follows:

> The combining circuit can be a series of tristate multiplexers for overlaying, such as the 74LS365 multiplexer circuits, for selecting the appropriate pixel from a plurality of pixels from the plurality of channels. Selection logic can include detection of a flag or color in the pixel word of each of the channels and a determination of which of the channels is to be enabled for display out of the plurality of channels for that particular pixel based upon image detection and image priority.

> For example, a flag in each pixel word associated with each overlaying image can be 0-set if the overlaying image occupies that pixel and can be 1-set i[f] the overlaying image does not occupy that pixel. Therefore, a plurality of overlaying images can be provided that are stored in a plurality of overlaying image memories where the pixels in each of the overlaying image memories that contain pixel information to be overlayed have a 0-set flag and the pixels in each of the overlaying image memories that do not contain pixel information to be overlayed have a 1-set pixel flag.

PTX-4.07948. Dr. Castleman did not testify about the 74LS365 circuit.

147.    Mr. Hite testified about this section (PTX-4.07948 *et seq.*), as well. "This section is from the overlay section where the specification expands upon the prior recitation…. And in this section there's probably, maybe ten pages of description on different ways to encode pixel priorities and work with associated circuitry." Trial Tr. 316:22–317:5 (Jan. 19, 2018). Mr. Hite then testified that, with "each pixel representation,… you would have a flag which indicated that that pixel within the image would contain data that the mux/demux circuit, which would operate on, and the encoding of these flags and with the pixel eliminates the need for any sort of computation at the mux/demux level. It reduces it to overall—as a data switch…" Trial Tr. 317:21–318:2 (Jan. 19, 2018) (citing PTX-4.07948).

148.    Mr. Hyatt also testified about PTX-4.07948: "I provide several different ways to implement the overlaying in this disclosure. At the top of this page, the multiplexer circuits, 74 LS365, can be used to multiplex together different images from different channels. Alternately they can be multiplexed using flags which are digital codes, or colors which also are digital codes, to determine the overlay priorities between the channels." Trial Tr. 76:22–77:9 (Dec. 4, 2017 PM Session).

149.    Mr. Hite testified about the 74LS365 integrated circuit referenced in this Disclosure, explaining that "the expandability is as simple as just adding another one":

> A 74LS365 is called a tristate hex gate. It's essentially a semi-conductor device that can have the output turned off. The advantage of these is that the outputs can be connected together electrically, and they would be enabled one at a time.

So if you had, say, three of them connected together and you turned one on, the other two are in what's called a high impedance state. So they're electrically inert. And this allows the active device to drive the common signal path.

And so you can see if you have three of these with three separate inputs and a control logic to enable one of them, they're obviously mutually exclusive, the selected signal would pass through and you essentially have a multiplexer where, acting like a data switch, you can pick one of the inputs that you want.

This particular circuit is used in microprocessor data buses to connect RAMs and ROMs and peripherals. So it's very, very common and well known in the industry and very simple to mechanize.

So this particular part allows you to, one, implement a very simple data switch. *And the expandability is as simple as just adding another one. If you have another input, you add another one. And in your selection logic, of course, you have to add another line for that. But for minimalistic circuitry, this is about as good as you can do.*

Q. And was the 74LS365 generally available in 1984?

A. Yes. They offered them in all sorts of -- CMOS, TTL, high speed, lots of different flavors. The data books that Mr. Hyatt has included as references in his patent are -- the TTL data book was sort of the dictionary or, you know, the go-to reference for any sort of logic design back in that day.

Trial Tr. 318:3–319:8 (Jan. 19, 2018) (emphasis added); *see also* PTX-4.07925 (identifying disclosure of the Texas Instruments *TTL Data Book* in a Disclosure section incorporating design materials by reference); Trial Tr. 319:9–16 (Jan. 19, 2018) (Hite); Trial Tr. 299:20–300:20 (Jan. 19, 2018) (Hyatt) (testimony citing PTX-4.07925 regarding disclosure of integrated circuits by catalog in Disclosure).

150.    Contrary to Dr. Castleman's testimony that only Figure 1G disclosed anything about the mux/demux, Trial Tr. 141:2–14 (Jan. 18, 2018), both Mr. Hite and Mr. Hyatt testified that additional description of the mux/demux circuitry was present in Figures 6Y and 6Z (respectively and as discussed below). *See also* PTX-4.07561–7562 (Brief description of the drawings describing Figures 6Y–6AF as schematic representation of

different multiplexer arrangements); *see generally* PTX-4.07900–7912 (description of Figures 6Y–6AF).

151.    Mr. Hite testified that Figure 6Y (PTX4.07539) provides additional written description support for the mux/demux:



(Highlighting added). Mr. Hite testified that this figure describes the multiplexer, which would be "easily expandable" (contrary to Dr. Castleman's testimony that it would be a "considerable design challenge" to build this circuitry):

[A] two channel multiplexer implemented from the LS365 parts where it multiplexes the two address buses to the left, to the RAMs [Random Access Memories] on the right. So the selection signal to pick A or B is the F0-bar which comes in from the topmost.

Another significant thing to notice here is if you follow the F0 line all the way down to the bottom and then make the turn, there's a little—another symbol called an inverter. So what that does it flips or negates the F0-signal, forcing the opposite logic level. And so what that implies is you either get one or the other, because the select signal for the other channel is the logic opposite. So that's A or B selection depending on if F0 would be high or low.

So this circuit is an example of what could be used as a two channel mux for geometric operation overlay that we discussed so often where you put the first geometric processor channel on one set of 365, the other on the other. And then it would be as simple as running the pixel flag from the higher priority circuit to the selector signal.

And if there was pixel data resident in the higher priority channel, hence image, there would be a flag set. It would be switched through. And if there was no data, then it would go to the other state, selecting the other channel.

*And this circuit is easily expandable. You would just replicate more and more of these -- connecting the outputs together and then connecting each input to a geometric processor channel.* And, of course, the selection logic would be more complicated, considering you'd have, you know, additional logic states to decode.

And so this provides, I believe, written description for the implementation of a 365-based mux.

Trial Tr. 319:17–320:25 (Jan. 19, 2018) (emphasis added); *see also id.* at 321:1–11 (Jan. 19, 2018) (Hite testifying that adding up to five potential channels would not be an issue).

152.    Mr. Hyatt testified that Figure 6Z (PTX-4.07540, a portion of which is reprinted below) further describes the LS365 integrated circuit used in a buffer memory mux:



(Highlighting added). According to Mr. Hyatt, the C2 signals (highlighted in yellow) "flows

into these two chips and is selected by this F0 with a bar over it at the top, which either

allows this eight bit pixel stream to flow through or to block it and allow a different eight bit

pixel stream to follow through." Trial Tr. 309:19–310:19 (Jan. 19, 2018) (further explaining

that this circuitry was reduced to practice and citing PTX-4.07540); *see also* Trial Tr. 301:22–

303:3 (Jan. 19, 2018) (citing PTX-914 at 2310) (Hyatt testimony that, "as a pixel word

comes into this 365 chip, this multiplexer chip…it enables of the channels -- assuming we

have two channels, it enables which of the two channels has priority for that particular pixel

on a pixel-by-pixel basis as the pixel stream propagates through the system.").

153.    These two figures (6Y and 6Z) are specifically described in the Disclosure:

> The first line buffer will now be discussed with reference to Figs 6Y and 6Z.
> Four RAM circuits U3E to U6E are addressed through tristate multiplexers
> U3C to U6C. Multiplexers U3C and U4C select the write address from the
> write bus (or input bus) and multiplexers U5C and U6C select the read
> address from the read bus (or output. bus) under control of the mode control

signal F0-bar U12B-4 in accordance with the logic shown in the BUFFER
MEMORY MULTIPLEXER ASSIGNMENT TABLE. Multiplexers U3C
and U4C are selected with the F0-bar signal and multiplexers U5C and U6C
are selected with the F0-bar signal complemented with U13B-2. The selected
address is applied to the address inputs on RAMs U3E to U6E. The write
multiplexer U4C also multiplexes the write pulse to U4C-11 and to the write
inputs to the RAMs WE-bar on pin-10. When the write multiplexer U3C and
U4C is selected, the write address is applied to RAMs U3E to U6E and the
write pulse CPG is applied to the write input WE-bar of the RAMs. When the
read multiplexer U5C and U6C is selected, the read address is applied to
RAMs U3E to U6E and the write pin-10 WE-bar is pulled up to select read
operations.

PTX-4.07900; *see also* Trial Tr. 321:12–322:2 (Jan. 19, 2018) (citing PTX-4.07990) (Hite).

154.    The Court therefore finds, contrary to Dr. Castleman's opinion and consistent

with Mr. Hite's opinion and Mr. Hyatt's testimony, that: (1) constructing the multichannel

mux/demux would not be a considerable design challenge; and (2) the Disclosure provides

adequate written description support for the multichannel mux/demux and its use in the

image processing system to multiplex and demultiplex image information. Mr. Hite and Mr.

Hyatt testified to simple circuitry implemented with Texas Instrument 74LS365 integrated

circuit chips described at various places in the Disclosure that Dr. Castleman did not

consider.

155.    Mr. Hite and Mr. Hyatt both testified that the mux/demux could perform its

operations in far less than 100 nanoseconds (the time Dr. Castleman testified was needed to

make decisions in the mux/demux to overlay pixels, *see* Trial Tr. 137:7–9 (Jan. 18, 2018)).

The LS365 chips described in the Disclosure could perform image multiplexing in 7 to 14

nanoseconds (depending on whether the "advanced" or regular chips were used), without

any "computational load" or "number crunching." Trial Tr. 303:13–304:19 (Jan. 19, 2018)

(Hyatt); *id.* at 322:23–323:18 (Hite) (testifying advanced chips operate twice as fast as regular

chips).

156.    Mr. Hyatt testified that the hardwired version of the mux/demux would take

no time to conduct operations because it is hardwired. Trial Tr. 305:19–306:18 (Jan. 19,

2018). The hardwired mux/demux (as described in Figure 6Z) was confirmed with the use

of the 74LS365 integrated circuit described in the Disclosure that was implemented in the

experimental system. Trial Tr. 309:23–310:9 (Jan. 19, 2018) (Hyatt).

157.    Based on the above, the Disclosure provides adequate written description

support exists for the mux/demux.

2.    Dr. Castleman's Testimony About The Mux/Demux Is Not Credible

158.    Dr. Castleman, referencing paragraphs 40, 121, 122, 123, 124, 126, and 127 of

his expert report, testified that he disclosed his opinions regarding the mux/demux in the

Disclosure. Trial Tr. 145:7–14, 147:17–19 (Jan. 18, 2018). But none of these portions of his

expert report disclosed his opinions stated at trial that constructing the mux/demux "would

be a considerable design challenge" and that the Disclosure does not provide a description

of how to "make a multichannel" mux/demux.[6] Trial Tr. 137:24–138:1, 138:17–20 (Jan. 18,

2018).

159.    For example, paragraph 40 of Dr. Castleman's expert report provides that

"'[t]he hardware arrangement depicted makes no provision for displaying multiple

overlapping windows o[n] a single display screen.'" Trial Tr. 145:25–146:3 (Jan. 18, 2018)

(quoting DX2018.25–26 at ¶ 40). However, this paragraph of Dr. Castleman's expert report

---

[6] The Board, contrary to Dr. Castleman's opinion, determined that one skilled in the art
could have performed overlaying, specifically finding that: (1) "there are no complex claim
limitations that would challenge a programmer or a display engineer"; (2) "[t]he combining
circuit can be a series of tristate multiplexers for overlaying"; and (3) that "we are
unpersuaded that the specification would not have enabled one skilled in the art to perform
overlaying." PTX.4-00078 (addressing enablement) (citations and quotation marks omitted).

also states that a mux/demux is disclosed and that "two or more images can be combined and routed to a single display." DX2018.25 at ¶ 40 ("The multiplexer/demultiplexer units can steer the images through the parallel pathways, splitting, combining and redirecting them as they pass through."). No mention is made in paragraph 40 as to any difficulty of construction of the mux/demux or whether support is lacking for making a multichannel mux/demux.

160.    Paragraphs 126–127 of Dr. Castleman's expert report also fail to disclose the opinions he offered at trial. DX2018.55; *see also* Trial Tr. 147:17–148:2 (Jan. 18, 2018) (citing DX2018.55–56 at ¶¶ 126–27). Paragraph 126 states only that "the figures and descriptions in the '211 application….fail[] to support all elements of any of the claims in dispute …." That paragraph makes no mention of the mux/demux. Paragraph 127 states, in pertinent part, that "[t]he specification does not describe overlaying 'windows' of image information. The only overlaying described in the specification is overlaying of multiple images within a window in memory to display in a *single* viewport on the monitor." (emphasis in original). Once again, this paragraph does not state that designing the mux/demux "would be a considerable design challenge" or that Mr. Hyatt provided no support for a multichannel mux/demux.

161.    Paragraphs 121–124 (reprinted in full below, along with paragraphs 119–120) also fail to disclose Dr. Castleman's opinions regarding the mux/demux:

> 119. I agree with the technical findings reached by the patent examiner and upheld by the Board in affirming the written description rejection of the claims.
>
> 120. I agree that the passages cited by Mr. Hyatt to the Board "fail[] to reasonably convey to the artisan that, as of the filing date of [Mr. Hyatt's] application, [Mr. Hyatt] had possession of" the invention recited in claim 172. See A2976-A2977.

121. First, Mr. Hyatt cited item I.E.2 on page 24 of the specification (A101). That item would not have illustrated to one of ordinary skill in the art in 1984 that Mr. Hyatt was in possession of any of the overlaying limitations of claim 172. It does not describe windows, a 3D image, a background image, a menu, graphics, overlaying, or overlapping.

122. Second, Mr. Hyatt cited lines from a computer program: page 548 (A625), lines 120 and 171; page 549 (A626) line 632; and page 551 (A627) line 2020. None of these program lines would have illustrated to one of ordinary skill in the art in 1984 that Mr. Hyatt was in possession of any of the overlaying limitations of claim 172. These computer program excerpts do not describe windows, a 3D image, a background image, graphics, or overlapping, let alone overlapping of windows on a single monitor screen.

123. Third, Mr. Hyatt cited pages 544-546 of the specification (A621-A623) as support for the displaying claim limitation. I agree with the Board that these pages fail to describe a background image, windows, a 3D image, graphics, a menu, overlaying, or overlapping, let alone displaying overlapping windows on a single monitor screen. These pages show source code that runs on the host computer and is used to initialize the graphics generator circuitry in the image processing system so that it is prepared to insert graphics into an image. These pages of the specification would not have illustrated to one of ordinary skill in the art in 1984 that Mr. Hyatt was in possession of the displaying limitation of claim 172.

124. I also agree with the examiner's finding that "[Mr. Hyatt's] generalized block diagrams and circuit depictions…have no disclosed relationship with the claimed subject matter, and…do not depict the claimed elements interconnected and interrelated in such [a] manner as to produce the claimed results," such as the displaying claim limitation. A2977.

DX 2018.54–55; *see also* Trial Tr. 146:15–147:16 (Jan. 18, 2018) (Castleman citing

DX2018.54–55).

162.     These paragraphs do nothing but offer Dr. Castleman's opinion parroting

certain conclusions of the Board and examiner that were set forth in the administrative

record. *See* DX2018.54 ¶ 120. Paragraph 121 offers Dr. Castleman's opinion that Mr. Hyatt

failed to provide adequate written description support for claim 172 (used by the Board as

an exemplary claim) on page 24 of the Disclosure (PTX-4.07577). DX2018.54. Paragraph

122 states Dr. Castleman's opinion that certain lines of software code disclosed in the '211

application (located at PTX-4.08102, 8103, 8108, and 8109) failed to provide adequate written description support for claim 172. DX2018.54. Paragraph 123 states Dr. Castleman's opinion that pages 621–623 of the Disclosure (PTX-4.08097–8099) fail to provide adequate written description support for the displaying claim limitation. DX2018.54. And paragraph 124 states Dr. Castleman's opinion agreeing with the examiner's finding (reproduced on PTX-4.00063) that the block diagrams and circuit depictions in the '211 do not depict the interconnections among the claim elements. DX2018.54–55.

163.    Paragraphs 121–124 of Dr. Castleman's expert report do not address whether adequate written description support exists for the mux/demux, let alone provide any opinions that constructing it would be "a considerable design challenge" or anything of the sort.

164.    On cross-examination, Dr. Castleman also testified that the Disclosure "describes a situation where images can be overlaid in different planes of different image processors where occulting priorities are assigned to each plane, and motion between them is controllable" in its "description of the multichannel processor." Trial Tr. 279:10–19 (Jan. 19, 2018).

165.    Therefore, the Court finds that Dr. Castleman's testimony as to whether the Disclosure adequately describes the mux/demux is not credible.

## I.   Adequate Written Description Support Exists For The Use of "Windows" In The Disclosure

166.   All of the claims at issue include a limitation of a window containing some type of information, such as a "window of three dimensional perspective image information." DX2003.3 (claim 131).

167.   The Disclosure describes that a window "may be considered as mapping a portion of image memory seen through a window into the display viewport." PTX-4.07633; Trial Tr. 74:22–75:21 (Dec. 5, 2017 PM Session) (Hite) ("So that sentence really explains the window, describes a portion of image memory, and describes that the portion is mapped through a window to the display."); Trial Tr. 14:17–15:19 (Dec. 5, 2017 AM Session) (Hyatt citing PTX-4.07633).

168.   Even Dr. Castleman agrees that the Disclosure primarily describes a window as "[a] designated area within an image memory that has been selected for processing or display." Trial Tr. 213:4–214:4 (Jan. 19, 2018); *see also* Trial Tr. 207:19–23 (Jan. 19, 2018) ("There are many descriptions of windows in the 211 specification that are consistent with" this primary description); Trial Tr. 280:18–25 (Jan. 19, 2018) (Castleman).

169.   Dr. Castleman concedes he has no opinions about whether adequate written description support exists for the claims in the Disclosure if one adopts the "primary" description of the term "windows" from the Disclosure—a portion of image memory scanned out for display or processing. Trial Tr. 263:15–264:18 (Jan. 19, 2018).

170.   Nonetheless, Dr. Castleman still contends that the claims at issue in this case introduce a description of window "referring to GUI." Trial Tr. 231:2–6 (Jan. 19, 2018).

171.   For the reasons set forth below, the Court finds that a "window," as used in the claims in the '211 application, is expressly and unmistakably described as a portion of

64

image memory scanned out for display or processing. The Court also finds that the broadest reasonable interpretation of the term "window" as used in the claims does not include a graphical user interface.

          1.    <u>The Disclosure Describes "Window" As A Portion of Image Memory Scanned Out for Display</u>

172.    Mr. Hite testified that a window is described in the Disclosure "to mean a portion of the image memory that is scanned out for image processing or display." Trial Tr. 71:15–23 (Dec. 5, 2017 PM Session). Mr. Hyatt testified similarly: "the contents of the window is essentially the image information and image memory that is scanned out to the display, and the window itself is processed geometrically in order to give the different types of incremental transforms on the display." Trial Tr. 4:22–5:4 (Dec. 4, 2017 PM Session).

173.    A window, as displayed to the viewer, constitutes the same portion of image memory that is processed or scanned for display; the display itself can have multiple windows "for different images" that can be seen on different areas of the display monitor. Trial Tr. 14:17–16:4 (Dec. 5, 2017 AM Session) (Hyatt referencing PTX-4.07633). The windows viewable on the screen are the same windows mapped out for display; the different windows shown on the display monitor "are created" by "mapping a portion of image memory seen through a window into the display viewport." Trial Tr. 14:17–16:16 (Dec. 5, 2017 AM Session); Trial Tr. 26:15–27:6 (Dec. 5, 2017 PM Session); PTX-4.07633.

