**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| GILBERT P. HYATT, Plaintiff, | ) | Civil Action No. 05-2310 (RCL) |
| v. | ) | Civil Action No. 09-1864 (RCL) |
| ANDREI IANCU, Defendant. | ) | Civil Action No. 09-1869 (RCL) |
| | ) | Civil Action No. 09-1872 (RCL) |

# MEMORANDUM OPINION, FINDINGS OF FACT, AND CONCLUSIONS OF LAW

## I. BACKGROUND

Before the Court is the defendant's asserted affirmative defense of prosecution laches in the four above-captioned cases. Prosecution laches is an equitable doctrine that can hold patents unenforceable when an applicant engages in unnecessary and unexplained delays in prosecuting a patent. *See In re Bogese*, 303 F.3d 1362, 1367 (Fed. Cir. 2002); *Symbol Technologies, Inc. v. Lemelson Medical*, 277 F.3d 1361, 1365-66 (Fed. Cir. 2002) (*Symbol Techs. I*); *Woodbridge v. United States*, 263 U.S. 50, 56 (1923) ("It is a case of forfeiting the right to a patent by designed delay.").

Plaintiff Gilbert P. Hyatt is a prolific inventor who has received more than 70 issued patents and has pending nearly 400 patent applications before the United States Patent and Trademark Office (PTO), the federal agency responsible for examining patent applications and for granting

U.S. patents. 35 U.S.C. § 1 et seq. Andrei Iancu is the named defendant in these matters in his official capacity as the Under Secretary of Commerce for Intellectual Property and the Director of the PTO.[1] Because of the nature and lengthy history of the actions at-hand, throughout this opinion the Court refers to the defendant as "PTO."

Mr. Hyatt brought these actions pursuant to 35 U.S.C. § 145 to obtain patents on four of his patent applications following decisions in the Board of Patent Appeals and Interferences, now known as the Patent and Trial Appeal Board (the "Board").[2] Section 145 allows an applicant dissatisfied with the decision of the Board to "have remedy by civil action" in district court, rather than taking an appeal directly to the Federal Circuit.[3] *See also Kappos v. Hyatt*, 566 U.S. 431 (2012). In a series of opinions issued August 23, 2016, the Court found genuine disputes of material fact precluded summary judgment in these matters;[4] trials on the merits would be required with respect to claims in three of the four applications.

After the Court resolved the summary judgment motions, the PTO moved to dismiss these actions for prosecution laches. Def.'s Mot Dismiss, ECF No. 91. In that set of motions, PTO argued that Hyatt's conduct in prosecuting these four patent applications, as well as approximately 400 others, called for dismissal. *Id.* at **8-9 ("Mr. Hyatt's conduct in each application and across his roughly 400 applications has been unreasonable, inexcusable, and warrants dismissal of his pending claims under the equitable doctrine of prosecution laches."). The PTO stressed that some of the applications claim priority to patents over 45 years old, *id.* at *9, and that Hyatt bulk-filed

[1] Andrei Iancu has been automatically substituted for Joseph Matal in these actions under Fed. R. Civ. P. 25(d).

[2] Case number 05-cv-2310 relates to the 08/457,211 application (the '211 application); No. 09-cv-1864 relates to the 08/456,398 application (the '398 application); No. 09-cv-1869 relates to the 08/472,062 application (the '062 application); and No. 09-cv-1872 relates to the 08/431,639 application (the '639 application). All docket citations herein are to 05-cv-2310 unless otherwise specified.

[3] At the time Mr. Hyatt filed the present cases, venue lay by statute with the District Court of the District of Columbia. In 2011, Congress amended the venue provision of certain patent-related statutes, including §145, such that suits under those sections are henceforth to be filed in the Eastern District of Virginia. Pub. L. 112-29, §9 (Sept. 16, 2011).

[4] *See* ECF No. 75 (05-cv-2310); ECF No. 71 (09-cv-1864); ECF No. 75 (09-cv-1869); ECF No. 72 (09-cv-1872).

approximately 400 photocopies of eleven applications in the days leading up to the effective date of the General Agreement on Tariff and Trade (GATT) in June 1995.[5] *Id.* It noted an October 24, 1995 meeting, during which Mr. Hyatt agreed to focus each application on a different invention, *id.* at 21, but that some twenty years later, in 2015, Mr. Hyatt revealed that he never had a "master plan" for amending all 400 applications. *Id.* at **30-31. Mr. Hyatt, on the other hand, argued that the PTO was responsible for extensive delay in adjudicating many of the applications, Pl. Mot. Dismiss, ECF No. 101 at **7-9, and made the case that he was entitled to discovery. *Id.* at **37-38.

On March 16, 2017, the Court found that genuine disputes of material fact required treating the motions to dismiss as if they were for summary judgment, and denied them accordingly. ECF No. 116. With leave of Court, the PTO subsequently amended its answers on leave of the Court to assert prosecution laches as an affirmative defense. ECF No. 123.

The Court set the PTO's affirmative defense of prosecution laches across all four actions for a bench trial, which also would consider evidence relating to Mr. Hyatt's approximately 400 pending applications. ECF No. 150. The PTO, bearing the burden of proof on the affirmative defense of prosecution laches and upon agreement of the parties, presented its case-in-chief first.

During the five trial days beginning October 6, 2017, during which the PTO presented its case in chief, the PTO presented the testimony of three witnesses: Robert A. Clarke, Gregory Morse, and Stephen Kunin, its expert witness. The parties also introduced a number of exhibits.

