## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **GILBERT P. HYATT,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | |
| ) | |
| **KATHERINE K. VIDAL,** ) | **Civil Action No. 05-2310** |
| ) | **09-1864** |
| Under Secretary of Commerce ) | **09-1869** |
| for Intellectual Property and ) | **09-1872** |
| Director of the United States ) | |
| Patent and Trademark Office, ) | |
| ) | |
| **Defendant.** ) | |

## MEMORANDUM OPINION

This opinion concerns the complex principles underlying equitable defenses—when used by and against the government—as well as the strange circumstance of applying the Federal Rules of Civil Procedure to a trial that began in 2017 but will continue in 2023.  The cases at issue arise from four of the many lawsuits brought by inventor Gilbert P. Hyatt against the Under Secretary of Commerce for Intellectual Property and Director of the United States Patent and Trademark Office (the official and the office collectively the "PTO").  These actions seek the issuance of patents connected to four applications that were denied by the PTO.

In 2017, this Court held a bench trial where the PTO presented evidence on the affirmative defense of "prosecution laches."  That equitable doctrine allows the PTO to resist issuing a patent when the applicant has abused the patent examination system.  The PTO presented its case-in-chief first, after which this Court concluded that it had not met its burden of proof and entered judgment for Hyatt without hearing additional evidence on prosecution laches.  *Hyatt v. Iancu*,

332 F. Supp. 3d 113 (D.D.C. 2018) ("*Hyatt I*").  The Federal Circuit subsequently vacated in part and held that the PTO had met its burden.  *Hyatt v. Hirshfeld*, 998 F.3d 1347 (Fed. Cir. 2021) ("*Hyatt II*").  It then remanded the case for this Court to conduct further proceedings.

Having stopped the bench trial before Hyatt had a chance to present his case, this Court must provide Hyatt that opportunity.  The Federal Circuit has made clear that he now bears the burden of proof.  *Hyatt II*, 998 F.3d at 1370–72.  And, with an eye toward Hyatt's likely proof, the PTO now moves in limine to exclude evidence "regarding Defendant's unclean hands, laches, and administrative delay" as well as the testimony of four of Hyatt's proposed witnesses.  Def.'s Mot., ECF No. 296.[1]

Upon consideration of the briefing, the applicable law, and the record, this Court will **GRANT IN PART AND DENY IN PART** the PTO's motion.  The Court will bar Hyatt from introducing evidence to prove that the unclean hands doctrine, which is unavailable to him, should apply to the PTO.  However, the Court will allow Hyatt to introduce evidence about PTO conduct for other relevant purposes and allow him to call his four proposed witnesses.

## I.        BACKGROUND

This Court, and the Federal Circuit, have already voluminously explained the background of this case.  *See Hyatt I*, 332 F. Supp. 3d at 117–20; *Hyatt II*, 998 F.3d at 1351–60.  Therefore, the Court will only briefly review the most important parts of the factual and procedural history in order to set the stage for resolution of the PTO's motion in limine.

### A.  The GATT Bubble

"Prior to 1995, a patent's term was measured as 17 years from the date of issuance."  *Hyatt II*, 998 F.3d at 1351.  That all changed in 1994 when the United States signed the Agreement on

---

[1] Unless otherwise noted, all ECF entries are for 1:05-cv-02310-RCL.

Trade-Related Aspects of Intellectual Property ("TRIPS Agreement") at the Uruguay Round of the General Agreement on Tariff and Trade ("GATT"). *Id.* at 1352. Under the new regime, a patent's term would be measured as 20 years from the date of filing. *Id.* The impetus for the change? "Submarine patents." *Id.* at 1351–52. That is, patents resulting from "certain patentees [] delay[ing] prosecuting their patents." *Id.* They are termed submarine patents because, while an application is pending, the underlying patent is metaphorically "submerged." *See id.* When a patent then issues, it has, to continue the metaphor, suddenly surfaced and surprised the relevant product market. *See id.* "By doing so, patentees could obtain a patent at a financially desirable time when the accused product market had become suitably developed." *Id.* This practice created significant administrative burdens for the PTO and threatened to harm industry expectations. *Id.* at 1352.

When Congress implemented TRIPS in 1994, it set June 8, 1995, as the date for the switchover of the patent term regime. *Id.* This impending shift led to a massive increase in patent applications in the days leading up to the switch from date of filing to date of issuance. *Id.* "[I]n the nine days leading to June 8, 1995, the PTO reported that it received and processed over 50,000 applications—one-quarter of the entire year's projected filings." *Id.* at 1353. This avalanche of applications is known as the "GATT Bubble." *Id.*

**B. Gilbert Hyatt's Patent Applications**

The plaintiff here "is the named inventor on 399 patent applications, 381 of which he filed during the GATT Bubble." *Id.* "Hyatt's GATT Bubble applications, including the four at issue here, are atypically long and complex," involving hundreds of pages of text and dozens of pages of figures, compared to the typical application of "20 to 30 pages." *Id.* "On October 24, 1995, about five months after Hyatt filed his GATT Bubble applications, PTO group Director Nicholas Godici [informally] met with Hyatt . . . and Hyatt agreed[] to focus each application's claims on

distinct subject matter." *Id.* "Between that meeting and 2003, Hyatt filed a series of amendments in his applications that grew the number of claims to a total of approximately 115,000, including approximately 45,000 independent claims." *Id.*

From 2003 to 2012, examination of the applications was stayed due to Hyatt's challenges to various PTO decisions and procedures. *Id.* at 1354 & n.3. In 2013, the PTO began examining the applications again and "the PTO created an art unit, comprised originally of 12 experienced examiners, dedicated to examining Hyatt's applications." *Id.* at 1354. The PTO made a variety of choices to facilitate that examination process, including notifying Hyatt regarding certain "Requirements" that would streamline prosecution of his applications. *Id.* at 1354–55.

The four cases at issue here, however, deal with only four of those applications—specifically, the '639 application, '211 application, '398 application, and '062 application. *Id.* at 1353. Each of the four "'applications' claims were finally rejected and reviewed on appeal by the Board of Patent Appeals and Interferences [] which affirmed rejections of certain claims in each application." *Id.* at 1355. No application was rejected during that process on the grounds of prosecution laches. *Id.*

## C.  History of this Lawsuit

In November 2005, Hyatt filed an action in this Court seeking to obtain a patent for one of those applications. *Id.* In September 2009, he filed three more lawsuits seeking patents for three additional rejected applications. *Id.*

In 2016, the PTO moved to dismiss all the cases on the grounds of prosecution laches. *Id.* at 1356. Prosecution laches "is an equitable affirmative defense" which "may 'render a patent unenforceable when it has issued only after an unreasonable and unexplained delay in prosecution that constitutes an egregious misuse of the statutory patent system under a totality of the circumstances.'" *Id.* at 1359–60 (quoting *Cancer Rsch. Tech. Ltd. v. Barr Lab'ys, Inc.*, 625 F.3d

724, 728 (Fed. Cir. 2010)).   Under the PTO's theory, Hyatt "engaged in a 'pattern of delay in prosecuting his nearly 400 patent applications from 1969 through the present day.'"   *Id.* at 1356 (citation omitted).   After Hyatt responded to the government's motion, this Court treated the motions to dismiss as motions for summary judgment, determined that there were genuine issues of material fact, and sat for a consolidated bench trial on whether prosecution laches barred patents in all four cases.   *Id.*

Because prosecution laches is an affirmative defense, the parties agreed to have the PTO present its case-in-chief first.   *Hyatt I*, 332 F. Supp. 3d at 118.   This order would allow the Court to determine whether the PTO had even established a prima facie case before requiring Hyatt to present his case.   "During the five trial days beginning October 6, 2017, during which the PTO presented its case in chief, the PTO presented the testimony of three witnesses: Robert A. Clarke, Gregory Morse, and Stephen Kunin, its expert witness. The parties also introduced a number of exhibits."   *Id.*   During the trial, this Court granted a motion by the PTO barring evidence of the equitable doctrine of unclean hands with a promise to "revisit [the ruling] when and if we get to the defendant's case."   ECF No. 296-2.   That time never arrived.