174.    Mr. Hite and Mr. Hyatt identified numerous portions of the Disclosure that supported their testimony as to how the Disclosure describes a window. In a section entitled "Image Hierarchy" (*see generally* PTX-4.07628–7629), the Disclosure states:

Database memory 204A can be implemented to store a very large image; such as a 1-million pixel image, a 50-million pixel image, a 1/2-billion pixel image, or a 2-billion pixel image. Database memory 204A can store multiple versions of the same image, such as pre-compressed and pre-filtered versions of the same image. Various database memory configurations are discussed herein....

Image memory 204C can be used for geometric processing of the image; such as for rotation, translation, expansion, compression, 3D-perspective, and warping of the image. The portion of the image loaded into image memory can be selected based upon the translated position of window 204D, such as in accordance with the virtual scrolling implementation discussed herein.

A portion of the image stored in image memory 204C can be processed with a window 204D, as discussed below. Window 204D can be rotated, translated, expanded, compressed, 3D-perspective processed, and warped in accordance with geometric processing to provide a correspondingly rotated, translated, expanded, compressed, 3D-perspective, and warped image; such as for display on a monitor.

PTX-4.07628–7629. Mr. Hyatt explained image hierarchies are

where the database covers a large image. The information is transformed...an intermediate buffer memory and then into image memory, which stores the image and for the window to be transformed to select the right image information to then scan out to the display. That is a top implantation of the window being used to implement the incremental transform processor.

Trial Tr. 8:12–23 (Dec. 5, 2017 PM Session).

175.    In a section entitled "Window Geometry," the Disclosure states that "[o]ne configuration of geometric processing is implemented by computationally defining certain parameters of a window and then scanning out the portions of image memory seen through the window in a raster scan referenced to the window." PTX-4.07626; *see also* Trial Tr. 71:18–72:14 (Dec. 5, 2017 PM Session) (Hyatt testimony citing PTX-4.07626 as relevant to describing "windows" as a portion of image memory scanned out for display); Trial Tr. 210:19–211:5 (Jan. 19, 2018) (Castleman testimony agreeing this section provides support for "windows" as construed by Mr. Hite and Mr. Hyatt); *see generally* PTX-4.07626–7627 (section entitled "Windows Geometry").

176.    Another part of that same "Window Geometry" section of the Disclosure

states:

> The window can be translationally positioned over image memory to
> implement image translation, can be rotationally oriented over image
> memory to implement image rotation, can be expanded or compressed to
> implement image compression or expansion respectively, can be warped to
> implement image warping, and can be otherwise controlled to provide other
> forms image processing.

PTX-4.07626. Mr. Hyatt explained that this section describes the implementation "with the

incremental processor by transforming the window to select certain image information in

the image memory and scan out this selected image information to the display to have a

transformed image on the display." Trial Tr. 7:13–8:11 (Dec. 5, 2017 AM Session).

Similarly, Mr. Hite opined that this section "provides a written description of window, of

image memory being scanned out, and the raster scan." Trial Tr. 71:18–72:14 (Dec. 5, 2017

PM Session).

177.    The Disclosure at PTX-4.07982 provides further support: "Window 756

represents the portion of the image in image memory 752 that will be scanned out, such as

to an image memory map or to a raster scan monitor." *See also* Trial. Tr. 74:12–20 (Dec. 5,

2017 PM Session) (Hite) (citing PTX-4.07982); *id.* at 6:1–15 (citing PTX-4.07982) (Hyatt

testimony stating that "the incremental transform processor which scans out an image and

image memory, and essentially through a window"). Dr. Castleman agrees this section also

provides support for this description. Trial Tr. 210:7–18 (Jan. 19, 2018).

178.    The figures of the Disclosure adequately describe windows as a portion of

image memory mapped out for processing or display. For example, Mr. Hyatt testified that

Figure 1K (PTX-4.07496) shows "the window as being rotated over the image memory.

This rotated window over image memory appears on the screen to be a rotated image."

Trial Tr. at 57:8–21 (Dec. 4, 2017 AM Session); *supra* ¶ 60.

179.    Figure 2A (PTX-4.07499) provides additional written description support for

Plaintiff's description of the term "window" from the Disclosure. The Disclosure section

describing Figure 2A provides:

> A portion of the image stores in image memory 204C can be processed with a
> window 204D, as discussed below. Window 204D can be rotated, translated,
> expanded, compressed, 3D-perspective processed, and warped in accordance
> with geometric processing to provide a correspondingly rotated, translated,
> expanded, compressed, 3D-perspective, and warped image; such as for
> display on a monitor.

PTX-4.07629; *see also* Trial Tr. 73:6–74:10 (Dec. 5, 2017 PM Session) (Hite) (citing PTX-

4.07828–29); *supra* ¶ 61. As Mr. Hyatt explained, this figure shows that "the image memory

is…shown as separate memory that contains a portion of the buffer memory. And, of

course, the window scans out a limited portion of the image that is to be displayed." Trial

Tr. 57:25–59:20 (Dec. 4, 2017 AM Session); *see also* Trial Tr. 8:12–9:24 (Dec. 5, 2017 AM

Session) (further Hyatt testimony regarding Figure 2A). Mr. Hite opined that Figure 2A and

its corresponding text describes "that the window is a subset of superimposed on the image

memory." Trial Tr. 73:6–74:10 (Dec. 5, 2017 PM Session). Dr. Castleman agreed that this

portion of the Disclosure supported the "primary" description of the term "windows." Trial.

Tr. 207:24–209:4, 213:4–12 (Jan. 19, 2018).

180.    Mr. Hyatt also testified about the importance of Figure 2B:



FIG 2B

PTX-4.07500. "The outer rectangle is a representation of a memory containing the image, we call that image memory, that's 205B, and a window is created within image memory. The window is identified, as, I think 205D." Trial Tr. 6:13–18 (Dec. 4, 2017 PM Session) (Hyatt). Mr. Hyatt thus testified that Figure 2B and the text associated it provides support for the description of a window "as a portion of image memory scanned out for display or processing." Trial. Tr. 6:8–9:1 (Dec. 4, 2017 PM Session); Trial Tr. 6:16–7:12 (Dec. 5, 2017 AM Session) (Hyatt) (explaining PTX-4.07635 and PTX-4.07593 and rotation of windows to display image).

181. Mr. Hyatt also testified regarding the Disclosure text that support Figure 2B. The Disclosure provides:

Geometry of window 205A relative to image memory 205B will now be discussed with reference to Fig 2B. Translation and rotation can be implemented with scanning logic that addresses pixels along a scanline having a selectable slope, such as scanlines 205C. This can be achieved with a column address generator by driving the independent variable in incremental column or pixel steps and by driving the dependent variable in sub-incremental column or pixel steps, where the sub-incremental column or pixel steps are determined by the slope of the line to be generated. The scanning of a plurality of lines offset therebetween 205C can be used to form a multiple scanline image 205D at selectable slope, such as for storing addressed pixels in another memory map or for directly outputting addressed pixels to a raster scan monitor. The plurality of lines 205C can be offset by starting each line at a different start pixel position at the left hand side of the window. This can be achieved with a row address generator by driving the independent variable in incremental row steps and by driving the dependent variable in sub-incremental row steps, where the sub-incremental row steps are determined by the slope of the row line to be generated. A row line 205E can be used to address the start point pixels for the column scanlines.

PTX-4.07630–7631. As Mr. Hyatt testified, "[t]his is a very important section relative to windows, so that it tells about what constitutes a window, how it is constructed, the relationship…between the window and image memory." Trial Tr. 4:7–21 (Dec. 4, 2017 PM Session); *see generally* PTX-4.07630–7632.

182.    Another portion of the Disclosure, PTX-4.07634, addresses Figures 2C to 2F and provides that "[a] window ABCD is shown superimposed on image memory[.] The image in image memory is represented by the page of the figure extending beyond the window outline. The portion of the image contained within the window ABCD is displayed in the viewport." *See also* Trial Tr. 72:15–73:5 (Dec. 5, 2017 PM Session) (Hite testimony stating this portion provides written description support for window); Trial. Tr. 9:25–10:18 (Dec. 5, 2017 AM Session) (Hyatt testimony regarding same portion).

183.    Mr. Hyatt testified about Figure 2C (PTX-4.07501), as well:



This figure shows that "transforms are implemented incrementally to essentially scan out the image information seen from -- image memory seen through the window into the display for, transformed to provide the display of a transformed image." Trial Tr. 10:19–11:6 (Dec. 5, 2017 AM Session) (Hyatt). *See generally* PTX-4.7634–7644 (Disclosure text that describes how to configure window geometry and rotation thereof as disclosed in Figures 2C to 2F).

184.    Other figures and their accompanying text in the Disclosure provide additional written description support. Figure 2G is described as "[a]n alternate window geometry" that "can be rotated, translated, compressed, and expanded," "and can be otherwise modified; such as to correct image distortions and to introduce image distortions." PTX-4.07645. Moreover, this is all "implemented in the BASIC PROGRAM LISTING DIS.ASC…" *Id.*; *see generally* PTX-4.07645–7646 (section of Disclosure regarding

71

Figure 2G). Another section of the Disclosure explains "[o]ne configuration of translational and rotational geometric processing…with reference to Figs 2H and 2I," that goes as far to explain how the image processing system actually "define[s] the rotation of the displayed image scanned-out of image memory 220I relative to the orientation of the image in image memory." PTX-4.07647, 7653; *see generally* PTX-4.07647–7654 ("Description of Figs 2H and 2I").

185.    The computer software programs described in the Disclosure also support the description of a window as a portion of image memory scanned out for display or processing. That software code (portions of which, with explanations, can be found at PTX-4.07822–7823) accomplishes, among other things, "the calculation of the view-port center point for the geometric window parameters to initiate the scan-out of the window of image information from the image memory." Trial Tr. 23:2–24:7 (Dec. 4, 2017 PM Session) (Hyatt citing PTX-4.07823).

186.    Dr. Castleman also agreed that three additional excerpts of the Disclosure that describe windows as a portion of image memory mapped out for display or processing. The first, located at PTX-4.07629, states,

> A portion of the image stored in image memory 204C can be processed with a window 204D, as discussed below. Window 204D can be rotated, translated, expanded, compressed, 3-D perspective processed, and warped in accordance with geometric processing to provide correspondingly rotated, translated, expanded, compressed, 3-D perspective, and warped image; such as for display on a monitor.

*See also* Trial Tr. 208:7–209:4 (Jan. 19, 2018) (Castleman). The second, located on PTX-4.07633, states:

> The geometric processor can be considered to implement a window that is
> superimposed on image memory, where the window can represent the
> viewport and the portions of the image seen through the window can be
> displayed on the viewport. A configuration having such a window
> arrangement will now be discussed with reference to Figs 2C to 2F.

*See also* Trial Tr. 209:6–19 (Jan. 19, 2018) (Castleman). The third, located on PTX-4.07732,

states, "As the geometric processor is commanded to expand, the geometric processor will

compress the window in image memory, outputting the expanded image (compressed

window) for post-processing and display." *See also* Trial Tr. 209:21–210:5 (Jan. 19, 2018)

(Castleman).

187.    As Mr. Hyatt testified, he is not broadly claiming windows, but he is claiming

"special types of windows, like 3D perspective rotating windows. Just because windows are

mentioned in the claims [does not] mean that [he] is claiming a window in its generic form."

Trial Tr. 54:22–55:22 (Dec. 4, 2017 AM Session); *see also* Trial Tr. 19:24–22:15 (Dec. 4,

2017 PM Session) ("I need this because this is a unique system where the windows are not

just rectangular outlines of text. They're imagery, textured imagery that is being rotated,

translated and warped for [3D] perspective and such[.]"); *id.* at 24:24–27:1 (Dec. 4, 2017

PM Session) ("I have six whole subsections specifically dedicated to the window geometry

and the mathematics of the windows and how it's implemented…. [T]his is image-

processing windows of a very sophisticated level where the windows are transformed

through [a] complex geometric processor and they're claimed as being 3D-perspective

windows as an example, not just windows. They're relatively specific, relatively narrow

window claims."); *id.* at 60:18–61:4 (Dec. 4, 2017 PM Session) ("The windows are, in many

of the claims are limited to 3D perspective claims …."); Trial Tr. 12:15–13:6 (Dec. 5, 2017

AM Session) (Hyatt testimony explaining he is seeking to claim a window of incrementally transformed image information).

188.    The claims of the '211 application support Mr. Hyatt's testimony. For example, claims 131 and 172 claim windows of "three dimensional perspective image information." DX2003.3, 9. Claim 139 claims windows of "graphics image information." DX2003.4. Claim 266 claims windows containing "video image information" and "image information." DX2003.16. Claim 276 claims "data decompressed image information." DX2003.19. Claim 399 claims windows of "alphanumeric image information." DX2003.42. These claims and types of window are exemplary, as nearly every claim in dispute seeks to claim a "special type[] of window[]" (as discussed in Mr. Hyatt's testimony). Trial Tr. 54:22–55:22 (Dec. 4, 2017 AM Session).

189.    The Court finds that the use of the word "window," separated from the claims, does not mean that Mr. Hyatt is only claiming *a* window because the claims have more limitations than just a window.

190.    As detailed above, Dr. Castleman concedes that the Disclosure primarily describes window "as a designated area within an image memory that has been selected for processing or display." Trial Tr. 213:4–214:4 (Jan. 19, 2018) (quoting PTX-805 at ¶ 59). In lieu of accepting this primary description, Dr. Castleman contended that the Court should construe "window" in another way.

191.    One way Dr. Castleman contends the Court should construe "windows" as "a plurality of areas on the display screen or the viewport, each of which is used to display a different image." Trial Tr.149:9–150:2 (Jan. 18, 2018). Dr. Castleman's expert report, although 350 pages long, offers only 3 paragraphs devoted to his opinion that no written

description support would exist for the claims of the '211 application if the Court were to adopt this description. Trial Tr. 265:3–17 (Jan. 19, 2018) (Castleman). Dr. Castleman identified only one portion of the Disclosure to attempt to support this opinion, found at PTX-4.07633 (A157), which states:

> A window arrangement may be considered as mapping a portion of image memory seen through a window into the display viewport. *This is different from windowing of the viewport, where the viewport is divided into a plurality of different areas, called windows, for different images.*

(emphasis added). This portion of the Disclosure, however, expressly disclaims the interpretation of "window" advanced by Dr. Castleman.

192.    Beyond Dr. Castleman's concession that this use of the word "windows" was not the "primary" version contained in the Disclosure, testimony from Plaintiff demonstrates that the primary description of "windows" in the Disclosure—a portion of image memory scanned out for display or processing—is consistent with the description in the Disclosure at PTX-4.07633. *See also* Trial Tr. 14:17–17:2 (Dec. 5, 2017 AM Session) (Hyatt).

193.    Mr. Hyatt testified that, "after describing what a window is, [this section] says that the display has several different windows for different images that can be positioned at different locations, different areas of the display monitor" but that the "plurality of windows" are created by "mapping a portion of the image memory seen through the window into the display view port." Trial Tr. 15:20–16:16 (Dec. 5, 2017 AM Session); *see also* Trial Tr. 25:25–27:17 (Dec. 5, 2017 PM Session) (Hyatt) ("It's effectively a way of saying that the windows are overlaid, and the overlaying of the different images provides the plurality of different areas.").

194.    Mr. Hite provided similar testimony: "[t]hat is a description where different areas for different images may also be called windows" and "that you can have multiple windows of image information on the viewport, which is the display." Trial Tr. 74:21–75:21 (Dec. 5, 2017 PM Session).

195.    The Court, therefore, finds that the Disclosure describes the term "window," as used in the claims at issue in this case, means a "portion of image memory scanned out for display or processing."

2.    Neither The Disclosure Nor The Claims Describe Or Claim A Graphical User Interface

196.    There are no references in the Disclosure to a "graphical user interface." Trial Tr. 75:22–76:4 (Dec. 5, 2017 PM Session) (Hite); *see also* Trial Tr. 11:7–12:14 (Dec. 5, 2017 AM Session) (Hyatt testimony stating that claim does not seek to cover graphical user interface but, rather, an image processing system). As Mr. Hyatt testified, he is not "seeking to claim in the claims of the '211 application a graphical user interface" and did not "disclose a graphical user interface in the" Disclosure. Trial Tr. 26:25–27:9 (Dec. 4, 2017 AM Session).

197.    Instead, Mr. Hyatt disclosed an image processing system and claims directed towards image processing technology. Trial Tr. 26:25–27:9 (Dec. 4, 2017 AM Session) (Hyatt). "The claims recite image processing type windows. Windows that have, for example, three-dimensional perspective transformed windows or rotated windows or such, which are not known in the graphical user interface systems, to the best of my knowledge." Trial Tr. 29:14–30:2 (Dec. 5, 2017 AM Session) (Hyatt) (responding to the PTO Pretrial Statement, ECF No. 201).

198.    The "operator interactivity" described in the Disclosure included operation

via joysticks that permitted the operator to move images via "X-axis translation, Y-axis

translation, rotation, expansion…or compression." Trial Tr. 17:24–19:5 (Dec. 5, 2017 AM

Session) (Hyatt); PTX-4.07586 (experimental configuration features tables that referenced

operation on joysticks). Indeed, a whole section of the Disclosure was dedicated to

operation with joystick controls: "[i]nteractive real time operation is demonstrated with the

use of joystick controls…. Keyboard inputs to the supervisory processor can be used to

provide joystick-type controls." PTX-4.07696; *see also* Trial Tr. 53:11–18 (Dec. 4, 2017 PM

Session) (Hyatt testimony explaining that system is user-interactive via rotation,

compression, expansion, and translation of images).

199.    The videos of the experimental system's operation that were entered as

evidence at trial further support the operator interactivity of the inventions described in the

Disclosure. These videos shown in Court during Dr. Castleman's testimony clearly showed

Mr. Hyatt as the operator interacting with the experimental system by manipulating images

on the display screen. PTX-332 at 1:05:50–1:07:07. Similar clips were shown during Mr.

Hyatt's testimony. *E.g.*, Trial Tr. 50:24–52:2 (Dec. 4, 2017 PM Session) (showing PTX-332

at 47:15–48:17) ("I'm controlling the motion with the joysticks, both expansion,

compression, rotation and translation of the images.").

200.    Dr. Castleman conceded on cross-examination that the image processing

system of the Disclosure demonstrably showed user interactivity in a video: "He's

interacting with the system, yes…. The 211 system can be operated by the operator, of

course, but the display screen is not operator interactive…. [I]t's definitely a system that

[can] be operated." Trial Tr. 246:1–247:19 (Jan. 19, 2018) (showing PTX-332 at 1:05:50–

1:07:07); *see also* Trial Tr. 157:15–19 (Jan. 18, 2018) (Castleman testimony that there is user-interactivity with the '211 image processing system via the terminal).

201.    In light of these videos and Dr. Castleman's testimony conceding the operator interactivity of the image processing system, Dr. Castleman's testimony that Mr. Hyatt was attempting to claim a GUI system by stating his system was "operator interactive" in a Reply Brief to the Board is not credible. Trial Tr. 165:9–17 (Jan. 18, 2018) (Castleman) (citing DX2010.155–156).

202.    Although the Disclosure describes operator interactivity, the Disclosure does not describe and the claims do not recite point and click capability (so that a user could execute a program by clicking on an icon or menu via a mouse) or drag and drop capabilities. Trial Tr. 48:4–11, 49:11–18, 60:11–17, (Dec. 4, 2017 PM Session) (Hyatt); Trial Tr. 17:14–16 (Dec. 5, 2017 AM Session) (Hyatt) ("No, the application doesn't have point and click capability. It's an image processing system. It's not a graphical user interface."); *id.* at 20:12–17, 21:16–23, 24:3–7, 27:16–22, 34:10–17 (Dec. 5, 2017 AM Session) (Hyatt); Trial Tr. 21:7–22 (Dec. 6, 2017 AM Session) (Hite). These features (point and click, drag and drop) are essential to a GUI system. Trial Tr. 214:19–215:12 (Jan. 19, 2018) (citing PTX-4.07939) (Castleman); *id.* at 227:25–228:17 (Jan. 19, 2018) (Castleman).