Mr. Clarke has worked for the PTO for 27 years, and he is currently the editor of the Manual of Patent Examining Procedure ("MPEP"), a 3,000-page collection of guidance material for use by patent examiners in the examination of patent applications. Trial Tr. 75:20–76:14 (Oct. 6, 2017

---

[5] The Court has addressed the GATT in previous memorandum opinions. Information about GATT and its impact on patents is available in those opinions or at the websites of the PTO or WTO.

A.M. Session). He also spent 9 years examining patent applications, wrote an article on patent procedure, taught more than 600 hours of classes to patent examiners, and served in the Office of Patent Legal Administration (which drafts examination guidelines), as Chief of Staff for the PTO, and as an Administrative Patent Judge. Trial Tr. 75:15–78:21, 81:20–83:16 (Oct. 6, 2017 A.M. Session). Mr. Clarke has had no personal involvement in the examination of Mr. Hyatt's patent applications. In or around 2012, however, Mr. Clarke spent approximately three days reviewing the file histories of approximately 80 of Mr. Hyatt's patent applications that were then subject to an undue delay action brought by Mr. Hyatt in the United States District Court for the Eastern District of Virginia and offered a declaration attesting to certain facts about those patent applications. *See* Trial Tr. 55:5–56:14 (Oct. 6, 2017 P.M. Session).

Mr. Morse is currently Supervisory Patent Examiner ("SPE") of Art Unit 2615, which is assigned to examine Mr. Hyatt's pending patent applications. Mr. Morse has worked at the PTO since 1992 and has been supervising the examination of Mr. Hyatt's patent applications since March 2013. Trial Tr. 72:19–75:3 (Oct. 10, 2017 A.M. Session). Before March 2013, Mr. Morse had no involvement in the examination of Mr. Hyatt's patent applications. Trial Tr. 47:14–49:5 (Oct. 11, 2017 P.M. Session).

Mr. Kunin, PTO's retained expert, testified as to PTO patent policy, practice, and procedure, and how the prosecution of the applications at-issue in these cases presented uniquely difficult circumstances for the PTO. Mr. Kunin, an attorney with an engineering background and over thirty years of service in the PTO, rose to very senior positions within the agency, including spending ten years as its Deputy Commissioner for Patent Examination Policy. In that position he provided administrative oversight to and coordinated the activities of several offices within the PTO, and was responsible for the promulgation of patent examination guidelines and training

materials. DX-1486 at paras. 7-13. Mr. Kunin offered no opinion as to whether prosecution laches should be applied to Mr. Hyatt's cases.

At the close of the PTO's case-in-chief, Hyatt moved for judgment pursuant to Federal Rule of Civil Procedure 52(c). Hyatt argued four bases for his motion: 1) the PTO did not prove that it provided Mr. Hyatt with adequate warnings of impending laches rejections; 2) the PTO failed to prove any intervening rights of third-parties in the technologies claimed in the present applications; 3) although the PTO may issue laches rejections, no such rejections are at issue in these cases and the Patent Act displaced the equitable remedy of prosecution laches in the context of a §145 action; and 4) assuming that an affirmative defense of prosecution laches is available in a §145 action, the PTO failed to meet its burden of proving unreasonable and unexplained delay.

Upon consideration of the evidence and arguments presented during trial and the entire records in these cases, and review of the relevant case law, the Court found the PTO failed to prove unreasonable and unexplained delay that supports a finding of prosecution laches, and accordingly granted Mr. Hyatt's motion on his fourth proffered ground. The present opinion, including the Court's findings and conclusions, is issued pursuant to Federal Rule of Civil Procedure 52(a)(1).[6]

## II. LEGAL STANDARD

### a. Rule 52(c)

Federal Rule of Civil Procedure 52(c) permits the Court to enter judgment against a party fully heard "on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue." Fed. R. Civ. P. 52(c). In determining a Rule 52(c)

[6] In a separate Order, the Court granted PTO's Motion for Leave to File its Corrected Response to Plaintiff's Proposed Findings of Fact and Conclusions of Law [ECF No. 214]. The Court therefore treats ECF No. 214-1 as the PTO's operative Responsive filing.

motion, "a district court may not draw any special inferences in favor of the non-movant." *Burke v. Record Press, Inc.*, 951 F.Supp.2d 26, 31 (D.D.C. 2013). However, if the party with the burden of proof has failed to meet that burden by the conclusion of its case-in-chief, the district court is to grant the motion against it. *Cf. id.*

**b. Patent Prosecution Laches**

Although the government has asserted prosecution laches administratively, *see, e.g., In re Bogese*, 303 F.3d 1362 (Fed. Cir. 2002), and both the government and private party litigants have done so in, *e.g.*, infringement actions, *see, e.g., Woodbridge v. United States*, 263 U.S. 50 (1923); *Symbol Techs. I*, 277 F.3d 1361 (Fed. Cir. 2002), these four cases are the first in which the PTO has asserted prosecution laches in actions before a district court under 35 U.S.C. §145. "Prosecution laches is an equitable defense." *Cancer Research Tech. Ltd. V. Barr Labs., Inc.*, 625 F.3d 724, 728 (Fed. Cir. 2010).[7] In its traditional articulation, the doctrine stands for the proposition that an already issued patent "may be rendered unenforceable if it was obtained after an unreasonable and unexplained delay in prosecution." *In re Bogese*, 303 F.3d at 1367 (citing *Symbol Techs. I*, 277 F.3d at 1365-66).