At the end of PTO's case-in-chief, Hyatt moved for the Court to enter judgment under Federal Rule of Civil Procedure 52(c), which allows a court to enter judgment against a party fully heard "on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue."   Fed. R. Civ. P. 52(c); *see Hyatt I*, 332 F. Supp. 3d at 119. This Court then concluded that "the PTO failed to prove unreasonable and unexplained delay that

supports a finding of prosecution laches" and granted Hyatt's motion. *Hyatt I*, 332 F. Supp. 3d at 119.[2]

On appeal, the Federal Circuit vacated in part the Court's judgment on prosecution laches. *Hyatt II*, 998 F.3d at 1372. It concluded that the Court erred in granting the Rule 52(c) motion because the PTO carried its burden to demonstrate that there was an unreasonable and inexcusable delay as well as that there was prejudice because of the delay. *Id.* at 1371–72. The Circuit then "remand[ed] to the district court for the limited purpose of affording Hyatt the opportunity to present evidence on the issue of prosecution laches, consistent with the standards set forth in [the Circuit's] opinion." *Id.* at 1371. At the same time, the panel retained jurisdiction over additional issues and is holding them in abeyance while this Court resolves the prosecution laches issue on remand. *Id.*

The parties subsequently moved for a status conference and created a joint proposed "pretrial schedule." ECF No. 283. They filed amended pretrial statements. Def.'s Amended Pretrial Statement, ECF No. 286; Pl.'s Amended Pretrial Statement, ECF No. 287. They then filed responses to each other's pretrial statements. Def.'s Response Amended Pretrial Statement, ECF No. 288; Pl.'s Response Amended Pretrial Statement, ECF No. 290.

On May 2, 2022, the PTO moved in limine to exclude evidence of unclean hands and newly added witnesses. Def.'s Mot.; Def.'s Mem., ECF No. 296-1. Hyatt opposed. Pl.'s Opp'n, ECF No. 300. And the PTO replied. Def.'s Reply, ECF No. 301.

The motion in limine is now fully briefed and ready for this Court's resolution.

---

[2] The Court also conducted additional bench trials on patentability that are not relevant to this opinion. *Hyatt II*, 998 F.3d at 1358.

## II.     LEGAL STANDARDS

### A.  The Mandate Rule

Under the mandate rule, "an inferior court has no power or authority to deviate from the mandate issued by an appellate court." *Briggs v. Pa. R.R. Co.*, 334 U.S. 304, 306 (1948).  "Once a question has been considered and decided by an appellate court, the issue may not be reconsidered at any subsequent stage of the litigation, save on appeal." *Banks v. United States*, 741 F.3d 1268, 1276 (Fed. Cir. 2014).  Nevertheless, the rule applies only to "issues 'actually decided, either explicitly or by necessary implication.'"  *Id.* (quoting *Toro Co. v. White Consol. Indus., Inc.*, 383 F.3d 1326, 1335 (Fed. Cir. 2004)).  In sum, "the issues actually decided—those within the scope of the judgment appealed from, minus those explicitly reserved or remanded by the court—are foreclosed from further consideration." *Engel Indus., Inc. v. Lockformer Co.*, 166 F.3d 1379, 1383 (Fed. Cir. 1999).

The Federal Circuit instructs that a district court must implement "both the letter and the spirit of the [Circuit's] mandate." *TecSec, Inc. v. Int'l Bus. Machines Corp.*, 731 F.3d 1336, 1342 (Fed. Cir. 2013) (quoting *Engel Indus.*, 166 F.3d at 1383).  This is not always an easy task.  *See, e.g.*, *Laitram Corp. v. NEC Corp.*, 115 F.3d 947, 951 (Fed. Cir. 1997) ("While the district court's interpretation of our mandate was reasonable, particularly in light of our refusal to clarify the issue when asked, the district court's reasoning was in error.").[3]  But it is the duty of a district court to determine the depth and breadth of a higher court's mandate and to implement it faithfully.  This

---

[3] There are three exceptional circumstances that allow for a lower court to circumvent the mandate. *Banks*, 741 F.3d at 1276.  Those are: "(1) subsequent evidence presented at trial was substantially different from the original evidence; (2) controlling authority has since made a contrary and applicable decision of the law; or (3) the decision was clearly erroneous and would work a manifest injustice."  *Id.* (internal quotation marks omitted).  The parties raise none of these circumstances at this juncture and the Court therefore does not reach them.

is particularly true where, as is true here, the appellate court has vacated the lower court's prior determination.

### B.  Motions in Limine and Relevance

Motions in limine allow for a court to provide a pretrial determination of the parties' evidence and a clarification of the legal principles governing admissibility.  21 Charles A. Wright & Kenneth W. Graham, Jr., Federal Practice and Procedure § 5037.10 (2d ed. Westlaw October 2022 Update).  "[I]n limine rulings are preliminary in character."  *Walter Kidde Portable Equip., Inc. v. Universal Sec. Instruments, Inc.*, 479 F.3d 1330, 1338 (Fed. Cir. 2007).  The benefit of a motion in limine is that it allows a court, and the parties, to narrow the expected issues at trial and therefore to provide for a more efficient and seamless process of adjudication.

"As provided in [Federal] Rules [of Evidence] 401–403, admissible evidence must be relevant in that it must tend to make a consequential fact more or less probable."  *Magnivision, Inc. v. Bonneau Co.*, 115 F.3d 956, 961 (Fed. Cir. 1997).  "Irrelevant evidence is not admissible." Fed. R. Evid. 402.  Even probative evidence may be excluded "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.  And while it is important for a court to police the bounds of relevant evidence, "a motion in limine is not the appropriate vehicle for weighing the sufficiency of the evidence." *Meyer Intell. Properties Ltd. v. Bodum, Inc.*, 690 F.3d 1354, 1378 (Fed. Cir. 2012); *accord Graves v. D.C.*, 850 F. Supp. 2d 6, 10–11 (D.D.C. 2011).

### C.  Prosecution Laches

Under prosecution laches, a patent may be rendered unenforceable if the proponent demonstrates "(a) that the patentee's delay in prosecution was unreasonable and inexcusable under the totality of circumstances, and (b) that the accused infringer suffered prejudice attributable to

the delay." *Hyatt II*, 998 F.3d at 1360, 1362.  The purpose behind this equitable doctrine is that

an applicant may not "deliberately and without excuse postpone[] beyond the date of the actual

invention, the beginning of the term of his monopoly, and thus put[] off the free public enjoyment

of the useful invention." *Id.* at 1360 (quoting *Woodbridge v. United States*, 263 U.S. 50, 56

(1923)).  Unreasonable or inexcusable delay should be of the type that demonstrates an "egregious

case[] of misuse of the statutory patent system." *Symbol Techs., Inc. v. Lemelson Med., Educ. &*

*Rsch. Found.*, 422 F.3d 1378, 1385 (Fed. Cir.), *amended on reh'g in part sub nom.* 429 F.3d 1051

(Fed. Cir. 2005).  For example, conduct "involv[ing] repetitive refilings that demonstrate

unjustifiable prosecution delay" may meet the standard.  *Hyatt II*, 998 F.3d at 1362.  Prejudice

then requires the proponent to establish "evidence of intervening rights." *Id.*

## III.   DISCUSSION

The PTO moves to exclude (1) evidence of "unclean hands, laches, and administrative

delay" in its conduct toward Hyatt and (2) testimony from four witnesses that the PTO argues is

procedurally unavailable to Hyatt.  Def.'s Mot.  For the first, the PTO wishes to exclude "alleged

'inequitable actions and unclean hands.'"  Def.'s Mem. 1–2.  It argues that the evidence is

irrelevant because the equitable doctrine of unclean hands is unavailable to Hyatt and such

evidence does not bear on the remaining prosecution laches issues on remand.  Second, the PTO

wishes to exclude four witnesses that Hyatt seeks to add to the trial, but that were not previously

on Hyatt's witness list at the time of the original bench trial on prosecution laches.  Def.'s Mem.