203.    Mr. Hite also testified that the disclosed system "is not a point and click…kind of a system" and that "the claims are [not] broad enough to cover [GUI] windows." Trial Tr. 68:6–70:18 (Jan. 18, 2018); *see also id.* at 87:11–14 (Hite testimony the disclosed system has "no mouse and GUI-type operation"); *id.* at 67:9–17 (Hite testimony that "the system is interactive, not window in particular, as in the specification"); *id.* at

72:19–23 (Hite testimony that "[t]here is no interactive component to" the use of an icon); *id.* at 90:20–25 (Hite testimony that menus of the disclosed system are not GUI menus).

204.    Dr. Castleman conceded that Mr. Hyatt's Disclosure does not describe GUI. *See* Trial Tr. 230:22–231:1 (Jan. 19, 2018) ("An artisan of ordinary skill would know that the aspects of the 211 specification that were reduced to actual practice through construction of the experimental system were pre-GUI concepts."). Dr. Castleman also conceded that Mr. Hyatt does not use the term GUI in his claims and included in his claims no use of drag and drop functions, no point and click, and no pointer interfacing with a window. Trial Tr. 233:13–235:1 (Jan. 19, 2018).

205.    Dr. Castleman, despite testifying that Mr. Hyatt's claims supposedly cover GUI, conceded that that Mr. Hyatt testified in Court that he was not seeking to claim GUI. Trial Tr. 216:8–13, 228:21–229:3 (Jan. 19, 2018).

206.    For the reasons set forth above, the Court credits Mr. Hyatt's and Mr. Hite's testimony that the claims of the '211 application currently pending before the Court do not seek to claim a graphical user interface, and does not credit Dr. Castleman's testimony that these claims should be interpreted to claim a graphical user interface.

207.    The Court therefore finds that, although the image processing system described in the Disclosure is operator interactive, the claims of the '211 application do not claim a graphical user interface and that the Disclosure does not describe a graphical user interface.

3.    Dr. Castleman Erroneously Construes "Window" By Disregarding
       The Disclosure

208.    Dr. Castleman disregarded the "primary" description of the word from the

Disclosure, and, instead, testified to a different construction of windows at trial: "A

computer operator aid as used in the graphical user interface which is visible to the user is

capable of overlapping and is user interactive." Trial Tr. 171:22–172:10 (Jan. 18, 2018);

*accord* Trial Tr. 195:17–196:1 (Jan. 19, 2018) (Castleman). That construction is never used in

the Disclosure even though the term window occurs 268 times. Trial Tr. 281:1–8 (Jan. 19,

2018) (Castleman).

209.    The construction offered by Dr. Castleman at trial is not contained in his 350-

page expert report. *See* Trial Tr. 195:21–203:7 (Jan. 19, 2018) (Castleman). And although

Dr. Castleman's expert report addresses "computer operator aids," it only does so when it

quotes a Reply Brief that Mr. Hyatt filed before the Board or addresses the construction of a

different term such as "icon." *See id.* Dr. Castleman also executed a sworn declaration in

this case; that declaration (while purporting to construe the term "window") does not

describe window as a "computer operator aid." Trial Tr. 205:7–206:9 (Jan. 19, 2018)

(Castleman).

210.    Moreover, Dr. Castleman's testimony about the interpretation of the term

"window" as used in the contested claims is not credible because it is based on an incorrect

understanding of the legal standard for interpreting claim terms. *See infra* ¶¶ 506–510. Dr.

Castleman's understanding of the legal standard for interpreting claim terms that are

described in a patent application disclosure is important to weighing the value of his

opinions because to construe the term "windows" as he did, Dr. Castleman "interpret[ed] it

differently than the primary description in the 211 specification…" Trial Tr. 216:24–217:4 (Jan. 19, 2018); *accord id.* at 218:5–14 (Jan. 19, 2018) (Castleman).

211.    The Court, therefore, finds Dr. Castleman's testimony construing a "window" as recited in the '211 claims as a "computer operator aid as used in the graphical user interface which is visible to the user and is capable of overlapping and is user interactive" neither credible nor persuasive.

212.    In addition, Dr. Castleman is neither credible nor persuasive because he disregards the established GUI characterizations of a "window" as having point and click and drag and drop features. *Infra* ¶ 216. It is undisputed that these GUI characterizations are not described in the Disclosure and are not recited in the '211 claims. *Supra* ¶ 204.

213.    Dr. Castleman's testimony that a "window" as used in the contested claims is a "computer operator aid as used in the graphical user interface which is visible to the user is capable of overlapping and is user interactive" is infirm for other reasons beyond Dr. Castleman's lack of credibility. Trial Tr. 171:22–172:10 (Jan. 18, 2018).

214.    Dr. Castleman's testimony relies upon an analysis of both the claims filed by Mr. Hyatt in 1999 (which are in dispute in this case) and Mr. Hyatt's Reply Brief. *See* Trial Tr. 231:2–233:1 (Jan. 19, 2018) (Castleman testimony that he had not analyzed whether claims in '211 application would not implicate GUI without use of Reply Brief); *see also id.* at 236:4–238:14 (Jan. 19, 2018) (Castleman testimony that no portions of Mr. Hyatt's responses to Office Actions or Appeal Brief to the Board were cited in his expert report).

215.    Dr. Castleman, therefore, relied on Mr. Hyatt's Reply Brief that he filed with the Board. *See* Trial Tr. 238:8–20 (Jan. 19, 2018) (Castleman). According to Dr. Castleman's testimony, the "computer operator aids" and "computer operator interaction" in the Reply

Brief all refer to GUI even though a graphical user interface is neither stated in the claims

nor described in the Disclosure.

216.    For example, Mr. Hyatt's Reply Brief states, in pertinent part, that

> If the Examiner had construed the claims, which he did not, and if the
> Examiner had performed the required <u>Gechter</u>, <u>Rouffet</u> and <u>Graham</u>
> analyses, which he did not, he would have concluded that the claimed
> "windows" having menus, cursors, icons, or other computer operator aids are
> significantly different from Marsh's windows of an aircraft displaying
> pictorial windows of terrain without any teaching of such claim limitations.

DX2010.184 (citations omitted). According to Dr. Castleman, this section supposedly

demonstrated that Mr. Hyatt wanted to cover a graphical user interface. Trial Tr. 124:15–

125:18, 167:15–169:3 (Jan. 18, 2018). However, Dr. Castleman conceded that this section

does not state "graphic[al] user interface" or identify "a pointer to select a command,"

"point and click," or "drag and drop"—all elements that Dr. Castleman identified as

essential to a GUI system. Trial Tr. 242:24–243:25 (Jan. 19, 2018) (citing DX2050 at slide

13 showing DX2010.184); *see also id.* at 244:24–245:21 (similar Castleman testimony

regarding DX2010.155–156) (citing DX2050 at slide 29); *id.* at 248:17–249:11 (similar

Castleman testimony regarding DX2010.159) (citing DX2050 at slide 30); *id.* at 250:20–

251:11 (similar Castleman testimony regarding DX2010.186) (citing DX2050 at slide 32).

217.    Mr. Hyatt testified that the computer operator aids in this section were not

GUI features but, rather, "images that are overlaid on the display monitor" that have no

"click control features." Trial Tr. 27:23–28:25 (Dec. 5, 2017 AM Session) (testifying about

DX2010.184). Examples of computer operator aids in the <u>Disclosure</u>—none of which have

any GUI features such as "point and click" or "drag and drop"—include: (1) "overlays

including vectors, points, alphanumerics, and symbols," PTX-4.07608; (2) icons, which are

"small symbols generally used to identify a feature…of an image" such as the center of

image memory, Trial Tr. 20:22–24 (Dec. 5, 2017 AM Session) (Hyatt); (3) "[c]ursors,

crosshairs, sights…graphic symbols… [a]lphanumerics…for annotating images [and]

[g]raphic polygons…used for overlay images," PTX-4.07939; and (4) "pictorial features,

annotation symbols, [and] imaginary pathways," PTX-4.07940. Trial Tr. 20:4–24:7 (Dec. 5,

2017 AM Session) (Hyatt); PTX-910 at slide 120 (showing center of image memory); *see also*

Trial Tr. 215:19–216:3 (Castleman testimony regarding PTX-4.07608 conceding that "[a]n

artisan of ordinary skill in 1984 would understand that this passage does not refer to a

GUI").

218.   Another section of the Reply Brief Dr. Castleman identified in his testimony

as showing that Mr. Hyatt supposedly is claiming is a graphical user interface is

DX2010.159, which states that "Marsh shows physical windows of an aircraft displaying

terrain-type pictures, not computer-type 'windows' for computer operator interaction having

computer-type features such as menus, cursors, and irregularly cropped image information."

Trial Tr. 166:23–167:14 (Jan. 18, 2018).

219.   Mr. Hyatt testified that this section was intended to distinguish his claims

over the prior art references relied upon by the PTO Examiner. For example, DX2010.159

was attempting to show that a "glass window in a cockpit[ is] significantly different and

[doesn't] render obvious image processing windows as disclosed and claimed in the instant

application." Trial Tr. 26:9–13 (Dec. 5, 2017 AM Session). And although Mr. Hyatt's image

processing system had a computer, display monitors, and memory, there were no GUI

functions such as point and click or drag and drop. *Id.* at 25:8–27:22 (Hyatt).

220.   All of the language cited by Dr. Castleman in his testimony appears in the

portion of Mr. Hyatt's Reply Brief that addresses whether the claims of the '211 application

were obvious in light of the prior art. *Compare* DX2010.150 (beginning of obviousness

section in Reply Brief), *with* Trial Tr. 164:6–170:3 (Jan. 18, 2018) (Castleman).

221.    Dr. Castleman, moreover, did not cite to the section of Mr. Hyatt's Reply

Brief that addressed written description. Those include:

- PTX-4.04214: "One configuration of geometric processing is implanted by computationally defining certain parameters of a **window** and then scanning out the portions of image memory seen through the **window** in a raster scan referenced to the **window**." *See also* Trial Tr. 240:23–241:12 (Jan. 19, 2018) (Castleman testimony stating he did not reference this portion of Hyatt's Reply Brief in expert report).

- PTX-4.04179: "The **geometric processor** can be considered to implement a **window** that is superimposed on image memory, where the **window** can represent the viewport and the portions of the image seen through the **window** can be displayed on the viewport." *See also* Trial Tr. 241:13–242:10 (Jan. 19, 2018) (Castleman testimony stating he did not reference this portion of Hyatt's Reply Brief in expert report).

Dr. Castleman conceded during cross-examination that these portions of the Reply Brief are

consistent with the description of windows being a portion of image memory mapped out

for display or processing. Trial Tr. 240:23–242:10 (Jan. 19, 2018).

222.    Mr. Hyatt testified that he addressed written description for "windows" in its

own section of the Reply Brief (entitled "The Disclosure Has Verbatim Written Description

of the 'Window' Claim Limitations") because he "wanted to make that very apparent to the

Board of Appeals." Trial Tr. 24:8–25:8 (Dec. 5, 2017 AM Session) (citing DX2010.72–73

(identical to PTX-4.04214 section referenced above). In contrast, Mr. Hyatt testified that the

other sections relied upon by Dr. Castleman (which, as shown above, dealt with

"obviousness") were intended to demonstrate that "windows in a cockpit are different than

the incremental transform windows in…[his] image processing system." Trial Tr. 27:23–

28:25 (Dec. 5, 2017 AM Session) (Hyatt) (citing DX2010.184).

223.    Dr. Castleman has no specific expertise in interpreting legal pleadings such as Mr. Hyatt's Reply Brief. Trial Tr. 238:21–239:4 (Jan. 19, 2018) (Castleman). Dr. Castleman also lacks first-hand knowledge of what Mr. Hyatt intended to convey with his Reply Brief. *See* Trial Tr. 244:11–23 (Jan. 19, 2018) (Castleman) (citing DX2050 at slide 13).

224.    The Court therefore finds that the Disclosure, not Mr. Hyatt's Reply Brief before the Board, is the best interpretative aid for construing the term "window" for written description purposes. Alternatively, and for the reasons set forth above, the Court finds that the Reply Brief does not alter the Disclosure's use of the term windows as a portion of image memory scanned out for display or processing.

**J.    The Disclosure Describes "Menu" As An On-Screen Display of Options Presented To A User For Selection**

225.    Claims 134, 172, 199, 236, 250, 268, 271, 316, 375, 381, 385, 390, 394, 424, 449, 459, 472, 503, 508, and 509 use the term "menu information" as a limitation; claims 449, 459, and 472 use the term "menu window" as a limitation.

226.    The parties differ on their construction of "menu." The PTO contends that the term menu, as claimed, requires GUI functionality, which is not described in the Disclosure. *See* Trial Tr. 119:10–121:15, 131:7–132:7, 156:22–159:13 (Jan. 18, 2018). Mr. Hyatt contends that GUI functionality is not used in his image processing system. *See, e.g.*, Trial Tr. 30:3–19 (Dec. 5, 2017 AM Session).

227.    The Court finds that the term "menu" as an on-screen display of options presented to a user for selection. *See* Trial Tr. 52:19–21 (Dec. 6, 2017 AM Session) (Hite) ("[A] skilled artisan would realize that menu is an on-screen display of options presented to a user for selection."). This definition is consistent with the common and normal usage of the term "menu" in the electrical arts in 1984, as shown by the computer dictionaries that

Dr. Castleman cited in his expert report. *See* PTX-805.00048 ¶ 104 (noting that Charles

Prenis's The Computer Dictionary, "published in 1983, defines 'menu' as '[a] list of

alternatives presented by a program for the user to choose among'" (emphasis omitted));

PTX-805.00050 ¶ 108 (noting that Que's Computer User's Dictionary, "published in 1991,

defines 'menu' as '[a]n on-screen display that lists the choices available to the user'").

228.    In this regard, the Disclosure describes the use of the image processing system

to construct a menu in the form of an image comprised of alphanumeric information. In the

portion of the Disclosure describing overlays, the Disclosure explains that "graphic overlays

can be referenced to the viewport and can be fixed to the viewport; such as with a viewport

frame, alphanumeric characters, and other features that are to remain stationary in the

viewport." PTX-4.7943. Testifying about this passage from the Disclosure, Mr. Hite offered

his expert opinion that, "to a skilled artisan the image with alphanumeric information that

was stationary would be recognized as… [a] menu…." Trial Tr. 55:23–56:13 (Dec. 6, 2017

AM Session).

229.    Similarly, Mr. Hyatt testified that "[a] menu is another one of the many

images that I describe that can be overlaid on the background and on other images." Trial

Tr. 30:3–14 (Dec. 5, 2017 AM Session). In this respect, Mr. Hyatt testified that

"alphabetical characters, words and…numbers" can be overlaid "on the other images for

various purposes such as notes for the user, symbols, things of that nature…. So the menus

implemented with alphanumerics would be overlaid on the images as disclosed and

claimed." Trial Tr. 47:15–22 (Dec. 4, 2017 PM Session); *see also* Trial Tr. 30:3–14 (Dec. 5,

2017 AM Session) (Hyatt) ("[T]he menu is merely provided as an image to the operator.

And then if the operator wants to select something from the menu, he would go over to the computer terminal and to press a number key on the keyboard.").

230.    The menu on the display screen is one of many images described in the Disclosure and processed by the image processor for display. Mr. Hyatt testified that "the supervisory processor is disclosed as providing images into the image processor in particular menus." Trial Tr. 48:8–10 (Dec. 4, 2017 AM Session). He further testified that "we have various ways of getting imagery into the image memories, which are sort of a way to combine images from different sources from the input image sources to the left, to the supervisory processor which can provide images from various external sources and from user created sources like menus and the like." Trial Tr. 48:17–22 (Dec. 4, 2017 AM Session).

231.    Mr. Hite testified that "[a] menu is another type of image as described in the specification. The source of the menu image could be…a database. That database could be represented in an image source, or it could be the memory of the supervisory processor. Another condition that's described in the specification is where the supervisory processor could directly write the menu information into an image memory of the geometric processor represented by the purple block. So the images in these geometric processor channels are all handled in the same manner for where they can come either from a database, or a -- the supervisory processor as described in the specification." Trial Tr. 5:24–6:11 (Jan. 18, 2018).

232.    The menu images, like all images described in the Disclosure, are then scanned out for display. Mr. Hite testified that "all of these image memories, including the menu image, are handled in the similar manner where the image memories are scanned out and they would be displayed on the image processor screen." Trial Tr. 7:6–9 (Jan. 18, 2018).

233.   Mr. Hite further testified that Figure 1A provides additional written description for menu and explained how it was interconnected with the other components of the disclosed system:

> And the menu itself would reside in a, now a fourth geometric module channel located at the bottom in the purple box. No geometric processing is performed in this case. And then that would be presented to the geographic mux/demux for overlay with the other images from their respective geometric module or geometric processor channels.
>
> Q. And does figure 1A also provide additional written description support for claim 172?
>
> A. Yes, that provides the interconnection between the various claim elements.

Trial Tr. 56:25–57:9 (Dec. 6, 2017 AM Session).

234.   Mr. Hyatt further testified that menus are old in the art, but that his Disclosure did not include menus with respect to a graphical user interface: "The menus are a very important part of computer technology. They've been known for many, many, many decades in a general form. And I used them in the image processing system as images to guide the operator. And then the operator used what was conventional in the field, a keyboard, completely different than the point and click type approach in the graphical user interface." Trial Tr. 30:25–31:6 (Dec. 5, 2017 AM Session); *see also* Trial Tr. 34:10–17 (Dec. 5, 2017 AM Session) (Hyatt) (confirming that the Disclosure does not disclose a point and click type function because "[i]t's an image processing system not a personal computer system").

235.   Dr. Castleman's testimony illustrated how this type of menu could appear. Dr. Castleman testified that in his slide presentation, he overlaid a menu comprised of alphanumerics on a still photograph of terminal screen of the experimental system:



DX2050 at slide 18; Trial Tr. 261:1–262:9 (Jan. 19, 2018) (Castleman). In this respect, Dr.

Castleman confirmed it was useful to use the image processing system to overlay an

alphanumeric (non-GUImenu on the still image. Trial Tr. 261:25–262:16 (Jan. 19, 2018)

(Castleman).

236.    Dr. Castleman also agreed that "a menu is a list of options that are available

to the operator at any particular time." Trial Tr. 119:10–12 (Jan. 18, 2018). However, Dr.

Castleman required that a menu also contain GUI functionality. *See id.* at 119:10–121:15.

For the reasons discussed above regarding "windows," Dr. Castleman's testimony that

menu requires GUI functionality is equally unpersuasive and not credible.

237.    The Disclosure describes an on-screen display of options, on the image

display, presented to a user for selection in other ways as well. For example, the Disclosure

describes that "[a]n image can be constructed by selection of a background image and

89

overlaying objects on the image interactively by the architect." PTX-4.08013–14. Mr. Hite

offered the opinion that "a skilled artisan would recognize" this "on-screen display of

options presented to the user for a selection…as a menu." *See* Trial Tr. 53:23–54:17 (Dec. 6,

2017 AM Session) (Hite).

238.    Mr. Hite further explained how the skilled artisan could use the Disclosure to

construct a composite image from the menu of options displayed on the screen in the

context of the disclosed landscape architecture application:

> [F]or example, the architect can select a shrub as an overlay object. An
> example of this would be you could construct it out of a couple of overlaying
> images where the one would be kind of visualized as a paned window that
> might contain nine sections…. And the architect could, for example, use a
> joystick to move through the list or display of objects. And they would pretty
> much be framed in the window…. And then depending on which one you
> would see within the panel display you would read the numeric code off and
> go over to the keyboard and type that, and then that image would then be
> subsequently moved into an image memory and be available for manipulation
> by the architect.

Trial Tr. 54:21–55:22 (Dec. 6, 2017 AM Session) (Hite).

239.    The Disclosure also describes the use of software to control a menu-driven

interface from which the operator can select options. *See* PTX-4.07800 ("The programs are

programed to be menu driven, prompting the operator to select various operator-selectable

options."). Considering this passage from the Disclosure, Mr. Hite offered his expert

opinion that an expert artisan would understand this passage as "provid[ing] written

description of software presenting menus for the operator to select things." Trial Tr. 52:22–

53:2 (Dec. 6, 2017 AM Session).