A pair of Federal Circuit opinions in 2002 concerning prosecution laches, and a 2012 Supreme Court case articulating district courts' duties under §145, *Kappos v. Hyatt*, 566 U.S. 431 (2012), make clear the Court can consider the PTO's affirmative defense of prosecution laches here, where the PTO has issued neither a patent nor any laches warnings. In *Symbol Techs. I*, the Federal Circuit upheld a district court's authority to find prosecution laches in an infringement case. Soon thereafter, that court affirmed the PTO's authority to assert prosecution laches as a

[7] This differs from standard laches, which "is an affirmative defense rather than a claim for equitable relief." *See Foster*, 733 F.2d at 90.

basis for rejecting a patent application. *See In re Bogese*, 303 F.3d at 1367. Because the PTO is empowered to assert prosecution laches administratively, and because litigants may assert the same before district courts, the affirmative defense ought also be available to the PTO in a §145 action. *Cf. id.* ("[W]e see no basis for denying the power to the PTO itself that we have recognized exists in the district courts in infringement actions. It necessarily follows that the PTO has the authority to reject patent applications for patents that would be [otherwise unenforceable].").

Further, under the Supreme Court's ruling in *Kappos v. Hyatt*,[8] district courts can consider new evidence not in the administrative record before the PTO from prosecution of a §145 plaintiff's antecedent patent application, and "the district court must make a *de novo* finding when new evidence is presented on a disputed question of fact." 566 U.S. at 434. This mandate for *de novo* findings likewise opens the door to new arguments concerning the evidence in the case, and just as the PTO can accordingly raise new grounds for rejecting a §145 plaintiff's claims on the merits in response to new evidence presented as to those claims, so too can the PTO raise an affirmative defense for the district court to consider. *See also Troy v. Samson Mfctrn'g Corp.*, 758 F.3d 1322 (Fed. Cir. 2014) (holding that, under *Kappos v. Hyatt*, new issues and arguments may be presented to district courts in §145 and §146 actions). In that vein, the Court here exercised its discretion to allow the PTO to amend its Answer to include an affirmative defense of prosecution laches. ECF No. 122.

Although there is no case directly on-point regarding how a district court should analyze prosecution laches as an affirmative defense in a §145 case, the contours of the doctrine previously articulated in infringement suits and in reviews of agency administrative actions, are instructive. "The doctrine [of prosecution laches] should be applied only in egregious cases of misuse of the

[8] Mr. Hyatt's application that gave rise to the *Kappos v. Hyatt* decision, 08/471,702, first litigated in this court, 09-cv-901, has origins and ancestry largely in common with the applications at issue here.

statutory patent system." *Symbol Technologies, Inc. v. Lemelson Medical*, 422 F.3d 1378, 1385 (Fed. Cir. 2005) (*Symbol Techs. II*). In other situations not involving *prosecution* laches, the Federal Circuit has cautioned, "The mere passage of time does not constitute laches." *Advanced Cardiovascular Systems v. Scimed Life Systems*, 988 F.2d 1157, 1161 (Fed. Cir. 1993). The Supreme Court has held the same. *United States v. American Bell Tel. Co.*, 167 U.S. 224, 246 (1897) ("The mere fact of delay does not, therefore, operate to deprive the inventor of his legal rights."). Indeed, lengthy patent application prosecutions have been held not to implicate prosecution laches in many cases. *See, e.g.*, *Cancer Research,* 625 F.3d at 728 (reversing finding of prosecution laches, despite "eleven continuation applications, ten abandonments, and no substantive prosecution for nearly a decade"); *Studiengesellschaft Kohle mbH v. Northern Petrochem. Co.*, 784 F.2d 351, 352 (Fed. Cir. 1986) (per curium) (affirming district court's finding of no laches despite prosecution period that lasted over twenty years); *Regents of the Univ. of Cal. v. Monsanto Co.*, 2005 WL 3454107, *25–26 (N.D. Cal. 2005) (finding the doctrine of prosecution laches inapplicable despite the fact that twenty-four years had passed between the application filing and patent issue); *Koninklijke Philips Electronics N.V. v. Cinram Intern., Inc.*, 2012 WL 4074419, *7 (S.D.N.Y. 2012) (prosecution laches inapplicable despite nearly 19 years between the application filing and patent issue dates).

Rather than merely calculating the passage of time, delay must be unreasonable and unexplained. To determine this, courts are to look to "the totality of the circumstances, including the prosecution history of all of a series of related patents and overall delay in issuing claims." *Symbol Techs. II,* 422 F.3d at 1386. Further, prosecution laches principally looks to a patent applicant's conduct, not his intent; although evidence that an applicant intended to delay issuance of a patent can be relevant, the absence of such intent does not forgive conduct that does, in fact

unreasonably and inexplicably delay examination of his application(s). *See, e.g.*, *Woodbridge*, 263 U.S. at 56 ("This is not a case where evidence has to be weighed as to the purpose of the inventor.").

Finally, whereas in an action between private parties a court will balance equities in its analysis, *see Symbol Techs. II*, 422 F.3d at 1385, the Federal Circuit has elsewhere determined that "a delay by the PTO cannot excuse the applicant's own delay." *See In re Bogese*, 303 F.3d 1362, 1369 (Fed. Cir. 2002). It is significant that each of those matters is somewhat distinct from the instant cases in their present posture. The *Symbol Techs.* cases involved private parties litigating issued patents, and in *Bogese* the Federal Circuit was reviewing an appeal from the Board's upholding administratively-issued prosecution laches rejections on an arbitrary and capricious standard.

In a §145 action where the district court is making a *de novo* determination on the evidentiary record before it and not the administrative record of the PTO, its review of the propriety of applicants' prosecution conduct in a §145 action is not done in light of any presumptions as to the validity of PTO's earlier actions. To the contrary, the same ground from which this Court derives authority to entertain the PTO's equity-based affirmative defense in the first instance, *i.e.*, PTO's broader administrative authority to reject patent applications, is relevant to an equitable inquiry that necessarily concerns, in part, PTO's failure or otherwise declining to exercise that authority earlier. An adapted standard is therefore appropriate where, as here, a district court is conducting a *de novo* analysis of PTO's *ex-post* assertion of prosecution laches during litigation, as opposed to during examination in which an applicant may have an opportunity to cure the alleged inequitable conduct in response to an agency's action or warning. While it remains that any delay by the PTO does not excuse any unreasonable and unexplained delay by the applicant,

under the totality of the circumstances test PTO's actions and omissions can likewise be considered in determining the reasonableness of any delay actually attributable to the applicant, and the applicant's explanations therefor.