12–38.

As an initial matter, Hyatt cannot and will not be given short shrift simply because he won

on his Rule 52(c) motion at this Court, but then subsequently lost on appeal.  *See Int'l Union,*

*United Auto., Aerospace & Agr. Implement Workers of Am., UAW v. Mack Trucks, Inc.*, 917 F.2d

107, 110–111 (3d Cir. 1990).  The proceedings here are meant to be conducted in a manner that

mimics "resumption of trial," *Hamlet v. United States*, 14 F.3d 613 (Fed. Cir. 1993) (per curiam) (unpublished), in which "the [Rule 52(c)] verdict had been denied by the district court," *Mack Trucks*, 917 F.2d at 110.  Here, the PTO has presented its case-in-chief and met its burden.  Now, Hyatt will have the opportunity to present the case-in-chief that this Court previously held to be unnecessary.  Such a result is proper under "principles of fairness,"  *Hyatt II*, 998 F.3d at 1372, and the Circuit's instruction that further proceedings be conducted "for the limited purpose of affording Hyatt the opportunity to present evidence on the issue of prosecution laches, consistent with the standards set forth in th[e Circuit's] opinion." *Id.* at 1371.

For purposes of evaluating admissibility, the Court will act as if it had denied the Rule 52(c) motion and articulated the proper legal standard, as clarified by the Federal Circuit.  Irrelevant evidence will then be excluded from Hyatt's case-in-chief, as it would have been if this Court had explained the appropriate state of the law upon denying the Rule 52(c) motion.

Before moving to the Federal Circuit's opinion, this Court must start by considering whether the unclean hands doctrine is available to Hyatt.  After concluding that it is not, the Court will then examine the relevant issues on remand for the two elements of prosecution laches and consider whether the kind of evidence that the PTO wishes to exclude is relevant for those issues.  Lastly, the Court will resolve the remaining procedural issues regarding Hyatt's proposed witnesses.

### A.  Unclean Hands is Unavailable to Hyatt Because the PTO is Pursuing a Congressional Mandate in the Public Interest

"The unclean hands doctrine derives from the equitable maxim that 'he who comes into equity must come with clean hands.' The doctrine 'closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief.'" *United States v. Philip Morris Inc.*, 300 F. Supp. 2d 61, 74–75 (D.D.C. 2004) (internal citation removed)

(quoting *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814 (1945)).  "It is a self-imposed ordinance . . . rooted in the historical concept of court of equity as a vehicle for affirmatively enforcing the requirements of conscience and good faith."  *Precision Instrument Mfg. Co.*, 324 U.S. at 814.  Therefore, even when the elements of prosecution laches have been met, the doctrine of unclean hands might offer a party who has failed to rebut a prosecution laches defense one last chance to prevent application of laches.

Hyatt seeks to use the unclean hands doctrine against the PTO and to admit evidence demonstrating inequitable government conduct.  Pl.'s Opp'n 8–15.  The PTO has moved to exclude evidence of unclean hands because the doctrine cannot be asserted against the PTO in this context.  Def.'s Mem. 5–12.  This Court holds that the unclean hands doctrine is unavailable because the PTO is before this Court enforcing a congressional mandate in the public interest.

As a general matter, "when the government calls upon equity to enforce laws on behalf of its citizens, a defendant may not rely on equitable defenses in the same manner as it could against an ordinary litigant."  *United States v. Bolton*, 514 F. Supp. 3d 158, 168 (D.D.C. 2021).  "Although the Supreme Court has left open the question of whether there exists a 'flat rule that [unclean hands] may not in any circumstances run against the Government,' it has nonetheless recognized that 'the Government may not be estopped on the same terms as any other litigant.'"  *Bartko v. Sec. & Exch. Comm'n*, 845 F.3d 1217, 1227 (D.C. Cir. 2017) (alteration in the original) (quoting *Heckler v. Cmty. Health Servs.*, 467 U.S. 51, 60 (1984)).  The reason is simple.  To allow a private party to assert equitable doctrines like unclean hands against the government when it is enforcing the interests of the "citizenry as a whole" would be to punish the broader public and undermine enforcement of law "because [of] the conduct of [the government's] agents."  *See Heckler*, 467 U.S. at 60.  This principle is at its apex when the government is "attempting to enforce a

congressional mandate in the public interest." *SEC v. Gulf & Western Ind., Inc.*, 502 F. Supp. 343, 348 (D.D.C. 1980).

This does not mean, however, that equitable defenses may never apply against the government when it is seeking to enforce the public interest or a congressional mandate. That question has been left open. *See Bartko*, 845 F.3d at 1227. At the very least, however, the non-governmental party would have to establish government misconduct rising to such an egregious level as to overwhelm "the public interest in ensuring that the Government can enforce the law free from estoppel" with prejudice rising to the degree "of a constitutional violation." *See id.* (internal quotation marks and citations omitted).[4] Applying these principles here, Hyatt may not rely on the unclean hands doctrine.[5]

To start, the PTO is sufficiently acting in an enforcement role here to be protected from application of unclean hands. It is true that the PTO is before this Court as a defendant, but it is a defendant in a special kind of civil action—one that seeks to obtain patents rejected by the PTO through "remedy by civil action against the Director." 35 U.S.C. § 145; *Kappos v. Hyatt*, 566 U.S. 431, 437 (2012). In response to Hyatt's lawsuit, the PTO is empowered to invoke prosecution laches and resist issuing those patents.

---

[4] There is no evidence of such an egregious situation here, nor does Hyatt plausibly try to establish one. *See* Def.'s Reply 6 n.6.

[5] To the extent that Hyatt argues against the general principle that equitable defenses fail to run against the government in this context, he is mistaken. *See* Pl.'s Opp'n 8–15. For one, Hyatt does not attempt to distinguish the many cases explaining how enforcement of a congressional mandate in the public interest bars application of equitable doctrines against the government absent extreme circumstances. Indeed, he seems to accept these cases, but merely argues that no congressional mandate is at issue here. *See id.* at 13. Second, his cases involving *litigation* laches, which is about delay in litigation, are inapposite to *prosecution* laches, which is about abuse and delay of the PTO's patent system. Third, his citations to equitable cases involving private parties say little about how equitable principles may be asserted against the government. And finally, while it is true that courts may weigh the equities when considering injunctive relief, that kind of equitable balancing is captured by the very nature of the prosecution laches inquiry, requiring a finding of abuse of the patent system and material prejudice before prosecution laches may be applied. *See infra* Part III.B.