240.    Beyond simply disclosing the use of software to control a menu-driven

interface, the Disclosure specifically describes the use of a supervisory processor generating

menu image information through the "LD.ASC program" at lines 112–142, 170–482, and

523–528 of the BASIC software code, with the menu information displayed in an alphanumeric format. PTX-4.08101–8102. For example, line 136 provides a "SQUARE PATTERN" which can be selected by operator input "8." *Id.*; *see also* Trial Tr. 24:11–23 (Dec. 4, 2017 PM Session) (Hyatt); Trial Tr. 33:8–23 (Dec. 5, 2017 AM Session) (Hyatt) (testifying that the LD program is used to load image memory and to select different patterns that Mr. Hyatt had programmed for geometric processing as part of the experimental system). Considering the software that Mr. Hyatt disclosed regarding the use of menus, Mr. Hite offered his expert opinion that an artisan would understand it as providing additional written description support for menu. *See* Trial Tr. 53:3–22 (Dec. 6, 2017 AM Session).

241.    For the reasons discussed above, the Court finds that the Disclosure provides adequate written description for "menu information" and "menu window," which do not have any GUI capabilities (*supra* ¶¶ 196–207).

### K.    The Disclosure Describes "Icon" As A Small Image Displayed On A Screen To Represent An Object

242.    Claims 159, 236, 415, and 510 all include "icon" as a limitation. The parties again differ on their construction of "icon." The PTO contends that the term icon, as claimed, requires GUI functionality, which is not described in the Disclosure. *See* Trial Tr. 191:16–192:10 (Jan. 19, 2018) (Castleman). Mr. Hyatt contends that GUI functionality is not claimed. *See, e.g.*, Trial Tr. 59:24–60:17 (Dec. 4, 2017 PM Session).

243.    The Disclosure "describes an icon as a primitive that can be…provided for overlay …. And a skill[ed] artisan would recognize an icon as a small image displayed on a screen to represent an object." Trial Tr. 20:20–25, 20:20–21:6 (Dec. 6, 2017 AM Session)

(Hite testimony regarding icon); Trial Tr. 59:24–60:7 (Dec. 4, 2017) (Hyatt testimony that "[a]n icon is a small photographic symbol used to identify a feature of a bigger image").

244.    Support for this description can be found at PTX-4.07963, which states that, "[i]n non-real world applications, an unlimited amount of terrain can be constructed with a relatively small amount of database memory by overlaying terrain primitives stored in the database. The primitives can include forested terrain, desert terrain, hilly terrain, mountainous terrain, cultural features, graphics, alphanumeric, icons, and other such primitives." *Accord* Trial Tr. 20:20–21:6 (Dec. 6, 2017 AM Session) (Hite); Trial Tr. 59:24–60:7 (Dec. 4, 2017 PM Session) (Hyatt); *see also id.* at 57:2–3 (Hyatt) ("Cursors and icons are well-known for identifying locations."); *id.* at 49:5–10 (Hyatt testimony that an "icon" could aid "a pilot in identifying a feature on the ground and its location").

245.    Dr. Castleman testified that the Disclosure "describes icons as small graphic symbols…" Trial Tr. 274:10–12 (Jan. 19, 2018). He also testified that "small graphic symbols can be used to demark the location of specific objects or areas. *Id.* at 274:13–12 (Jan. 19, 2018); *see also id.* at 190:15–191:15 (Jan. 19, 2018) (Castleman); *supra* ¶ 71 (Hyatt testimony identifying center of image memory as an icon).

246.    The icon described in Disclosure was not an icon used in a graphical user interface and did not have point and click functionality. Mr. Hyatt testified that his icons could not execute a program. Trial Tr. 60:11–17 (Dec. 4, 2017 PM Session); *see also* Trial Tr. 21:16–23 (Dec. 5, 2017 AM Session) (Hyatt) ("These are just simple symbols that are used to annotate or identify locations or the like in the images. They are not -- they don't have the ability to control anything. They are just small images that are overlaid on other images."). Mr. Hite also confirmed that the icon described in the Disclosure is not a graphical user

interface icon. Trial Tr. 21:7–22:1 (Dec. 6, 2017 AM Session) (testimony that icons in Disclosure had no GUI capabilities).

247.    While it describes a user interactive system, the Disclosure does not describe a graphical user interface and there is nothing in the Disclosure or in the claims of the '211 application that suggests an icon can be employed in the same way an icon in a GUI system can be employed, such as via point and click or drag and drop. *Supra* ¶¶ 196–207. Therefore, there is nothing in the Disclosure that suggests that the icon recited in the claims of the '211 application should be construed as a GUI icon.

248.    Accordingly, the Court finds that the broadest reasonable interpretation of the term "icon" as used in the claims is a small image displayed on a screen to represent an object and that the Disclosure adequately describes icons. The Court further construes the term icon, as used in the claims, to lack any graphical user interface characteristics.

**L.    The Claims of the '211 Application Have Adequate Written Description Support**

249.    As detailed above, the Court finds that the Disclosure provides adequate written description for background image information, 3D perspective image information, textured image information, graphic image information, video image information, irregular image information, alphanumeric image information, alphanumeric image information, database image information, data compressed image information, data decompressed image information, data compressed and data decompressed video image information, overlaid image information, and icon image information. The Court also finds that the Disclosure provides adequate written description for the overlaying, overlapping, and occulting of each of these images.

250.    As detailed above, the Court finds that the Disclosure provides adequate written description for scanout circuitry to scanout a window of each type of image information from image memory, the scanning out of each of these images in a window, and the processing of the windows of each of these images.

251.    As detailed above, the Court finds that the Disclosure provides adequate written description for a database memory or database memories, an image memory or image memories, a disk memory or memories, a buffer memory or memories, and a supervisory computer memory or memories. The Court also finds that the Disclosure provides adequate written description for the storing of each of these types of image information in the database memory or memories, in the image memory or memories, in the disk memory or memories, in the buffer memory or memories, and in the supervisory computer memory or memories.

252.    As detailed below, the Court finds that the Disclosure provides adequate written description for display of a scanned out window of each of these types of image information. And as further discussed below, the Court finds that the Disclosure provides adequate written description for geometric processing of these images including rotation, translation, spatial compression, spatial expansion, 3D perspective, and warping.

253.    These terms are used as limitations in the claims of the '211 application or otherwise demonstrate interconnections. Additional limitations, as they arise in the claims, are discussed in more detail below.

254.    There exist four types of claims before the Court. First, claims 131, 139, 151, 156, 175, 196, 202, 210, 252, 266, 274, 276, 282, 287, 290, 298, 306, 314, 322, 399, 405, 410, 420, 428, 434, 439, 443, 463, 467, 477, 482, 487, 491, 496, 500, 501, 502, 504, 505, 511, 512,

and 513 of the '211 application recite a "window" of some type of information as a limitation without reciting "menu" or an "icon" (otherwise known as the "**window claims**"). Second, claims 134, 172, 199, 250, 268, 271, 316, 375, 381, 385, 390, 394, 424, 449, 459, 472, 503, 508, and 509 recite the term "menu" as a limitation (the "**menu claims**"). Third, claims 159, 236 (which also recites "menu" as a limitation), 415, and 510 recite "icon" as a limitation (the "**icon claims**"). Fourth, claims 126, 132, 135, 152, 157, 160, 168, 169, 173, 174, 176, 177, 195, 197, 200, 211, 221, 222, 235, 237, 238, 251, 253, 254, 256, 267, 269, 272, 273, 275, 277, 283, 285, 288, 289, 291, 299, 307, 315, 317, 318, 323, 329, 331, 332, 334–336, 338, 340, 341, 343–346, 348–358, 360–367, 369, 377, 379, 380, 382, 383, 384, 386, 388, 389, 391, 393, 395, 398, 401–404, 406, 408, 409, 411, 413, 414, 416–419, 421, 423, 425, 427, 430, 432, 433, 435–438, 440, 442, 445, 447, 448, 450, 452, 453, 455, 457, 458, 460–462, 464, 466, 468–471, 473–476, 478, 480, 481, 483–486, 488, 490, 492, 494, 495, and 497–499 are the "**making the product claims**."

255.    Other than testifying that particular limitations of the claims lacked adequate written description support, Trial Tr. 182:20–25, 189:1–14, 193:23–194:2 (Jan. 19, 2018) (Castleman testimony regarding "window," "menu" and "icon"), Dr. Castleman only testified about claims 131, 172, 394, 415, and 472. *See, e.g.*, Trial Tr. 116:3–15, 172:11–25 (Jan. 18, 2018) (Castleman testimony regarding claims 172 and 394); Trial Tr. 179:10–16, 191:16–25, 267:22–268:1 (Jan. 19, 2018) (Castleman testimony regarding claims 472, 415, and 131). And other than disputing these specific matters, Dr. Castleman did not testify that any particular claims lacked adequate written description support.

1.     Figure 1A (Simplified)

256.     In analyzing the claims of the '211 application, Mr. Hite used Figures 1A, 1B,

1C, and 1D to demonstrate the interconnections between the limitations of each claim:



PTX-912 at slide 10; Trial Tr. 57:20–58:2 (Dec. 5, 2017 PM Session); *see generally* Trial Tr.

54:15–58:2 (Dec. 5, 2017 PM Session).

257.     "Typically, these [process claims] will recite generating some type of

information, and then that's an instance performed mainly by the geometric processor. Then

there will be an overlaying component where the windows of image information or other

images are overlaid to create a new image, and then that will be displayed for visual

presentation." Trial Tr. 65:19–66:8 (Dec. 5, 2017 PM Session) (Hite).

258.     Mr. Hite testified that these claims typically: (1) recite limitations that

generate image information; (2) then overlay the information that has been generated; and

(3) display the information for viewing. *See* Trial Tr. 66:6–69:10 (Dec. 5, 2017 PM Session)

(citing PTX-912 at slides 22–25). "And we'll see that that's a common theme that is found in every claim. And the types of image and image windows will be the different types of data, but they all pretty much follow this same relationship of generating, overlaying, and display." Trial Tr. 69:11–16 (Dec. 5, 2017 PM Session) (Hite).

>       2.   <u>Claim 131</u>

259.   Mr. Hite testified that claim 131 "has a lot of general features and claim elements" common to other claims at issue. Trial Tr. 65:17–23 (Dec. 5, 2017 PM Session). Claim 131 (one of the claims of the Helicopter Training Simulator Application) recites:

> A process comprising the acts of:
>
> [1] generating background image information;
>
> [2] generating a first window of three dimensional perspective image information;
>
> [3] overlaying the first window of three dimensional perspective image information onto the background image information;
>
> [4] generating a second window of three dimensional perspective image information;
>
> [5] overlaying the second window of three dimensional perspective image information onto the background image information overlapping with the first window of three dimensional perspective image information; and
>
> [6] displaying a background image overlaid by a first window of three dimensional perspective images and overlaid by an overlapping second window of three dimensional perspective images in response to the background image information overlaid with the first window of three dimensional perspective image information and in response to the background image information overlaid with the overlapping second window of three dimensional perspective image information.

DX2003.3.

260.   Slide 25 from PTX-912 illustrates the claim limitations of generating, overlaying, and displaying in reference to claim 131:



261.    As detailed above, the Disclosure provides adequate written description support for: (1) limitation 1 (background image information); (2) limitations 2 and 4 (3D perspective image information); (3) limitations 3 and 5 (overlaying the windows onto the background and/or another window); and (4) windows. *See also* Trial Tr. 69:17–77:5 (Dec. 5, 2017 PM Session) (Hite) (citing PTX-912 at slides 26–35) (identifying adequate written description support for claim 131); Trial Tr. 4:14–10:20 (Dec. 6, 2017 AM Session) (Hite) (citing PTX-912 at slides 36–41) (same). Limitation 6 of claim 131 is "displaying" the previously generated and overlaid windows of image information.

262.    The Disclosure describes processing an image with the geometric processor and then scanning it out for display on a monitor in the context of the experimental system, one particular embodiment of the Disclosure that was actually reduced to practice by Mr. Hyatt. PTX-4.07584; *see also* PTX-4.07586 (noting that the display used for the experimental system was a Barco 13-inch CRT color monitor). The Disclosure describes the use of a CRT monitor, which is a display device, in other places as well. *See* PTX-4.07583 (listing the "CRT monitor" on the "MODULAR CONFIGURATION FEATURES TABLE" under the heading "video output interface"); PTX-4.07586.

263.    Different types of display monitors are adequately described in the Disclosure at PTX-4.07615–7616: "Also, the display monitor can be implemented with a calligraphic CRT display monitor, a liquid crystal display monitor, a plasma display monitor, and other display monitors."

264.    Based on the portions of the Disclosure set forth at PTX-4.07584 and PTX-4.07583, Mr. Hite offered his expert opinion that a skilled artisan would find that the Disclosure adequately described the "displaying" limitation of Claim 131. Trial Tr. 12:5–9 (Dec. 6, 2017 AM Session) (Hite).

265.    Mr. Hyatt likewise testified that, in the context of Claim 131, the Disclosure "specifically describes windows of image information that are incrementally transformed and one of the incremental transforms is three-dimensional perspective information…. [W]e get a three-dimensional perspective transform by scanning out…[a] three-dimensional transform window to the display." Trial Tr. 4:18–5:6 (Dec. 5, 2017 AM Session) (Hyatt).

266.    The Disclosure explains the windows of image information that are set forth in the "display" limitation of Claim 131 are the same portions of image information that are scanned out of image memory: "the displayed image scanned-out of image memory relative to the position of the image in image memory. Effectively, these rotation and translation initial conditions place a display window over the image memory map…." PTX-4.07653; *see also* Trial Tr. 10:12–18 (Dec. 5, 2017 AM Session) (Hyatt) (explaining that the same window of image information that is geometrically processed is scanned out through the window geometry to be displayed on the display monitor); Trial Tr. 13:7–18 (Dec. 5, 2017 AM Session) (Hyatt) ("Can you explain the display function in your application? A. Yes. Basically the image information is generated in the initial part of the claim. It's then recited

as being overlaid in the middle of the claim. And then what has been generated and overlaid in the top part of the claim is then being displayed. So that the displayed image merely recites what has been generated in the top part of the claim.").Therefore, the Disclosure provides adequate written description support for the displaying limitation of Claim 131.

267.    Mr. Hite testified that the Disclosure provides adequate written description support for claim 131. Mr. Hite testified how all the limitations of claim 131 fit into his Figure 1A (Simplified) in slide 46 of PTX-912:



Well, you can see that the various images are resident within the geometric modules 110A block. So what this is depicting is the output of the geometric modules block is essentially the generating step.

So the images are stored in an image memory, and then the geographic module would perform the window scanout and some other possible geometric operations. So for the first one, which is the background image, it's stored in an image memory and then it [is] scanned out with no modification. That's why the second block there is blank.

The second item down which corresponds to our 3D perspective window in the claim element, there would be an image stored in an image memory. The geometric processor for that channel would scan out and process the window of information. And then perform a 3D perspective geometric operation on it. And then the output by that would be the 3D perspective image window information.

Same argument pertains to the green item below it. And that would make -- the red one would be window 1, and the green one is window 2. So [they] are passed into the geometric mux/demux combiner 110D. And that block maps up to our overlaying function from the other picture.

So looking [at] how it's presented here, the priority of the occulting is from bottom going to the top. So the green box would be placed, in this example, on top or overlapping the red box. And both of them would appear overlaid on top of the background image.

And that processed image would then be presented to the output device, which is our displaying function. And now you can see the results of that overlaying operation where the green 3D perspective image window overlays the red 3D perspective image window. Both of them are overlaying the background. And the red is overlaying the background, too, as described in the -- or recited in the claim elements.

Q. So does Figure 1A also provide written description support for claim 131?

A. Yes. Figure 1A shows where the operations are performed and interconnections between how they're recited in the claim elements.

Trial Tr. 12:10–14:3 (Dec. 6, 2017 AM Session).

268.    Therefore, the Court finds that the Disclosure provides adequate written description support for claim 131 including the interconnections.

3.    The Disclosure Provides Adequate Written Description Support For The Window Claims

269.    Claim 139. Claim 139 recites:

A system comprising:

[1] means for generating background image information;

[2] means for generating a first window of graphics image information;

[3] means for overlaying the first window of graphics image information onto the background image information;

[4] means for generating a second window of three dimensional perspective image information;

[5] means for overlaying the second window of three dimensional perspective image information onto the background image information nonoverlapping with the first window of graphics image information; and

[6] means for displaying a background image overlaid by a first window of graphics images and overlaid by a nonoverlapping second window of three dimensional perspective images in response to the background image information overlaid with the first window of graphics image information and in response to the background image information overlaid with the nonoverlapping second window of three dimensional perspective image information.

DX2003.4–5.

270.    As described above, the Disclosure provides adequate written description support for limitations 1, 2, 3, 4, 5, and 6 of claim 139 (including "windows"). Mr. Hite also testified that the Disclosure provides adequate written description support for claim 139, including the interconnections for the different claim limitations. Trial Tr. 14:4–18:14 (Dec. 6, 2017 AM Session) (citing PTX-912 at slides 47–51); *see also* Trial Tr. 16:25–17:19 (Dec. 6, 2017 AM Session) (Hite testimony that "nonocculting images or nonoverlapping [images]" is the opposite of overlapping and occulting images and is supported by the same written description).

271.    Therefore, the Court finds that the Disclosure provides adequate written description support for claim 139 including its interconnections.

272.    <u>Claim 156.</u> The Court has already found adequate written description support for background image information, 3D-perspective image windows, graphic image windows, overlaying and overlapping of the windows, and displaying the various limitations. DX2003.5–6.

273.     Mr. Hite testified that the Disclosure provides adequate written description support for claim 156, including the interconnections for the different claim limitations. Trial Tr. 18:15–19:25 (Dec. 6, 2017 AM Session) (citing PTX-912 at slides 52–54).

274.     Therefore, the Court finds that the Disclosure provides adequate written description support for claim 156 including the interconnections.

275.     <u>Claim 196.</u> The Court has already found adequate written description support for two windows of 3D perspective images, one of which occults the other. DX2003.10.

276.     Mr. Hite testified that the Disclosure provides adequate written description support for claim 196, including the interconnections for the different claim limitations as evidenced by Figure 1A. Trial Tr. 22:23–24:23 (Dec. 6, 2017 AM Session) (citing PTX-912 at slides 59–62).

277.     Therefore, the Court finds that the Disclosure provides adequate written description support for claim 196 including the interconnections.

278.     <u>Claim 252.</u>  The Court has already found adequate written description support for two windows of three dimensional perspective information, one of which occults the other in part, with both windows being displayed. DX2003.15.

279.     Mr. Hite testified that the Disclosure provides adequate written description support for claim 252, including the interconnections for the different claim limitations as evidenced by Figure 1A. Trial Tr. 24:24–26:12 (Dec. 6, 2017 AM Session) (citing PTX-912 at slides 63–65).

280.     Therefore, the Court finds that the Disclosure provides adequate written description support for claim 252 including the interconnections.

281.   <u>Claim 202.</u> Claim 202 recites a new limitation, "decreasing the size":

A system comprising:

[1] means for generating a first window of three dimensional perspective image information;

[2] means for generating a second window of three dimensional perspective image information;

[3] means for overlaying the second window of three dimensional perspective image information onto the first window of three dimensional perspective image information; and

[4] means for decreasing the size of the second window of three dimensional perspective image information.

DX2003.11. The Court has already found that the Disclosure provides adequate written description support for limitations 1 and 2 (3D perspective image information and windows) and limitation 3 (overlaying the windows). Limitation 4 recites "decreasing the size."