## III. ANALYSIS

The PTO accuses Mr. Hyatt of inequitable prosecution conduct that caused unreasonable and unexplained delay in the examination of his applications. PTO argues, *inter alia*, that the following alleged factors contributed to unreasonable delay in examination: 1) the large number of claims in and across Mr. Hyatt's applications; 2) his amendment practice; 3) his alleged shifting of claims; 4) numerous and complicated priority claims in Mr. Hyatt's applications, including that the claims of priority made it difficult for examiners to identify written description support; 5) difficulties in identifying written description support for Mr. Hyatt's claims due to challenges in identifying priority dates for claims, the length of the applications, the incorporation by reference of other applications, and unclear interconnections among claim elements; 6) double-patenting, duplicate claims, and indistinct claims across the applications, including overlaps with claims in applications pending before the Court; 7) prosecution of claims previously allowed in another application (06/663,094, referred to as 'the '094 application'); 8) reintroducing certain claims previously lost in interference actions; and 9) delay in presenting the claims contained in his 1995 pre-GATT applications, including the four applications pending before this Court, which claim priority to earlier-filed applications.

The Court does not doubt that Mr. Hyatt's "GATT Bubble" applications (*i.e.*, those filed in the spring of 1995) have menaced the PTO for decades. They are long, highly technical, and voluminous. But also true, and particularly telling for present purposes, is that many of Mr. Hyatt's

applications spent an inordinate time in a proverbial Never-Never Land, during which he was not allowed under PTO's procedures to prosecute his applications further, until the PTO took certain actions. As detailed further below and as PTO concedes, ECF No. 214-1 at *29, at least a nine-year period thus does not factor into the Court's laches analysis.

Unsurprisingly, the PTO's approach at trial tracked very closely with its earlier motions to dismiss for prosecution laches. ECF No. 91 (05-cv-2310); ECF No. 91 (09-cv-1864); ECF No. 94 (09-1869); ECF No. 93 (09-cv-1872). For example, the PTO spent most of its presentation addressing facts concerning Mr. Hyatt's approximately 400 applications not otherwise implicated in the four cases before this Court, with a particular and peculiar emphasis on prosecution conduct related to those applications that post-date the filing of the present actions in district court. The obvious rationale for the PTO's doing so is that PTO apparently understands the Federal Circuit's totality test to include consideration of all prosecution conduct as to all related applications, without temporal or procedural limitation.[9] But, for reasons explained below, that sweeping construction cannot reasonably be applied to these cases. The PTO also relies upon representations allegedly made at a meeting with Mr. Hyatt in 1995, but does not adequately establish a corresponding duty by Mr. Hyatt to ease PTO's burden as a result of that meeting. These and other factors are detailed in the Court's findings and conclusions below.

**a. <u>Findings of Fact</u>**

**The Nature of the Cases and Mr. Hyatt's Applications**

Each of the applications at issue in these cases was filed before June 8, 1995, the effective date of the law that changed the term of a patent from 17 years after issuance to 20 years from the

[9] At the same time, however, the PTO objects to this Court making any findings as to those other 400 applications that are not the subject to any of the four actions here. *See, e.g.*, ECF no. 214-1 at *3, *16. This desire for the Court to consider but not decide matters not directly before it permeated PTO's entire litigation strategy.

application date of the oldest application from which the application claims priority. This change in the U.S. patent term was part of the implementation of the Uruguay Round of the General Agreement on Tariff and Trade ("GATT"). See Trial Tr. 43:8–44:3 (Oct. 6, 2017 P.M. Session); 20:6–14 (Oct. 10, 2017 P.M. Session).

To address circumstances where an applicant had the right under U.S. patent law to file a new patent application to pursue claims described in a specification that had already been filed with the PTO (known as a "continuing application"), Congress required the PTO to promulgate rules to provide applicants further examination of additional patent claims that claim priority from pre-GATT applications without loss of patent term. Pub. L. No. 103-465, sec. 532(a)(1), § 532(a)(2), 108 Stat. 4809, 4984 (1994) (codified as amended at 35 U.S.C. § 154). The PTO's rule implementing this legislation is in 37 C.F.R. § 1.129 ("Rule 129"), which was promulgated on April 25, 1995. See 60 Fed. Reg. 20,195, 20,226–27 (Apr. 25, 1995) ("Changes to Implement 20-Year Patent Term and Provisional Applications"); *see also* Trial Tr. 45:18–47:9 (Oct. 6, 2017 P.M. Session) (addressing Rule 129).

To preserve the opportunity to obtain a 17-year term for patents based on pre-GATT applications, many applicants filed a large number of patent applications during the brief period between the promulgation of Rule 129 in April 1995 and the date on which the new patent term law went into effect, June 8, 1995. The surge in applications filed during this period is known as the "GATT Bubble." Trial Tr. 104:17–107:21 (Oct. 6, 2017 P.M. Session).

Mr. Hyatt's GATT Bubble applications filed in 1995, including the four applications pending before the Court, were continuing applications that claim the benefit of earlier-filed parent applications under 35 U.S.C. § 120. Their claims also claim the benefit of the date of the earliest-filed parent application whose specification provides support for the claims.