As a broad matter, "the PTO has the authority to deny patent issuance on prosecution laches grounds." *Hyatt II*, 998 F.3d at 1362.  This is true both in the PTO's internal process, *In re Bogese*, 303 F.3d 1362, 1367 (Fed. Cir. 2002), as well as in an action like this one, *see Hyatt II*, 998 F.3d at 1362–63.  In a Section 145 action, the PTO channels this authority by asserting it as an equitable affirmative defense, *id.*, which Congress maintained in these actions, *id.* (citing 35 U.S.C. § 282).  But the foundation for the PTO's authority is fundamentally the same here as it is for a PTO internal proceeding.  *See id.* at 1363 ("[I]t would make little sense for the PTO to have the authority to use prosecution laches as a basis for denying a patent, but to lack the authority to defend against issuance of a patent in a § 145 action on the same basis.").  Even as it sits on the defendant side of the "v" in this case, the PTO is acting in an enforcement role by pursuing its prosecution laches authority as an affirmative defense.

The PTO's congressional mandate stems from its position as the agency tasked with the issuance of patents and administration of the patent system.  *See* 35 U.S.C. § 2.  In managing that process, the PTO has the "authority to sanction undue delay" and "the authority to reject patent applications for patents that would be unenforceable [due to prosecution laches]."  *In re Bogese*, 303 F.3d at 1367–68.  The Federal Circuit has held that this authority is "inherent" in the PTO's statutorily assigned role.  *See id.* (citing 35 U.S.C. § 2).  Hyatt is therefore wrong to assert that "there is no congressional mandate that PTO seeks to enforce" because "the PTO 'shall issue a patent' when 'it appears that the applicant is entitled to a patent under the law.'"  Pl.'s Opp'n 13–14 (quoting 35 U.S.C. § 131).  The requirement that the PTO must decide whether an "applicant is entitled to a patent *under the law*" directs the PTO to resist issuing a patent in situations like this one.  *See* 35 U.S.C. § 131 (emphasis added).  And Congress maintained that authority in a Section 145 action.  *Hyatt II*, 998 F.3d at 1362–63.  Indeed, the Federal Circuit has previously

described the statutory mandate of the PTO using exactly this lens.  *See, e.g.*, *BlackLight Power, Inc. v. Rogan*, 295 F.3d 1269, 1273 (Fed. Cir. 2002) (considering it the "responsibility, and the mission of the PTO . . . to assure that patents are properly examined, and valid" (citing 35 U.S.C. § 151 and *Skidmore v. Swift & Co.*, 323 U.S. 134, 139–40 (1944)); *id.* at 1274 ("[T]he Commissioner has an obligation to refuse to grant a patent if he believes that doing so would be contrary to law." (quoting *In re Alappat*, 33 F.3d 1526, 1535 (Fed. Cir. 1994) (en banc), *abrogated on other grounds by In re Bilski*, 545 F.3d 943 (Fed. Cir. 2008))).

As for public interest, the PTO litigates its congressional mandate in the public interest whenever it satisfies the two prongs of prosecution laches.  After all, the unclean hands doctrine only applies when the PTO has successfully established the two elements of prosecution laches: (1) unreasonable and inexcusable delay and (2) prejudice.  *Hyatt II*, 998 F.3d at 1360, 1362.  The first prong requires the kind of delay demonstrating an "egregious case[] of misuse of the statutory patent system."  *Symbol Techs.*, 422 F.3d at 1385.  The latter involves "evidence of intervening rights."  *Hyatt II*, 998 F.3d at 1362.  When the PTO resists issuance of a patent to someone who has egregiously misused the patent system and prejudiced others, it is definitionally acting to protect the public.

The public interest showing is particularly strong in this case, where, if Hyatt fails to meet his burden, the evidence will have established that he is "responsibl[e] for the sizable undue administrative burden that his applications have placed on the PTO in its efforts to process Hyatt's applications, which the record before [the Circuit] demonstrates to be extreme" and his "conduct amounted to a clear abuse of the PTO's patent examination system" that requires him to show "that [his] delay has not caused the PTO or any third party material prejudice."  *Id.* at 1371–72.  It is possible, of course, that Hyatt will meet his burden to overcome that evidence, in which case he

will not need to rely on the unclean hands doctrine because he will have defeated prosecution laches on the merits.  But if he cannot meet his burden, then the PTO's resistance of Hyatt's effort to obtain these patents is in pursuit of the public interest.[6]

Finally, even if it were possible for unclean hands to sometimes run against the government when it is enforcing a congressional mandate in the public interest, it certainly is not appropriate to impose unclean hands in the specific prosecution laches context.  Indeed, the purpose of prosecution laches cuts against Hyatt.  This type of laches originates in a fundamental concern about "the rights of the public" and protecting the public from abuse of the beneficial patent system.  *See Woodbridge*, 263 U.S. at 58–60.  That basis is at odds with permitting a litigant to attack the propriety of the PTO's conduct to force the issuance of a patent improperly delayed by the applicant.  Furthermore, the doctrine of unclean hands, upon which Hyatt relies, has largely "evolved" in the patent prosecution context to prevent "egregious affirmative acts of misconduct intended to deceive both *the PTO* and the courts [as well as] the mere nondisclosure of information *to the PTO*."  *See Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1285–87 (Fed. Cir. 2011) (en banc) (emphases added).  It is telling that the form of unclean hands typically at issue when challenging behavior during the patent prosecution process, called "inequitable conduct," *see id.*, is centered on harm and abuse to the PTO and its process.  The aim is to protect the PTO and by extension the larger public.  To then apply unclean hands against the PTO in the patent prosecution context would be at odds with the development of equity in this space and undermine the important policies underlying prosecution laches.  Accordingly, when the PTO demonstrates

---

[6] Because the Court finds that the PTO is acting to enforce a congressional mandate in the public interest, it need not address the extent to which only one of those elements is required.  *See Philip Morris Inc.*, 300 F. Supp. 2d at 75 (appearing to consider "the unclean hands doctrine [] unavailable as a matter of law" whenever "the Government acts in the public interest").  *Contra* Pl.'s Opp'n 15 ("[I]t is not enough for an agency to assert that it is acting 'in the public interest.'" (quoting Def.'s Mem. 9)).

the kind of abuse and harm necessary for a prosecution laches finding, the principles of equity do not condone attacks on that showing by appeal to the principle of unclean hands.

*      *      *

In sum, the PTO is before this Court pursuing the public interest and doing so to enforce a congressional mandate.  Under the principles of equity, Hyatt is barred from asserting the unclean hands doctrine to defeat the PTO's affirmative showing of prosecution laches.  Even if that were not enough, the specific context of the PTO asserting its prosecution laches authority cuts against allowing unclean hands to be wielded as a response.  And because the unclean hands doctrine is unavailable to Hyatt as a rebuttal to the PTO's showing of prosecution laches, he may not introduce evidence on this remand for the purpose of demonstrating unclean hands on the part of the PTO.

## B.  The Federal Circuit's Opinion Sets Out the Relevant Prosecution Laches Issues on Remand

As explained above, prosecution laches involves two elements that must be established by the proponent, here the PTO.  First, the defendant must establish "that the patentee's delay in prosecution was unreasonable and inexcusable under the totality of circumstances." *Hyatt II*, 998 F.3d at 1362.  Second, the proponent must establish "that the accused infringer suffered prejudice attributable to the delay." *Id.*  Since prosecution laches is an equitable affirmative defense, the initial burden lay with the PTO to prove both elements.  The Circuit concluded that it met both and shifted the burden to Hyatt to rebut the PTO's case.  *Hyatt II*, 998 F.3d at 1371–72; *see also Serdarevic v. Advanced Med. Optics, Inc.*, 532 F.3d 1352, 1359–60 (Fed. Cir. 2008).

The Federal Circuit provided substantial guidance on how to apply prosecution laches. To determine what remains relevant, the Court will lay out the standard for each element of prosecution laches, discuss the Circuit's application of those elements to this case, and finally identify the remaining issues on remand.