282.   The Disclosure describes (at PTX-4.08025) that "a tree image…can be…scaled." The Disclosure also describes compression and expansion. *E.g.*, PTX-4.07997–7998. Further support can be found at PTX-4.07999, which describes that "as an aircraft increases and decreases altitude, the map image is compressed and expanded, respectively." PTX-4.07999. Mr. Hite testified that all these references describe decreasing the size. Trial Tr. 27:8–29:6 (Dec. 6, 2017 AM Session); *see also* Trial Tr. 56:18–23 (Dec. 4, 2017 AM Session) (Hyatt citing Figure 1K, PTX-4.07496); Trial Tr. 6:3–7 (Dec. 4, 2017 PM Session) (Hyatt citing PTX-4.07644); *id.* at 18:24–19:23 (Dec. 4, 2017 PM Session) (Hyatt citing PTX-4.07801 and program to run experimental system); *id.* at 33:21–35:6 (Dec. 4, 2017 PM Session) (Hyatt citing PTX-4.07579); *id.* at 51:19–52:2 (Dec. 4, 2017 PM Session) (Hyatt showing compression in PTX-332 at 47:15–48:17).

283.    Dr. Castleman did not opine or testify that the Disclosure lacked adequate written description support for "compression," compressed images, or decreasing the size of images.

284.    The Court finds that the Disclosure provides adequate written description support for "decreasing the size."

285.    Mr. Hite testified that the Disclosure provides adequate written description support for claim 202, including the interconnections for the different claim limitations. Trial Tr. 26:13–29:25 (Dec. 6, 2017 AM Session) (citing PTX-912 at slides 64–71.).

286.    Therefore, the Court finds that the Disclosure provides adequate written description support for claim 202 including the interconnections.

287.    <u>Claim 194.</u> Claim 194 recites a new limitation, "cropping":

A process comprising the acts of:

[1] generating a first window of three dimensional perspective image information;

[2] generating a second window of three dimensional perspective image information;

[3] overlaying the second window of three dimensional perspective image information onto the first window of three dimensional perspective image information;

[4] generating cropping information; and

[5] cropping the second window of three dimensional perspective image information in response to the cropping information.

DX2003.10. The Court has already found that the Disclosure provides adequate written description support for limitations 1 and 2 (3D perspective image information and windows) and limitation 3 (overlaying the windows). Limitations 4 and 5 recite "cropping."

288.    Cropping is described at PTX-4.08025–8026: "[t]he tree image can be automatically cropped to an irregular external profile" and "the tree image can be automatically cropped to an internal pattern." Cropping is also described at PTX-4.07941, which provides that textured overlays can be "cropped to irregular external and even internal features." Mr. Hite testified that all these references describe cropping. Trial Tr. 30:19–31:25 (Dec. 6, 2017 AM Session); *see also* Trial Tr. 52:3–19 (Dec. 4, 2017 PM Session) (Hyatt testifying that "cropping…is essentially cutting out the portions of the figure that are really spaces so that the tree is cropped to the irregular outline....") (citing PTX-4.07581); Trial Tr. 60:13–20 (Dec. 5, 2017 PM Session) (Hite) (citing PTX-4.08024).

289.    Dr. Castleman did not opine or testify that the Disclosure lacked adequate written description support for "cropping."

290.    The Court finds that the Disclosure provides adequate written description support for "cropping."

291.    Mr. Hite testified that the Disclosure provides adequate written description support for claim 194, including the interconnections for the different claim limitations. Trial Tr. 30:1–32:21 (Dec. 6, 2017 AM Session) (citing PTX-912 at slides 72–76).

292.    Therefore, the Court finds that the Disclosure provides adequate written description support for claim 194 including the interconnections.

293.    <u>Claim 410.</u> The Court has already found adequate written description support for a background image, a 3D perspective image window, a textured image window cropped to an irregular external outline, overlaying and overlapping of the windows, and displaying all of these limitations. DX2003.44–45.

294.    Mr. Hite testified that the Disclosure provides adequate written description support for claim 410, including the interconnections for the different claim limitations. Trial Tr. 32:22–35:10 (Dec. 6, 2017 AM Session) (citing PTX-912 at slides 77–81).

295.    Therefore, the Court finds that the Disclosure provides adequate written description support for claim 410 including the interconnections.

296.    <u>Claim 151.</u> Claim 151 recites a new limitation, a "cursor":

A process comprising the acts of:

[1] generating a window of three dimensional perspective image information;

[2] generating cursor information; and

[3] overlaying the cursor information onto the window of three dimensional perspective image information.

DX2003.5. The Court has already found that the Disclosure provides adequate written description support for limitation 1 (3D perspective image information and windows) and limitation 3 (overlaying). Limitation 2 recites "cursor information."

297.    The Disclosure describes a cursor on PTX-4.07939, disclosing that graphic overlays include a cursor. Trial Tr. 36:3–11 (Dec. 6, 2017 AM Session) (Hite); *see also* PTX-4.08038.

298.    Dr. Castleman did not opine or testify that the Disclosure lacked adequate written description support for a "cursor."

299.    The Court finds that the Disclosure provides adequate written description support for a "cursor."

300.    Mr. Hite testified that the Disclosure provides adequate written description support for claim 151, including the interconnections for the different claim limitations. Trial Tr. 35:11–36:23 (Dec. 6, 2017 AM Session) (citing PTX-912 at slides 82–85).

301.    Therefore, the Court finds that the Disclosure provides adequate written description support for claim 151 including the interconnections.

302.    <u>Claim 210.</u> The Court has already found adequate written description support for a window of 3D perspective image information, alphanumeric characters, overlaying alphanumeric characters on the 3D perspective image window, and displaying the limitations. DX2003.12.

303.    Mr. Hite testified that the Disclosure provides adequate written description support for claim 210, including the interconnections for the different claim limitations. Trial Tr. 41:4–43:2 (Dec. 6, 2017 AM Session) (citing PTX-912 at slides 94–97).

304.    Therefore, the Court finds that the Disclosure provides adequate written description support for claim 210 including the interconnections.

305.    <u>Claim 175.</u> Claim 175 recites two new limitations, "operator input information" and "control information":

A process comprising the acts of:

[1] generating operator input information;

[2] generating control information in response to the operator input information;

[3] generating a window of three dimensional perspective image information;

[4] generating alphanumeric character information in response to the control information; and

[5] overlaying the alphanumeric character information onto the window of three dimensional perspective image information.

DX2003.9. The Court has already found that the Disclosure provides adequate written description support for limitation 3 (3D perspective image information and windows),

limitation 4 (alphanumeric characters), and limitation 5 (overlaying). Limitation 1 recites

"operator input information" and limitation 2 recites "control information."

306.     Operator input information and control information are described at PTX-

4.08013–8014, 7584–7585, which discloses that: (1) "[a]rchitect controls can be joystick,

keyboard, trackball, and other controls for image manipulation"; (2) "the architect can

select a shrub as an overlay object" (which will then be stored in overlay image memory);

(3) the architect can "change the overlay objects"; and (4) "[s]upervisory processor 120I also

controls operation of geometric processor 120E…to interface to operator controls 120K."

That same section also describes:

> Operator controls 120K can include controls for X-translation, Y-translation,
> compression/expansion, and rotation. These controls can be implemented in
> different ways; such as with switches, potentiometers, encoders, and other
> input devices. For convenience of implementation, a pair of joysticks, each
> having two axis of control, were selected. One joystick implements control of
> X-translation and Y-translation. The other implements control of rotation and
> compression/expansion. Operator controls 120K are interrogated by the
> supervisory processor operating under program control and scenario
> parameters are updated by the supervisory processor operating under program
> control in response to the operator control conditions for initializing
> geometric processor 120E.

PTX-4.07585; *accord* PTX-4.06935; *see also* Trial Tr. 44:7–46:5 (Dec. 6, 2017 AM Session)

(Hite) (citing PTX-912 at slides 99–102). And as discussed above, there is no dispute that the

disclosed system is user-interactive (which is different than a GUI system) and, therefore,

responds to "operator inputs which provide control information." *Supra* ¶¶ 198–200; Trial

Tr. 44:10–19 (Dec. 6, 2017 AM Session) (Hite).

307.     Dr. Castleman did not opine or testify that the Disclosure lacked adequate

written description support for "operator input information" and/or "control information."

308.   The Court finds that the Disclosure provides adequate written description support for "operator input information" and "control information."

309.   Mr. Hite testified that the Disclosure provides adequate written description support for claim 175, including the interconnections for the different claim limitations. Trial Tr. 43:10–47:7 (Dec. 6, 2017 AM Session) (citing PTX-912 at slides 98–104).

310.   Therefore, the Court finds that the Disclosure provides adequate written description support for claim 175 including the interconnections.

311.   <u>Claim 399.</u> The Court has already found adequate written description support for background image information, an alphanumeric image window, a 3D perspective image window, overlaying and overlapping of the windows, and displaying the limitations. DX2003.42.

312.   Mr. Hite testified that the Disclosure provides adequate written description support for claim 399, including the interconnections for the different claim limitations. Trial Tr. 47:8–49:2 (Dec. 6, 2017 AM Session) (citing PTX-912 at slides 105–108).

313.   Therefore, the Court finds that the Disclosure provides adequate written description support for claim 399 including the interconnections.

314.   <u>Claim 405.</u> The Court has already found adequate written description support for a background image, a graphics image window, an alphanumerics image window, overlaying the windows on the background (without overlapping the windows), and displaying the various limitations. DX2003.43–44.

315.   Mr. Hite testified that the Disclosure provides adequate written description support for claim 405, including the interconnections for the different claim limitations. Trial Tr. 49:3–23 (Dec. 6, 2017 AM Session) (citing PTX-912 at slides 109–111).

316.    Therefore, the Court finds that the Disclosure provides adequate written description support for claim 405 including the interconnections.

317.    <u>Claim 420.</u> The Court has already found adequate written description support for a background image, an alphanumerics image window, a 3D perspective image window, overlaying the windows on the background (without overlapping the windows), and displaying the various limitations. DX2003.46–47.

318.    Mr. Hite testified that the Disclosure provides adequate written description support for claim 420, including the interconnections for the different claim limitations. Trial Tr. 49:24–50:17 (Dec. 6, 2017 AM Session) (citing PTX-912 at slides 112–114).

319.    Therefore, the Court finds that the Disclosure provides adequate written description support for claim 420 including the interconnections.

320.    <u>Claim 500.</u> The Court has already found adequate written description support for a background image, graphic image windows, overlaying and overlapping the windows on the background, and displaying the various limitations. DX2003.65–66.

321.    Mr. Hite testified that the Disclosure provides adequate written description support for claim 500, including the interconnections for the different claim limitations. Trial Tr. 10:16–11:11 (Dec. 6, 2017 PM Session) (citing PTX-912 at slides 168–170).

322.    Therefore, the Court finds that the Disclosure provides adequate written description support for claim 500 including the interconnections.

323.    <u>Claim 511.</u> The Court has already found adequate written description support for a background image, alphanumeric image windows, overlaying the windows on the background, and displaying the various limitations. DX2003.73.

324.    Mr. Hite testified that the Disclosure provides adequate written description support for claim 511, including the interconnections for the different claim limitations. Trial Tr. 12:18–13:14 (Dec. 6, 2017 PM Session) (citing PTX-912 at slides 174–176).

325.    Therefore, the Court finds that the Disclosure provides adequate written description support for claim 511 including the interconnections.

326.    Claim 512. The Court has already found adequate written description support for a background image, a 3D perspective image window, a graphics image window, overlaying the windows on the background, and displaying the various limitations. DX2003.74.

327.    Mr. Hite testified that the Disclosure provides adequate written description support for claim 512, including the interconnections for the different claim limitations. Trial Tr. 13:15–14:12 (Dec. 6, 2017 PM Session) (citing PTX-912 at slides 177–179).

328.    Therefore, the Court finds that the Disclosure provides adequate written description support for claim 512 including the interconnections.

329.    Claim 513. The Court has already found adequate written description support for a background image, a graphics image window, an alphanumeric image window, overlaying the windows on the background, and displaying the various limitations. DX2003.74.

330.    Mr. Hite testified that the Disclosure provides adequate written description support for claim 513, including the interconnections for the different claim limitations. Trial Tr. 14:13–15:13 (Dec. 6, 2017 PM Session) (citing PTX-912 at slides 180–182).

331.    Therefore, the Court finds that the Disclosure provides adequate written description support for claim 513 including the interconnections.

332.   <u>Claim 276.</u> Claim 276 recites:

A process comprising the acts of:

[1] generating background image information;

[2] generating data compressed image information;

[3] generating data decompressed image information in response to the data compressed image information;

[4] generating a first window of graphics image information;

[5] overlaying the first window of graphics image information onto the background image information;

[6] generating a second window of data decompressed image information in response to the data decompressed image information;

[7] overlaying the second window of data decompressed image information onto the background image information; and

[8] displaying a background image overlaid by a first window of graphics images and overlaid by a second window of data decompressed images in response to the background image information overlaid with the first window of graphics image information and in response to the background image information overlaid with the second window of data decompressed image information.

DX2003.19–20. The Court has already found that the Disclosure provides adequate written description support for: (1) limitation 1 (background image information); (2) limitations 2, 3, and 6 (data compressed and data decompressed image information and windows); (3) limitation 3 (graphic image information and windows); (4) limitations 5 and 7 (overlaying the images and windows); and (5) limitation 8 (displaying).

333.   Mr. Hite testified that the Disclosure provides adequate written description support for claim 276, including the interconnections for the different claim limitations. Trial Tr. 15:14–19:5 (Dec. 6, 2017 PM Session) (citing PTX-912 at slides 183–186).

334. Therefore, the Court finds that the Disclosure provides adequate written description support for claim 276 including the interconnections.

335. <u>Claim 434.</u> The Court has already found adequate written description support for a data compressed and decompressed image and window, a background image, a graphics image window, overlaying and overlapping the various windows, and displaying the various limitations. DX2003.50.

336. Mr. Hite testified that the Disclosure provides adequate written description support for claim 434, including the interconnections for the different claim limitations. Trial Tr. 19:6–21:1 (Dec. 6, 2017 PM Session) (citing PTX-912 at slides 187–191).

337. Therefore, the Court finds that the Disclosure provides adequate written description support for claim 434 including the interconnections.

338. <u>Claim 287.</u> The Court has already found adequate written description support for a data compressed and decompressed image and window, a background image, a 3D perspective image window, overlaying and overlapping the various windows, and displaying the various limitations. DX2003.23.

339. Mr. Hite testified that the Disclosure provides adequate written description support for claim 287, including the interconnections for the different claim limitations. Trial Tr. 21:2–23 (Dec. 6, 2017 PM Session) (citing PTX-912 at slides 192–194).

340. Therefore, the Court finds that the Disclosure provides adequate written description support for claim 287 including the interconnections.

341. <u>Claim 439.</u> The Court has already found adequate written description support for a data compressed and decompressed image and window, a background image, an

alphanumeric image window, overlaying the various windows, and displaying the various limitations. DX2003.51.

342.    Mr. Hite testified that the Disclosure provides adequate written description support for claim 439, including the interconnections for the different claim limitations. Trial Tr. 21:24–23:13 (Dec. 6, 2017 PM Session) (citing PTX-912 at slides 195–199).

343.    Therefore, the Court finds that the Disclosure provides adequate written description support for claim 439 including the interconnections.

344.    Claim 428. The Court has already found adequate written description support for a data compressed and decompressed image and window, a background image, a window of textured image cropped to an irregular shape,[7] overlaying the various windows and images, and displaying the various limitations. DX2003.48–49.

345.    Mr. Hite testified that the Disclosure provides adequate written description support for claim 428, including the interconnections for the different claim limitations. Trial Tr. 23:14–25:8 (Dec. 6, 2017 PM Session) (citing PTX-912 at slides 200–203).

346.    Therefore, the Court finds that the Disclosure provides adequate written description support for claim 428 including the interconnections.

347.    Claim 502. The Court has already found adequate written description support for data compressed and decompressed images and windows, a background image, overlaying and overlapping the various windows and images, and displaying the various limitations. DX2003.67.

---

[7] The same support for cropping in claim 194 (PTX-4.07941) supports "cropping to an irregular shape" in claim 428. *Supra* ¶¶ 287–292.

348.    Mr. Hite testified that the Disclosure provides adequate written description support for claim 502, including the interconnections for the different claim limitations. Trial Tr. 25:9–27:3 (Dec. 6, 2017 PM Session) (citing PTX-912 at slides 204–208).

349.    Therefore, the Court finds that the Disclosure provides adequate written description support for claim 502 including the interconnections.

350.    Claim 504. The Court has already found adequate written description support for data compressed and decompressed images and windows, a background image, overlaying the various windows and images, and displaying the various limitations. DX2003.68–69.

351.    Mr. Hite testified that the Disclosure provides adequate written description support for claim 504, including the interconnections for the different claim limitations. Trial Tr. 27:4–28:20 (Dec. 6, 2017 PM Session) (citing PTX-912 at slides 209–213).

352.    Therefore, the Court finds that the Disclosure provides adequate written description support for claim 504 including the interconnections.

353.    Claim 505. The Court has already found adequate written description support for a data compressed and decompressed image and window, a background image, a 3D perspective image window, overlaying the various windows and images, and displaying the various limitations. DX2003.69.

354.    Mr. Hite testified that the Disclosure provides adequate written description support for claim 505, including the interconnections for the different claim limitations. Trial Tr. 28:21–30:9 (Dec. 6, 2017 PM Session) (citing PTX-912 at slides 214–218).

355.    Therefore, the Court finds that the Disclosure provides adequate written description support for claim 505 including the interconnections.

356.   <u>Claim 443.</u> Claim 443 recites four new limitations, "translation," "zoom," "rotation," and "roaming":

A process comprising the acts of:

[1] generating background image information;

[2] generating translation information;

[3] generating zoom information;

[4] generating rotation information;

[5] generating first three dimensional perspective image information;

[6] generating second three dimensional perspective image information;

[7] displaying a background image overlaid by a first display window in response to the background image information and in response to the first three dimensional perspective image information;

[8] displaying the background image overlaid by a second display window in response to the background image information and in response to the second three dimensional perspective image information;

[9] displaying roaming through the first display window in response to the first three dimensional perspective image information, in response to the translation information, in response to the zoom information, and in response to the rotation information; and

[10] displaying roaming through the second display window in response to the second three dimensional perspective image information, in response to the translation information, in response to the zoom information, and in response to the rotation information.

DX2003.52.

357.   The Court has already found that the Disclosure provides adequate written description support for: (1) limitation 1 (background image information); (2) limitations 5 and 6 (3D perspective image information and windows); and (3) limitations 7 and 8 (overlaying the windows onto the background and/or another window and displaying the overlaid image information). Limitation 2 of claim 443 is "translation information,"

limitation 3 of claim 443 is "zoom information," limitation 4 of claim 443 is "rotation information," and limitations 8–10 are displaying "roaming" through the display windows of image information.

358. The Disclosure describes the generation of simulated motion with translation, zooming, and rotation upon the background image information. The Disclosure describes moving map display applications, in part, with "[o]bserver motion, such as motion of an aircraft, is simulated." PTX-4.07997–7998. "Translation" is used to simulate motion "in a particular direction, [as] translation of the image processor window in the related direction provides translation of the map in the display as the aircraft flies over the related terrain." PTX-4.07997. "Rotation" is used to simulate turns of the aircraft, because, "[a]s the aircraft changes heading, rotation of the image processor window provides rotation of the map in the display as the aircraft rotates over the related terrain." PTX-4.07997. Finally, "zooming" would be used to show changes in altitude. "As the aircraft decreases altitude, expansion of the image processor window provides expansion of the map in the display as the aircraft flies over the related terrain." PTX-4.07998; *see also generally* PTX-4.07997–7998.

359. "[T]he zoom operation…can either be a compression or expansion of the image process[ing] window depending on if you are zooming in or zooming out." Trial Tr. 46:25–47:3 (Dec. 6, 2017 PM Session) (Hite); *see also* Trial Tr. 47:14–15 (Dec. 6, 2017 PM Session) (Hite) ("[C]ompress and expand are…zoom operations.").

360. The "translation" operation "means translat[ing] the position" and is equivalent to "scrolling across the window." Trial Tr. 47:19–23 (Dec. 6, 2017 PM Session) (Hite).