Mr. Hyatt's GATT Bubble applications differed in number and size from those filed by most other applicants. Mr. Hyatt filed many more applications, with much longer specifications, and many more claims, than most other applicants. The number, volume, length, and complexity of Mr. Hyatt's applications are not ordinary.

Mr. Hyatt's patent applications, including the four applications pending before the Court, contain lengthy and detailed disclosures, including specifications. The 700-family specification, which forms the basis of the '211 and '398 applications, is comprised of 576 pages of text and 65 pages of figures. PTX-001.05255–5830; PTX-001.05840–905. The 500-family specification, which forms the basis of the '062 application, is comprised of 238 pages and 40 pages of figures. PTX-002.01183–1458. The 600-family specification, which forms the basis of the '639 application, is comprised of 518 pages and 46 pages of figures. PTX-003.01333–1896. "Typical" specifications are 20 or 30 pages. Trial Tr. 23:16 (Oct. 6, 2017 P.M. Session).

Mr. Hyatt's applications, including the four applications pending before the Court, contain unusually large sets of claims. Trial Tr. 79:10–11 (Oct. 10, 2017 P.M. Session) ("[I]t was extremely unusual. I can recall one case that had approximately that number of claims."). The four applications before this Court presented a total of approximately 1,592 claims, including claims that were subsequently canceled by Mr. Hyatt. Trial Tr. 50:6–20 (Oct. 12, 2017 P.M. Session). Across Mr. Hyatt's approximately 400 applications pending before the PTO in 2003, those applications presented a total of approximately 115,000 claims, or on average approximately 300 claims per application. Trial Tr. 68:19–70:9 (Oct. 10, 2017 P.M. Session).

A PTO study of patent applications filed between 1995 and 2013 reveals that the "typical application" contained 20 claims at the time it was filed. Trial Tr. 78:22–81:19 (Oct. 6, 2017 A.M. Session); 74:2–8 (Oct. 10, 2017 P.M. Session); DX 251. A typical examiner on average is allotted

about 20 hours to examine 20 claims. Only 0.02% of all applications filed included more than 299 claims. *See* DX1486 ¶ 162.

The largest technology companies filing GATT Bubble applications did not engage in the same examinational behavior as Mr. Hyatt engaged in. *See, e.g.*, Trial Tr. Day 4 P.M. Session, 29:17-31:15 (describing how 10 large companies filed pre-GATT applications with only 17.7 claims per application, as opposed to Mr. Hyatt's average of 299 claims per application), 55:17-25, Oct. 10, 2017.

The cases before the Court were filed in 2005 and 2009. In accord with a PTO stipulation, *see, e.g.*, 214-1 at *29, the years 2003-2012, a period in which PTO suspended examination of the majority of Mr. Hyatt's applications, is not considered in the present analysis. PTO restarted examination of Mr. Hyatt's remaining applications in 2013. PTO began issuing Requirements that included prosecution laches warnings beginning in April 2015.[10]

**The Four Applications Before the Court**

<u>The '211 Application (Case no. 05-cv-2310)</u>

Mr. Hyatt filed the '211 application on June 1, 1995. PTX-004.07554. The '211 application is a continuation of patent application serial number 07/289,355, filed December 22, 1988, which is a continuation of patent application serial number 06/663,094, filed October 19, 1984. PTX-004.07555. The PTO entered a non-final Office Action rejecting the claims on

[10] During oral arguments before the Federal Circuit in *Hyatt v. Lee*, 797 F.3d 1374 (Fed. Cir. 2015), Judge Moore asked Government counsel, "How could there be 115,000 claims that were filed prior to June 8, 1995, that are still kicking around? . . . . If Mr. Hyatt is responsible . . . why aren't you nailing him to the wall with prosecution laches? We handed it to you – why aren't you using it?" *See* oral arg., dkt. 2014-1596, May 6, 2015 40:06 – 44:09. Presumably, Judge Moore was referring to *Bogese* in 2002. PTO issued its first prosecution laches warning in one of Mr. Hyatt's applications nineteen days before that exchange. After oral arguments and up through its filing of its Motion for Leave to file its Motion to Dismiss for Prosecution Laches in this Court on September 30, 2016, PTO issued fifty-one additional warnings. *See* ECF 81-2 at *21-22.

September 22, 1995, and entered a final rejection made on July 31, 1996. PTX-087.00004. Mr. Hyatt, using the transitional rules provided in 37 C.F.R. § 1.129(a) ("Rule 129(a)"), petitioned to file an amendment, the effective equivalent of a continuing application, on March 25, 1997. PTX-004.06587–89. The PTO issued a non-final Office Action rejecting the claims on August 3, 1998. PTX-087.00004. The PTO entered a final rejection of the claims on August 27, 1999. PTX-087.00003; Trial Tr. 30:12–31:18 (Oct. 11, 2017 P.M. Session). Prosecution concluded in just over four years, when the PTO issued a final rejection from which Mr. Hyatt appealed. PTX-087 (PALM record).

Having been twice rejected, the '211 claims were eligible for an appeal to the Board. *E.g.*, Trial Tr. 6:16–20 (Oct. 13, 2017 P.M. Session); 35 U.S.C. § 134(a). Mr. Hyatt timely noticed his appeal to the Board on February 28, 2000, and he filed his appeal brief on August 28, 2000. PTX-087.00003; Trial Tr. 30:12–31:18 (Oct. 11, 2017 P.M. Session). In the course of its decisions on Mr. Hyatt's appeal and subsequent motion for reconsideration, the Board reversed several rejections by the examiner of the '211 application claims, ending the PTO's administrative adjudication of the '211 application on September 21, 2005. PTX-087.00006. Mr. Hyatt filed suit under 35 U.S.C. § 145 to obtain a patent on claims in the '211 application on which the Board affirmed at least one ground of rejection on November 18, 2005. At that time, jurisdiction passed from the PTO to the United States District Court for the District of Columbia.