In sum, this Court will, and indeed must, allow Hyatt to present evidence on prosecution laches in a manner mimicking a continuation of the bench trial after denial of the Rule 52(c) motion. *See Mack Trucks*, 917 F.2d at 110–11. This is in keeping with the "principles of fairness and due process" that any litigant in front of a federal court is afforded. *See Hyatt II*, 998 F.3d at 1351. Hyatt did not have a chance to put on his evidence. Now he will. And, in safeguarding that opportunity, this Court will not unnecessarily and improperly limit the bounds of admissible proof.

Wholly irrelevant evidence will of course be excluded. But the hour is yet to arrive when this Court should weigh the sufficiency of the evidence. *See Meyer Intell. Properties Ltd.*, 690 F.3d at 1378; *Graves*, 850 F. Supp. 2d at 10–11. Now is the time for Hyatt to make his case. It is only upon the close of evidence that this Court will finally determine what weight his proof deserves and then apply the relevant legal standards. Therefore, Hyatt will largely be allowed to submit evidence about the PTO's conduct.

### 1. Unreasonable and Inexcusable Delay Under the Totality of the Circumstances

#### a. The Federal Circuit's Standard

In its opinion, the Federal Circuit clarified several important rules of law that govern the application of the totality of the circumstances test for unreasonable and inexcusable delay. Of course, "[w]hether an applicant's delay is unreasonable depends on the specific circumstances." *Hyatt II*, 998 F.3d at 1366. Nevertheless, the Circuit's opinion carefully lays out the legal requirements guiding a district court during its review of the circumstances.

As to the initial burden, the Federal Circuit provided guidance regarding how a proponent may "trigger prosecution laches." *Id.* at 1367–69. Ways of triggering prosecution laches include (1) establishing a sufficient quantity of time of delay; (2) demonstrating that the applicant used "an approach to prosecution that all but guaranteed indefinite prosecution delay"; and (3) "show[ing]

that [the applicant] engaged in specific, exemplary acts during prosecution that were patently unreasonable" such as failing to cooperate with the PTO. *Id.* at 1367–69. When sufficient evidence has been put forth, the applicant must provide a reasonable explanation to justify the conduct that triggered prosecution laches. *See id.* at 1369, 1371–72. And when "a clear abuse of the patent system" has been demonstrated, it is no excuse for the applicant to declare that his or her conduct did not "literally violate regulations or statutory provisions." *Id.* at 1369.

When considering evidence of unreasonable or inexcusable delay, a court errs by inappropriately discounting evidence of an applicant's overall conduct in pursuing patent prosecution. This can occur by (1) disregarding prosecution conduct for *related* applications, or (2) blaming the PTO for prosecution delays rather than focusing on the applicant's choices. *See id.* at 1363–67.

First, a court cannot overlook any discrete part of the applicant's prosecution conduct and related history when evaluating the totality of the circumstances. *Id.* at 1363–64. That includes both the scope and the substance of the applicant's conduct.

For scope, a court must consider the entire history of prosecution conduct, including related conduct. *Id.* To determine relevant related conduct, a court should consider where there is overlapping "subject matter, claim scope, and priority disclosures" between the applications at issue and proffered related applications—even if the behavior occurs after the filing date of the lawsuit, or after denial of the relevant applications. *See id.* Conduct for related applications can be particularly important for determining whether a pattern of unreasonable and inexcusable delay has been established. *Id.* at 1364.

For substance, a court must be careful not to discount any part of the applicant's interactions with the PTO. Therefore, a court must consider even informal interactions between

the applicant and members of the PTO so long as those interactions provide insight into the unreasonableness or inexcusableness of the applicant's conduct. See *id.* at 1363–65. Furthermore, a court must consider the PTO's fiscal and administrative burden in administering the applicant's applications as compared to the fees paid by the applicant. *See id.* And, whenever unreasonable conduct is suggested or established by the prosecution history, such conduct cannot be discounted—including filing claims already lost in interference proceedings or "rewriting or shifting claims midway through prosecution in applications." *See id.* at 1363–64.

Taken together, a district court errs by eliminating from consideration the scope and substance of an applicant's prosecution conduct. *Id.* And when that full scope and substance reveals, a "consistent pattern of conduct across an enormous body of similar applications" that pattern must be acknowledged and applied by the district court. *Id.*

Second, the totality of the circumstances test cannot serve "as a vehicle for blaming the PTO for the prosecution delays" rather than focusing on the applicant's own conduct. *Id.* at 1364–66. Delay by the PTO "provides a weak reason to negate prosecution laches" and the focus must be on whether the applicant "prosecute[d] its applications in an equitable way that avoids unreasonable, unexplained delay that prejudices others." *Id.* at 1366.

Consequently, evidence concerning the PTO's process cannot entirely excuse an applicant's delay. *Id.* at 1365. This includes (1) the formality or informality of the PTO's procedures and conduct; (2) the choice by the PTO of whether it wishes to follow regular procedures; (3) whether the PTO decides to police the activity of the applicant during the prosecution; and (4) if the PTO does so choose to police the applicant, the manner by which the

PTO notices applicants to their obligations and requirements.[7]  *See id.* at 1364–66; *see also id.* at 1366 ("Requiring the PTO to adopt tailored approaches to make sure that each applicant that delays, is unresponsive, or is otherwise outside normal prosecution conduct successfully progresses through prosecution would impose obligations on the PTO not contemplated by the statute.").  Indeed, time periods of delay, or even suspension of prosecution by the PTO, cannot be counted against the PTO if the delay or suspension was linked to the applicant's actions, including challenges in court to PTO procedures and conduct.  *Id.* at 1365.  In sum, "[t]he applicant is in the driver's seat and must take care to avail itself of the PTO's beneficial patent examination process as it stands and in a way that avoids undue delay leading to prejudice imposed on others."  *Id.* at 1366.

> b.  Application by the Circuit to this Case

In its opinion, the Circuit concluded that the PTO met its burden on prosecution laches—shifting the burden onto Hyatt—and that Hyatt has thus far failed to demonstrate a sufficient explanation for his conduct.

First, the PTO triggered prosecution laches just by establishing, as Hyatt conceded, that he delayed "seven to 11 years to file the four applications at issue and between 10 and 19 years before presenting the claims now in dispute."  *Id.* at 1368.[8]  Thus, even by Hyatt's own calculations, "the magnitude of Hyatt's delay" was sufficient as a matter of law to trigger prosecution laches.  *Id.*; *see also id.* at 1369 ("[A] delay of more than six years raises a 'presumption that it is unreasonable, inexcusable, and prejudicial.'" (quoting *Wanlass v. Gen. Elec. Co.*, 148 F.3d 1334, 1337 (Fed. Cir.

---

[7] Although, notifications to an applicant that give the applicant an opportunity to avoid prosecution laches, formal or otherwise, will lend support to a prosecution laches finding.  *Hyatt II*, 998 F.3d at 1366.

[8] "Hyatt argue[d]" for the time periods quoted from the Circuit.  *Hyatt II*, 998 F.3d at 1367–68.  Those periods of delay were less than the ones PTO argued for, generally ranging from "12 to 28 years."  *Id.*  "Even accepting Hyatt's arguments" the Circuit concluded that the shorter periods of time alleged by Hyatt triggered prosecution laches.  *Id.*

1998))).  Given the Circuit's discussion, the time of delay alone shifted the burden to Hyatt to demonstrate a sufficient reason for the delay.