361. Mr. Hite testified that the Disclosure describes the zooming, translation, and rotation functions through processing by the geometric processor 110A in Figure 1A. Trial Tr. 46:15–19 (Dec. 6, 2017 PM Session) (Hite); *see also* PTX-912 at slide 272.

362. Moreover, the Disclosure describes geometric processing in the manner of rotation, translation, and expansion/compression specifically in the context of overlays and occulting priorities. *See* PTX-4.07577; *see also* PTX-912 at slide 274.

363. Based on the portions of the Disclosure set forth at PTX-4.07997–7998 and PTX-4.07577, Mr. Hite offered his expert opinion that a skilled artisan would find that the Disclosure adequately described rotation, translation, and expansion/compression (i.e., zooming) of image information. *See* Trial Tr. 50:8–14 (Dec. 6, 2017 PM Session) (Hite).

364. The Disclosure likewise describes roaming through an image. In the portion of the Disclosure entitled "[d]iscussion of Fig[ures] 1L [t]o 1O," which discusses "image processing having rotation, translation, and compression of an image to further illustrate various features of the present invention," PTX-4.07602, the Disclosure explains that an "output image can roam through the input memory map; such as by transferring a portion of the input memory map; properly rotated, translated, scaled, and otherwise processed; into the output memory map for displaying of a rotated, translated, scaled and otherwise processed portion of the image in the memory map stored in input memory…on [the] display monitor…." PTX-4.07610; *see also* PTX-4.08027 (noting that "[t]he operator [of the image processing system] can [] selectively roam over the image….").

365. The Disclosure further describes displaying roaming in the context of specific uses for Mr. Hyatt's innovative image processing technology. For example, in the portion of the Disclosure discussing "display applications," the Disclosure describes a medical

investigator "control[ling] the system to roam through the image and zoom [in] on key points" or "roam[ing] across the image to an area of interest." PTX-4.07995.

366.     Based on the portions of the Disclosure set forth at PTX-4.07610 and PTX-4.07995, Mr. Hite offered his expert opinion that a skilled artisan would find that the Disclosure adequately described displaying roaming. *See* Trial Tr. 50:12–14 (Dec. 6, 2017 PM Session) (Hite).

367.     Dr. Castleman did not opine or testify that the Disclosure lacked written description support for translated, zoomed, or rotated images.

368.     Therefore, the Court finds that the Disclosure provides adequate written description for translation, zoom, rotation, and zooming of images.

369.     Mr. Hite testified that the Disclosure provides adequate written description support for claim 443, including the interconnections for the different claim limitations. Trial Tr. 44:21–50:25 (Dec. 6, 2017 PM Session) (citing PTX-912 at slides 269–279).

370.     Therefore, the Court finds that the Disclosure provides adequate written description support for claim 443 including the interconnections.

371.     Claim 467. The Court has already found adequate written description support for a background image, image windows, translation, zoom, roaming, and displaying the various limitations (some of which are overlaid and overlapped). DX2003.58.

372.     Mr. Hite testified that the Disclosure provides adequate written description support for claim 467, including the interconnections for the different claim limitations. Trial Tr. 51:1–52:10 (Dec. 6, 2017 PM Session) (citing PTX-912 at slides 280–284).

373.     Therefore, the Court finds that the Disclosure provides adequate written description support for claim 467 including the interconnections.

374.   Claim 496. The Court has already found adequate written description support for a background image, image windows, translation, zoom, roaming, and displaying the various limitations (some of which are overlaid and overlapped). DX2003.64–65.

375.   Mr. Hite testified that the Disclosure provides adequate written description support for claim 496, including the interconnections for the different claim limitations. Trial Tr. 52:11–53:10 (Dec. 6, 2017 PM Session) (citing PTX-912 at slides 285–289).

376.   Therefore, the Court finds that the Disclosure provides adequate written description support for claim 496 including the interconnections.

377.   Claim 482. The Court has already found adequate written description support for a background image, image windows, translation, roaming, and displaying the various limitations (some of which are overlaid). DX2003.61–62.

378.   Mr. Hite testified that the Disclosure provides adequate written description support for claim 482, including the interconnections for the different claim limitations. Trial Tr. 53:11–54:7 (Dec. 6, 2017 PM Session) (citing PTX-912 at slides 290–292).

379.   Therefore, the Court finds that the Disclosure provides adequate written description support for claim 482 including the interconnections.

380.   Claim 463. Claim 463 recites a new limitation, a "simulated three dimensional environment":

A process comprising the acts of:

[1] generating background image information;

[2] generating translation information;

[3] generating rotation information;

[4] generating zoom information;

[5] generating data compressed image information;

[6] generating first data decompressed image information representing a first simulated three dimensional environment in response to the data compressed image information;

[7] generating second data decompressed image information representing a second simulated three dimensional environment in response to the data compressed image information;

[8] displaying a background image overlaid by a first display window in response to the background image information and in response to the first data decompressed image information;

[9] displaying the background image overlaid by a second display window in response to the background image information and in response to the second data decompressed image information;

[10] displaying roaming through the first display window in response to the first data decompressed image information, in response to the translation information, and in response to the zoom information; and

[11] displaying roaming through the second display window in response to the second data decompressed image information, in response to the translation information, and in response to the rotation information.

DX2003.57. The Court has already found that the Disclosure provides adequate written description support for: (1) limitations 1 (background image information); (2) limitation 2 (translation information); (3) limitation 3 (rotation information); (4) limitation 4 (zoom information); (5) limitation 5 (data compressed image information); and limitations 8, 9, 10, and 11 (displaying the various images and windows, some of which are overlaid). The Court has also already found that the Disclosure provides adequate written description support for data decompressed images.

381.    A "simulated three dimensional environment" is described at PTX-4.07963: "[t]errain primitives can be combined to form a virtually unlimited number of simulated environments to construct enormous areas of terrain .... Terrain images can be constructed by overlaying…to constructing a simulated scene." The Disclosure, at PTX-4.08024–8025, describes that "[t]he expansion capability discussed herein facilitates approaching an overlay

object, such as a tree, and having the object expand in size as it is approached to simulate 3D-perspective." *See also* Trial Tr. 10:21–11:10 (Jan. 18, 2018) (Hite testimony regarding PTX-4.07963 and PTX-4.08025); Trial Tr. 74:11–75:4 (Dec. 4, 2017 PM Session) (Hyatt testimony regarding PTX-4.08024–8025) (testifying that image processing system includes "3D perspective…so that this becomes a created environment converted to a full-blown three-dimension perspective environment"); *supra* ¶¶ 79–81 (description of 3D perspective images from Disclosure).

382.    Dr. Castleman did not opine or testify that the Disclosure lacked adequate written description for a simulated three dimensional environment.

383.    Therefore, the Court finds that the Disclosure provides adequate written description for a simulated three dimensional environment.

384.    Mr. Hite testified that the Disclosure provides adequate written description support for claim 463, including the interconnections for the different claim limitations. Trial Tr. 9:16–12:6 (Jan. 18, 2018) (citing PTX-912 at slides 308–313).

385.    Therefore, the Court finds that the Disclosure provides adequate written description support for claim 463 including the interconnections.

386.    Claim 454. The Court has already found adequate written description support a background image, simulated 3D environment image windows, translation, roaming, and displaying the various limitations (some of which are overlaid). DX2003.55.

387.    Mr. Hite testified that the Disclosure provides adequate written description support for claim 454, including the interconnections for the different claim limitations. Trial Tr. 12:7–13:13 (Jan. 18, 2018) (citing PTX-912 at slides 314–316).

388.    Therefore, the Court finds that the Disclosure provides adequate written description support for claim 454 including the interconnections.

389.    <u>Claim 477.</u> The Court has already found adequate written description support for a background image, data compressed and decompressed simulated 3D environment image windows, translation, zoom, rotation, roaming, and displaying the various limitations (some of which are overlaid). DX2003.60–61.

390.    Mr. Hite testified that the Disclosure provides adequate written description support for claim 477, including the interconnections for the different claim limitations. Trial Tr. 13:14–15:2 (Jan. 18, 2018) (citing PTX-912 at slides 317–321).

391.    Therefore, the Court finds that the Disclosure provides adequate written description support for claim 477 including the interconnections.

392.    <u>Claim 487.</u> The Court has already found adequate written description support for a background image, 3D perspective images of simulated 3D environment windows, translation, zoom, roaming, and displaying the various limitations (some of which are overlaid and overlapped). DX2003.62–63.

393.    Mr. Hite testified that the Disclosure provides adequate written description support for claim 487, including the interconnections for the different claim limitations. Trial Tr. 15:3–16:11 (Jan. 18, 2018) (citing PTX-912 at slides 322–326).

394.    Therefore, the Court finds that the Disclosure provides adequate written description support for claim 487 including the interconnections.

395.    <u>Claim 491.</u> The Court has already found adequate written description support for a background image, data compressed and decompressed simulated 3D environment

image windows, translation, zoom, rotation, roaming, and displaying the various

limitations (some of which are overlaid and overlapped). DX2003.63–64.

396.    Mr. Hite testified that the Disclosure provides adequate written description

support for claim 491, including the interconnections for the different claim limitations.

Trial Tr. 16:12–17:24 (Jan. 18, 2018) (citing PTX-912 at slides 327–331).

397.    Therefore, the Court finds that the Disclosure provides adequate written

description support for claim 491 including the interconnections.

398.    Claim 501. The Court has already found adequate written description support

for a background image, simulated 3D environment image windows, translation, zoom,

roaming, and displaying the various limitations (some of which are overlaid). DX2003.66.

399.    Mr. Hite testified that the Disclosure provides adequate written description

support for claim 501, including the interconnections for the different claim limitations.

Trial Tr. 17:25–19:6 (Jan. 18, 2018) (citing PTX-912 at slides 332–336).

400.    Therefore, the Court finds that the Disclosure provides adequate written

description support for claim 501 including the interconnections.

401.    Claim 266. Claim 266 recites a new limitation, "receiving input video from a

remote location":

A process comprising the acts of:

[1] receiving input video image information from a remote location;

[2] generating a first window containing video image information in response
to the input video image information;

[3] generating window image information;

[4] displaying a second window in response to the window image
information; and

> [5] displaying the first window containing video image information overlaid onto the second window.

DX2003.16. The Court has already found that the Disclosure provides adequate written description support for limitation 2 (video image information and window), limitation 3 (image information and window), and limitations 4 and 5 (displaying the windows and images, some of which are overlaid). Limitation 1 recites "receiving input video from a remote location."

402.    The Disclosure, at PTX-4.08008, describes that "[a]n RPV can have different types of sensors and a datalink for communicating sensor information to a ground station.... For example, a video camera in the RPV can provide video images.... These images can be processed or pre-processed in the RPV, can be communicated to the ground station, and can be processed or post-processed on the ground." *See also* Trial Tr. 21:23–22:15 (Jan. 18, 2018) (Hite testimony that "[s]o that is description of providing video over a link from a remote location) (citing PTX-4.08008).

403.    Dr. Castleman did not opine or testify that the Disclosure lacked written description support for "receiving input video from a remote location."

404.    Therefore, the Court finds that the Disclosure provides adequate written description support for "receiving input video from a remote location."

405.    Mr. Hite testified that the Disclosure provides adequate written description support for claim 266, including the interconnections for the different claim limitations. Trial Tr. 20:24–23:22 (Jan. 18, 2018) (citing PTX-912 at slides 340–344).

406.    Therefore, the Court finds that the Disclosure provides adequate written description support for claim 266 including the interconnections.

407.   Claim 298. The Court has already found adequate written description support for input video image information from a remote location, a video image window, a 3D perspective image window, and displaying the various limitations (some of which are overlaid). DX2003.24.

408.   Mr. Hite testified that the Disclosure provides adequate written description support for claim 298, including the interconnections for the different claim limitations. Trial Tr. 23:23–25:4 (Jan. 18, 2018) (citing PTX-912 at slides 345–347).

409.   Therefore, the Court finds that the Disclosure provides adequate written description support for claim 298 including the interconnections.

410.   Claim 282. The Court has already found adequate written description support for a data compressed video image from remote location, a decompressed video image window, an image window, and displaying the various limitations (some of which are overlaid). DX2003.21.

411.   Mr. Hite testified that the Disclosure provides adequate written description support for claim 282, including the interconnections for the different claim limitations. Trial Tr. 27:2–21 (Jan. 18, 2018) (citing PTX-912 at slides 350–351).

412.   Therefore, the Court finds that the Disclosure provides adequate written description support for claim 282 including the interconnections.

413.   Claim 314. The Court has already found adequate written description support for a data compressed video image information from a remote location, a video image window, a 3D perspective image window, and displaying the various limitations (some of which are overlaid). DX2003.25.

414.    Mr. Hite testified that the Disclosure provides adequate written description support for claim 314, including the interconnections for the different claim limitations. Trial Tr. 27:22–28:24 (Jan. 18, 2018) (citing PTX-912 at slides 352–354).

415.    Therefore, the Court finds that the Disclosure provides adequate written description support for claim 314 including the interconnections.

416.    <u>Claim 274.</u> The Court has already found adequate written description support for operator input, control information, an input video image, a video image window, an image window, and displaying the various limitations (some of which are overlaid). DX2003.19.

417.    Mr. Hite testified that the Disclosure provides adequate written description support for claim 274, including the interconnections for the different claim limitations. Trial Tr. 28:25–30:12 (Jan. 18, 2018) (citing PTX-912 at slides 355–357).

418.    Therefore, the Court finds that the Disclosure provides adequate written description support for claim 274 including the interconnections.

419.    <u>Claim 290.</u> The Court has already found adequate written description support for operator input, control information, a data compressed video image, a video image window, an image window, and displaying the various limitations (some which are overlaid). DX2003.23–24.

420.    Mr. Hite testified that the Disclosure provides adequate written description support for claim 290, including the interconnections for the different claim limitations. Trial Tr. 30:13–31:25 (Jan. 18, 2018) (citing PTX-912 at slides 358–360).

421.    Therefore, the Court finds that the Disclosure provides adequate written description support for claim 290 including the interconnections.

422. <u>Claim 306.</u> The Court has already found adequate written description support for operator input, control information, an input video image, a video image window, a 3D perspective image window, and displaying the various limitations (some of which are overlaid). DX2003.24–25.

423. Mr. Hite testified that the Disclosure provides adequate written description support for claim 306, including the interconnections for the different claim limitations. Trial Tr. 32:1–33:10 (Jan. 18, 2018) (citing PTX-912 at slides 361–363).

424. Therefore, the Court finds that the Disclosure provides adequate written description support for claim 306 including the interconnections.

425. <u>Claim 322.</u> The Court has already found adequate written description support for operator input, control information, a data compressed video image from remote location, a video image window, a 3D perspective image window, and displaying the various limitations (some of which are overlaid). DX2003.27–28.

426. Mr. Hite testified that the Disclosure provides adequate written description support for claim 322, including the interconnections for the different claim limitations. Trial Tr. 33:11–35:1 (Jan. 18, 2018) (citing PTX-912 at slides 364–366).

427. Therefore, the Court finds that the Disclosure provides adequate written description support for claim 322 including the interconnections.

4.      The Disclosure Provides Adequate Written Description Support For The "Menu" Claims

428.    Claim 172. Claim 172 recites:

A process comprising the acts of:

[1] generating operator input information;

[2] generating background image information;

[3] generating menu information in response to the operator input information;

[4] generating a first window of three dimensional perspective image information;

[5] overlaying the first window of three dimensional perspective image information onto the background image information;

[6] overlaying the menu information onto the first window of three dimensional perspective image information;

[7] generating a second window of graphics image information;

[8] overlaying the second window of graphics image information onto the background image information overlapping with the first window of three dimensional perspective image information; and

[9] displaying a background image overlaid by a first window of three dimensional perspective images further overlaid by a menu image and overlaid by an overlapping second window of graphics images in response to the background image information overlaid with the first window of three dimensional perspective image information overlaid with the menu information and in response to the background image information overlaid with the overlapping second window of graphics image information.

DX2003.8–9.

429.    The Court has already found that the Disclosure provides adequate written description support for: (1) limitation 1 (operator input information); (2) limitation 2 (background image information); (3) limitation 4 (3D perspective image information and window); (4) limitation 7 (graphics image information and window); (5) limitations 5, 6, and 8 (overlaying and overlapping the various images and windows); and (6) limitation 9

(displaying). The Court has also already found that the Disclosure provides adequate written description support for "menu information" and "menu image[s]," as recited in limitations 3 and 6.

430.    Mr. Hite testified that the Disclosure provides adequate written description support for claim 172, including the interconnections for the different claim limitations. Trial Tr. 50:18–57:9 (Dec. 6, 2017 AM Session) (citing PTX-912 at slides 115–123).

431.    Therefore, the Court finds that the Disclosure provides adequate written description support for claim 172 including the interconnections.

432.    Claim 134. The Court has already found adequate written description support for operator input information, menu, a background image, an alphanumerics image window, a 3D perspective image window, overlaying the various windows and images, and displaying the various limitations. DX2003.3–4.

433.    Mr. Hite testified that the Disclosure provides adequate written description support for claim 134, including the interconnections for the different claim limitations. Trial Tr. 57:10–58:25 (Dec. 6, 2017 AM Session) (citing PTX-912 at slides 124–128).

434.    Therefore, the Court finds that the Disclosure provides adequate written description support for claim 134 including the interconnections.

435.    Claim 199. The Court has already found adequate written description support for operator input information, a background image, a 3D perspective image window, menu information, a graphics image window, overlaying the various windows and images including a non-destructive overlay, and displaying the various limitations. DX2003.10–11.

436.    Mr. Hite testified that the Disclosure provides adequate written description support for claim 199, including the interconnections for the different claim limitations. Trial Tr. 59:1–61:1 (Dec. 6, 2017 AM Session) (citing PTX-912 at slides 129–134).

437.    Therefore, the Court finds that the Disclosure provides adequate written description support for claim 199 including the interconnections.

438.    Claim 385. The Court has already found adequate written description support for operator input information, a background image, a 3D perspective image window, menu information, an alphanumeric image window, overlaying the various windows and images including a non-destructive overlay, and displaying the various limitations. DX2003.38–39.

439.    Mr. Hite testified that the Disclosure provides adequate written description support for claim 385, including the interconnections for the different claim limitations. Trial Tr. 62:14–64:8 (Dec. 6, 2017 AM Session) (citing PTX-912 at slides 140–144).

440.    Therefore, the Court finds that the Disclosure provides adequate written description support for claim 385 including the interconnections.

441.    Claim 390. The Court has already found adequate written description support for operator input information, a background image, a 3D perspective image window, menus, an alphanumeric image window, overlaying the various windows and images, and displaying the various limitations. DX2003.39–40.

442.    Mr. Hite testified that the Disclosure provides adequate written description support for claim 390, including the interconnections for the different claim limitations. Trial Tr. 64:9–66:13 (Dec. 6, 2017 AM Session) (citing PTX-912 at slides 145–149).

443.    Therefore, the Court finds that the Disclosure provides adequate written description support for claim 390 including the interconnections.

444.   <u>Claim 394.</u> The Court has already found adequate written description support for operator input information, a background image, a graphics image window, menus, an alphanumeric image window, overlaying the various windows and images, and displaying the various limitations. DX2003.40–41.

445.   Mr. Hite testified that the Disclosure provides adequate written description support for claim 394, including the interconnections for the different claim limitations. Trial Tr. 66:14–68:22 (Dec. 6, 2017 AM Session) (citing PTX-912 at slides 150–154).

446.   Therefore, the Court finds that the Disclosure provides adequate written description support for claim 394 including the interconnections.

447.   <u>Claim 268.</u> The Court has already found adequate written description support for a data compressed and decompressed image and window, operator input, a menu, a background image, a graphics image window, overlaying the various windows and images, and displaying the various limitations. DX2003.17.

448.   Mr. Hite testified that the Disclosure provides adequate written description support for claim 268, including the interconnections for the different claim limitations. Trial Tr. 30:10–31:21 (Dec. 6, 2017 PM Session) (citing PTX-912 at slides 219–223).