<u>The '398 Application (Case no. 09-cv-1864)</u>

Mr. Hyatt filed the '398 application on June 1, 1995. PTX-001.05921. The '398 application is a continuation of patent application serial number 07/289,355, filed December 22, 1988, which is a continuation of patent application serial number 06/663,094, filed October 19, 1984. PTX-001.05921; *see* PTX-004.07555. The PTO entered a non-final Office Action rejecting

the claims on September 19, 1995, and a final rejection on August 9, 1996. PTX-001.05184; PTX-001.05137. Mr. Hyatt petitioned to enter a submission pursuant to 37 C.F.R. § 1.129(a) with an amendment, effectively equivalent to a continuation application; the PTO subsequently rejected the then-pending claims in a non-final Office Action on December 12, 2000. PTX-001.04812; PTX-001.04505–06. Mr. Hyatt amended the claims on January 30, 2002. PTX-001.04268–69. On July 31, 2002, January 23, 2003, and August 18, 2003, the PTO suspended prosecution in the '398 application for a cumulative total of twenty months ending on February 18, 2004. PTX-001.04255–57; PTX-001.04246–48; PTX-001.04211–13; Trial Tr. 31:20–33:13 (Oct. 11, 2017 P.M. Session). The PTO issued a non-final Office Action on September 7, 2004. PTX-001.04025-26; Trial Tr. 33:6–34:7 (Oct. 11, 2017 P.M. Session).

Mr. Hyatt timely noticed his appeal to the Board on March 7, 2005. PTX-001.03898. He filed his appeal brief on August 26, 2005, thereby closing prosecution. PTX-001.00928; Trial Tr. 34:14–25 (Oct. 11, 2017 P.M. Session). In the course of its decisions on Mr. Hyatt's appeal and subsequent two motions for reconsideration, the Board reversed numerous grounds of rejection found by the examiner of the '398 claims, concluding the PTO's administrative adjudication of the '398 application on July 8, 2009. PTX-086.00007. Mr. Hyatt filed suit under 35 U.S.C. § 145 to obtain a patent on claims on which the Board affirmed at least one ground of rejection on September 25, 2009. At that time, jurisdiction passed from the PTO to the United States District Court for the District of Columbia.

<u>The '062 Application (Case no. 09-cv-1869)</u>

Mr. Hyatt filed the '062 application on June 6, 1995. PTX-002.1223. The '062 application is a continuation of patent application serial number 06/661,649, filed October 17, 1984, through

several other continuation applications. PTX-002.1224. The PTO entered a non-final Office Action rejecting the claims on September 18, 1995, and another non-final Office Action rejecting the claims in full on June 26, 1996. PTX-088.00004. After Mr. Hyatt amended his claims, the PTO entered a final rejection on October 16, 1997. PTX-088.00003. It therefore took the PTO approximately two years and four months to issue the final rejection of Mr. Hyatt's claims from which he appealed. Trial Tr. 25:7–26:5 (Oct. 11, 2017 P.M. Session).

Mr. Hyatt timely noticed his appeal to the Board on or around March 4, 1998. PTX-002.00891; PTX-088.00006. He filed his appeal brief on September 3, 1998. PTX-002.00557; Trial Tr. 25:7–26:22 (Oct. 11, 2017 P.M. Session). In the course of its decisions on Mr. Hyatt's appeal and three subsequent motions for reconsideration, the Board reversed numerous rejections by the examiner of the '062 claims, concluding the PTO's administrative adjudication of the '062 application on July 8, 2009. PTX-088.0006. Mr. Hyatt filed suit under 35 U.S.C. § 145 to obtain a patent on claims on which the Board affirmed at least one ground of rejection on September 25, 2009. At that time, jurisdiction passed from the PTO to the United States District Court for the District of Columbia.

<u>The '639 Application (Case no. 09-cv-1872)</u>

Mr. Hyatt filed the '639 application on May 1, 1995. The '639 application is a continuation application of patent application serial number 07/279,592, filed December 2, 1988. PTX-003.01380. The PTO entered a restriction requirement requiring Mr. Hyatt to elect one group of claims for examination drawn to one invention on October 19, 1995. PTX-003.01311–13. On July 24, 1996, the PTO rejected the claims in a non-final Office Action. PTX-085.00005. The PTO rejected the claims in a final Office Action dated May 19, 1999. PTX-085.00005. It therefore took the PTO just over four years from the filing of the '639 application to issue the final rejection

from which Mr. Hyatt appealed to the Board. Mr. Hyatt timely noticed his appeal on October 19, 1999. PTX-085.00005.

Mr. Hyatt filed his Appeal Brief on April 18, 2000, thereby closing prosecution. PTX-085.00005; Trial Tr. 28:2–29:15.7. In the course of its decisions on Mr. Hyatt's appeal and three subsequent motions for reconsideration, the Board reversed numerous rejections by the examiner of the '639 claims, concluding the PTO's administrative adjudication of the '639 application on July 8, 2009. PTX-085.00005. Mr. Hyatt filed suit under 35 U.S.C. § 145 to obtain a patent on claims on which the Board affirmed at least one ground of rejection on September 25, 2009. At that time, jurisdiction passed from the PTO to the United States District Court for the District of Columbia.

**PTO's Examination Policy and Practice**

PTO's longstanding policy is to engage in "compact prosecution." The goal of compact prosecution is for the examiner to raise every noncumulative ground of rejection or objection that the examiner finds to exist in one office action. *See* Trial Tr. 8:22-9:11; 84:17-85:7 (Oct. 6, 2017 P.M. Session). In general, the practice and policy of compact prosecution is prudent for PTO and patent applicants alike, with the aim of resolving applications as quickly as possible. Trial Tr. 85:8-86:1.