Second, the PTO demonstrated that Hyatt's "patterns of prosecution conduct created a perfect storm that overwhelmed the PTO" and therefore "all but guaranteed indefinite prosecution delay."  *Id.* at 1368.  Hyatt's "applications claim[ed] priority to a large number of earlier applications, creating a large number of possible priority dates."  *Id.*  Hyatt "fail[ed] to identify written description support for his claims" for "many years" despite "the length and complexity of both the specifications themselves and those of the priority applications."  *Id.*  He effectively restarted examinations over and over again by "adding hundreds of claims to each application" "fil[ing] identical or patentably indistinct claims across different applications" and "engaging in a pattern of rewriting claims entirely or in significant part midway through prosecution."  *Id.*  In sum, "[i]t was virtually impossible for examiners to perform a double patenting analysis . . . determine[] priority dates and identify[] written description support."  *Id.*  The Circuit therefore found that Hyatt's choices "made it effectively impossible for the PTO to process" his applications.  *Id.*

Finally, the Circuit concluded that Hyatt's "specific, exemplary acts during prosecution" "were patently unreasonable."  *Id.* at 1368.  One act was Hyatt's decision to "file[] claims that he had previously lost in interference proceedings."  *Id.* at 1369.  The Circuit held that, regardless of intent, those filings at the very least evince "that his prosecution approach had overwhelmed even his own ability to manage his applications and claims."  *Id.*  And more broadly, the Circuit held that Hyatt had not been able to justify his prosecution approach with any "reasonable explanation."  *Id.*  The Circuit explained that this was particularly true given his October 1995 discussion with Director Godici in which he agreed to "demarcate his applications" but then "did precisely the

21

opposite to an extreme degree" without "a 'master plan' for demarcating his applications." *Id.* (citation omitted).

The Circuit also found this Court's previous opinion lacking because, in the Circuit's estimation, it "discount[ed] or ignore[ed] evidence—indeed swaths of evidence in certain situations—regarding Hyatt's prosecution conduct as a cause for delay." *Id.* at 1364. Specifically, this Court erred by focusing on the time period up until 2002, rather than the entire temporal range, discounting other applications by Hyatt, failing to consider "a consistent pattern of conduct" by Hyatt, and improperly shifting blame onto the PTO. *Id.* at 1364–66.

Considering the PTO's proof, the Circuit found that "the conclusion is inescapable that the PTO satisfied its burden of proving that Hyatt engaged in unreasonable and unexplainable delay, as prosecution laches requires." *Id.* at 1369. Indeed, the Circuit explained that it "c[ould] divine no reason in the record currently before the court that would suffice" "to negate that [Hyatt's] delay has been unreasonable and unexplained." *Id.* at 1372. The Circuit specifically held that the following reasons "without more are insufficient as a matter of law to negate that Hyatt's delay was unreasonable and unexplained": (1) "he timely completed examination" for the "four applications at issue;" (2) "his conduct during prosecution of his other GATT Bubble applications is irrelevant to the prosecution laches analysis;" (3) "he filed his GATT Bubble applications to cover a number of inventions he believed he had made;" and (4) "[he] met statutory requirements and followed the PTO's rules in prosecuting his applications." *Id.* at 1371.

Given the circumstances of this case, the Circuit concluded that "Hyatt must show by preponderance of evidence that Hyatt had a legitimate, affirmative reason for his delay" strong enough to "excuse Hyatt from responsibility for the . . . extreme" "administrative burden that his applications have placed on the PTO." *Id.* at 1371–72. At the very least, Hyatt must justify his

(1) "decision to ignore Director Godici's instruction to demarcate his applications in 1995;" (2) "decision to adopt the specific prosecution approach that he did—unique in its scope and nature— as detailed in the PTO's Requirements;" and (3) "failure to develop a plan for demarcating his applications over at least the 20 year period from 1995 to 2015." *Id.* at 1372. "Any reasons that fall short of justifying those decisions or omissions fail to negate that his delay has been unreasonable and unexplained." *Id.*

### c.   The Relevant Issues on Remand

On remand, Hyatt is entitled to "present evidence and be heard" on the element of unexplained and inexcusable delay. *Id.* Therefore, Hyatt may challenge evidence offered by the PTO during its case-in-chief with a case-in-chief of his own aimed at (1) rebutting the assertion that his approach "all but guaranteed indefinite prosecution delay" and (2) justifying his "specific, exemplary" and apparently "patently unreasonable" actions. *See id.* at 1367–69. Per the Circuit's discussion of scope and substance, Hyatt may (and must) discuss not just the applications before this Court, but also his pattern of conduct and interactions with the PTO across all relevant applications. *See id.* at 1363–67. And Hyatt must specifically address the three decisions singled out by the Circuit for justification. *See id.* at 1371–72.

Hyatt argues that the PTO's conduct is relevant for his burden on unreasonable and inexcusable delay. Pl.'s Opp'n 15–18. The PTO argues that such evidence has been largely foreclosed by the Circuit's opinion. Def.'s Reply 15–18. The PTO makes strong points on why the Federal Circuit's reasoning suggests that it will ultimately succeed on a final weighing of the evidence. But that is not the posture of this case. Hyatt is entitled to present evidence in his favor so long as it makes a fact of consequence under the legal standard more or less probable. And the Court concludes that PTO conduct may be relevant to Hyatt's burden on delay in several ways.

First, outward-facing PTO conduct that Hyatt was aware of is intuitively relevant when used to explain Hyatt's own choices.  For example, if Hyatt took a certain action based on a PTO communication sent to him, he may seek to admit evidence of that communication to justify his action.

Second, PTO conduct may also be relevant to overcome the implication, on the current record, that Hyatt's approach "all but guaranteed indefinite prosecution delay."  *See Hyatt II*, 998 F.3d at 1367–69.  PTO communications and decisions, even if unknown to Hyatt at the time, may be relevant when used to establish that Hyatt's conduct did not invariably guarantee delay.  For example, Hyatt may pair a justification for his choice to "claim priority to a large number of earlier applications, creating a large number of possible priority dates" with evidence suggesting that his decision did not actually "frustrate[] the examiners' ability to take the preliminary step of identifying the relevant body of prior art for purposes of examining the claims."  *See id.* at 1368.

Third, evidence challenging responsibility for periods of delay is not entirely irrelevant. Of course, the Circuit ultimately concluded that, under any calculation of delay, prosecution laches has been *triggered* by Hyatt's conduct.  *Id.* at 1367–68.  And the PTO relies on that determination to argue that all discussion of responsibility for delay is now irrelevant.  Def.'s Reply 15–16.  Not so.  The triggering of prosecution laches has shifted the burden to Hyatt to rebut the PTO's case. While Hyatt has a heavy burden to overcome, he may still attempt to discredit or refute the PTO's evidence, including on responsibility for delay.  The Court will then consider that evidence when evaluating the totality of the circumstances in accordance with the instructions from the Circuit. Of course, "[t]he PTO's delay [] provides a weak reason to negate prosecution laches."  *Id.* at 1366. But Hyatt is nevertheless entitled to provide such evidence in the hope that, combined with other evidence justifying his choices, he will be able to ultimately rebut the PTO's case as it stands.

It is true, however, that evidence admitted simply to establish a lack of good faith by the PTO is inadmissible. *See supra* Part III.A. Instead, evidence of outward-facing or internal PTO conduct must relate to Hyatt's burden to rebut the PTO's case and the legal elements identified as important by this Court and the Circuit.

In sum, the Federal Circuit made clear that even though it could "divine no reason in the record currently before the court" that might justify the delay here, "Hyatt is entitled as a matter of fairness to present evidence and be heard on this issue." *Hyatt II*, 998 F.3d at 1372. Keeping those dual considerations in mind, Hyatt must be provided a sufficient opportunity to make his case. And this Court has accordingly laid out the legally relevant issues under which PTO conduct may be relevant.