449.   Therefore, the Court finds that the Disclosure provides adequate written description support for claim 268 including the interconnections.

450.   <u>Claim 381.</u> The Court has already found adequate written description support for operator input, a menu, a background image, a graphics image window, overlaying the various windows and images, and displaying the various limitations. DX2003.37–38.

451.     Mr. Hite testified that the Disclosure provides adequate written description support for claim 381, including the interconnections for the different claim limitations. Trial Tr. 31:22–33:2 (Dec. 6, 2017 PM Session) (citing PTX-912 at slides 224–228).

452.     Therefore, the Court finds that the Disclosure provides adequate written description support for claim 381 including the interconnections.

453.     Claim 503. The Court has already found adequate written description support for operator input, a menu, data compressed and decompressed images and windows, a background image, an alphanumeric image window, overlaying the various windows and images, and displaying the various limitations. DX2003.67–68.

454.     Mr. Hite testified that the Disclosure provides adequate written description support for claim 503, including the interconnections for the different claim limitations. Trial Tr. 33:3–34:16 (Dec. 6, 2017 PM Session) (citing PTX-912 at slides 229–233).

455.     Therefore, the Court finds that the Disclosure provides adequate written description support for claim 503 including the interconnections.

456.     Claim 508. The Court has already found adequate written description support for operator input, a menu, a background image, alphanumeric image windows, overlaying and overlapping the various windows and images, and displaying the various limitations. DX2003.71–72.

457.     Mr. Hite testified that the Disclosure provides adequate written description support for claim 508, including the interconnections for the different claim limitations. Trial Tr. 34:17–35:23 (Dec. 6, 2017 PM Session) (citing PTX-912 at slides 234–238).

458.     Therefore, the Court finds that the Disclosure provides adequate written description support for claim 508 including the interconnections.

459.    <u>Claim 250.</u> The Court has already found adequate written description support for operator input, a menu, a background image, 3D perspective image windows, overlaying the various windows and images, and displaying the various limitations. DX2003.14–15.

460.    Mr. Hite testified that the Disclosure provides adequate written description support for claim 250, including the interconnections for the different claim limitations. Trial Tr. 35:24–37:5 (Dec. 6, 2017 PM Session) (citing PTX-912 at slides 239–243).

461.    Therefore, the Court finds that the Disclosure provides adequate written description support for claim 250 including the interconnections.

462.    <u>Claim 271.</u> The Court has already found adequate written description support for operator input, menus, a background image, a graphics image, a data compressed and decompressed image and window, overlaying the various windows and images, and displaying the various limitations. DX2003.18.

463.    Mr. Hite testified that the Disclosure provides adequate written description support for claim 271, including the interconnections for the different claim limitations. Trial Tr. 37:6–38:24 (Dec. 6, 2017 PM Session) (citing PTX-912 at slides 244–248).

464.    Therefore, the Court finds that the Disclosure provides adequate written description support for claim 271 including the interconnections.

465.    <u>Claim 316.</u> The Court has already found adequate written description support for an operator input, menus, a background image, data compressed and decompressed images and windows, overlaying the various windows and images, and displaying the various limitations and images. DX2003.25–26.

466.     Mr. Hite testified that the Disclosure provides adequate written description support for claim 316, including the interconnections for the different claim limitations. Trial Tr. 38:25–40:15 (Dec. 6, 2017 PM Session) (citing PTX-912 at slides 249–253).

467.     Therefore, the Court finds that the Disclosure provides adequate written description support for claim 316 including the interconnections.

468.     Claim 375. The Court has already found adequate written description support for operator input, menus, a background image, graphic image windows, textured image windows, overlaying the various windows and images, and displaying the various limitations. DX2003.36.

469.     Mr. Hite testified that the Disclosure provides adequate written description support for claim 375, including the interconnections for the different claim limitations. Trial Tr. 40:16–41:25 (Dec. 6, 2017 PM Session) (citing PTX-912 at slides 254–258).

470.     Therefore, the Court finds that the Disclosure provides adequate written description support for claim 375 including the interconnections.

471.     Claim 424. The Court has already found adequate written description support for operator input, menus, a background image, data compressed and decompressed images and windows, overlaying the various windows and images, and displaying the various limitations. DX2003.47–48.

472.     Mr. Hite testified that the Disclosure provides adequate written description support for claim 424, including the interconnections for the different claim limitations. Trial Tr. 42:1–43:11 (Dec. 6, 2017 PM Session) (citing PTX-912 at slides 259–263).

473.     Therefore, the Court finds that the Disclosure provides adequate written description support for claim 424 including the interconnections.

474.   <u>Claim 509.</u> The Court has already found adequate written description support for operator input, menus, a background image, a graphics image window, an alphanumerics image window, overlaying the various windows and images, and displaying the various limitations. DX2003.72.

475.   Mr. Hite testified that the Disclosure provides adequate written description support for claim 509, including the interconnections for the different claim limitations. Trial Tr. 43:12–44:20 (Dec. 6, 2017 PM Session) (citing PTX-912 at slides 264–268).

476.   Therefore, the Court finds that the Disclosure provides adequate written description support for claim 509 including the interconnections.

477.   <u>Claim 459.</u> The Court has already found adequate written description support for a background image, image windows, translation, rotation, roaming, operator input, a menu, and displaying the various limitations (some of which are overlaid). DX2003.56.

478.   Mr. Hite testified that the Disclosure provides adequate written description support for claim 459, including the interconnections for the different claim limitations. Trial Tr. 54:8–55:16 (Dec. 6, 2017 PM Session) (citing PTX-912 at slides 293–297).

479.   Therefore, the Court finds that the Disclosure provides adequate written description support for claim 459 including the interconnections.

480.   <u>Claim 472.</u> The Court has already found adequate written description support for a background image, 3D perspective image windows, translation, rotation, roaming, operator input, a menu, and displaying the various limitations (some of which are overlaid). DX2003.59.

481.    Mr. Hite testified that the Disclosure provides adequate written description support for claim 472, including the interconnections for the different claim limitations. Trial Tr. 55:17–56:20 (Dec. 6, 2017 PM Session) (citing PTX-912 at slides 298–302).

482.    Therefore, the Court finds that the Disclosure provides adequate written description support for claim 472 including the interconnections.

483.    Claim 449. The Court has already found adequate written description support for a background image, operator input, a menu, data compressed and decompressed images and windows, translation, zoom, roaming, and displaying the various limitations (some of which are overlaid). DX2003.53–54.

484.    Mr. Hite testified that the Disclosure provides adequate written description support for claim 449, including the interconnections for the different claim limitations. Trial Tr. 4:12–9:15 (Jan. 18, 2018) (citing PTX-912 at slides 303–307).

485.    Therefore, the Court finds that the Disclosure provides adequate written description support for claim 449 including the interconnections.

5.    The Disclosure Provides Adequate Written Description Support For The "Icon" Claims

486.    Claim 415. Claim 415 recites:

A process comprising the acts of:

[1] generating background image information;

[2] generating icon image information;

[3] overlaying the icon image information onto the background image information;

[4] generating a window of graphics image information;

[5] overlaying the window of graphics image information onto the background image information overlapping with the icon image information; and

[6] displaying a background image overlaid by an icon image and overlaid by an overlapping window of graphics images in response to the background image information overlaid with the icon image information and in response to the background image information overlaid with the overlapping window of graphics image information.

DX2003.45–46.

487.    The Court has already found that the Disclosure provides adequate written description support for: (1) limitation 1 (background image information); (2) limitation 3 and 5 (overlaying the various windows and images); (3) limitation 4 (graphics image information and window); and (4) limitation 6 (displaying). The Court has also already found that the Disclosure provides adequate written description support for limitation 2 (icon image information).

488.    Mr. Hite testified that the Disclosure provides adequate written description support for claim 415, including the interconnections for the different claim limitations. Trial Tr. 20:1–22:22 (Dec. 6, 2017 AM Session) (citing PTX-912 at slides 55–58).

489.    Therefore, the Court finds that the Disclosure provides adequate written description support for claim 415 including the interconnections.

490.    Claim 236. The Court has already found adequate written description support for operator input information, a background image, menu, a graphics image window, an icon image, overlaying various images and windows, and displaying the limitations. DX2003.14.

491.    Mr. Hite testified that the Disclosure provides adequate written description support for claim 236, including the interconnections for the different claim limitations. Trial Tr. 61:6–62:13 (Dec. 6, 2017 AM Session) (citing PTX-912 at slides 136–139).

139

492.     Therefore, the Court finds that the Disclosure provides adequate written description support for claim 236 including the interconnections.

493.     <u>Claim 159.</u> The Court has already found adequate written description support for a 3D perspective image window overlaid with an icon. DX2003.6.

494.     Mr. Hite testified that the Disclosure provides adequate written description support for claim 159, including the interconnections for the different claim limitations. Trial Tr. 9:15–10:15 (Dec. 6, 2017 PM Session) (citing PTX-912 at slides 165–167).

495.     Therefore, the Court finds that the Disclosure provides adequate written description support for claim 159 including the interconnections.

496.     <u>Claim 510.</u> The Court has already found adequate written description support for a background image, an icon, an alphanumeric image window, overlaying the icon and the window on the background, and displaying the various limitations. DX2003.73.

497.     Mr. Hite testified that the Disclosure provides adequate written description support for claim 510, including the interconnections for the different claim limitations. Trial Tr. 11:12–12:17 (Dec. 6, 2017 PM Session) (citing PTX-912 at slides 171–173).

498.     Therefore, the Court finds that the Disclosure provides adequate written description support for claim 510 including the interconnections.

6.     <u>The Disclosure Provides Adequate Written Description Support For The "Making A Product" Claims</u>

499.     The Court finds that the Disclosure includes adequate written description support for claims 126, 132, 135, 152, 157, 160, 168, 169, 173, 174, 176, 177, 195, 197, 200, 211, 221, 222, 235, 237, 238, 251, 253, 254, 256, 267, 269, 272, 273, 275, 277, 283, 285, 288, 289, 291, 299, 307, 315, 317, 318, 323, 329, 331, 332, 334–336, 338, 340, 341, 343–346, 348–358, 360–367, 369, 377, 379, 380, 382, 383, 384, 386, 388, 389, 391, 393, 395, 398,

401–404, 406, 408, 409, 411, 413, 414, 416–419, 421, 423, 425, 427, 430, 432, 433, 435–438, 440, 442, 445, 447, 448, 450, 452, 453, 455, 457, 458, 460–462, 464, 466, 468–471, 473–476, 478, 480, 481, 483–486, 488, 490, 492, 494, 495, 497–499.

500.    Each of these "making a product claims" take the form of an enumerated independent, parent claim and a single dependent limitation where the dependent claim is limited to "making a product" either generically or to the making of a specific type of product, e.g., "making a signal product." The Court and parties have therefore called these claims the "making a product" claims.

501.    In its decision, the Board of Patent Appeals and Interferences found that "each" of the "making a product" dependent limitations "refers to the disclosed making of static photographs." PTX-4.00069.

502.    The Board further found, for each of the "making a product claims," that it was "not persuaded that the specification would not have enabled one skilled in the art to make static photographs without undue experimentation" and therefore "reverse[d] the enablement rejection of" these claims. PTX-4.00084–85. But despite finding adequate written description support in the Disclosure for the dependent "making a product" limitations, the Board found that disclosure of the dependent limitation "does not cure the lack of support for the independent claims from which" the "making a product" claims depend. PTX-4.00069.

503.    As described elsewhere in these Findings and Conclusions, the Court finds that the independent parent claims from which each of the "making a product" claims depend have adequate written description support in the Disclosure.

504.    Neither party introduced testimony at trial on the "making a product" dependent limitations.

505.    With the Court's decision that the independent parent claims of the "making a product" claims having written description support and the Board having found that each such dependent claims is describe by the making of static photographs, the Court finds that the Disclosure provides adequate written description support for claims 126, 132, 135, 152, 157, 160, 168, 169, 173, 174, 176, 177, 195, 197, 200, 211, 221, 222, 235, 237, 238, 251, 253, 254, 256, 267, 269, 272, 273, 275, 277, 283, 285, 288, 289, 291, 299, 307, 315, 317, 318, 323, 329, 331, 332, 334–336, 338, 340, 341, 343–346, 348–358, 360–367, 369, 377, 379, 380, 382, 383, 384, 386, 388, 389, 391, 393, 395, 398, 401–404, 406, 408, 409, 411, 413, 414, 416–419, 421, 423, 425, 427, 430, 432, 433, 435–438, 440, 442, 445, 447, 448, 450, 452, 453, 455, 457, 458, 460–462, 464, 466, 468–471, 473–476, 478, 480, 481, 483–486, 488, 490, 492, 494, 495, 497–499.

### 7.    Dr. Castleman's Testimony On Written Description Is Unreliable And Not Credible

506.    Dr. Castleman offered his opinion that the claims in the '211 application lack written description support was based on the following legal standard:

> [T]he application must provide sufficient written description of the invention to convince a person of ordinary skill in the art at the time the application was filed that the applicant possessed the invention. *And by possessed, we knew he understood the invention, that he knew how to make it, and he knew how to use it.*

Trial Tr. 113:5–13 (Jan. 18, 2018 Session) (Castleman) (emphasis added); *see also* Trial Tr. 22:18–23:6 (Jan. 19, 2018 Session) (Castleman).

507.    Dr. Castleman's understanding of the legal standard governing written description is incorrect. Whether the artisan of ordinary skill could make or use the claimed

invention without undue experimentation is a question of enablement not written description, which is separate and different from whether the artisan would understand that the inventor was in possession of the claimed invention from the Disclosure. *See infra* ¶ 529.

508.   Likewise, Dr. Castleman testified that the Disclosure "is not the best source for determining the meaning of the claim term[]" "window." Trial Tr. 218:15–21 (Jan. 19, 2018). But while material beyond simply the Disclosure may be considered in interpreting the terms of a claim, the applicable legal standard states that that claim terms should be given their broadest reasonable interpretation consistent with the specification. *See In re Baker Hughes Inc.*, 215 F.3d 1297, 1301 (Fed. Cir. 2000). In this regard, the specification "is the single best guide to the meaning of a disputed term." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). But Dr. Castleman testified that the Disclosure "is not the best source for determining the meaning of the claim term" window if his construction is adopted. Trial Tr. 218:15–21 (Jan. 19, 2018).

509.   Dr. Castleman's testimony on written description is, therefore, unreliable because it is based on an incorrect legal standard. *See Martinez v. Porta*, 601 F. Supp. 2d 865, 866–67 (N. D. Tex. 2009); *United States v. 319.88 Acres of Land, More or Less, Situate in Clark Co., Nev.*, 498 F. Supp. 763, 766 (D. Nev. 1980); *Hill v. NSB Niederelbe Schiffahartsges.mbH & Co.*, No. CIV.A. 02-2713, 2004 WL 569908, at *1 (E.D. Pa. Mar. 5, 2004) (expert opinion that "clearly contradicts an established principle of law" is inadmissible).

510.   In addition to undermining the reliability of his testimony, Dr. Castleman's offering of an opinion on written description improperly premised on the standard for enablement also undermines the credibility of his testimony generally because, in his expert report and in prior sworn statements, he articulated the legal standard for determining

written description under 35 U.S.C. § 112, ¶ 1, without confusing the legal standard for enablement, offered a separate opinion on enablement in his expert report that in this case that did not confuse the written description and enablement standards, and previously offered sworn testimony that he understood the difference between written description and enablement. Trial Tr. 221:7–224:15 (Jan 19, 2018).

511.    The credibility of Dr. Castleman's testimony is further undermined by his decision to offer opinions that are neither supported by any expert analysis nor the PTO's own positions in this case.

512.    For example, Dr. Castleman contended that Mr. Hyatt's claims "might cover" products from Apple, Samsung, Microsoft, and other companies using a graphical user interface. Trial Tr. 183:17–184:10 (Jan. 19, 2018). Dr. Castleman, however, testified that the Apple Macintosh operating system and its manual were published in 1983 (based upon a document he obtained from the PTO, DX2023), which pre-dates the effective filing date of the '211 application. Trial Tr. 255:19–257:23 (Jan. 19, 2018). Despite the availability of this Apple manual that Dr. Castleman relied upon in his expert report, *see* Trial Tr. 255:2–5 (Jan. 19, 2018) (citing PTX-805 ¶ 1185), Dr. Castleman did not conduct any analysis that the Apple Macintosh operating system anticipates or renders obvious the claims in the '211 application. Trial Tr. 257:24–258:2 (Jan. 19, 2018); *see also* 35 U.S.C. §§ 102, 103.

513.    In fact, the PTO made a judicial admission that it would not introduce such evidence. Trial Tr. 258:3–15 (Jan. 19, 2018) ("So just responding to some of those issues on obviousness…. We're not planning to put any evidence on that issue") (citing Pretrial Hr'g Tr. 9:20–23 (Nov. 28, 2017)); *see also supra* ¶ 15. Based upon this admission, Dr. Castleman's

testimony that Mr. Hyatt's claims "might cover" other products when the PTO dropped its obviousness arguments prior to trial is not credible.

514.    For these reasons, the Court finds Dr. Castleman's testimony unreliable and not credible.

**M.    Ultimate Findings On Written Description**

515.    For the reasons set forth above, the Court finds that the Disclosure provides adequate written description for claims 131, 139, 151, 156, 175, 196, 202, 210, 252, 266, 274, 276, 282, 287, 290, 298, 306, 314, 322, 399, 405, 410, 420, 428, 434, 439, 443, 463, 467, 477, 482, 487, 491, 496, 500, 501, 502, 504, 505, 511, 512, and 513 (the windows claims).

516.    For the reasons set forth above, the Court finds that the Disclosure provides adequate written description for claims 134, 172, 199, 250, 268, 271, 316, 375, 381, 385, 390, 394, 424, 449, 459, 472, 503, 508, and 509 (the menu claims).

517.    For the reasons set forth above, the Court finds that the Disclosure provides adequate written description for claims 159, 236, 415, and 510 (the icon claims).

518.    For the reasons set forth above, the Court finds that the Disclosure provides adequate written description for claims 126, 132, 135, 152, 157, 160, 168, 169, 173, 174, 176, 177, 195, 197, 200, 211, 221, 222, 235, 237, 238, 251, 253, 254, 256, 267, 269, 272, 273, 275, 277, 283, 285, 288, 289, 291, 299, 307, 315, 317, 318, 323, 329, 331, 332, 334–336, 338, 340, 341, 343–346, 348–358, 360–367, 369, 377, 379, 380, 382, 383, 384, 386, 388, 389, 391, 393, 395, 398, 401–404, 406, 408, 409, 411, 413, 414, 416–419, 421, 423, 425, 427, 430, 432, 433, 435–438, 440, 442, 445, 447, 448, 450, 452, 453, 455, 457, 458, 460–462, 464, 466, 468–471, 473–476, 478, 480, 481, 483–486, 488, 490, 492, 494, 495, and 497–499 (the making a product claims).

## II.   Proposed Conclusions Of Law

### A.   Legal Framework For Review Of Patents In Section 145 Actions

519.    The '211 application was filed on June 1, 1995. PTX-4.08140. Because it was filed before the changes in the patent law enacted under the Leahy-Smith America Invents Act ("AIA"), Pub. L. No. 112-29, 125 Stat. 284 (2011), it is subject to the pre-AIA patent statute, to which this section refers.

520.    An applicant seeking a patent must file a patent application with the PTO. 35 U.S.C. § 111. Every patent application must include several components, including drawings, *see* 35 U.S.C. § 113, an oath, *see* 35 U.S.C. § 115, and a "specification" containing a "written description of the invention, and of the manner and process of making and using it…to enable any person skilled in the art to which [the invention] pertains" to make and use the invention without undue experimentation. 35 U.S.C. § 112, ¶ 1.

521.    The application must also contain "one or more claims particularly pointing out and distinctly claiming" the invention. 35 U.S.C. § 112, ¶ 2.