Patent applicants have discretion as to how to prosecute their claims within the PTO's rules and regulations. The PTO has several legal authorities to regulate inequitable applicant conduct during the examination process. These include undue multiplicity rejections, PTO's Rule 11.18, and 37 C.F.R. §1.145. PTO policy is that, absent entry of a restriction requirement, undue multiplicity rejection, or prosecution laches rejection, applicants are entitled to an examination of

the claims presented in a single application, including claims directed to multiple inventions, provided the applicant pays the required fees and complies with the patent statutes. Trial Tr. 15:13–18 (Oct. 10, 2017 A.M. Session); 16:8–22 (Oct. 10, 2017 A.M. Session); 65:14–23 (Oct. 13, 2017 A.M. Session); *see also* Trial Tr. 78:24–79:3 (Oct. 10, 2017 P.M. Session) ("There is no limit to what can be presented.").

Applicants pay for every independent claim in excess of three and for every claim in excess of 20 total claims in accordance with fee schedules set by the Government. Trial Tr. 16:23–17:11 (Oct. 10, 2017 A.M. Session). Mr. Hyatt has paid more than $7,000,000 in fees to the PTO in recent years to have his applications and claims examined. PTX-099; Trial Tr. 17:2–19 (Oct. 10, 2017 AM Session); 65:9–12 (Oct. 11, 2017 P.M. Session). The PTO's accounting is that Mr. Hyatt paid only approximately $59 per claim, in light of the fact that an examiner on average was allotted about 20 hours to examine 20 claims. *See* Trial Tr. Day 1 P.M. Session, 31:4-14, 4:9-16, Oct. 6, 2017; Trial Tr. Day 1 A.M. Session, 89:17-20, Oct. 6, 2017. In the past 5 years, the PTO has paid over $10 million to examine Mr. Hyatt's claims. *See* Trial Tr. Day 4 A.M. Session, 57:1-16, Oct. 12, 2017.

The time a patent application is pending in the PTO can vary based on factors intrinsic and extrinsic to the application. Intrinsic factors might include: the number of claims presented for examination, the claim amendment practice, claim "shifting," entitlement to priority and benefit sought by the applicant, written description support issues, double-patenting issues, and other discrete issues raised by the patent office. *See* Trial Tr. 4:6–7:3 (Oct. 12, 2017 P.M. Session). Extrinsic factors generally relate to PTO's workload and allocation of resources, but also can include an applicant's willingness to cooperate with PTO examiners' informal requests during the examination process.

If an applicant wants to show entitlement to the right of priority to establish an earlier effective filing date as against intervening prior art, it is the applicant's burden to establish that right of priority. *See* Trial Tr. 23:20–24:7 (Oct. 13, 2017 P.M. Session).

Under 35 U.S.C. § 112(1), the test for whether a specification contains an adequate written description of the subject matter claimed in a patent application is whether it enables any person with ordinary skill in the art to make and use the invention. Trial Tr. 22:9–14 (Oct. 10, 2017 P.M. Session). That is a legal determination regularly made in patent application examination. Written description rejections are "fairly common" in PTO practice, with numerous court decisions and specific PTO guidelines addressing such issues. Trial Tr. 97:11–99:5 (Oct. 6, 2017 P.M. Session); 23:4–15 (Oct. 13, 2017 P.M. Session). The PTO can and does address claims that it contends lacks written description support through written description rejections. Trial Tr. 97:11–99:10 (Oct. 6, 2017 P.M. Session); 23:4–24:12 (Oct. 13, 2017 P.M. Session). Should the examiner make a written description rejection, the application must then demonstrate that there is adequate written description support for the claims.

Double patenting is relevant to examination to avoid issuing a claim that is substantially similar to another claim that is also under examination and may be subject to a rejection that would be relevant to the other pending claim. The PTO attempts to police double-patenting issues during examination, and issues provisional double-patenting rejections to which applicants respond, when those issues arise in two (or more) pending applications. *See, e.g.*, Trial Tr. Day 1 P.M. Session, 92:5-17, Oct. 6, 2017; Trial Tr. Day 3 A.M. Session, 40:18-41:4, Oct. 11, 2017; Trial Tr. Day 4 A.M. Session, 44:19-45-17, Oct. 12, 2017. Double patenting rejections "may be deferred until allowable subject matter has been indicated. At that time, the allowed claims should be reviewed against all related application claims for any double patenting issues." PTX-003.00970.

Patent applicants are entitled to traverse rejections, including challenging those decisions before the Board and/or in the courts. Patent applicants are entitled to amend or cancel claims to avoid a ground of rejection.

After a patent application is filed, further mandatory action on the part of the applicant can only be triggered by formal means in accord with PTO regulations.

**Examination and Prosecution of Mr. Hyatt's Applications**

Despite being 3,000 pages long, the PTO's Manual of Patent Examining Procedure does not cover a case such as Mr. Hyatt's. The PTO could not practice its typical and preferred mode of compact prosecution of Mr. Hyatt's claims across 400 lengthy applications. The PTO's policy of compact prosecution made it impossible to complete examination of Mr. Hyatt's applications in its desired manner under the time typically given to examiners. Mr. Hyatt's applications could not be treated as typical applications given their size and scope. *See* ECF No. 214-1 at *9 ("the evidence showed that the applications could not be treated as typical applications given their size and scope") (*citing* Trial Tr. Day 2 A.M. Session, 75:14-77:15, Oct. 10, 2017); *id.* at *30 ("all agree that Mr. Hyatt's applications are far from typical"). The PTO has conceded that it could not engage in compact prosecution with respect to Mr. Hyatt's applications, given their unusual characteristics. *See* ECF no. 214-1 at *8.