### 2. Prejudice

#### a. The Federal Circuit's Standard

In addition to unreasonable and inexcusable delay under the totality of the circumstances, a proponent of prosecution laches must also establish prejudice attributable to the patentee's delay—that is, "evidence of intervening rights." *Id.* at 1362, 1369–70. This rule applies to the PTO. *Id.*

The prejudice burden can be satisfied a variety of ways. One method is by demonstrating "a delay of more than six years" which then "raises a 'presumption that it is . . . prejudicial.'" *Id.* at 1369 (citation omitted). Upon a showing of an unreasonable and unexplained prosecution delay of six years or more, the burden shifts to the applicant to demonstrate either that (1) the delay was reasonable or excusable or (2) the proponent of prosecution laches "suffered neither economic nor evidentiary prejudice." *Id.* at 1369–70 (citation omitted).

Prejudice can also be established when "a patent applicant has committed a clear abuse of the PTO's patent examination system." *Id.* at 1370. Clear abuse is met when "the applicant's

conduct unduly increases the administrative burden on the PTO and thereby effectively taxes everyone using the system." *Id.* Such behavior creates "a dangerous likelihood" of harm to the overall public interest, and therefore the "applicant's conduct and its effects on the PTO can alone suffice to prove prejudice." *Id.* In keeping with the extraordinary nature of clear abuse, this should, however, be a "rare circumstance." *Id.* Nevertheless, the PTO need not prove an intentional abuse to satisfy this standard. *See id.*

        b.  Application by the Circuit to this Case

This Court did not squarely reach the prejudice issue in its earlier ruling. *See id.* at 1369 n.10. The Circuit then resolved the issue for the first time on appeal.

The Circuit concluded that the PTO had established during its case-in-chief six years of unreasonable and unexplained delay "by any measure" as well as a clear abuse of the PTO's patent examination system. *Id.* at 1370. The former alone shifted the burden to Hyatt to establish that there had been a lack of prejudice. *Id.* For the latter, the Circuit looked to (1) Hyatt's approach to prosecuting his applications; (2) the PTO's special art unit created to deal with his applications, the associated atypical procedures, and the "inordinate amounts of time preparing office actions"; and (3) the $3 million deficit between PTO administrative expenses over five years and the $7 million in fees paid by Hyatt. *Id.* at 1370–72. Taking those details and "combined with the details surrounding Hyatt's pattern of prosecution conduct[,]" the Circuit held that the PTO had established a clear abuse contributing to the delay for the applications at issue in this case. *Id.* at 1370–71. Given those two showings, the burden has shifted to Hyatt to rebut the presumption of prejudice established by the PTO. *See id.* at 1370–72.

c.   The Relevant Issues on Remand

In response to the PTO's motion, Hyatt argues that the PTO's actions and choices are relevant to rebut its showing of prejudice and therefore he may demonstrate that the government's actions were not taken in good faith.  Pl.'s Opp'n 17–18.  The PTO argues that, given the Federal Circuit's findings and the nature of the PTO's procedures, the government's conduct is largely irrelevant at this point.  Def.'s Reply 16–17.  Once again, Hyatt's evidence will largely be allowed.

At trial, it will be Hyatt's burden to "prove that Hyatt's delay has not caused the PTO or any third party material prejudice."  *Hyatt II*, 998 F.3d at 1372.  His showing must be substantial to defeat the showing of prejudice made by the PTO; the Circuit already opined that it "cannot guess what might negate this evidence."  *Id.*  To succeed, Hyatt will have to show that his conduct did not cause harm to the PTO and its patent examination process in the ways discussed by the Circuit and that, despite the "dangerous likelihood" of broader harm to the public's interest, there was in fact no material prejudice to third parties.  *See id.* at 1370–72.

To satisfy Hyatt's burden for prejudice, the conduct of the PTO may indeed be relevant.  Evidence demonstrating that the PTO did not actually suffer material prejudice based on Hyatt's actions is relevant for Hyatt's case on the prejudice prong of prosecution laches.  Therefore, evidence explaining why administrative expense and burden were not, in fact, caused by Hyatt's approach to prosecuting his applications may be admissible when used for that purpose.  This includes evidence of internal PTO conduct making it more probable that independent PTO decisions are responsible for administrative burdens presumptively attributable to Hyatt.  Evidence admitted simply to establish a lack of good faith by the PTO is still, however, inadmissible.

Once again, this decision is in keeping with the Federal Circuit's dual statements that it "cannot guess what might negate this evidence of prejudice" and yet "Hyatt is entitled to present

evidence that his delay did not cause prejudice." *Id.* at 1372.  The Court may not disregard either directive and it shall not do so.  Hyatt will be permitted to offer relevant evidence and the Court will accord it whatever weight it merits.

### C.  Hyatt May Call the Four Witnesses Identified

In addition to the PTO's broader relevance arguments, it takes issue with four witnesses Hyatt seeks to call.  First, the PTO argues that those witnesses are untimely because they are, in essence, being added "in the middle of the trial" and that the PTO is prejudiced.  Def.'s Mem. 27–29, 31–32 (emphasis removed).  Second, the PTO argues that the witnesses are irrelevant because they address PTO conduct.  *Id.* at 18–27, 30.  Finally, the PTO argues that issues of attorney-client privilege and deliberative-process privilege will infect testimony by the proposed witnesses.  *Id.* at 35–39.[9]  While the Court will not preclude Hyatt's witnesses from testifying, it will limit the scope of their testimony based on relevance.  Determination of the privilege issues would be premature at this juncture.

#### 1.  Hyatt's Four Witnesses May Testify

The PTO argues that Hyatt's witnesses should be excluded because Hyatt seeks to, in essence, add witnesses in the middle of a trial in violation of Federal Rule of Civil Procedure Rule 37(c)(1).  That rule states: "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, [or the Court may impose an alternative sanction as provided for in the Rule] unless the failure was substantially justified or is harmless."  Fed. R. Civ. P. 37(c)(1).  Rule 26(a)(3) requires that pretrial disclosures for witnesses "be made at least 30 days

---

[9] The PTO also argues, and Hyatt concedes, that the witnesses cannot testify as experts and thus will not be called upon to give opinions.  Def.'s Mem. 32–35; Pl.'s Opp'n 28.  PTO asks this Court to enter an order holding him to that concession, *see* Def.'s Reply 23 (arguing that Hyatt may still try to elicit expert testimony). The Court sees no need to issue such an order.  If Hyatt attempts to admit expert testimony, then the PTO may object at that time.

before trial." Fed. R. Civ. P. 26(a)(3). The PTO reasons that the trial here began in 2017 and is continuing on remand. Therefore, since Hyatt did not include the witnesses in his pretrial statement at that time, he should be excluded from calling the four witnesses absent a showing of substantial justification or harmlessness. Def.'s Mem. 28. While Hyatt's proposed witnesses do violate Rule 26(a)(3), this Court concludes that they are permissible under Rule 37(c)(1).[10]

The Court held a trial in 2017 which ended upon the Rule 52(c) motion for judgment. The Federal Circuit vacated the Court's judgment in part and remanded for "further proceedings." *Hyatt II*, 998 F.3d at 1372. In many ways, these proceedings will be a resumption of the 2017 trial. The PTO's evidence, for example, will stand as it did when the Rule 52(c) motion was granted. On the other hand, both parties have recognized that the further proceedings cannot literally continue from the moment that the PTO's case-in-chief concluded. For example, both have filed amended pretrial statements, ECF No. 286, 287. It is impossible to pretend that not a day has passed when the Court plans on resuming the bench trial more than five years after the first part of the trial concluded.