522.    "An applicant in a nonprovisional application…may claim the benefit of one or more prior-filed copending nonprovisional applications," 37 C.F.R. § 1.78(d), provided the prior application contains support under 35 U.S.C. § 112 for the claims in the continuing application. *See* 35 U.S.C. §§ 120, 121.

523.    If the application prerequisites are satisfied, the Patent Act states that an applicant "shall be entitled to a patent" unless the claimed invention is not patentable because, for example, it is not novel or would have been obvious to one of ordinary skill in the art at the time of invention. 35 U.S.C. §§ 102, 103.

524.     For each patent application that it receives, the PTO assigns an examiner who reviews the application to ensure it satisfies the statutory prerequisites for a patent. 35 U.S.C. § 131. If upon examination of the application "it appears that the applicant is entitled to a patent under the law, the [PTO] shall issue a patent therefor." *Id.*

### 1.     Written Description

525.     The patent laws require a patent applicant to provide a "written description" of the claimed invention, *see* 35 U.S.C. § 112, ¶ 1, which must "clearly allow persons of ordinary skill in the art to recognize that [the inventor] invented what is claimed." *Ariad Pharm., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (en banc) (alterations in original; internal quotation marks omitted). Whether an application's written description adequately supports the claimed invention is a question of fact. *Id.*; *accord Energy Transp. Grp., Inc. v. William Demant Holding A/S*, 697 F.3d 1342, 1350 (Fed. Cir. 2012).

526.     "[T]he test for sufficiency [of written description] is whether the disclosure of the application relied upon reasonably conveys to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date." *Ariad,* 598 F.3d at 1351. In meeting that requirement, a specification need not "recite the claimed invention *in haec verba*." *Id.* at 1352; *see also Eiselstein v. Frank*, 52 F.3d 1035, 1038 (Fed. Cir. 1995) ("In order to determine whether a prior application meets the 'written description' requirement with respect to later-filed claims, the prior application need not describe the claimed subject matter in exactly the same terms as used in the claims ….").

527.     In determining whether the disclosure provides adequate written description support for the claimed invention, the specification need only use "'such descriptive means as words, structures, figures, diagrams, formulas, etc., that fully set forth the claimed

invention.'" *In re Skvorecz*, 580 F.3d 1262, 1269 (Fed. Cir. 2009) (quoting *Lockwood v. American Airlines, Inc.*, 107 F.3d 1565, 1572 (Fed. Cir. 1997)).

528.    The "level of detail required to satisfy the written description requirement varies depending on the nature and scope of the claims and on the complexity and predictability of the relevant technology." *Ariad*, 598 F.3d at 1351. Factors for evaluating the adequacy of the disclosure include "'the existing knowledge in the particular field, the extent and content of the prior art, the maturity of the science or technology, [and] the predictability of the aspect at issue.'" *Id.* (quoting *Capon v. Eshhar*, 418 F.3d 1349, 1359 (Fed. Cir. 2005) (alterations in original)).

529.    The written description requirement of 35 U.S.C. § 112, ¶ 1 is separate from the enablement requirement. *Ariad*, 598 F.3d at 1344. Unlike written description, which focuses on whether an inventor possessed the claim subject matter as of the filing date, "[t]o meet the enablement requirement, 'the specification of a patent must teach those skilled in the art how to make and use the full scope of the claimed invention without undue experimentation.'" *Martek Biosciences Corp. v. Nutrinova, Inc.*, 579 F.3d 1363, 1378 (Fed. Cir. 2009) (quoting *In re Wright*, 999 F.2d 1557, 1561 (Fed. Cir. 1993)). Accordingly, a claim in a patent application (or issued patent the validity of which is challenged in litigation) may be adequately described by the specification but not enabled. *See Regents v. Eli Lilly and Co.*, 119 F.3d 1559 (Fed. Cir. 1997); *O'Reilly v. Morse*, 56 U.S. (15 How.) 62 (1853). Alternatively, a claim may or may not be adequately described in patents where enablement is not an issue. *See ICU Medical, Inc. v. Alaris Medical Systems, Inc.*, 558 F.3d 1368 (Fed. Cir. 2009).

2.      Claim Construction

530.    Claim construction is an issue of law that this Court determines *de novo*. *See In re Baker Hughes Inc.*, 215 F.3d 1297, 1301 (Fed. Cir. 2000). "[I]n construing a patent claim, [the Court] is engaged in much the same task as the judge would be in construing other written instruments, such as deeds, contracts, or tariffs." *Teva Pharmaceuticals USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 837 (2015) (citing *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 384, 386, 388, 389 (1996)). But where a patent claim uses "technical words or phrases not commonly understood, those words may give rise to factual disputes," such as usage in the relevant industry, that is a question of fact precedent to interpretation of the claim. *See id.* at 837–838 (citations and internal quotations omitted). Accordingly, claim construction is a practice with evidentiary underpinnings that may require the resolution of subsidiary factual disputes, including making credibility judgments about witnesses. *See id.* at 838 (citations and quotations omitted). Thus, while the interpretation of certain terms, such as "window," "menu," and "icon" are legal matters, the Court must determine subsidiary factual disputes surrounding how the artisan of ordinary skill would have understood those terms in 1984 and how those terms are described in the Disclosure.

531.    In construing a claim presented in a patent *application*, courts should give terms their broadest reasonable interpretation consistent with the specification. *See Baker Hughes Inc.*, 215 F.3d at 1301; *see also In re Shaneur*, 600 Fed. Appx. 734, 738 (Fed. Cir. 2015) (quoting *Phillips v. AWH Corp.*, 415 F.3d 1303, 1316 (Fed. Cir. 2005) (en banc) (noting that in examination patents are afforded the "broadest reasonable construction in light of the specification as it would be interpreted by one of ordinary skill in the art").

532.     The specification prevents the PTO from having "an unfettered license to interpret claims to embrace anything remotely related to the claimed invention." *In re Suitco Surface, Inc.*, 603 F.3d 1255, 1260 (Fed. Cir. 2010). Instead, "claims should always be read in light of the specification and teachings in the underlying patent." *Id.*

533.     "Claims must be read in view of the specification, of which they are a part. The specification contains a written description of the invention which must be clear and complete enough to enable those of ordinary skill in the art to make and use it. Thus, the specification is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Vitronics Corp.*, 90 F.3d at 1582 (internal citations, quotations, and alterations omitted).

534.     When two or more accepted but divergent definitions of a term exist and the specification provides guidance as to which definition applies to the term as used in the claims, the claim should be given the definition that is consistent with the specification. *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998) ("[W]here there are several common meanings for a claim term, the patent disclosure serves to point away from the improper meanings and toward the proper meaning.").

535.     "[E]ven when guidance is not provided in explicit definitional format, the specification may define claim terms by implication such that the meaning may be found in or ascertained by a reading of the patent documents." *In re Abbott Diabetes Care Inc.*, 696 F.3d 1142, 1150 (Fed. Cir. 2012) (internal alteration and quotation marks omitted). Therefore, the specification need not include an explicit definition of a term in order to give it meaning.

536.     "Even when giving claim terms their broadest reasonable interpretation, the [PTO] cannot construe the claims 'so broadly that its constructions are *unreasonable* under

general claim construction principles…. The protocol of giving claims their broadest

reasonable interpretation…does not include giving claims a legally incorrect interpretation

divorced from the specification and the record evidence." *In re Smith Int'l, Inc.*, 871 F.3d

1375, 1382 (Fed. Cir. 2017) (quoting *Microsoft Corp. v. Proxyconn, Inc.*, 789 F.3d 1292, 1298

(Fed. Cir. 2015) (emphasis in original, citations and internal quotation marks omitted).

537.     Accordingly, under the broadest reasonable interpretation rule, when a

specification-supported definition of a term exists, the PTO cannot select an unsupported

definition in its stead and then, in circular fashion, argue that the use of that unsupported

definition in a claim lacks written description.

538.     Because the broadest reasonable interpretation rule requires a construction in

light of the specification, the PTO errs if it "adopt[s] a construction of [a] claim beyond that

which [is] reasonable in light of the totality of the written description." *Baker Hughes*, 215

F.3d at 1303.

### 3.     Procedural Framework For Examination And Administrative Review

539.     In determining whether an applicant is entitled to a patent, the PTO "'bears

the initial burden…of presenting a prima facie case of unpatentability.'" *Hyatt v. Dudas*, 551

F.3d 1307, 1313 (Fed. Cir. 2008) (quoting *In re Alton*, 76 F.3d 1168, 1175 (Fed. Cir. 1996))

(alteration in original). "[I]t is important to require the PTO to adequately explain the

shortcomings it perceives so that the applicant is properly notified and able to respond."

*Hyatt v. Dudas*, 492 F.3d 1365, 1370 (Fed. Cir. 2007).

540.     Once the PTO meets its burden of presenting a prima facie case of

unpatentability, "'the burden of coming forward with evidence or argument shifts to the

applicant.'" *Alton*, 76 F.3d at 1775 (quoting *In re Oetiker*, 977 F.2d 1443, 1445 (Fed. Cir.

1992)). "After evidence or argument is submitted by the applicant in response, patentability is determined on the totality of the record, by a preponderance of the evidence with due consideration to persuasiveness of argument." *Id.* (quoting *Oetiker*, 977 F.2d at 1445) (internal quotation marks omitted).

541.    "If examination at the initial stage does not produce a *prima facie* case of unpatentability, then without more the applicant is entitled to grant of the patent." *In re Lowry*, 32 F.3d 1579, 1584 (Fed. Cir. 1994) (quoting *Oetiker*, 977 F.2d at 1444) (internal quotation marks omitted).

542.    If the examiner believes that any of the prerequisites are not met, the examiner is required to issue a notice to the applicant, known as an "Office Action," detailing the relevant shortcomings. *See* 35 U.S.C. § 132(a); 37 C.F.R. § 1.104(a)(2).

543.    The applicant may respond to the examiner's rejections, for example, by providing reasons why the examiner's rejections are unwarranted, by amending the claims to address the reasons underlying those rejections, and/or by presenting evidence. *See* 37 C.F.R. §§ 1.121, 1.131, 1.132.

544.    The applicant may amend claims and retain the benefit of the filing date of the original application, so long as the amendments do not add new matter to the application. *See* 35 U.S.C. § 132(a).

545.    If the examiner maintains the rejections, a final office action may issue. *See* 37 C.F.R. § 1.113. The applicant then may appeal the examiner's adverse findings to the Board. *See* 35 U.S.C. § 134.

546.    At the Board level, the applicant files a brief in support of the application and the examiner files an Examiner's Answer in support of his or her rejections. *See* 37 C.F.R.

§§ 41.37, 41.39. A panel of three administrative law judges then rules on the pending claims.
*See* 35 U.S.C. § 6(c).

547.    An "[a]ppellant may file a single request for rehearing within two months of
the date of the original decision of the Board." 37 C.F.R. § 41.52(a)(1). "The request for
rehearing must state with particularity the points believed to have been misapprehended or
overlooked by the Board." *Id.*

548.    "When a request for rehearing is made, the Board shall render a decision on
the request for rehearing. The decision on the request for rehearing is deemed to incorporate
the earlier opinion reflecting its decision for appeal, except for those portions specifically
withdrawn on rehearing, and is final for the purpose of judicial review, except when noted
otherwise in the decision on rehearing." *Id.*

### 4.    Judicial Review Of Patentability Determinations

549.    An applicant dissatisfied with the Board's decision may file a civil action
against the Director of the PTO under 35 U.S.C. § 145.

550.    At the time this action was filed in 2005, the U.S. District Court for the
District of Columbia was the proper venue for suits brought under 35 U.S.C. § 145. *See* 35
U.S.C. § 145 (2009).

551.    In a section 145 action, this Court's role is to determine whether "to set aside
a decision of the Board and to resolve questions of patentability to the extent issues are
raised at trial." *Gould v. Quigg*, 822 F.2d 1074, 1079 (Fed. Cir. 1987). Ultimately, the Court
is to determine whether the "applicant is entitled to receive a patent for his invention." 35
U.S.C. § 145.

552.    An applicant in a Section 145 action is entitled to introduce new evidence that was not before the PTO, subject to the normal restrictions in any civil case as provided by the Federal Rules of Evidence and Civil Procedure. *See Kappos v. Hyatt*, 566 U.S. 431, 445–446 (2012).

553.    The opportunity for the applicant in a Section 145 action "is significant, not the least because the PTO generally does not accept oral testimony." *Kappos*, 566 U.S. at 435.

554.    "[U]nder *Troy v. Samson Manufacturing Corporation*, 758 F.3d 1322 (Fed. Cir. 2014), both Mr. Hyatt and the USPTO are permitted to raise new issues in a Section 145 case. Therefore, neither Mr. Hyatt, nor the USPTO, are required to make all arguments for or against patentability during examination." ECF No. 211-1 ¶ 24.

555.    In a Section 145 action, the Board's decision is accorded no deference and "the district court must make its own findings *de novo* and does not act as the 'reviewing court' envisioned by the APA." *Kappos*, 566 U.S. at 438.

556.    "[T]he principles of administrative exhaustion do not apply in a § 145 proceeding." *Kappos*, 566 U.S. at 438.

557.    "Section 145…does not provide for remand to the PTO to consider new evidence, and there is no pressing need for such a procedure because a district court, unlike a court of appeals, has the ability and the competence to receive new evidence and to act as a factfinder." *Id.* at 439.

558.    "[A] district court conducting a § 145 proceeding may consider 'all competent evidence adduced,' and is not limited to considering only new evidence that could not have

been presented to the PTO." *Id.* at 444 (quoting *Butterworth v. United States ex rel. Hoe,* 112 U.S. 50, 61(1884)) (internal citation omitted).

559.   "'[W]here new evidence is presented to the district court on a disputed fact question, a *de novo* finding will be necessary to take such evidence into account together with the evidence before the board.'" *Kappos*, 566 U.S. at 444 (quoting *Fregeau v. Mossinghoff,* 776 F.2d 1034, 1038 (1985)).

560.   In a Section 145 action, "[t]he district court must assess the credibility of new witnesses and other evidence, determine how the new evidence comports with the existing administrative record, and decide what weight the new evidence deserves." *Kappos*, 566 U.S. at 444.

561.   A district court has discretion to "consider the proceedings before and findings of the Patent Office in deciding what weight to afford an applicant's newly-admitted evidence." *Id.* at 445 (quoting *Hyatt v. Kappos*, 625 F.3d 1320, 1335 (Fed. Cir. 2010)) (internal quotation marks and citation omitted).

562.   The district court's discretion to consider the proceedings before the PTO and to determine what weight to afford the applicant's newly admitted evidence includes the discretion to give the proceedings before the PTO little or no weight and to give the proceedings before the PTO more weight in some respects and less weight in other respects.

563.   If the Court concludes that the plaintiff is entitled to a patent, section 145 states that it "shall authorize the Director [of the PTO] to issue such patent on compliance with the requirements of law." 35 U.S.C. § 145.

**B.    Legal Conclusions Regarding The '211 Application**

564.    The Court heard testimony from Mr. Hyatt and Mr. Hite for Mr. Hyatt, and testimony from Dr. Castleman for the PTO, on the question of whether the Disclosure provides adequate written description support for all limitations of every contested claim. Moreover, the Court has considered the evidence in the record, in particular the portions of the Disclosure set forth at PTX-4.07488–8139. Based upon the testimony and evidence adduced at trial, as well as the evidence set forth in the administrative record, in particular the portions of the Disclosure set forth at PTX-4.07488–8139, the Court concludes that the Disclosure provides adequate written description support for all limitations of every contested claim.

565.    For the reasons set forth above, the Court concludes as a matter of law that the term "window," as used in the claims at issue in this case, means a "portion of image memory scanned out for display or processing."

566.    For the reasons set forth above, the Court concludes as a matter of law that the term "menu," as used in the claims at issue in this case, means "an on-screen display of options presented to a user for selection."

567.    For the reasons set forth above, the Court concludes as a matter of law that the term icon," as used in the claims at issue in this case, means "a small image displayed on a screen to represent an object."[8]

568.    For the reasons set forth above, the Court concludes as a matter of law that the claims at issue in this case do not seek to claim a graphical user interface.

---

[8] The Court also concludes, as a matter of law, that the meaning given to any other disputed term shall be consistent with the meaning given to that term in the Findings of Fact.

569.    For the reasons set forth above, the Court concludes as a matter of law that the Disclosure provides adequate written description for claims 131, 139, 151, 156, 175, 196, 202, 210, 252, 266, 274, 276, 282, 287, 290, 298, 306, 314, 322, 399, 405, 410, 420, 428, 434, 439, 443, 463, 467, 477, 482, 487, 491, 496, 500, 501, 502, 504, 505, 511, 512, and 513 (the window claims).

570.    For the reasons set forth above, the Court concludes as a matter of law that the Disclosure provides adequate written description for claims 134, 172, 199, 250, 268, 271, 316, 375, 381, 385, 390, 394, 424, 449, 459, 472, 503, 508, and 509 (the menu claims).

571.    For the reasons set forth above, the Court concludes as a matter of law that the Disclosure provides adequate written description for claims 159, 236, 415, and 510 (the icon claims).

572.    For the reasons set forth above, the Court concludes as a matter of law that the Disclosure provides adequate written description for claims 126, 132, 135, 152, 157, 160, 168, 169, 173, 174, 176, 177, 195, 197, 200, 211, 221, 222, 235, 237, 238, 251, 253, 254, 256, 267, 269, 272, 273, 275, 277, 283, 285, 288, 289, 291, 299, 307, 315, 317, 318, 323, 329, 331, 332, 334–336, 338, 340, 341, 343–346, 348–358, 360–367, 369, 377, 379, 380, 382, 383, 384, 386, 388, 389, 391, 393, 395, 398, 401–404, 406, 408, 409, 411, 413, 414, 416–419, 421, 423, 425, 427, 430, 432, 433, 435–438, 440, 442, 445, 447, 448, 450, 452, 453, 455, 457, 458, 460–462, 464, 466, 468–471, 473–476, 478, 480, 481, 483–486, 488, 490, 492, 494, 495, and 497–499 (the making a product claims).

## III.    Conclusion

573.    Pursuant to Federal Rule of Civil Procedure 52, the Court renders judgment in favor of Mr. Hyatt and against Defendant Joseph Matal.

574.    The Court finds as a matter of fact and concludes as a matter of law that Mr. Hyatt is entitled to a patent on claims 126, 131, 132, 134, 135, 139, 151, 152, 156, 157, 159, 160, 168, 169, 172–177, 194–197, 199, 200, 202, 210, 211, 221, 222, 235–237, 238, 250–256, 267–269, 271–273, 275–277, 283, 285, 287–289, 291, 299, 307, 315–318, 323, 329, 331, 332, 334–336, 338, 340, 341, 343–346, 348–358, 360–367, 369, 375, 377, 379–386, 388–391, 393–395, 398, 399, 401–406, 408–411, 413–421, 423–425, 427, 428, 430, 432–440, 442, 443, 445, 447–450, 452–455, 457–464, 466–478, 480–488, 490–492, 494–505, and 508–513.

575.    The Court authorizes the Director to issue a patent on compliance with the requirements of law for these claims.

576.    The Court shall retain jurisdiction over this '211 application to enforce this judgment.

Dated: February 5, 2018                          Respectfully submitted,

                                                            /s/ Paul M. Levine
                                                Mark W. DeLaquil (D.C. Bar. No. 493545)
                                                Jason F. Hoffman (D.C. Bar No. 985166)
                                                Paul M. Levine (D.C. Bar No. 999320)
                                                Baker & Hostetler LLP
                                                1050 Connecticut Ave., N.W., Suite 1100
                                                Washington, D.C. 20036
                                                (202) 861-1500
                                                mdelaquil@bakerlaw.com

                                                *Attorneys for Plaintiff Gilbert P. Hyatt*

**<u>Certificate of Service</u>**

I hereby certify that, on February 5, 2018, I served a copy of the foregoing Proposed

Findings of Fact and Conclusions of Law on Counsel for Defendant via ECF.


<u>/s Paul M. Levine</u>
Paul M. Levine