Mr. Hyatt attended a meeting in October 1995 with Nicholas Godici, a former PTO group Director, during which they discussed focusing each of his applications on different subject matter. Trial Tr. 54:10–65:3 (Oct. 10, 2017 P.M. Session). At the meeting, Mr. Hyatt agreed to "focus" his claims by increasing the demarcation between applications. Trial Tr. 69:14–70:9 (Oct. 10, 2017 P.M. Session). Neither Mr. Godici nor Mr. Hyatt memorialized the purported agreement in an interview summary, even though doing so is required by PTO rules. Trial Tr. 53:17–20 (Oct.

11, 2017 P.M. Session); 14:4–15:1 (Oct. 6, 2017 P.M. Session); 12:25–13:20 (Oct. 10, 2017 A.M. Session). Despite those formal rules, conversations between applicants and examiners, never mind Group Directors like Mr. Godici, are not always memorialized in interview summaries. Trial Tr. Day 2 A.M. Session, 62:10-16, Oct. 10, 2017.

After his conversation with Mr. Godici, Mr. Hyatt proceeded to file petitions to enter amendments in some of his applications. Trial Tr. 53:1–13 (Oct. 11, 2017 P.M. Session). A number of those petitions were denied by Mr. Godici. Trial Tr. 54:3–56:12 (Oct. 11, 2017 P.M. Session); PTX-051; PTX-052. After the October 1995 meeting, the PTO continued examining Mr. Hyatt's applications, rather than make rejections on procedural grounds.

Mr. Hyatt never "focused" his claims in accordance with the informal agreement made during the October 1995 meeting. In 2015, Mr. Hyatt stated he never had a "master plan" to do so. *See* ECF 81-2 at *23; Trial Tr. 73:7-76:5 (Oct. 11, 2017 A.M. Session).

Mr. Hyatt has made numerous amendments to the claims in his applications, including the four applications pending before this Court. *See* Trial Tr. 68:19–70:9 (Oct. 10, 2017 P.M. Session) (contending Mr. Hyatt submitted 115,000 claims for examination via his amendments); 51:3–56:15 (Oct. 10, 2017 P.M. Session) (testifying regarding amendments in the four applications before the Court); *see also* PTX-001.05167; PTX-001.04951; PTX-001.04812; PTX-001.04268; PTX-002.01180; PTX-002.01102; PTX-002.01111; PTX-003.01314; PTX-003.01257; PTX-003.00990; PTX-004.06831; PTX-004.06716; PTX-004.06607; PTX-004.06309; PTX-004.05962; Trial Tr. 50:6–20 (Oct. 12, 2017 P.M. Session) (stating Mr. Hyatt submitted 1,592 claims for examination via amendments). Mr. Hyatt's amendments, in some instances, substantially rewrite claim language and add additional claims. *E.g.*, Trial Tr. 75:13–78:14 (Oct. 10, 2010 P.M. Session) (Morse testimony discussing amendment in the '211 application).

From approximately 1995 through 2003, the PTO issued numerous non-final and final Office Actions on the merits of Mr. Hyatt's patent applications. The PTO issued 13 of Mr. Hyatt's patent applications (between June 1995 and May 1997), and withdrew from issuance 4 applications. For approximately 100 of Mr. Hyatt's applications, the PTO issued rejections that Mr. Hyatt appealed (closing prosecution) and briefed before the Board. *See* PTX-005; PTX-019.00008–9; DX-254; DX-268.

Between approximately 2003 and 2012, 80 of Mr. Hyatt's pending applications were held by PTO in a proverbial Never-Never Land, with no Examiners' Answers filed that, under PTO regulations, were required to trigger Board consideration of Mr. Hyatt's appeals in those applications. PTO has stipulated that this period is not time that can be attributed to Mr. Hyatt's allegedly unreasonable and unexplained delay. *See, e.g.*, ECF No. 214-1 at *29.

The PTO did not issue any prosecution laches warnings as to any of Mr. Hyatt's pending applications prior to the commencement of litigation in these cases, although it had authority to do so if it had deemed his conduct so inequitable as to merit it.

The PTO did not reject any of Mr. Hyatt's pending claims under the doctrine of prosecution laches prior to the commencement of litigation in these cases, although it had authority to do so if it had deemed his conduct so inequitable as to merit it.

There is no record of the PTO invoking Rule 11.18 in these applications, nor did the PTO apply undue multiplicity rejections or deny entry of amendments in Mr. Hyatt's applications prior to 2013. More recently, the PTO has issued formal Requirements, laches warnings, and laches rejections as to several of Mr. Hyatt's applications not among the four directly at issue in this litigation.

Although the PTO did not prevail in its gamble here, the Court's ruling today is nevertheless a narrow one. The Court today grounds its ruling in findings as to the prosecution conduct before the PTO up through 2002, the last date the PTO includes in its own calculations prior to the onset of litigation in these cases. The Court's opinion does not reach patent prosecution conduct after those dates, and should not be read either to draw conclusions based upon later conduct, nor upon the PTO's prosecution laches rejections that presumably took into account that later conduct in conjunction with pre-2003 conduct in a totality of the circumstances approach.[20]

In other words, though Mr. Hyatt's 1995-2003 conduct itself is not sufficient to warrant applying prosecution laches here; that does not mean that it is irrelevant to a totality of circumstances analysis that would include later-occurring events.

An order consistent with this holding accompanies this opinion.

Date: 7/31/18

Royce C. Lamberth
United States District Judge

[20] The Court likewise makes no findings or conclusions as to the intervening rights of third-parties.