Nevertheless, Hyatt's failure to disclose his proposed witnesses before the trial began in 2017 violates Rule 26(a)(3). He submitted them shortly after the Federal Circuit's opinion was issued. *See* ECF No. 300-4. Treating these proceedings as essentially a "resumption of trial," *Hamlet*, 14 F.3d, as if the Court had denied the Rule 52(c) motion, *see Mack Trucks*, 917 F.2d at 110–11, the disclosure was not made thirty days before the start of the 2017 portion of the trial that is about to continue. This formally violates Rule 26(a)(3).

Despite Hyatt's violation, the proposed witnesses will not be excluded under Rule 37(c)(1). The sanction authority in Rule 37(c)(1) is not an inflexible one; it makes an exception upon

---

[10] Because Rule 37(c)(1) permits the witnesses, the Court need not consider the effect of Local Rule 16.5(b)(5).

substantial justification or harmlessness.  Fed. R. Civ. P. 37(c)(1).  That carve-out ensures that a court may "avoid unduly harsh penalties" in unique situations like this one.  *See* Fed. R. Civ. P. 37(c)(1), advisory committee note to 1993 amendment.  And these circumstances truly are unique.  The Court will soon resume a proceeding on remand, based on the mandate from an appellate court reversing a granted Rule 52(c) motion, more than half a decade since the last testimony was heard.  Given the significant passage of time between the PTO's case-in-chief and the start of his own, Hyatt was substantially justified in adding these four witnesses based simply on the posture of the proceedings and the five-year gap.  And the violation is also harmless here if cured by the opportunity for depositions.  *See Robinson v. D.C.*, 75 F. Supp. 3d 190, 197 (D.D.C. 2014).  Either way, such depositions are in keeping with the "principles of fairness" that dictated this remand, *Hyatt II*, 998 F.3d at 1372, as well as the broad discretion afforded district courts in this area, *see Hussain v. Nicholson*, 435 F.3d 359, 363 (D.C. Cir. 2006).

In sum, there is simply no basis to apply the "extreme sanction" of "preclusion of evidence" under these circumstances.  *Richardson v. Korson*, 905 F. Supp. 2d 193, 200 (D.D.C. 2012).[11]  Hyatt may properly use the proposed witnesses during his case-in-chief and the PTO may properly depose them in order to prepare for that testimony.

### 2.  The Witnesses May Testify Only to Relevant Issues, Including Bias

Of course, even though the four proposed witnesses may testify, they cannot do so unbounded.  The rule of relevance always applies.  *See Magnivision, Inc.*, 115 F.3d at 961.  As this Court has previously explained, the doctrine of unclean hands is not relevant on this remand and the witnesses may not testify for the purpose of establishing the applicability of that doctrine.  *See*

---

[11] That is particularly true given the PTO's own tardy noticing of witnesses in 2017, an allegation made by Hyatt that the PTO does not dispute in its reply.  Pl.'s Opp'n 26–27; *see generally* Def.'s Reply.

*supra* Part III.A.  The relevant issues will be those that go to Hyatt's burden on unreasonable and inexcusable delay or prejudice.  *See supra* Part III.B.  For both relevant elements then, evidence purporting to demonstrate a lack of good faith on the part of the PTO is not relevant without more.  To the extent that Hyatt expected that his witnesses would testify to that issue, he must abandon that understanding and use the witnesses for the relevant purposes identified.

Finally, Hyatt argues that his witnesses should be allowed to testify that two of the PTO's witnesses were biased against Hyatt.  Pl.'s Opp'n 18.  The PTO opposes, arguing that Hyatt's "claim of bias would discredit witnesses for the same reason they are competent to testify, i.e., their personal knowledge of the examination of his applications."  Def.'s Reply 18.  The PTO further fears that this Court will invite error by allowing evidence of bias.  *Id.*  The PTO's objections, however, are incorrect.

It is axiomatic that "[e]vidence otherwise inadmissible may be admitted if it shows bias on the part of the witness."  *United States v. Slough*, 22 F. Supp. 3d 29, 33 (D.D.C. 2014).  "Bias is never classified as a collateral matter which lies beyond the scope of [questioning], nor as a matter on which an examiner is required to take a witness's answer [and] may be proved by extrinsic evidence even after a witness's disavowal of partiality."  *United States v. Robinson*, 530 F.2d 1076, 1079 (D.C. Cir. 1976) (quoting 3 Weinstein's Evidence 607–17 (1975)).  Bias focuses on "the relationship between a party and a witness which might lead the witness to slant, unconsciously or otherwise, [the] testimony in favor of or against a party."  *United States v. Abel*, 469 U.S. 45, 52 (1984).  Therefore, "[f]avor or friendly feeling toward a party" as well as "*hostility against* a party" may be proven any number of ways including by admitting evidence of "the witness's conduct or expressions evincing such feeling."  1 McCormick on Evid. § 39 (8th ed. Westlaw July 2022

Update) (emphasis in the original).  Hyatt may accordingly offer evidence that makes the existence of such hostility more likely.

At the same time, it is well within this Court's discretion to ensure that evidence as to bias does not turn into a sideshow.  *See, e.g.*, *Betts v. City of Chicago*, 784 F. Supp. 2d 1020, 1028–29 (N.D. Ill. 2011) (policing the limits of relevant bias evidence).  If Hyatt wishes to introduce evidence showing specific evidence of bias against him, demonstrated by the two PTO witnesses whom he identified, Hyatt may do exactly that.  If, instead, Hyatt attempts to introduce evidence that he understands the PTO as a whole to have been biased against him, particularly evidence of non-witness bias, this Court can and will exclude such evidence as not bearing on the specific bias of the specific witnesses he wishes to challenge.

### 3.  The Court Cannot Yet Fully Resolve the Privilege Issues Identified

The PTO also challenges Hyatt's new witnesses on the grounds that they will testify to matters of attorney-client privilege and deliberative-process privilege.  Def.'s Mem. 36–39.  As to the former, Hyatt asserts that he "has no intention of eliciting testimony that is subject to the attorney-client privilege from any witness."  Pl.'s Opp'n 28.  He does not address the latter.

Given Hyatt's stated intention, there is not much for the Court to resolve at this juncture. It is of course true that the attorney-client privilege is held by the client, here the PTO, and may not be waived unilaterally by former employees of the PTO.  *See In re Subpoenas Duces Tecum*, 738 F.2d 1367, 1369 (D.C. Cir. 1984); *Houser v. Church*, 486 F. Supp. 3d 117, 138 (D.D.C. 2020). Similarly, the deliberative-process privilege is held by the PTO and covers predecisional and deliberative communications.  *Nat'l Sec. Archive v. CIA*, 752 F.3d 460, 464 (D.C. Cir. 2014); *see generally Nat'l Pub. Radio, Inc. v. U.S. Dep't of Homeland Sec.*, No. 1:20-CV-2468-RCL, 2022 WL 4534730, at *4–6 (D.D.C. Sept. 28, 2022) (discussing the standards for predecisional and deliberative communications).  If, after deposing the relevant witnesses, the PTO has additional

concerns as to possibly privileged information being used at trial, it can act then to specifically exclude identified topics and communications.

## IV.   CONCLUSION

It is unclear at this juncture how the testimony of Hyatt's witnesses, and for that matter his exhibits, will fall inside and outside the bounds of relevance when trial resumes on this remand. Consequently, this Court can only issue a broad order delineating the bounds of admissibility. Objections to enforce the directives in this opinion and accompanying order may come at a later date if necessary.

A separate order will issue this date.

Date: December 23, 2022

/s/ Royce C. Lamberth
_____
Royce C. Lamberth
United States District Judge