**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **GILBERT P. HYATT,** | |
| *Plaintiff,* | |
| **v.** | **Case No. 05-cv-2310-RCL** |
| | **Case No. 09-cv-1864-RCL** |
| **KATHERINE K. VIDAL,** in her official | **Case No. 09-cv-1869-RCL** |
| capacity as Under Secretary of Commerce for | **Case No. 09-cv-1872-RCL** |
| Intellectual Property and Director of the | |
| United States Patent and Trademark Office, | |
| *Defendant.* | |

**MEMORANDUM OPINION**

When this Court held in 2017 that Plaintiff Gilbert P. Hyatt's patent applications should not be barred from issuance based on prosecution laches, it did not have the benefit of consulting the Federal Circuit's landmark opinion in *Hyatt v. Hirshfeld*. That opinion clarified the law of prosecution laches, vacated this Court's earlier holding, and remanded for further proceedings. Thus, the Court must now revisit its factual findings and legal conclusions concerning Mr. Hyatt's applications. More precisely, it must evaluate the complete evidentiary record in light of the Federal Circuit's binding instructions on remand and this Court's post-remand rulings.

Mr. Hyatt has now received a full and fair opportunity to present his side of the story. Alas, the scope of remand and recent precedent commands a different result from that expounded by this Court in 2017. Today, the Court must enter judgment in favor of the Patent and Trademark Office. This memorandum opinion, which comprises the Court's findings of fact and conclusions of law on the issue of prosecution laches, explains why that is so.[1]

---

[1] The Court's findings of fact appear in Part III of this opinion. The Court cites its factual findings using the acronym "FOF" followed by the relevant paragraph(s) (e.g., FOF ¶ 45). The Court's conclusions of law appear in Part IV.

1

Mr. Hyatt is an inventor of computer technologies who filed hundreds of patent applications in the lead-up to the 1995 change in patent term. Four of those applications are now before the Court in actions filed by Mr. Hyatt under 35 U.S.C. § 145. *Hyatt v. Vidal*, No. 05-cv-2310 (RCL), Compl., ECF No. 3 (D.D.C. Nov. 18, 2005); *Hyatt v. Vidal*, No. 09-cv-1864 (RCL), Compl., ECF No. 5 (D.D.C. Sept. 25, 2009); *Hyatt v. Vidal*, No. 09-cv-1869 (RCL), Compl., ECF No. 5 (D.D.C. Sept. 25, 2009); *Hyatt v. Vidal*, No. 09-cv-1872 (RCL), Compl., ECF No. 5 (D.D.C. Sept. 25, 2009).[2]

In early 2017, after years of litigation, the Patent and Trademark Office ("PTO") asserted the affirmative defense of prosecution laches. *E.g.*, 2d Am. Answer, ECF No. 123, at 1 (No. 05-cv-2310).[3] Later that year, the Court held a five-day consolidated bench trial on that issue. Min. Entries (Oct. 6, 10–13, 16, 2017). At the close of the PTO's case-in-chief, the Court granted Mr. Hyatt's motion for judgment on partial findings under Federal Rule of Civil Procedure 52(c), finding that the PTO had failed to meet its burden of proving prosecution laches. Min. Entry (Oct. 16, 2017).[4] The Court then issued written findings of fact and conclusions of law. *Hyatt v. Iancu* (*Hyatt I*), 332 F. Supp. 3d 113 (D.D.C. 2018), *vacated in part sub nom. Hyatt v. Hirshfeld* (*Hyatt II*), 998 F.3d 1347 (Fed. Cir. 2021). In 2021, the Federal Circuit partly vacated this Court's decision, finding that the PTO had carried its burden of proving prosecution laches, thereby shifting the burden to Mr. Hyatt; the Federal Circuit remanded the case so that Mr. Hyatt would

---

[2] When filed, the named defendants in these matters were Jon W. Dudas (2005 action) and David J. Kappos (2009 actions). In the intervening years since filing, a succession of defendants have automatically substituted for Mr. Dudas and Mr. Kappos under Federal Rule of Civil Procedure 25(d). Fed. R. Civ. P. 25(d). The current named defendant is Katherine K. Vidal, in her official capacity as Under Secretary of Commerce for Intellectual Property and Director of the United States Patent and Trademark Office. FOF ¶ 2.

[3] When referring to procedural events or filings that span all four Section 145 actions at issue in these consolidated proceedings, the Court will generally cite only the procedural event or filing in Case No. 05-cv-2310. When citing electronic filings, the Court refers to the ECF header page numbers, not the page numbers of the filed documents.

[4] All references to "Rule 52" in this opinion are to Federal Rule of Civil Procedure 52. Fed. R. Civ. P. 52.

have the opportunity to present evidence and rebut the PTO's showing. *Hyatt II*, 998 F.3d at 1372. The Federal Circuit retained jurisdiction over the PTO's other defenses. *Id.*

Trial on prosecution laches resumed in September 2023. Min. Entry (Sept. 18, 2023). During the 2023 phase of trial, the Court heard from several witnesses, including Mr. Hyatt, and admitted hundreds of exhibits. At the end of trial, the Court took these cases under advisement and set a briefing schedule for the parties' proposed findings of fact and conclusions of law. Min. Entry (Oct. 5, 2023); ECF No. 344 (revised briefing schedule). Pursuant to that schedule, the parties submitted proposed findings, followed by an exchange of responses and replies. Hyatt Proposal, ECF No. 345; PTO Proposal, ECF No. 346; Hyatt Resp., ECF No. 351; PTO Resp., ECF No. 352; Hyatt Reply, ECF No. 355; PTO Reply, ECF No. 354. The Court has now reviewed the parties' filings, the trial record, and the applicable law. For the following reasons, the Court finds in favor of the PTO on the issue of prosecution laches and will enter judgment on that issue for the PTO.

## I.     PROCEDURAL HISTORY

The complicated procedural history of these cases is already well-documented. *See Hyatt II*, 998 F.3d at 1355–59; *Hyatt I*, 332 F. Supp. 3d at 117–19; *see also Hyatt v. Vidal* (*Hyatt III*), Nos. 05-cv-2310, 09-cv-1864, 09-cv-1869, 09-cv-1872 (RCL), 2022 WL 17904225, at *2–3 (D.D.C. Dec. 23, 2022). Instead of recounting events that predate *Hyatt II*, the Court will detail the progress of litigation since remand.

After the Federal Circuit remanded these consolidated proceedings in mid-2021, the parties jointly proposed a schedule for resuming trial. ECF No. 283. They each then filed amended pretrial statements, ECF Nos. 286, 287, followed by responses to each other's statements, ECF Nos. 288, 290. A few months later, the PTO moved in limine to exclude evidence of unclean hands and certain witnesses that Mr. Hyatt had added to his witness list following remand. ECF No. 296.

After the motion became ripe, the Court issued a memorandum opinion granting in part and denying in part the PTO's motion. *Hyatt III*, 2022 WL 17904225, at *1. Specifically, the Court barred Mr. Hyatt from introducing evidence of unclean hands but permitted him to call several additional witnesses contingent on the PTO receiving the opportunity to depose them first. *Id.* at *8, *16. Shortly after the Court issued its opinion, it scheduled a pretrial conference for September 1, 2023, with trial set to resume on September 18. ECF No. 313.

The parties submitted amended exhibit lists about two months before trial was scheduled to resume, ECF Nos. 320, 321, followed by a round of written objections, ECF Nos. 323, 324. Approximately one month before trial resumed, the PTO filed its final pretrial statement. ECF No. 325. A few days later, the PTO moved in limine to exclude several of Mr. Hyatt's exhibits. ECF No. 326. The Court set an expedited briefing schedule that ensured the motion would be ripe before the pretrial conference. ECF No. 327. During the conference, the Court granted the PTO's motion for the reasons stated on the record. Min. Entry (Sept. 1, 2023); ECF No. 330. The Court also chastised Mr. Hyatt for failing to file his final pretrial statement before the pretrial conference. Mr. Hyatt filed his final pretrial statement later that day. ECF No. 331. The Court issued its final pretrial order on September 13, 2023, ECF No. 334, and trial resumed on September 18, Min. Entry (Sept. 18, 2023).

The 2023 phase of trial took roughly 14 trial days and concluded on October 5, 2023. Min. Entries (Sept. 18–22, 25–29, 2023; Oct. 2–5, 2023). During this phase of trial, Mr. Hyatt presented his case-in-chief and personally testified for several days. Multiple fact witnesses also testified for Mr. Hyatt, virtually all of whom were former PTO employees. At the end of Mr. Hyatt's case-in-chief, the Court heard and denied the PTO's oral motion for judgment on partial findings under Rule 52(c). Min. Entry (Oct. 4, 2023). The PTO then presented its rebuttal case. During trial, Mr.

Hyatt submitted two bench briefs. ECF No. 337. At the conclusion of trial, the Court took the PTO's prosecution laches defense under advisement and set a schedule for filing proposed findings of fact and conclusions of law, followed by responses and replies. Min. Entry (Oct. 5, 2023). The parties then filed their final exhibit lists. ECF Nos. 339, 340. Approximately two months later, the parties jointly moved to limit the number of pages in their post-trial briefs. ECF No. 341. The Court granted that motion, ECF No. 342, and revised the applicable filing deadlines, ECF No. 344.

Mr. Hyatt and the PTO filed their proposed findings of fact and conclusions of law on December 22, 2023. Hyatt Proposal; PTO Proposal. They filed their responses on February 23, 2024, Hyatt Resp.; PTO Resp., followed by replies on March 5, Hyatt Reply; PTO Reply.[5] The Court, having reviewed the parties' filings along with the entire trial record, is now prepared, consistent with the scope of the remand from the Federal Circuit, to render its decision on the PTO's prosecution laches defense.

## II.    LEGAL PRINCIPLES

The doctrine of prosecution laches is an equitable affirmative defense to infringement or issuance of a patent that originates from two Supreme Court cases from the early 1900s. *Hyatt II*, 998 F.3d at 1360; *see Woodbridge v. United States*, 263 U.S. 50 (1923); *Webster Elec. Co. v. Splitdorf Elec. Co.*, 264 U.S. 463 (1924). Prosecution laches may render a patent unenforceable when an applicant's conduct "constitutes an egregious misuse of the statutory patent system under a totality of the circumstances." *Hyatt II*, 998 F.3d at 1360 (quoting *Cancer Rsch. Tech. Ltd. v. Barr Lab'ys Inc.*, 625 F.3d 724, 728 (Fed. Cir. 2010)). In the context of an action under 35 U.S.C. § 145, prosecution laches requires the PTO to prove that (1) the applicant's delay in prosecution

---

[5] Mr. Hyatt initially filed a version of his reply that exceeded the Court-ordered page limit. ECF No. 353. Mr. Hyatt filed a corrected version on March 6, 2024, which the Court considers to be his reply. Hyatt Reply. The Court will treat Mr. Hyatt's corrected reply as though it were timely filed on March 5.

was unreasonable and inexcusable under the totality of the circumstances and (2) the applicant's delay caused prejudice. *Id.* at 1361–62. When defending a Section 145 action, the PTO may establish prejudice by evidencing intervening rights, which may be presumed if the PTO shows a sufficient magnitude of applicant delay, or by proving that the applicant clearly abused the patent examination system. *Id.* at 1370.

The Federal Circuit has carefully delineated the scope of the issues before this Court on remand. *See id.* at 1371–72. This Court must apply the law as the Federal Circuit has given it. *Hyatt III*, 2022 WL 17904225, at *3–4 (discussing the mandate rule).[6] Accordingly, the Court will reach its conclusions of law by applying the legal standard elucidated in *Hyatt II* to the facts the Court finds in Part III of this opinion. Thus, the Court will begin, as it must, by retracing the analysis and holding of *Hyatt II*, which effectively crystallized the law of prosecution laches as it applies in Section 145 actions before applying it to the specific facts of these consolidated proceedings. *See generally* 998 F.3d 1347. The Court will also briefly discuss *Personalized Media Commc'ns, LLC v. Apple, Inc.*, 57 F.4th 1346 (Fed Cir. 2023), which applied *Hyatt II* to new facts and helpfully clarified certain legal principles underlying that decision, and the Court's opinion in *Hyatt III*, 2022 WL 17904225, at *1, which ruled out unclean hands as a defense to prosecution laches and clarified what constitutes relevant evidence on remand.

## A.  *Hyatt II*

This Court initially granted Mr. Hyatt's motion for judgment on partial findings under Rule 52(c) because it was persuaded that the PTO had not shown unreasonable and unexplained delay. *Hyatt I*, 332 F. Supp. 3d at 138. This Court limited its review of Mr. Hyatt's prosecution

---

[6] For this reason, the Court declines to consider Mr. Hyatt's argument that prosecution laches is inconsistent with the Patent Act, Hyatt Proposal 273–77, which this Court has already rejected in any event, Tr. Oct. 13, 2017 PM (43:17–44:14, 54:8–55:3) (Rule 52(c) Argument and Oral Ruling).

conduct to that occurring before 2002. *Id.* at 131. However, the Court broadly took issue with the PTO's examination of Mr. Hyatt's applications, which the Court deemed relevant under the totality of the circumstances. The Court principally focused on two issues. First, the Court took issue with a period of PTO inaction between 2003 and 2012, which the Court attributed to the PTO and found undermined its present entitlement to relief. *Id.* at 131–32. Second, the Court took issue with the PTO's failure to deploy bespoke procedures earlier to ensure timely examination of Mr. Hyatt's highly unusual patent applications. *Id.* at 133–34. The Court considered other matters as well, but the crux of its decision was that the onus was on the PTO, as a government agency, to ensure timely examination of Mr. Hyatt's applications or, in the alternative, expeditiously notify Mr. Hyatt that his prosecution conduct was outrageous and take definitive action against his claims and applications. *See id.* at 134–36.

*Hyatt II* disagreed with this Court's reasoning, holding that it had applied the wrong legal standard and given too much weight to PTO conduct. 998 F.3d at 1363–66. "The mandate rule means a district court must do as it was told by the court of appeals." *United States v. Little*, No. 21-cr-315 (RCL), 2024 WL 181260, at *3 (D.D.C. Jan. 17, 2024). The Federal Circuit has now provided significant clarification regarding the controlling law, much of which was lacking when the Court first considered this matter in 2017. As an outsider to the patent system, this Court continues to be troubled by the conduct of the PTO during the nearly decade-long suspension period. FOF ¶¶ 234–235. Nevertheless, *Hyatt II* tightly constrains this Court on remand, with the result that the factual focus of *Hyatt I*—and the legal conclusions that followed from that focus—is no longer tenable, no matter how concerned this Court may be with PTO inaction. The Court is not inclined to develop the law in a direction contrary to the Federal Circuit. Thus, this Court's

opinion on remand—including its findings of fact—differ dramatically from those the Court expounded in *Hyatt I*.

The Court largely sets aside matters it once considered necessary, such as PTO delay, while giving significant weight to matters it once did not focus on, such as Mr. Hyatt's prosecution conduct after 2002. *See infra* Parts III–IV. The Court also resolves various factual disputes on which it was once noncommittal, such as alleged claim shifting, reflecting that *Hyatt II* has since clarified which factual disputes are important. Because *Hyatt II* constrains this Court and directs it in an entirely different direction from that adopted in *Hyatt I*, the Court will spend considerable time detailing *Hyatt II*'s specific holdings and directives on remand. The Court's explanation will hopefully make clear to the parties and the general public why its opinion here differs from *Hyatt I* in many important respects.

### 1.  Errors Identified in *Hyatt I*

The Federal Circuit identified two errors in this Court's opinion granting Mr. Hyatt's motion for judgment on partial findings under Rule 52(c). *Hyatt I*, 331 F. Supp. 3d 113.

*First*, the Federal Circuit found that this Court failed to properly consider the totality of the circumstances. *Hyatt II*, 998 F.3d at 1363. This Court in *Hyatt I* primarily focused on the prosecution history of the four patent applications at issue in Mr. Hyatt's pending Section 145 actions. *See* 332 F. Supp. 3d at 122–39. It also only considered Mr. Hyatt's prosecution conduct through 2002. *Id.* at 131. From this limited view of the record, the Court concluded that Mr. Hyatt's prosecution conduct was insufficient to trigger prosecution laches. *Id.* at 138. However, the Federal Circuit determined that the Court's inquiry was too narrow. *See Hyatt II*, 998 F.3d at 1363–64. Per the Federal Circuit, "[t]he district court did not appreciate the PTO's evidence as that of a consistent pattern of conduct across an enormous body of similar applications." *Id.* at 1364. On

remand, the Court must consider the entirety of Mr. Hyatt's prosecution conduct across all his related applications, including the prosecution period from 2002 through the present day.

*Second*, the Federal Circuit found that this Court placed undue emphasis on the PTO's conduct rather than Mr. Hyatt's. *Id.* at 1366. This Court in *Hyatt I* acknowledged the peculiarity of Mr. Hyatt's applications but largely focused its attention on delay attributable to the PTO, including its decision to mostly suspend examination of Mr. Hyatt's applications from 2003 to 2012 and its failure to deploy special procedures for examining Mr. Hyatt's unusual applications earlier than it did. *See* 332 F. Supp. 3d at 131–36. The Federal Circuit disagreed with this focus and clarified that the Court should have emphasized Mr. Hyatt's conduct instead. That is because "a delay by the PTO cannot excuse the appellant's own delay." *Hyatt II*, 998 F.3d at 1364 (quoting *In re Bogese*, 303 F.3d 1362, 1369 (Fed. Cir. 2002)). Indeed, "the patent statute already deals with delay by the PTO." *Id.* at 1366. Prosecution laches, in contrast, "is one example of an [applicant's] obligation to tailor prosecution conduct in pursuit of patent rights." *Id.* at 1365. Accordingly, applicants must "not only comply with the statutory requirements and PTO regulations but must also prosecute [their] applications in an equitable way that avoids unreasonable, unexplained delay that prejudices others." *Id.* at 1366 (citing *Cancer Rsch.*, 625 F.3d at 729). "The PTO's delay therefore provides a weak reason to negate prosecution laches, which asks a separate question . . . in light of the applicant's prosecution conduct." *Id.* On remand, the Court must focus on delay attributable to Mr. Hyatt; delay caused by the PTO is only weakly relevant.

### 2. Unreasonable and Inexcusable Delay

After identifying these errors, the Federal Circuit turned to the merits and assessed whether the factual record adduced during the PTO's case-in-chief was sufficient to show unreasonable and inexcusable delay and thereby shift the burden to Mr. Hyatt to prove that his delay was

reasonable or excusable under the circumstances or to prove lack of prejudice.[7] The Federal Circuit concluded that the PTO had made the requisite showing.

*First*, the Federal Circuit found that under either the PTO's or Mr. Hyatt's measure of delay, Mr. Hyatt had delayed filing his applications for a quantity of time sufficient to trigger prosecution laches. *Id.* at 1367–68. Both parties measured delay as the difference between his applications' earliest claimed priority dates and their actual filing dates. *Id.*[8] The parties disagreed over the earliest priority dates, but the Federal Circuit nevertheless found that Mr. Hyatt had conceded at least seven years of delay. *Id.* at 1368.

*Second*, the Federal Circuit found that Mr. Hyatt's approach to prosecuting his applications "all but guaranteed indefinite prosecution delay." *Id.* The Federal Circuit based this conclusion on the PTO's evidence that Mr. Hyatt's applications contained complex priority chains and lengthy specifications; that Mr. Hyatt repeatedly failed to identify written description support for his claims; that Mr. Hyatt routinely amended his claims in a manner that effectively restarted examination; and that this prosecution conduct created a "perfect storm" at the PTO that made it virtually impossible for the Office to perform double-patenting analysis, determine priority dates, or identify written description support. *Id.* The Federal Circuit noted other issues with Mr. Hyatt's applications, including his attempts to reclaim counts lost in an interference proceeding and his failure to demarcate his applications per his agreement with Group Director Nicholas Godici. *Id.* at 1368–69.

---

[7] The Federal Circuit also affirmed this Court's holding that the PTO may assert the defense of prosecution laches in a Section 145 action and may do so even when it had not previously issued laches rejections or warnings during prosecution of the patent application at issue. *Hyatt II*, 998 F.3d at 1362–63.

[8] As detailed *infra*, FOF ¶¶ 48–50, patent applicants may claim the benefit of the filing date of an earlier application under 35 U.S.C. § 120. This is known as "priority."

*Third*, the Federal Circuit rejected various explanations for Mr. Hyatt's conduct as insufficient to justify his prosecution approach, including his goal of "correctly capturing his inventions or steering clear of prior art" and that his conduct "was not literally violative of law or PTO regulation." *Id.* at 1369.

*Fourth*, the Federal Circuit compared Mr. Hyatt's conduct to that deemed unreasonable in *Bogese*, observing that "[Mr.] Hyatt's pattern of conduct resembles, but goes well beyond, Bogese's consistent pattern of receiving a rejection on an application, filing a continuation application without any amendments, and abandoning the original application. *Id.* (citing *Bogese*, 303 F.3d at 1364–65). The Federal Circuit noted that Mr. Hyatt's "time-wasting process" affected "nearly all of his [relevant] applications." *Id.*

### 3. Prejudice

After concluding that the PTO had shown unreasonable and inexcusable delay and shifted the burden to Mr. Hyatt, the Federal Circuit made findings concerning prejudice.

*First*, the Federal Circuit concluded that although prosecution laches ordinarily requires its proponent to show intervening rights to establish prejudice—i.e., that members of the public invested in, worked on, or used the claimed technology during the period of delay—an unreasonable and unexplainable delay of six or more years suffices to raise a presumption of prejudice that includes intervening rights. *Id.* at 1370. Accordingly, the PTO's showing that Mr. Hyatt unreasonably and inexcusably delayed filing his applications for at least seven years raised a presumption of intervening rights that Mr. Hyatt bears the burden of rebutting. *Id.*

*Second*, the Federal Circuit concluded that where an applicant clearly abused the patent examination system, the prejudice requirement is satisfied. *Id.* Based on the evidence adduced during the PTO's case-in-chief, the Federal Circuit found that Mr. Hyatt had, intentionally or

otherwise, engaged in a clear abuse of the PTO's examination system that caused delay in the four applications in suit. *Id.* Accordingly, "[b]arring significant evidence to the contrary from [Mr.] Hyatt," the PTO had demonstrated material prejudice stemming from Mr. Hyatt's unreasonable and inexcusable delay. *Id.* The Federal Circuit noted specific ways in which Mr. Hyatt's clearly abusive conduct had given rise to material prejudice, including because his conduct had made ordinary compact prosecution impossible; the PTO had created a specialized art unit to examine his applications; after 2013, the PTO had spent $10 million examining Mr. Hyatt's applications whereas he had only paid $7 million in fees; the art unit could barely reach its expected production rate because of the complex nature of Mr. Hyatt's applications; the amount of time it would take the art unit to examine Mr. Hyatt's approximately 400 applications was equivalent to the amount of time ordinarily required to examine 40,000 normal applications; Mr. Hyatt's applications had forced the PTO to issue requirements to get examination back on track; and the PTO's examiners had spent inordinate amounts of time since 2013 preparing office actions. *Id.* at 1370–71.

### 4.  Remand

The Federal Circuit then remanded the prosecution laches issue to this Court while retaining jurisdiction over the PTO's other defenses to patentability. The Federal Circuit gave this Court specific guidance, explaining that it was remanding "to the district court for the limited purpose of affording [Mr.] Hyatt the opportunity to present evidence on the issue of prosecution laches, consistent with the standards set forth in this opinion." *Id.* at 1371. The Federal Circuit specifically limited the scope of this Court's review on remand.

*First*, the Federal Circuit stated that the following explanations for Mr. Hyatt's delay are insufficient as a matter of law to explain or excuse his conduct: he completed examination of the four applications in suit in a timely manner; his conduct prosecuting his other applications is

irrelevant; he filed his applications to cover a number of inventions he believed he had made; and he met statutory requirements and followed PTO's rules in prosecuting his applications. *Id.*

*Second*, the Federal Circuit clarified that Mr. Hyatt bears the burden of showing by a preponderance of the evidence that he "had a legitimate, affirmative reason for his delay" that "operate[s] to excuse [him] from responsibility for the sizable undue administrative burden that his applications have placed on the PTO[,]" which "the record before [the Federal Circuit] demonstrates to be extreme." *Id.* at 1371–72.[9] The Federal Circuit noted that at a minimum, Mr. Hyatt must "justify [his] decision to ignore Director Godici's instruction to demarcate his applications in 1995," "justify his decision to adopt the specific prosecution approach that he did—unique in its scope and nature—as detailed in the PTO's Requirements," and "justify his failure to develop a plan for demarcating his applications over at least the 20 year period from 1995 to 2015." *Id.* at 1372. Per the Federal Circuit, "[a]ny reasons that fall short of justifying those decisions or omissions fail to negate that his delay has been unreasonable and unexplained." *Id.* Thus, Mr. Hyatt bears the burden of making these specific showings. Not every justification or reason will suffice; Mr. Hyatt's reasons must be persuasive enough to absolve him from responsibility for the burden he placed on the PTO. *See id.* at 1372.

*Third*, the Federal Circuit directed this Court to consider two points regarding prejudice. *Id.* The first was that any delay by Mr. Hyatt of more than six years shifts the burden to him of showing that he has not caused the PTO or any third-party material prejudice. *Id.* The second was that absent significant negating evidence, Mr. Hyatt's prosecution conduct amounted to a clear

---

[9] This Court in *Hyatt I* applied a preponderance standard to the PTO's affirmative defense of prosecution laches. 332 F. Supp. 3d at 131. The Federal Circuit in *Hyatt II* stated that Mr. Hyatt's burden on remand is by a preponderance of the evidence, so the Court will presume that the same burden applies at the outset to the PTO. 998 F.3d at 1371–72.

abuse of the PTO's patent examination system, which suffices to establish prejudice even in the absence of intervening rights. *Id.*

## B.  Other Sources of Law

In *Personalized Media*, the Federal Circuit evaluated the district court's application of *Hyatt II* to the facts of an unrelated infringement action. *See generally Personalized Media*, 57 F.4th 1346. Besides confirming that *Hyatt II* has not been superseded by more recent decisions, *Personalized Media* confirmed two principles that are salient here. First, the fact that a patent applicant complied with the law does not obviate their obligation to prosecute their applications "in an equitable way." *Id.* at 1354 (quoting *Hyatt II*, 998 F.3d at 1366). Accordingly, conduct that was lawful or expressly permitted by the PTO may nevertheless support prosecution laches. *See id.*; *see also Hyatt II*, 998 F.3d at 1369. Second, the fact that an applicant previously obtained many patents does not by itself defeat prosecution laches or outweigh other evidence of unreasonable conduct. *See Personalized Media*, 57 F.4th at 1356.

In *Hyatt III*, this Court concluded that the unclean hands doctrine is unavailable to Mr. Hyatt because the PTO is enforcing a congressional mandate in the public interest. 2022 WL 17904225, at *5–8. Accordingly, this Court barred Mr. Hyatt from introducing evidence that the PTO is "tainted with inequitableness or bad faith." *See id.* at *5–6 (quoting *United States v. Philip Morris Inc.*, 300 F. Supp. 2d 61, 74–75 (D.D.C. 2004)). However, the Court permitted Mr. Hyatt to introduce evidence that specific witnesses were biased against him. *Id.* at *17. The Court, consistent with this ruling, will not consider implied or express allegations of bad faith on the part of the PTO, though it will entertain particularized charges of bias against testifying witnesses.

Additionally, this Court in *Hyatt III* explained that evidence of PTO conduct may be relevant for specific limited purposes. For example, to show that Mr. Hyatt was aware of PTO

conduct that explains why he acted the way he did or to establish that administrative expense and burden on the PTO was due to independent choices by the PTO and not Mr. Hyatt's conduct. *Id.* at *13. The Court will consider evidence of PTO conduct for these limited purposes, though its focus, consistent with *Hyatt II*, will be on Mr. Hyatt.

## C.  The Court's Duty on Remand

The Court's duty on remand is clear. The Court must find facts based on the now-complete trial record. Then, the Court must apply the legal standard articulated by the Federal Circuit in *Hyatt II*, consistent with its instructions for further proceedings on remand. In doing so, the Court must evaluate the totality of the circumstances while focusing on Mr. Hyatt's—and not the PTO's—conduct.

Because the Federal Circuit has already evaluated the evidence adduced during the PTO's case-in-chief and explained its legal importance standing alone, this Court is bound, should it find equivalent facts after reviewing the whole record, to give those facts the same legal weight the Federal Circuit did. For example, if the Court's factual findings confirm that Mr. Hyatt's applications and prosecution conduct are afflicted by the same characteristics and exemplary figures that the Federal Circuit held in *Hyatt II* would constitute a clear abuse of the patent examination system, then the Court must conclude that Mr. Hyatt clearly abused the patent examination system and materially prejudiced the PTO. The Court is duty-bound to draw the legal conclusion the Federal Circuit has already stated follows from those facts. In any event, even if the facts shake out differently on consideration of the entire record than they did based solely on the PTO's case-in-chief, Mr. Hyatt still bears burdens of persuasion prescribed by the Federal Circuit. The Court will hold Mr. Hyatt to those burdens.

# III.   FINDINGS OF FACT

The Court's findings of fact, set forth below pursuant to Rule 52(a), are based on the record as a whole, including a four-week bench trial.[10] The PTO presented its case-in-chief during the first phase of trial, which ran from October 6, 2017, to October 16, 2017. After the Federal Circuit vacated in part and remanded to this Court, trial resumed on September 18, 2023, and concluded on October 5, 2023. During the second phase of trial, Mr. Hyatt presented his case-in-chief, followed by the PTO's rebuttal case. In total, across both phases of trial, the PTO presented three fact witnesses (Gregory Morse, Robert Clarke, and Vincent Turner) and one expert witness (Stephen Kunin). Mr. Hyatt presented six fact witnesses, five of whom appeared live (Gilbert Hyatt, Howard Goldberg, Edward Kazenske, Jessica Harrison, and John LeGuyader), and one of whom appeared by deposition designation (Richard Bawcombe). Mr. Hyatt presented one expert witness (Arthur Steiner).

The Court's findings of fact are calibrated to the issues the Federal Circuit has indicated are legally relevant. The Court will not reach factual disputes that cannot move the needle or are directed to evidence the Federal Circuit or this Court have already deemed irrelevant or improper. The Court will not acknowledge literally every factual dispute identified by the parties; some are best regarded as legal arguments or are more efficiently resolved through broader findings that necessarily subsume other issues. The Court's findings reflect careful consideration of the

---

[10] The Court's factual findings are its own. *Hyatt II* undoubtedly dictates the legal significance of certain facts once found by the Court. *See, e.g.*, 998 F.3d at 1369 (explaining that certain prosecution conduct, including "delay[ing] in presenting claims, . . . creat[ing] . . . an overwhelming, duplicative web of applications and claims, . . . and fail[ing] to cooperate with the PTO" constitutes "a clear abuse of the patent system," which establishes prejudice). However, it does not require the Court to find facts that are no longer tenable now that the trial record is complete. *See id.* at 1371 (remanding so that Mr. Hyatt may present evidence on the issue of prosecution laches); *Hyatt III*, 2022 WL 17904225, at *13 (explaining that Mr. Hyatt is entitled to present evidence that rebuts the PTO's case). In finding the following facts, the Court has exercised its independent judgment and reviewed all of the evidence, including Mr. Hyatt's testimony and rebuttals of the PTO's evidence. Mr. Hyatt, therefore, has now received a full and fair hearing on prosecution laches.

testimony of these witnesses along with the over five hundred documentary exhibits submitted by the parties.[11]

## A. Parties

1. Plaintiff Gilbert P. Hyatt is a prolific inventor who has received more than seventy issued patents. He is the applicant of and named inventor on four patent applications that are the subject of the present matter. In each action, filed under 35 U.S.C. § 145, Mr. Hyatt asks the Court to review the PTO's final decision denying him a patent.

2. Katherine K. Vidal is the named defendant in these matters in her official capacity as the Under Secretary of Commerce for Intellectual Property and Director of the United States Patent and Trademark Office. The PTO is the federal agency responsible for examining patent applications and for granting U.S. patents.

## B. Background

3. Each of the applications at issue in these cases was filed before June 8, 1995, the effective date of the law that changed the term of a patent from 17 years from issuance to 20 years from the effective filing date.[12] This change in the U.S. patent term was part of the implementation of the Uruguay Round Agreements Act of the General Agreement on Tariff and Trade ("GATT"). Tr. Oct. 6, 2017 PM (43:8–44:3) (Clarke); Tr. Oct. 10, 2017 PM (20:8–14) (Morse).

4. To address circumstances where an applicant had the right under U.S. patent law to file a new patent application to pursue claims that the applicant had disclosed in an earlier-filed application (known as a "continuing application"), *see generally* FOF ¶¶ 59–63, Congress required the PTO to promulgate rules to provide applicants further examination, without loss of patent term, of additional patent claims that claim priority to pre-GATT applications. Uruguay Round Agreements Act ("URAA"), Pub. L. No. 103-465, § 532(a)(1), 108 Stat. 4809 (1994) (codified as amended at 35 U.S.C. § 154). The PTO's rule implementing this legislation is 37 C.F.R. § 1.129 ("Rule 129"), which was promulgated on April 25, 1995. *See* Changes to Implement 20-Year Patent Term and Provisional Applications ("Final Rule"), 60 Fed. Reg. 20195, 20226–27 (Apr. 25, 1995); *see also* Tr. Oct. 6, 2017 PM (45:18–47:11) (Clarke).

5. To preserve the opportunity to obtain a 17-year pre-GATT patent term, many applicants filed patent applications between April 25, 1995, when the PTO promulgated Rule 129, and June 8, 1995, when the new patent term law went into effect. Applicants filed approximately 52,000 applications during this period. Tr. Sept. 27, 2023 (1240:11–13)

---

[11] Any finding of fact more appropriately characterized as a conclusion of law is adopted as such, and any conclusion of law more properly characterized as a finding of fact is adopted as such.

[12] *See supra* note 8.

(Goldberg). This surge in applications is known as the "GATT Bubble." Tr. Oct. 6, 2017 PM (104:17–22) (Clarke).

6.     Mr. Hyatt filed approximately 400 GATT Bubble applications. These applications, including the four pending before the Court, are continuing applications that claim the benefit of—priority to—the filing dates of many earlier filed applications, some of which date to the late 1960s and early 1970s. If Mr. Hyatt were to receive a patent on these applications, he would be entitled to a pre-GATT patent term that starts from the date of issuance, not the effective filing date.

## C.  Pre-GATT Bubble Applications

### 1.  Early Warnings

7.     In the late 1960s, Mr. Hyatt began filing patent applications with the PTO. PTX-569.00002. Mr. Hyatt became a registered patent agent in 1975. Tr. Sept. 25, 2023 (856:17–20) (Hyatt). Mr. Hyatt testified that he was familiar with patent prosecution practices from the 1970s through the 1990s, and that he followed the Manual of Patent Examining Procedure ("MPEP") closely. Tr. Sept. 18, 2023 PM (131:17–23) (Hyatt). However, PTO personnel told Mr. Hyatt on several occasions that his prosecution conduct did not conform to PTO norms.

8.     On May 11, 1973, in Application No. 05/135,040 (#104),[13] the examiner rejected Mr. Hyatt's pending claims for double patenting, warning him that he "may not claim the same thing in two different applications." DX2220-000005–06.

9.     On August 1, 1975, in Application No. 05/101,881 (#101), Mr. Hyatt received an office action in which the examiner claimed that he "continually added claims in response to any Office Action. Applicant has thus continually increased the burden upon the Office and particularly upon the Examiner." DX2226-000002. The examiner noted that "[t]hese added claims have been continually directed to new, diverse and different inventions than were presented previously," and that "[t]he sheer bulk of the application and the complexity and number of issues, the number of outstanding claims, the number of independent claims, etc.[,] all contribute to the mushrooming complexity of examining this application to the extent that a proper and complete examination [sic] of all c[l]aims approaches unmanageability." DX2226-000002. The examiner issued written description rejections and noted that "[t]he specification is in a confused state in view of the prolixity of new matter added to this application." DX2226-000013. The

---

[13] When referring to Mr. Hyatt's applications, the Court will provide the serial number assigned to the application by the PTO, followed by Mr. Hyatt's docket number (e.g., Application No. 05/135,040 (#104)). The serial number is denoted by "Application No." followed by a specially formatted eight-digit number (e.g., Application No. 05/135,040). Mr. Hyatt's docket number is denoted by the hashtag symbol followed by a three-digit number (e.g., #104). The Court will occasionally refer to Mr. Hyatt's applications using only his docket numbers (e.g., the Court will refer to "the #104 application"). The Court will do so only when it is exceedingly clear from context which application the Court is referring to.

examiner further observed that Mr. Hyatt's application imposed a "tremendous" burden on the PTO's ability to determine double patenting. DX2226-000017.

10.    On November 16, 1978, in Application No. 05/860,257 (#157), Mr. Hyatt "was informed that claims of the instant application cross-read on claims of related applications and that the claims of the instant application are directed to multiple inventions." DX11-000001. Recognizing "the burden on the PTO for examination of the instant application," Mr. Hyatt sought "an opportunity to amend the claims . . . to correct any cross reading and any multiple inventions before examination." DX11-000001.

11.    On June 15, 1989, in Application No. 06/849,243 (#310), Mr. Hyatt was informed that his application's "disclosure[,] which encompasses 449 pages of text, w[h]ere 34 documents whose disclosures are incorporated by reference, and an untold number of cross references to related applications and other documents, creates an unreasonable and largely unnecessary burden on anyone attempting to understand applicant's invention." DX2132-000008.

### 2. Successful Patent Prosecution

12.    Despite these issues, between 1971 and 1997, Mr. Hyatt successfully prosecuted 75 patent applications to issuance as patents. *See* PTX-569.00002–03. In some instances, prosecution concluded after only a few years. For example, Mr. Hyatt obtained a patent on Application No. 06/160,871 (#168) on April 24, 1984, less than four years after he filed the application on June 19, 1980. PTX-2008.0001. He obtained a patent on Application No. 06/160,872 (#169) on January 1, 1985, less than five years after he filed the application on June 19, 1980. PTX-2010.0001. He obtained a patent on Application No. 06/425,731 (#191) on April 8, 1986, less than four years after he filed the application on September 28, 1982. PTX-2011.0001. And he obtained a patent on Application No. 07/343,112 (#325) on January 23, 1990, less than a year after he filed the application on April 24, 1989. PTX-2020.0001.

### 3. Serial Prosecution Norms

13.    Mr. Hyatt filed continuing, or "child," applications in his prosecutions to pursue subject matter disclosed in the "parent" or "ancestor" applications by establishing a "chain of continuity" with the ancestor applications. *E.g.*, Tr. Sept. 18, 2023 PM (99:19–22) (Hyatt). Mr. Hyatt testified that filing continuing applications was a "common practice among patent applicants at the time." Tr. Sept. 19, 2023 AM (174:10–13) (Hyatt).

14.    Mr. Hyatt testified that PTO was reluctant to examine continuing applications in parallel with their ancestor applications before 1995. Tr. Sept. 26, 2023 (1062:25–1064:17) (Hyatt). He testified that for this reason, he chose to prosecute his continuing applications serially—one after the other—often waiting to file child applications until after allowance or abandonment of the parent application. Tr. Sept. 29, 2023 (1587:14–21) (Hyatt). Mr. Hyatt intended to maintain his serial prosecution

practice until the GATT transition forced him to file his applications in parallel or risk losing the benefit of earlier priority dates. *See* Tr. Sept. 18, 2023 PM (124:19–21) (Hyatt). This means that had the GATT transition not occurred, Mr. Hyatt would have continued to file his applications serially for decades, if not centuries. *See* Tr. Sept. 19, 2023 AM (187:25–188:12) (Hyatt). For example, Mr. Hyatt counted at least 100 inventions in the 700 Family specification. DX233-000008; Tr. Sept. 18, 2023 AM (58:19–59:3) (Hyatt). Assuming Mr. Hyatt pursued one application per invention and took two years to prosecute each application, then following a serial prosecution approach, it would have taken Mr. Hyatt approximately 200 years to prosecute each invention disclosed in the 700 Family specification.[14]

15.    Mr. Hyatt testified that a March 16, 1992 decision by the Board of Patent Appeals and Interferences (the "Board")[15] reversing a prosecution laches rejection in Application No. 07/128,659 (#315) persuaded him that his serial prosecution approach was reasonable. PTX-1717.0009. In that decision, the Board explained that "35 U.S.C. 120 does not place a time limit on filing the continuing application; rather, all that is required in this regard to preserve an earlier effective filing date as to common subject matter is copendency or a continuous chain of copendency." PTX-1717.0008. Mr. Hyatt testified that this decision "reinforced [his] previous perception that [he] was prosecuting [his] applications correctly." Tr. Sept. 18, 2023 PM (138:6–21) (Hyatt). That perception included the propriety of prosecuting continuing applications serially.

16.    However, in a Reply Brief filed on September 15, 2020, appealing a prosecution laches rejection in Application No. 08/455,320 (#380), Mr. Hyatt represented to the Board that he "pursued many applications in parallel, rather than 'waiting' to file claims, both before and during the 'GATT bubble.'" PTX-836.51. Mr. Hyatt relied on his record of parallel prosecution to distinguish his applications from the prosecution conduct deemed unreasonable by the Federal Circuit in *Bogese*. PTX-836.51. He further argued that "the pendency of parallel filings rebuts the accusation of delay." PTX-836.52. These prior representations are inconsistent with Mr. Hyatt's trial testimony that he could not prosecute his ancestor applications in parallel or that doing so would have been futile. *See* Tr. Sept. 29, 2023 (1587:6–13) (Hyatt).

17.    In fact, Mr. Hyatt often prosecuted his ancestor applications in parallel. *See, e.g.*, PTX-1830.0002 (graphically illustrating parallel prosecution of ancestor applications); PTX-1831.0002 (same); PTX-1832.0002 (same); PTX-1835.0002 (same); PTX-1837.0002 (same); PTX-1839.0002 (same).

---

[14] This estimate is conservative given the multi-year timeline typical of Mr. Hyatt's successful patent prosecutions. *See* DX268-000001–03; *see also* FOF ¶ 12.

[15] The Board of Patent Appeals and Interferences is now known as the Patent and Trial Appeal Board. "Generally speaking, they are the same body." Tr. Oct. 6, 2017 PM (56:15–56:23) (Clarke).

### 4. Restrictions

18.  When a patent applicant presents more than one independent or distinct invention in a patent application, the PTO may require the applicant to restrict the application to a single invention. MPEP § 803 (6th ed., Jan. 1995).[16] The office action containing such a requirement is referred to as a "restriction." MPEP § 802.02. "[F]iling a divisional application in response to a restriction requirement, even if the filing occurs immediately before issuance of the parent application" can constitute reasonable delay. *Hyatt II*, 998 F.3d at 1361–62. During trial, Mr. Hyatt testified that his GATT Bubble applications were divisional applications filed in response to restriction requirements in his ancestor applications. *E.g.*, Tr. Sept. 18, 2023 PM (124:14–24) (Hyatt); Tr. Sept. 19, 2023 AM (172:8–174:5) (Hyatt).

### i. Finality

19.  Mr. Hyatt testified that he needed to wait for pre-GATT restrictions in his ancestor applications to become final before he could file continuing applications claiming restricted inventions. *E.g.*, Tr. Sept. 18, 2023 PM (123:18–124:18) (Hyatt). According to Mr. Hyatt, "[o]nly a few, very few of the restriction requirements pre-1995 were made final," and "without the restriction requirement being made final, everything is on hold relative to the prosecution of that application." Tr. Sept. 18, 2023 PM (129:7–15) (Hyatt). The non-finality of restrictions in Mr. Hyatt's ancestor applications through 1995 purportedly explains why he waited until shortly before the GATT transition to file his continuing applications. However, Mr. Hyatt also testified that a restriction not being "made final does not prevent [an applicant] from filing a divisional application." Tr. Sept. 18, 2023 PM (130:12–14) (Hyatt).

20.  There were 63 restrictions in Mr. Hyatt's ancestor applications before the GATT transition on June 8, 1995. PTX-895. Of the 63, all but one became final well before Mr. Hyatt filed his GATT Bubble applications. That is so because: (1) the applications in which the restrictions appeared were no longer pending because examiners allowed the applications; (2) the applications in which the restrictions appeared were no longer pending because Mr. Hyatt abandoned the applications; (3) Mr. Hyatt did not challenge the restrictions; and (4) the examiners had made the restrictions final.

21.  Petitions challenging a restriction must be filed while an application is pending. MPEP § 818.03(c) (citing 37 C.F.R. § 1.144). Thirty-two (32) out of 63 of Mr. Hyatt's pre-GATT restrictions were no longer petitionable because the corresponding ancestor application issued as a patent, and thus was no longer pending. Those restrictions are described below:

---

[16] All MPEP citations in this opinion are to the Sixth Edition, published January 1995. https://www.uspto.gov/web/offices/pac/mpep/old/mpep_E6R0.htm [https://perma.cc/NJ7X-3C36]. The Court will elsewhere omit this parenthetical information.

a.       A restriction mailed on July 17, 1972, in Application No. 05/152,105 (#105). PTX-895. The application issued as U.S. Patent No. 3,738,242 on June 12, 1973. DX268-000001.

b.       A restriction mailed on November 17, 1972, in Application No. 05/229,213 (#106). PTX-895. The application issued as U.S. Patent No. 3,820,894 on June 28, 1974. DX2112-000001.

c.       Restrictions mailed on January 27, 1976, May 28, 1976, January 24, 1977, April 9, 1979, and January 7, 1983, in Application No. 05/230,872 (#107). PTX-895. The application issued as U.S. Patent No. 4,531,182 on July 23, 1985. DX268-0000001.

d.       Restrictions mailed on March 28, 1979, and July 3, 1979, in Application No. 05/232,459 (#108). PTX-895. The application issued as U.S. Patent No. 4,370,720 on January 25, 1983. DX268-000001.

e.       A restriction mailed on March 27, 1975, in Application No. 05/288,247 (#110). PTX-895. The application issued as U.S. Patent No. 4,121,284 on October 17, 1978. DX268-000001.

f.       Restrictions mailed on April 25, 1977, July 30, 1979, and December 27, 1982, in Application No. 05/291,394 (#111). PTX-895. The application issued as U.S. Patent No. 4,396,976 on August 2, 1983. DX268-000001.

g.       A restriction mailed on April 11, 1975, in Application No. 05/325,941 (#114). PTX-895. The application issued as U.S. Patent No. 4,060,848 on November 29, 1977. DX268-000001.

h.       Restrictions mailed on September 19, 1974, and February 14, 1975, in Application No. 05/366,714 (#118). PTX-895. The application issued as U.S. Patent No. 3,986,022 on October 12, 1976. DX268-000001.

i.       Restrictions mailed on July 14, 1975, and January 4, 1979, in Application No. 05/476,743 (#125). PTX-895. The application issued as U.S. Patent No. 4,364,110 on December 14, 1982. DX268-000001.

j.       Restrictions mailed on December 27, 1977, and June 26, 1979, in Application No. 05/522,559 (#127). PTX-895. The application issued as U.S. Patent No. 4,209,852 on June 24, 1980. DX268-000001.

k.       Restrictions mailed on September 9, 1976, and December 9, 1976, in Application No. 05/550,231 (#128). PTX-895. The application issued as U.S. Patent No. 4,209,843 on June 24, 1980. DX268-000001.

l. A restriction mailed on August 17, 1977, in Application No. 05/754,660 (#135). PTX-895. The application issued as U.S. Patent No. 4,486,850 on December 4, 1984. DX268-000001.

m. Restrictions mailed on November 29, 1979, and February 19, 1980, in Application No. 05/860,256 (#153). PTX-895. The application issued as U.S. Patent No. 4,829,419 on May 9, 1989. DX268-000001.

n. A restriction mailed on April 21, 1981, in Application No. 05/860,257 (#157). PTX-895. The application issued as U.S. Patent No. 4,371,923 on February 1, 1983. DX268-000001.

o. A restriction mailed on September 9, 1985, in Application No. 05/950,901 (#164). PTX-895. The application issued as U.S. Patent No. 4,225,225 on September 30, 1980. DX268-000002.

p. Restrictions mailed on October 20, 1981, and June 2, 1982, in Application No. 06/160,872 (#169). PTX-895. The application issued as U.S. Patent No. 4,491,930 on January 1, 1985. DX268-000002.

q. A restriction mailed on December 5, 1986, in Application No. 06/676,769 (#304). PTX-895. The application issued as U.S. Patent No. 4,744,042 on May 10, 1988. DX268-000002.

r. Restrictions mailed on July 1, 1991, and November 22, 1991, in Application No. 07/495,808 (#330). PTX-895. The application issued as U.S. Patent No. 5,339,275 on August 16, 1994. DX268-000002.

22. Seven (7) out of 63 of Mr. Hyatt's pre-GATT restrictions were no longer petitionable because Mr. Hyatt had abandoned the corresponding ancestor application. Those restrictions are described below:

a. Restrictions mailed on April 8, 1975, and August 1, 1975, in Application No. 05/101,881 (#101). PTX-895. Proceedings terminated in the application no later than February 4, 1981. PTX-1835.0002–03; *see also* PTX-932.14222–29 (United States Court of Customs and Patent Appeals decision affirming the examiner's rejection of the #101 application).

b. A restriction mailed on December 16, 1974, in Application No. 05/495,349 (#126). PTX-895. Mr. Hyatt abandoned the application when he failed to seek judicial review of the Board's April 30, 1986 decision on Mr. Hyatt's request for reconsideration. DX2128-000001–04.

c. A restriction mailed on August 28, 1980, in Application No. 05/860,260 (#152). PTX-895. Mr. Hyatt expressly abandoned the application on April 20, 1987. DX2130.

    d.    A restriction mailed on April 13, 1981, in Application No. 05/860,254 (#151). PTX-895. Mr. Hyatt abandoned the application when he failed to seek judicial review of the Board's July 28, 1983 decision affirming the examiner's rejection. DX2129-000001–06.

    e.    A restriction mailed on January 31, 1985, in Application No. 06/223,959 (#175). PTX-895. Mr. Hyatt expressly abandoned the application on June 12, 1989. DX2131.

    f.    A restriction mailed on July 14, 1986, in Application No. 06/661,649 (#301). PTX-895. Mr. Hyatt abandoned the application on March 14, 1989, when he failed to pay the issue fee after receiving a notice of allowance. DX2218.

23.    Eight (8) out of 63 of Mr. Hyatt's pre-GATT restrictions became final when he elected to prosecute one claimed invention "without traverse," meaning he acquiesced in the restriction and forfeited his right to petition the requirement. Tr. Sept. 27, 2023 (1247:15–19) (Goldberg). Those restrictions are described below:

    a.    A restriction mailed on July 20, 1978, in Application No. 05/849,812 (#145). PTX-895. Mr. Hyatt elected "without traverse" on August 15, 1978. DX2221-000001.

    b.    A restriction mailed on May 19, 1986, in Application No. 06/662,211 (#302). PTX-895. Mr. Hyatt elected "without traverse" on July 23, 1986. PTX-945.165.

    c.    A restriction mailed on January 8, 1987, in Application No. 06/663,094 (#303). PTX-2255.0004. Mr. Hyatt elected "without traverse" on February 5, 1987. PTX-2255.0004.

    d.    A restriction mailed on December 18, 1989, in Application No. 07/059,286 (#313). PTX-895. Mr. Hyatt's April 23, 1990 response did "not traverse [the] restriction and constructive election." DX2135.000008.

    e.    A restriction mailed on September 27, 1990, in Application No. 07/279,592 (#319). PTX-895. Mr. Hyatt elected "without traverse" on November 29, 1990. PTX-1162.0175.

    f.    A restriction mailed on September 27, 1990, in Application No. 07/289,355 (#321). PTX-895. Mr. Hyatt elected "without traverse" on March 22, 1991. PTX-1046.18262.

    g.    A restriction mailed on May 18, 1990, in Application No. 07/357,570 (#324). PTX-895. Mr. Hyatt elected "without traverse" on June 19, 1990. PTX-932.13665.

h.    A restriction mailed on October 23, 1990, in Application No. 07/506,642 (#332). PTX-895. Mr. Hyatt elected "without traverse" on November 26, 1990. DX2134.

24.    Two (2) out of 63 of Mr. Hyatt's pre-GATT restrictions became final when he failed to traverse the restriction, effectively acquiescing in it and forfeiting his right to petition that requirement. MPEP § 818.03(c). Those restrictions are described below:

a.    A restriction mailed on September 13, 1988, in Application No. 05/849,812 (#145). PTX-895. Mr. Hyatt's July 9, 1991 response did not traverse the restriction. DX2222. Instead, Mr. Hyatt canceled certain claims as "being directed to a non-elected invention" without traversing the restriction. DX2222-000002.

b.    A restriction mailed on February 22, 1988, in Application No. 06/662,211 (#302). PTX-895. Mr. Hyatt's June 24, 1988 response did not traverse the restriction. PTX-945.69–76. Instead, it "affirm[ed]" his election without traversing. PTX-945.70.

25.    Thirteen (13) out of 63 of Mr. Hyatt's pre-GATT restrictions were made final by the examiner. Those restrictions are described below:

a.    Mr. Hyatt identified restrictions dated December 5, 1972, and May 11, 1973, in Application No. 05/135,040 (#104). PTX-895. The May 11, 1973 restriction repeats the December 5, 1972 restriction and makes it "Final." DX2220-000003.

b.    Mr. Hyatt identified restrictions dated August 23, 1973, January 11, 1974, March 14, 1974, and September 13, 1974, in Application No. 05/302,771 (#112). The January 11, 1974 restriction repeats the August 23, 1973 restriction and makes it "final." DX2207-000002. The September 13, 1974 restriction repeats the March 14, 1974 restriction and makes it "Final." DX2205-000002.

c.    Mr. Hyatt identified a restriction dated April 21, 1988, in Application No. 07/059,286 (#313). In an advisory action dated June 27, 1988, the examiner stated that the restriction would "not be withdrawn." DX2136-000002.

d.    Mr. Hyatt identified a restriction dated March 1, 1989, in Application No. 06/849,243 (#310). In an office action dated June 22, 1989, the examiner stated that Mr. Hyatt's arguments directed to the restriction were "not deemed to be persuasive." DX2132-000002. In his response dated November 15, 1989, Mr. Hyatt did not further dispute or attempt to traverse the March 1, 1989 restriction. PTX-937.228–47.

e.    Mr. Hyatt identified a restriction dated July 29, 1991, in Application No. 07/419,911 (#326). In an office action dated April 3, 1992, the examiner stated

that the restriction was "deemed proper" and "therefore made FINAL." DX2133-000003.

f.     Mr. Hyatt identified restrictions dated July 23, 1992, and July 19, 1993, in Application No. 07/774,159 (#344). In an office action dated November 24, 1992, the examiner stated that the July 23, 1992 restriction was "deemed proper" and "therefore made FINAL." DX2215-000002. In an office action dated May 12, 1994, the examiner stated that the July 19, 1993 restriction was "deemed proper" and "therefore made FINAL." DX2214-000002.

g.     Mr. Hyatt identified a restriction dated August 17, 1992, in Application No. 07/357,570 (#324). In an office action dated January 11, 1993, the examiner stated that the restriction was "deemed proper" and "therefore made FINAL." DX2210-000035.

h.     Mr. Hyatt identified a restriction dated August 5, 1993, in Application No. 08/034,627 (#349). In an office action dated November 29, 1994, the examiner made the restriction "FINAL." PTX-943.210.

26.   The sole remaining pre-GATT restriction was issued on April 8, 1991, in Application No. 06/848,017 (#307). PTX-895. None of Mr. Hyatt's GATT Bubble applications are children of this application. DX231.

27.   Accordingly, Mr. Hyatt did not need to wait for pre-GATT restrictions in his ancestor applications to become final before filing his continuing applications. The written record contradicts Mr. Hyatt's testimony that the non-finality of restrictions in his ancestor applications caused him to delay filing his continuing applications until shortly before the GATT transition.

28.   Thirty-two (32) out of 63 restrictions date to the 1970s. PTX-895. Twenty-two (22) out of 63 date to the 1980s. PTX-895. Even if Mr. Hyatt were correct that these restrictions were non-final as of the GATT transition, that means Mr. Hyatt passively waited for approximately 6 to 23 years for the PTO to make these restrictions final, rather than actively seeking their finalization.

### ii.  Number of Non-Elected Species

29.   Mr. Hyatt testified that the impending GATT transition caused him to file divisional applications to protect restricted species (i.e., independent inventions) in his ancestor applications. FOF ¶ 18.

30.   The total number of species in the 63 pre-GATT restrictions issued in Mr. Hyatt's ancestor applications is 206. PTX-895; *see also* Tr. Sept. 18, 2023 PM (122:22–123:2) (Hyatt). However, the total number of *non-elected* species in the 63 pre-GATT restrictions is lower. The number of non-elected species is lower than the total number of species because the PTO requires applicants to respond to restriction requirements

by making a "provisional election of one invention for prosecution." 37 C.F.R. § 1.143; *see also* MPEP § 818.03(b). Accordingly, to determine the total number of non-elected species, the total number of restricted species (206) must be reduced by the number of species that Mr. Hyatt elected in his ancestor applications (49).[17] This gives a total of 157 non-elected species.

31.    The total number of non-elected species in Mr. Hyatt's ancestor applications (157) is less than half of the approximately 400 GATT Bubble applications that Mr. Hyatt filed.

32.    For example, the total number of non-elected species in the applications that Mr. Hyatt claims are ancestors to the 700 family is 6. PTX-1838.0002 (showing claimed ancestors); PTX-895 (showing number of restricted species). The 700 Family includes 100 applications. Tr. Sept. 18, 2023 PM (96:22–97:2) (Hyatt); *see also* PTX-271.00001 (grouping application families by docket number).

33.    As a further example, the total number of non-elected species in the application that Mr. Hyatt claims is the ancestor to the 600 family is three. PTX-1836.0002; PTX-895. The 600 Family includes 29 applications. PTX-271.00001.

34.    Thus, Mr. Hyatt did not file a number of GATT Bubble applications commensurate with the number of restricted species in his ancestor applications.

35.    Mr. Hyatt's testimony that he filed his GATT Bubble applications in response to restrictions in his ancestor applications is inconsistent with prior representations to this Court. Mr. Hyatt previously represented that he "filed about 100 patent applications [in the 700 Family] in 1995 because an initial count of inventions contained in the [700 Family] specification exceeded 100 inventions." DX233-000008. Mr. Hyatt further stated that he "made sure . . . to file enough applications to address the quantity of inventions described in [his] large and diverse disclosures." DX233-000008. In his 2017 opening statement, counsel for Mr. Hyatt stated that Mr. Hyatt "went and he counted what he believed to be the inventive features in those applications. That count led to 400 patent applications. So he submitted 400 patent applications." Tr. Oct. 6, 2017 AM (59:17–20) (Plaintiff's Opening Statement). Mr. Hyatt has made similar representations to the PTO. PTX-828.14081–82; *see also* PTX-2250.4297. In other words, Mr. Hyatt has historically tied his decision to file GATT Bubble applications in the manner that he did to the number of inventions he counted in his disclosures, not the existence of restricted species in his ancestor applications.

36.    Mr. Hyatt's testimony that he filed his GATT Bubble applications in response to restrictions in his ancestor applications is inconsistent with his other trial testimony. Mr. Hyatt testified that to protect each invention "in [his] 11 [application] families, [he] filed numerous applications that were copies of the ancestor application." Tr. Sept. 18,

---

[17] The number of elected species is less than the total number of pre-GATT restrictions (63) because 14 of these restrictions simply repeated prior restrictions and made them final. *E.g.*, DX2220-000003. Accordingly, there were no species in these 14 restrictions for Mr. Hyatt to elect. Mr. Hyatt only made elections in the 49 pre-GATT restrictions with listed species.

2023 AM (58:19–23) (Hyatt). He further testified that because the 700 Family's specification disclosed "at least 100 inventions," he "filed 100 copies of the ancestor application, so that [he] could focus each one of them on a different one of the inventions" he had disclosed. Tr. Sept. 18, 2023 AM (58:24–59:3) (Hyatt). In other words, during trial, Mr. Hyatt tied his decision to file GATT Bubble applications in the manner that he did to the number of inventions he counted in his disclosures.

37.   During trial, Mr. Hyatt attempted to reconcile his earlier contention that he filed a certain number of GATT Bubble applications based on the number of inventions he believed he had disclosed with his more recent contention that he filed divisional applications to protect restricted species. He testified that he filed more GATT Bubble applications than he had restricted species because the restricted species in his ancestor applications were broad, and he expected to narrow them in his continuing applications by adding many narrower claims to cover the same inventions. Tr. 10/2/23 PM (1780:21–1781:9) (Hyatt). The Court finds this explanation unpersuasive and not credible. If Mr. Hyatt's applications had been directed to broad restricted species, such that he needed to add many narrower claims, he could have done so by adding narrower claims to a single application drawn to that species rather than filing additional applications. Mr. Hyatt did not explain why adding more claims required additional applications rather than additional claims per application.

38.   The only explanation the Court can divine is that Mr. Hyatt believed he would need additional applications pursuing narrower claim sets to avoid the PTO issuing post-GATT restriction requirements. *See* Tr. Oct. 2, 2023 PM (1781:3–16) (Hyatt). To that point, Mr. Hyatt suggested that he should have filed *more* transitional applications than he did because the PTO ultimately issued a substantial number of post-GATT restriction requirements. *See* Tr. Oct. 2, 2023 PM (1781:10–16) (Hyatt). But this explanation—that he filed more GATT Bubble applications than there were non-elected species in anticipation of future restrictions—is inconsistent with his testimony that he filed a certain number of applications based on the number of inventions he believed he had disclosed. It is inconsistent with Mr. Hyatt's concession that he filed his GATT Bubble applications to protect both restricted species and unclaimed—i.e., never before presented and, therefore, never before broadly restricted—inventions. Hyatt Resp. 32 (citing Tr. Sept. 18, 2023 PM (124:21–24, 140:1–9) (Hyatt) and Tr. Sept. 19, 2023 AM (172:8–174:5) (Hyatt)). And it is inconsistent with Mr. Hyatt's testimony that he believed Rule 129 authorized him to claim more than one invention in a GATT Bubble application, which indicates Mr. Hyatt believed post-GATT restriction requirements would not be a problem so long as he paid the requisite fees. *See* Tr. Oct. 2, 2023 AM (1740:10–23) (Hyatt). Mr. Hyatt is not credible on this point.

39.   Mr. Hyatt's shifting explanations and representations to this Court on this point are incapable of neat resolution except by recourse to his originally proffered explanation that he filed a certain number of GATT Bubble applications based on the number of inventions he believed he had disclosed. The discrepancy between the total number of GATT Bubble applications (approximately 400) and the total number of non-elected species in Mr. Hyatt's ancestor applications (157) fatally undermines Mr. Hyatt's more

recent contention that he filed divisional applications to protect restricted species. The Court concludes that Mr. Hyatt filed his GATT Bubble applications to protect the inventions he believed he had disclosed, regardless of whether they were previously restricted.

### 5. #303 Application

40. Mr. Hyatt abandoned Application No. 06/663,094 (#303) rather than pay the issue fee and receive a patent on allowed claims. On October 6, 1988, the PTO informed Mr. Hyatt that claims 1–10 (as renumbered) in the application were allowable. DX260-000001. If Mr. Hyatt had paid the $280 issue fee, the PTO would have issued him a patent on those claims. DX260-000001. Instead, Mr. Hyatt abandoned the application in favor of a continuation-in-part application, Application No. 07/289,355 (#321). PTX-060.00003. That continuation-in-part application became the parent of Mr. Hyatt's 700 Family of applications.

41. Mr. Hyatt testified at trial that he abandoned the #303 application and filed a continuation-in-part to obtain consideration of new prior-art references that called into question the patentability of claims the examiner had allowed in the #303 application. Tr. Sept. 22, 2023 (711:20–712:18) (Hyatt). The Court does not credit Mr. Hyatt's testimony that he abandoned the #303 application to ensure he obtained a valid patent rather than to delay issuance and pursue other unrelated claims.

42. Mr. Hyatt did not use the #321 application to submit the allowed claims to the examiner for consideration. Instead, he filed "*nearly identical*" claims. DX233-000012 (emphasis in original). Although similar, these claims are not the same as the claims allowed in the #303 application. DX233-000068. Additionally, Mr. Hyatt introduced several claims drawn to new subject matter. *See* PTX-1046.18315 (showing 57 total claims). This caused the examiner to issue a restriction requirement in the #321 application. PTX-1046.18278. In response, Mr. Hyatt elected a group of claims that did not include any of the "nearly identical" claims from the #303 application. *Compare* DX1640-000001 (electing "without traverse . . . the group II invention including claims 11-21") *with* DX233-000069–71 (representing that claims 23 and 31–38 of the #321 application correspond to the #303 application allowed claims). Put differently, Mr. Hyatt did not elect any of the claims previously allowed in the #303 application for examination in the #321 application. Mr. Hyatt's testimony that he abandoned the #303 application to obtain review of the allowed claims in light of new prior-art references is inconsistent with his decision not to elect any of those claims (more precisely, the "nearly identical" claims filed in the #321 application) for examination.

43. Further, if Mr. Hyatt wanted his allowed claims examined in light of new prior art references, he could have filed a file wrapper continuation ("FWC") under 37 C.F.R. § 1.62. MPEP § 201.06(b). The FWC rule provided a streamlined process for reconsidering the patentability of allowed claims in view of new prior art. *See* MPEP § 609B(3); *see also* DX233-000011–12. Filing a FWC containing the allowed claims from the #303 application would not have prevented Mr. Hyatt from also filing a

continuation-in-part application directed to new subject matter. Mr. Hyatt used the FWC rule in other applications, but not here. PTX-1833.0002–03; PTX-1834.0002–03.

44.     Mr. Hyatt attempted to reinsert his previously allowed claims in a different application nearly ten years after he prevented them from issuing. Tr. Oct. 10, 2017 PM (9:21–12:4) (Morse); Tr. Oct. 12, 2017 PM (38:24–41:18) (Kunin). Specifically, more than ten years after abandoning the #303 application, Mr. Hyatt filed claims in another application, Application No. 08/458,004 (#713), that were substantially similar to the allowed claims in the #303 application. DX131-000039–40 (explaining substantial subject matter correspondence between allowed claims in the #303 application and claims in the #713 application); PTX-5007, Slide 30 (showing claims side-by-side). The claims in the #303 application were originally allowed on October 6, 1988; Mr. Hyatt effectively refiled them in the #713 application on December 22, 1998. Tr. Oct. 10, 2017 PM (10:7–18) (Morse).

## D.  GATT Bubble Applications

### 1.  Application Families

45.     As of October 2013, there were 399 applications pending with the PTO that name Mr. Hyatt as the inventor and were filed before June 8, 1995 (the effective date of the GATT transition). DX144-000004. Mr. Hyatt filed 381 of these applications between April 6, 1995, and June 7, 1995. DX253-000005–16. Three hundred and thirty one (331) of those applications were filed in the eight days before the 20-year term went into effect—from May 31, 1995, to June 7, 1995. DX253-000007–16. On June 5, 1995 alone, Mr. Hyatt filed 65 applications. DX253-000011–13. On June 6, he filed another 115 applications. DX253-000013–16.

46.     Mr. Hyatt groups his GATT Bubble applications into 11 families according to his assigned docket numbers. PTX-271.00001. Each of Mr. Hyatt's families corresponds to a family of applications identified in the PTO's Requirements. *E.g.*, DX140-000005–07.[18] Mr. Hyatt's applications within the same family share an identical specification. PTX-271. Those families are described below:

a.      The 360 Family contains Mr. Hyatt's GATT Bubble applications with docket numbers 360 through 369. PTX-271.00001. This family's general subject matter is "analog memory." Tr. Sept. 18, 2023 AM (59:24–60:1) (Hyatt). This family corresponds to the PTO's Family 1. DX200-000005–06. Mr. Hyatt provided the Court with a chart showing five ancestor applications for this family and an earliest priority date of October 25, 1977. PTX-1830.0002–03. The chart further shows that Application No. 08/429,272 (#360), a member of the family, was filed on April 24, 1995. PTX-1830.0003. Contrary to Mr. Hyatt's chart, this family actually claims priority to 36 applications, with an earliest claimed priority date of December 28, 1970, the filing date of

---

[18] The "PTO's Requirements" refers to the 2013 Requirements, detailed *infra*, FOF ¶¶ 228–231.

Application No. 05/101,881 (#101). PTX-1069.17624–27. The earliest identical specification for this family was filed on March 13, 1990, in Application No. 07/493,061 (#329). DX1486-000052.

b.     The 370 Family contains Mr. Hyatt's GATT Bubble applications with docket numbers 370 through 393. PTX-271.00001. This family's general subject matter is "illumination control systems." Tr. Sept. 18, 2023 PM (81:9–11) (Hyatt). This family corresponds to the PTO's Family 11. DX69-000007–08. Mr. Hyatt provided the Court with a chart showing three ancestor applications for this family and an earliest priority date of June 4, 1973. PTX-1831.0002–03. The chart further shows that Application No. 08/456,138 (#382), a member of the family, was filed on May 31, 1995. PTX-1831.0003. Contrary to Mr. Hyatt's chart, this family actually claims priority to 29 applications, with an earliest claimed priority date of December 28, 1970, the filing date of Application No. 05/101,881 (#101). PTX-836.6365–68. The earliest identical specification for this family was filed on December 3, 1987, in Application No. 07/128,659 (#315). DX1486-000052.

c.     The 410 Family contains Mr. Hyatt's GATT Bubble applications with docket numbers 410 through 439. PTX-271.00001. This family's general subject matter is "signal processing technology." Tr. Sept. 18, 2023 PM (85:7–10) (Hyatt). This family corresponds to the PTO's Family 7. DX46-000005–07. Mr. Hyatt provided the Court with a chart showing four ancestor applications for this family and an earliest priority date of February 14, 1975. PTX-1832.0002–03. The chart further shows that Application No. 08/426,554 (#435), a member of the family, was filed on April 21, 1995. PTX-1832.0003. Contrary to Mr. Hyatt's chart, this family actually claims priority to 34 applications, with an earliest claimed priority date of December 28, 1970, the filing date of Application No. 05/101,881 (#101). PTX-826.17232–34. The earliest identical specification for this family was filed on April 7, 1986, in Application No. 06/849,243 (#310). DX1486-000052.

d.     The 450 Family contains Mr. Hyatt's GATT Bubble applications with docket numbers 400 through 409, 440 through 442, and 450 through 499. PTX-271.00001. This family's general subject matter is "visual processing for host systems, where the host system performs various functions." Tr. Sept. 18, 2023 PM (87:7–11) (Hyatt). This family corresponds to the PTO's Family 9. DX27-000005–07. Mr. Hyatt provided the Court with a chart showing two ancestor applications, with an earliest priority date of June 15, 1983. PTX-1833.0002–03. The chart further shows that Application No. 08/464,995 (#442), a member of the family, was filed on June 5, 1995. PTX-1833.0003. Contrary to Mr. Hyatt's chart, this family actually claims priority to 43 applications, with an earliest claimed priority date of November 24, 1969, the filing date of Application No. 04/879,293 (#100). DX27-000008–09. The earliest identical specification for this family was filed on June 15, 1983, in Application No. 06/504,691 (#193). DX1486-000052.

e.    The 500 Family contains Mr. Hyatt's GATT Bubble applications with docket number 500 through 548. PTX-271.00001. This family's general subject matter is "memory architecture." Tr. Sept. 18, 2023 PM (88:17–20) (Hyatt). This family corresponds to the PTO's Family 12. DX179-000005–07. Mr. Hyatt provided the Court with a chart showing three ancestor applications, with an earliest priority date of October 18, 1984. PTX-1834.0002–03. The chart further shows that Application No. 08/470,080 (#529), a member of the family, was filed on June 6, 1995. PTX-1834.0003. Contrary to Mr. Hyatt's chart, this family actually claims priority to 14 applications, with an earliest claimed priority date of February 14, 1975, the filing date of Application No. 05/550,231 (#128). PTX-002.00897–98. The earliest identical specification for this family was filed on October 18, 1984, in Application No. 06/662,211 (#302). PTX-1834.0003.

f.    The 550 Family contains Mr. Hyatt's GATT Bubble applications with docket numbers 550 through 569. PTX-271.00001. This family's general subject matter is "computer architecture," especially that pertaining to "computer machine control." Tr. Sept. 18, 2023 PM (90:15–19) (Hyatt). This family corresponds to the PTO's Family 2. DX158-000005–06. Mr. Hyatt provided the Court with a chart showing four ancestor applications for this family and an earliest priority date of December 28, 1970. PTX-1835.0002–03. The chart further shows that Application No. 08/470,075 (#567), a member of the family, was filed on June 6, 1995. PTX-1835.0003. Contrary to Mr. Hyatt's chart, this family actually claims priority to 10 applications. DX158-000007. December 28, 1970, the filing date of Application No. 05/101,881 (#101), is the correct priority date. DX2204. The earliest identical specification for this family was filed on December 27, 1989, in Application No. 07/457,451 (#327). DX1486-000052.

g.    The 600 Family contains Mr. Hyatt's GATT Bubble applications with docket numbers 600 through 628. PTX-271.00001. This family's general subject matter is improvement on memory systems. Tr. Sept. 18, 2023 PM (93:1–3) (Hyatt). This family corresponds to the PTO's Family 8. DX140-000005–07. Mr. Hyatt provided the Court with a chart showing one ancestor application for this family and an earliest priority date of December 2, 1988. PTX-1836.0002–03. The chart further shows that Application No. 08/434,424 (#604), a member of the family, was filed on May 3, 1995. PTX-1836.0003. Contrary to Mr. Hyatt's chart, this family actually claims priority to 43 applications, with an earliest claimed priority date of December 28, 1970, the filing date of Application No. 05/101,881 (#101). DX61-000002–06. The earliest identical specification for this family was filed on December 2, 1988, in Application No. 07/279,592 (#319). DX1486-000052.

h.    The 650 Family contains Mr. Hyatt's GATT Bubble applications with docket numbers 650 through 678. PTX-271.00001. This family's general subject

matter is "fault tolerant systems associated with the [370 Family's] illumination control technology." Tr. Sept. 18, 2023 PM (95:22–96:1) (Hyatt). This family corresponds to the PTO's Family 6. DX129-000005–06. Mr. Hyatt provided the Court with a chart showing three ancestor applications and an earliest priority date of June 4, 1973. PTX-1837.0002–03. The chart further shows that Application No. 08/458,579 (#677), a member of the family, was filed on June 1, 1995. PTX-1837.0003. Contrary to Mr. Hyatt's chart, this family actually claims priority to 34 applications, with an earliest claimed priority date of December 28, 1970, the filing date of Application No. 05/101,881 (#101). DX129-000006–07. The earliest identical specification for this family was filed on October 10, 1989, in Application No. 07/419,911 (#326). DX1486-000052.

i.     The 700 Family contains Mr. Hyatt's GATT Bubble applications with docket numbers 700 through 799. PTX-271.00001. This family's general subject matter is "image processing." Tr. Sept. 18, 2023 PM (96:11–13) (Hyatt). This family corresponds to the PTO's Family 10. DX144-000005–07. Mr. Hyatt provided the Court with a chart showing two ancestor applications for this family and an earliest priority date of October 19, 1984. PTX-1838.0002–03. The chart further shows that Application No. 08/457,208 (#711), a member of the family, was filed on June 1, 1995. PTX-1838.0003. Contrary to Mr. Hyatt's chart, this family actually claims priority to six applications, with an earliest priority date of June 15, 1983, the filing date of Application No. 06/504,691 (#193). PTX-001.05093–94. The earliest identical specification for this family was filed on October 19, 1984, in Application No. 06/663,094 (#303). Tr. Oct. 2, 2023 AM (1751:5–13) (Hyatt).

j.     The 800 Family contains Mr. Hyatt's GATT Bubble applications with docket numbers 800 through 829. PTX-271.00001. This family's general subject matter is "duty cycle modulated illumination control systems." Tr. Sept. 18, 2023 PM (99:3–6) (Hyatt). This family corresponds to the PTO's Family 5. DX75-000005–06. Mr. Hyatt provided the Court with a chart showing five ancestor applications for this family and an earliest priority date of June 4, 1973. PTX-1839.0002–03. The chart further shows that Application No. 08/454,879 (#816), a member of the family, was filed on May 31, 1995. PTX-1839.0003. Contrary to Mr. Hyatt's chart, this family actually claims priority to 30 applications, with an earliest claimed priority date of December 28, 1970, the filing date of Application No. 05/101,881 (#101). PTX-2212.2292–95. The earliest identical specification for this family was filed on May 25, 1989, in Application No. 07/357,570 (#324). DX1486-000052.

k.     The 850 Family contains Mr. Hyatt's GATT Bubble applications with docket numbers 850 through 869. PTX-271.00001. This family's general subject matter is "sound and speech processing." Tr. Sept. 18, 2023 PM (100:3–6) (Hyatt). This family corresponds to the PTO's Family 4. DX196-000006–07. Mr. Hyatt provided the Court with a chart showing two ancestor applications for this family and an earliest priority date of January 22, 1973.

PTX-1840.0002–03. The chart further shows that Application No. 08/486,151 (#855), a member of the family, was filed on June 6, 1995. PTX-1840.0003. Contrary to Mr. Hyatt's chart, this family actually claims priority to 19 applications, with an earliest claimed priority date of December 28, 1970, the filing date of Application No. 05/101,881 (#101). DX196-000008. The earliest identical specification for this family was filed on November 9, 1977, in Application No. 05/849,812 (#145). DX 1486-000052.

### 2. Pre-Filing Delay

47.    Mr. Hyatt delayed filing his GATT Bubble applications for 12 to 26 years. FOF ¶ 51. Even if the Court were to credit his claimed priority dates, that would mean he delayed filing for 6 to 24 years, or 11 to 24 years, excluding the 600 Family. *Id.* In other words, Mr. Hyatt has conceded significant pre-filing delay. Mr. Hyatt further delayed by amending his claims late in prosecution, effectively presenting new claims for examination decades after he could have first filed them. FOF ¶ 56. For instance, in certain of his applications, Mr. Hyatt delayed 46 years before presenting claims for examination. *Id.*

### i. GATT Bubble Applications

48.    Mr. Hyatt's GATT Bubble applications claim priority to a series of applications filed from the late 1960s through the 1980s. A claim of priority to those earlier applications, if valid, would give Mr. Hyatt the benefit of the filing date of those applications. 35 U.S.C. § 120. Put differently, a valid claim of priority would require the PTO to treat Mr. Hyatt's GATT Bubble applications as if they were filed on those earlier dates. *Id.* Thus, if Mr. Hyatt's priority claims to those earlier applications are proper, Mr. Hyatt's GATT Bubble applications, which were filed in 1995, would be treated as if they were filed decades earlier. *Id.*

49.    For Mr. Hyatt's priority claims to be valid, his earlier applications have to provide adequate support for the inventions claimed in his GATT Bubble applications. *Id.* More precisely, those earlier applications must provide written description and enablement support for his later claims. *Id.*; *see also* 35 U.S.C. § 112.

50.    By claiming priority to those earlier applications, Mr. Hyatt represented to the PTO that he believed his earlier applications provided written description and enablement support for his later claims. Accordingly, Mr. Hyatt represented to the PTO that he could have filed his later claims with his earlier applications.

51.    Mr. Hyatt waited decades to file his later claims rather than include them with his earlier applications. The below table shows the approximate magnitude of filing delay across Mr. Hyatt's GATT Bubble applications. The table shows delay based on the Court's findings respecting Mr. Hyatt's claimed priority dates ("Actual Filing Delay"), as well as delay based on the priority dates presented in Mr. Hyatt's charts ("Admitted Filing Delay"), which the Court has now largely rejected. FOF ¶ 46.

| Family | Hyatt Chart Priority Date | Actual Claimed Priority Date | Filing Date[19] | Admitted Filing Delay[20] | Actual Filing Delay[21] |
|--------|---------|---------|---------|---------|---------|
| 360 | 10/25/1977 | 12/28/1970 | 4/24/1995 (#360) | 17 years | 24 years |
| 370 | 6/4/1973 | 12/28/1970 | 5/31/1995 (#382) | 22 years | 24 years |
| 410 | 2/14/1975 | 12/28/1970 | 4/21/1995 (#435) | 20 years | 24 years |
| 450 | 6/15/1983 | 11/24/1969 | 6/5/1995 (#442) | 12 years | 26 years |
| 500 | 10/18/1984 | 2/14/1975 | 6/6/1995 (#529) | 11 years | 20 years |
| 550 | 12/28/1970 | 12/28/1970 | 6/6/1995 (#567) | 24 years | 24 years |
| 600 | 12/2/1988 | 12/28/1970 | 5/3/1995 (#604) | 6 years | 24 years |
| 650 | 6/4/1973 | 12/28/1970 | 6/1/1995 (#677) | 22 years | 24 years |
| 700 | 10/19/1984 | 6/15/1983 | 6/1/1995 (#711) | 11 years | 12 years |
| 800 | 6/4/1973 | 12/28/1970 | 5/31/1995 (#816) | 22 years | 24 years |
| 850 | 1/22/1973 | 12/28/1970 | 6/6/1995 (#855) | 22 years | 24 years |

52.     Mr. Hyatt significantly delayed presenting his GATT Bubble applications for examination, with delays ranging from 12 to 26 years. Even if the Court were to adopt the priority dates presented in Mr. Hyatt's charts, the delay range would be 6 to 24 years. Excluding the applications that comprise the 600 Family, the delay range would be 11 to 24 years. In other words, Mr. Hyatt has conceded significant periods of pre-filing delay in his GATT Bubble applications.

53.     Mr. Hyatt has indicated that he would have waited even longer to file his continuing applications if not for the GATT transition. Mr. Hyatt previously represented to this Court that he was "forced by the change of law to provide in co-pending applications for all inventions that [he] would need to cover," and therefore "could not wait to file

---

[19] The Court used the filing dates provided in Mr. Hyatt's charts as exemplars for the whole family when calculating the delays displayed in this summary chart. PTX-1830.0003 (360 Family); PTX-1831.0003 (370 Family); PTX-1832.0003 (410 Family); PTX-1833.0003 (450 Family); PTX-1834.0003 (500 Family); PTX-1835.0003 (550 Family); PTX-1836.0003 (600 Family); PTX-1837.0003 (650 Family); PTX-1838.0003 (700 Family); PTX-1839.0003 (800 Family); PTX-1840.0003 (850 Family).

[20] The Court rounded each year to the nearest integer. For example, there were 24 years, 5 months, and 9 days of pre-filing delay in the 550 Family. That amounts to approximately 24.44 years of pre-filing delay. Rounding that number to the nearest integer yields 24 years of pre-filing delay, which is what appears in the table.

[21] *See supra* note 20.

until after examination of some claims to address additional subject matter later because filing after June 8, 1995 would have resulted in loss of patent term." DX233-000009. Examiners noted that this meant Mr. Hyatt "was simply waiting and, if not for the change in law in 1995, he would *have waited even longer*" to file additional applications. PTX-2250.1983 (emphasis in original). Mr. Hyatt included similar language in his appeal briefs, but eventually stopped including it in his filings. DX1922-000047 & n.8.

### ii.  Presenting Newly Amended Claims

54.   In addition to delaying filing his GATT Bubble applications, Mr. Hyatt delayed presenting amended claims for examination. As detailed *infra*, FOF ¶¶ 122–142, Mr. Hyatt routinely filed amendments in his GATT Bubble applications that shifted his claims to new inventions and restarted examination years after he initially filed his applications.

55.   By amending his claims while maintaining his claimed priority dates, Mr. Hyatt represented to the PTO that he believed his earlier applications provided written description and enablement support for his newly amended claims. Accordingly, Mr. Hyatt represented to the PTO that he could have filed his newly amended claims with his earlier applications.

56.   Mr. Hyatt waited decades to file his newly amended claims rather than include them with his earlier applications. The below table shows non-exhaustive examples of delay in presenting amended claims for examination across many of Mr. Hyatt's application families. FOF ¶¶ 122–142. The table shows delay based on the Court's findings respecting Mr. Hyatt's claimed priority dates ("Actual Filing Delay"), as well as delay based on the priority dates presented in Mr. Hyatt's charts ("Admitted Filing Delay"). FOF ¶ 46.

| Family | Application | Hyatt Chart Priority Date | Actual Claimed Priority Date | Amended Date | Admitted Filing Delay[22] | Actual Filing Delay[23] |
|---|---|---|---|---|---|---|
| 360 | 08/428,737 (#361) | 10/25/1977 | 12/28/1970 | 2/23/2015 | 37 years | 44 years |
| 370 | 08/455,320 (#380) | 6/4/1973 | 12/28/1970 | 4/27/2017 | 44 years | 46 years |
| 410 | 08/418,213 (#412) | 2/14/1975 | 12/28/1970 | 1/7/2016 | 41 years | 45 years |
| 450 | 08/417,530 (#450) | 6/15/1983 | 11/24/1969 | 8/3/2015 | 32 years | 46 years |
| 500 | 08/471,704 (#514) | 10/18/1984 | 2/14/1975 | 10/22/1998 | 14 years | 24 years |
| 500 | 08/472,062 (#524) | 10/18/1984 | 2/14/1975 | 10/21/1996 | 12 years | 22 years |
| 600 | 08/431,639 (#601) | 12/2/1988 | 12/28/1970 | 8/19/1998 | 10 years | 28 years |
| 700 | 08/457,211 (#708) | 10/19/1984 | 6/15/1983 | 2/22/1999 | 14 years | 16 years |
| 700 | 08/456,398 (#717) | 10/19/1984 | 6/15/1983 | 1/30/2002 | 17 years | 19 years |
| 700 | 08/463,823 (#758) | 10/19/1984 | 6/15/1983 | 12/21/1996 | 12 years | 14 years |
| 700 | 08/471,553 (#783) | 10/19/1984 | 6/15/1983 | 5/11/1999 | 15 years | 16 years |
| 700 | 08/469,580 (#789) | 10/19/1984 | 6/15/1983 | 12/10/2015 | 31 years | 32 years |
| 700 | 08/471,042 (#798) | 10/19/1984 | 6/15/1983 | 6/1/2015 | 31 years | 32 years |
| 800 | 08/456,126 (#817) | 6/4/1973 | 12/28/1970 | 10/15/2014 | 41 years | 44 years |

57.   Mr. Hyatt significantly delayed presenting his newly amended claims for examination, with delays in some applications reaching as high as 46 years. Mr. Hyatt's delay in presenting amended claims exceeded his delay in filing his GATT Bubble applications. For example, Mr. Hyatt delayed 24 years in filing Application No. 08/428,737 (#361) because he filed it on April 25, 1995, 24 years after his earliest claimed priority date for the 360 Family. DX253-000006; FOF ¶ 51. Approximately 20 years later, on February 23, 2015, Mr. Hyatt submitted an amendment that substantially rewrote claim 168 in the #361 application, shifting it to a new invention. FOF ¶ 135. In other words, Mr. Hyatt introduced a substantially new claim for examination 44 years after his earliest claimed priority date. FOF ¶ 56. That constituted additional delay, such that

---

[22] *See supra* note 20.

[23] *See supra* note 20.

Mr. Hyatt delayed at least 24 to 44 years in the #361 application—24 years to file the application and 44 years to present newly amended claim 168 for examination. Even if the Court were to adopt the priority dates presented in Mr. Hyatt's charts, Mr. Hyatt still would have delayed at least 18 to 37 years. Although this example is emblematic of Mr. Hyatt's amendment practice, Mr. Hyatt's delay in presenting newly amended claims is not limited to claim-shifting amendments.

### 3. Application Types

58.   During trial, Mr. Hyatt testified that his GATT Bubble applications were divisional applications filed in response to restriction requirements in his ancestor applications. *E.g.*, Tr. Sept. 18, 2023 PM (124:14–24) (Hyatt); Tr. Sept. 19, 2023 AM (172:8–174:5) (Hyatt). Mr. Hyatt's testimony is inconsistent with prevailing practices at the time and the file histories of his GATT Bubble applications.

#### i. Prevailing Practice

59.   The PTO allows an applicant to file one of three types of continuation applications: continuation, continuation-in-part ("CIP"), and divisional. MPEP §§ 201.06–08; Tr. Oct. 5, 2023 AM (2373:10–2375:3) (Kunin).

60.   "A continuation is a second application for the same invention claimed in a prior application and filed before the original becomes abandoned or patented." MPEP § 201.07; *see also* Tr. Oct. 5, 2023 AM (2373:22–25) (Kunin).

61.   "A continuation-in-part is an application filed during the lifetime of an earlier application by the same applicant, repeating some substantial portion or all of the earlier application and *adding matter not disclosed* in the said earlier case." MPEP § 201.08 (emphasis in original); *see also* Tr. Oct. 5, 2023 AM (2374:8–15) (Kunin).

62.   A divisional is "[a] later application for a distinct or independent invention, carved out of a pending application and disclosing and claiming only subject matter disclosed in the earlier or parent application." MPEP § 201.06; *see also* Tr. Oct. 5, 2023 AM (2374:20–2375:2) (Kunin). "The divisional application should set forth only that portion of the earlier disclosure which is germane to the invention as claimed in the divisional application." *Id.*

63.   There are two types of divisional applications: voluntary and involuntary. Tr. Oct. 5, 2023 AM (2376:21–2377:7) (Kunin). Voluntary divisionals involve situations where "the applicant discloses but does not claim multiple inventions in an application, and then chooses to file a divisional application claiming those disclosed but unclaimed inventions." Tr. Oct. 5, 2023 AM (2377:3–7) (Kunin). A voluntary divisional is indistinguishable from a continuation. Tr. Oct. 3, 2023 AM (1944:17–1945:4) (Steiner). Involuntary divisionals, in contrast, are filed "if the USPTO makes a restriction requirement and then the applicant files a divisional application." Tr. Oct. 5, 2023 AM (2376:–2377:2) (Kunin). Only involuntary divisionals qualify for safe harbor

protection under 35 U.S.C. § 121, whereby the earlier application may not be used as a reference against the divisional. Tr. Oct. 5, 2023 AM (2377:8–11) (Kunin).

64.   To be considered a divisional application, the claims of the application must be "consonant" with the restriction: the applicant must "cabin[] that divisional to claims that . . . corresponded [to] or . . . were consonant with the claims in the group that [the applicant] didn't elect." Tr. Oct. 4, 2023 PM (2246:9–23) (Morse). Put differently, the claims in the divisional must be drawn to substantially the same invention as the set of claims that were restricted into the non-elected species corresponding to that divisional application. If the applicant "went off in some other direction, it's not a divisional that gets that protection." Tr. Oct. 4, 2023 PM (2246:22–23) (Morse).

65.   In 1995, it was generally understood that the terms "continuation," "continuation-in-part," and "divisional" referred to distinct application types. Tr. Oct. 5, 2023 AM (2375:4–8) (Kunin); Tr. Oct. 4, 2023 PM (Tr. 2224:16–2225:15) (Morse); Tr. Sept. 27, 2023 (1248:17–22) (Goldberg); *cf.* DX2109-000003 (Official Gazette notice dated March 18, 2003). Although the PTO acknowledged that the application type was "immaterial" to "the right [applicants possess] under [35 U.S.C. § 120]," MPEP § 201.11, the PTO otherwise treated these applications differently, *see* MPEP §§ 201.06–.08, and the Federal Circuit acknowledged in a contemporaneous decision that they differ by claiming different things, *see Transco Prods. Inc. v. Performance Contracting, Inc.*, 38 F.3d 551, 555 (Fed. Cir. 1994); *see also Pfizer, Inc. v. Teva Pharms. USA, Inc.*, 518 F.3d 1353, 1362 (Fed. Cir. 2008) (later decision clearly distinguishing divisionals and continuations-in-part and declining to apply 35 U.S.C. § 121's safe harbor to the latter); *Amgen Inc. v. F. Hoffman-La Roche Ltd.*, 580 F.3d 1340, 1354 (Fed. Cir. 2009) (later decision clearly distinguishing divisionals and continuations and declining to apply 35 U.S.C. § 121's safe harbor to the latter).

66.   Mr. Hyatt understood that the terms "continuation," "continuation-in-part," and "divisional" referred to distinct application types and used them accordingly. *See, e.g.*, Tr. Sept. 28, 2023 (1505:7–1507:22) (Hyatt) (discussing PTX-003.01380, PTX-1069.17624, PTX-826.17232, PTX-828.17782, PTX-286.08453, and DX2110). Indeed, Mr. Hyatt was "very particular in the terms" he used when constructing his applications. Tr. Sept. 19, 2023 PM (261:12–18) (Hyatt).

67.   For example, in the "CROSS REFERENCE TO RELATED APPLICATIONS" section in Mr. Hyatt's 550 Family specification, Mr. Hyatt used the term "continuation" to describe the relationship between the GATT Bubble applications in the 550 Family and Application No. 07/457,451 (#327), but used the term "divisional" to describe the relationship between Application No. 05/402,520 (#122) and Application No. 05/101,881 (#101). DX2204.

68.   Similarly, in the "CROSS REFERENCE TO RELATED APPLICATIONS" section in Mr. Hyatt's 360 Family specification, Mr. Hyatt used the term "continuation" to describe the relationship between the GATT Bubble applications in the 360 Family and Application No. 08/254,818 (#350), but used the term "continuation in part" to describe

the relationship of Application No. 06/160,871 (#168) to 29 listed applications. PTX-1069.17624–27. Mr. Hyatt used the term "divisional" to refer to the relationship between Application No. 08/254,818 (#350) and Applications Nos. 08/283,374 (#351), 08/285,669 (#352), and 08/286,620 (#353). PTX-1069.17624. He also used the term "divisional" to refer to the relationship between Application No. 06/520,277 (#195) and Application No. 06/160,871 (#168). PTX-1069.17624.

### ii. Designation in Mr. Hyatt's Applications

69. To claim the benefit of an earlier filing date, a patent applicant must include in their application a specific reference to the earlier application to which they claim priority. MPEP § 201.11. That reference usually occurs in the first sentence of the specification. Tr. Oct. 5, 2023 AM (2366:8–12) (Morse); Tr. Oct 3, 2023 AM (1944:7–15) (Steiner).

70. Mr. Hyatt included the required references to the applications to which he claimed priority in a section entitled the "cross-reference to related applications" (often styled "CROSS REFERENCE TO RELATED APPLICATIONS"). *E.g.*, DX2204. In this section of Mr. Hyatt's GATT Bubble applications, he consistently denominated his applications "continuation[s]," "continuation[s] in part," or more generically, "continuing applications." *E.g.*, PTX-1069.17624–27; *see* Tr. Sept. 19, 2023 AM (176:12–177:4) (Hyatt). Mr. Hyatt did not designate any of his GATT Bubble applications as divisionals.

71. Mr. Hyatt designated the following application families as "continuation[s]": 360 Family (PTX-1069.17624); 410 Family (PTX-826.17232); 450 Family (PTX-828.17782); 550 Family (DX2204); 600 Family (PTX-003.01380); 800 Family (DX2110-000003).

72. Mr. Hyatt testified that the 650 Family and 800 Family applications "were really continuations in part of the 370 [F]amily." Tr. Sept. 18, 2023 AM (59:20–21) (Hyatt).

73. Mr. Hyatt designated the 500 Family a "continuation" of one application and a "continuation in part" of another. DX225-000002.

74. Mr. Hyatt labeled his 700 Family applications "continuing application[s]" of two ancestor applications, Applications No. 06/663,094 (#303) and Application No. 07/289,355 (#321). DX104-000002. The 700 Family applications further identified the #303 application as a "continuation in part" of Application No. 06/661,649 (#301) and Application No. 06/662,211 (#302). DX104-000002. During prosecution of Application No. 08/457,211 (#708) and Application No. 08/456,398 (#717), both members of the 700 Family that Mr. Hyatt had labeled "continuing application[s]," the examiner noted that the "continuing application" label was "vague because it can be interpreted as a continuation or a continuation-in-part." DX112-000002 (#708 application); DX81-000004 (#717 application). Notably, the examiner did not indicate that the term "continuing application" could be interpreted to refer to a divisional application. DX112-000002; DX81-000004. In response, Mr. Hyatt stated that each

application was a "continuation." DX112-000002; DX81-000004. Based on Mr. Hyatt's characterizations, the PTO would have treated these applications as continuations, not divisionals. Tr. Oct. 5, 2023 AM (2379:14–2380:14) (Kunin).

75. The file history record demonstrates that Mr. Hyatt's GATT Bubble applications are continuations or continuations-in-part, *not* divisional applications.

76. Additionally, Mr. Hyatt's prior representations to this Court, conflicting trial exhibits, and passivity in the face of prior examiner findings that his applications are not divisionals, further supports the Court's conclusion that Mr. Hyatt's GATT Bubble applications are not divisional applications.

77. Mr. Hyatt previously represented to this Court that the applications in suit are "continuation applications." DX233-000008. In his Proposed Findings of Fact and Conclusions of Law filed after the first phase of trial, he referred to the applications in suit as continuations. ECF No. 200 ¶¶ 18, 26, 34, 41. He also described them as "continuation[s]" in his brief before the Federal Circuit. *Hyatt v. Vidal*, No. 18-2390, ECF No. 43 at 19, 22–24 (Fed Cir. Apr. 25, 2019).

78. Mr. Hyatt's own trial exhibits referred to three of the four applications in suit—Application No. 08/431,639 (#601), Application No. 08/457,211 (#709), and Application No. 08/456,398 (#717)—as "continuation[s]." PTX-1585 (#601 application); PTX-1587 (#708 application); PTX-1589 (#717 application). He identified Application No. 08/472,062 (#524) as a "New Application," but not a "divisional." PTX-1583.

79. In Application No. 08/471,633 (#779), on March 23, 2020, the examiner issued a final office action in which they responded to Mr. Hyatt's arguments concerning prosecution laches. PTX-2250.1725–988. The examiner found that "[n]one of [Mr. Hyatt's] pending applications appear to be proper divisions of prior applications." PTX-2250.1983. Mr. Hyatt filed two responses but did not dispute the examiner's determination that Mr. Hyatt's applications are not divisionals. PTX-2250-0146–59, 0112–42. Although the Court does not defer to the examiner's finding, the Court finds Mr. Hyatt's reticence in the face of it suggestive that he did not believe his applications were divisionals and only developed this argument as a litigating position in preparation for the second phase of trial.

80. Mr. Hyatt's preliminary amendment practice also supports the Court's conclusion that Mr. Hyatt's GATT Bubble applications are not divisional applications. Mr. Hyatt testified that he did not file his applications with preliminary amendments because "[i]t was impossible to file" them in the period between when Rule 129 became final and the GATT implementation. Tr. Sept. 19, 2023 AM (187:19–24) (Hyatt). As detailed *infra*, FOF ¶¶ 91–92, Mr. Hyatt anticipated that he would have more time to file preliminary amendments before the PTO began examining his GATT Bubble applications. When the PTO accelerated this timeline, he filed identical preliminary amendments instead of filing amendments that focused his claims. *See infra* FOF

¶¶ 93–98. However, if Mr. Hyatt's GATT Bubble applications were divisionals, preparing his preliminary amendments would not have been difficult because Mr. Hyatt had already written the claims for his ancestor applications in which the PTO issued restriction requirements. Mr. Hyatt needed time to write new claims, which indicates that he was not simply filing divisional applications directed to non-elected species.

81.   The Court does not credit Mr. Hyatt's testimony that his applications were divisionals because, in addition to conflicting with the file history record and his prior representations to this Court, it conflicts with his prior deposition testimony. Mr. Hyatt stated during his deposition that the applications in suit are "continuations." DX2165-000095:1–6 (located at ECF No. 338-1). The Court does not credit his explanation at trial that these statements resulted from a vague recollection made without the benefit of recollection-refreshing documents or were inadvertent. Tr. Oct. 2, 2023 PM (1806:9–21, 1808:10–19) (Hyatt).

### iii.   Applications in Suit: Whether Directed to Non-Elected Species

82.   Mr. Hyatt's applications in suit are not directed to non-elected species from his ancestor applications:

   a.   Application No. 08/472,062 (#524) is one of four applications in suit. According to Mr. Hyatt, there are three ancestors to the #524 application: Application Nos. 06/662,211 (#302), 07/815,644 (#345), and 08/034,627 (#349). *See* PTX-1834.0003. The #524 application is not directed to a non-elected species from any of these three ancestor applications. *Compare, e.g.*, PTX-002.00760–61 (extant claim 81 in the #524 application, which Mr. Hyatt alleged is drawn to an invention restricted at claims 1–8 in the #302 application) *with* PTX-945.454–55 (restricted claims 1–8 in the #302 application).[24]

   b.   Application No. 08/431,639 (#601) is one of four applications in suit. According to Mr. Hyatt, there is one ancestor to the #601 application: Application No. 07/279,592 (#319). *See* PTX-1836.0003. The #601 application is not directed to a non-elected species from the #319 application. *Compare, e.g.*, PTX-003.00849 (extant claim 94 in the #601 application, which Mr. Hyatt alleged is drawn to an invention restricted at claims 51–57, 71–77, 84–91, 102, 103, and 112–118 in the #319 application) *with* PTX-1162.0206–34 (restricted claims 51–57, 71–77, 84–91, 102, 103, and 112–118 in the #319 application).[25]

   c.   Application No. 08/457,211 (#708) is one of four applications in suit. According to Mr. Hyatt, there are two ancestors to the #708 application: Application Nos. 06/663,094 (#303) and 07/289,355 (#321). *See*

---

[24] Claims 1–8 in the #302 application, which the PTO labeled restricted species group "I," are drawn to an "image analysis system." PTX-945.169.

[25] Claims 51–57, 71–77, 84–91, 102, 103, and 112–118 in the #319 application, which the PTO labeled restricted species group "IV," are drawn to a "shared memory storage accessing." PTX-1162.0177.

PTX-1838.0003. The #708 application is not directed to a non-elected species from either of these two ancestor applications. *Compare, e.g.*, PTX-004.05164–65 (extant claim 503 in the #708 application, which Mr. Hyatt alleged is drawn to an invention restricted at claims 1–10 and 31–51 in the #321 application) *with* PTX-1046.18281–83, 18290–94 (restricted claims 1–10 and 31–51 in the #321 application).[26]

d.    Application No. 08/456,398 (#717) is one of four applications in suit. According to Mr. Hyatt, there are two ancestors to the #717 application: Application Nos. 06/663,094 (#303) and 07/289,355 (#321). *See* PTX-1838.0003. The #717 application is not directed to a non-elected species from either of these two ancestor applications. *Compare, e.g.*, PTX-001.05025 (extant claim 129 in the #717 application, which Mr. Hyatt alleged is drawn to an invention restricted at claims 15, 16, and 18–20 in the #303 application) *with* DX261-000007–10 (restricted claims 15, 16, and 18–20 in the #303 application).[27]

83.    These examples further undermine Mr. Hyatt's testimony that his GATT Bubble applications are divisionals drawn to restricted species. They support the Court's conclusion that Mr. Hyatt's GATT Bubble applications are not divisional applications.

### 4. GATT Transition

84.    Mr. Hyatt filed his GATT Bubble applications in the days and weeks leading to the effective date of the new 20-years-from-earliest-priority-date patent term regime. He filed most of his applications during the six weeks between the date the PTO finalized Rule 129, April 25, 1995, and the effective date of the patent term changeover, June 8, 1995. *See* DX144-000004; DX253-000006–16. Mr. Hyatt filed his GATT Bubble applications as photocopies of approximately 11 ancestor applications. Tr. Sept. 18, 2023 AM (58:19–23) (Hyatt). Shortly after the changeover, the PTO began rejecting his GATT Bubble applications. Tr. Sept. 19, 2023 PM (233:20–234:13) (Hyatt). In response, Mr. Hyatt filed duplicate preliminary amendments in an attempt to delay examination and stay off rejections. *E.g.*, DX1841 (identical claim sets filed by Mr. Hyatt in the 700 Family). Around this time, Mr. Hyatt met with Group Director Nicholas Godici to discuss his applications. DX84-000001–02. During the meeting, Mr. Hyatt agreed to focus his claims on a single different invention in each application. DX84-000001–02. Mr. Hyatt made this promise despite lacking a "master plan" for demarcating his applications. DX2000-69.

---

[26] Claims 1–10 and 31–51 in the #321 application, which the PTO labeled restricted species group, "I," are drawn to a "display device and processor." PTX-1046.18278.

[27] Claims 15, 16, and 18–20 in the #303 application, which the PTO labeled restricted species group, "IV," are drawn to an "image processing system using image transformation." PTX-2255.0002.

### i. Window to File

85. The change to the patent term became law on December 8, 1994. URAA § 532(a)(1). Mr. Hyatt testified that he did not begin filing his GATT Bubble applications immediately after the patent term became law because he was waiting for the PTO to publish final rules implementing the GATT legislation. Tr. Sept. 25, 2023 (922:13–19) (Hyatt).

86. Four days after the change became law, the PTO published its proposed rule package to "implement the changes related to patent term." Changes to Implement 20-Year Patent Term and Provisional Applications ("Draft Rule"), 59 Fed. Reg. 63951 (Dec. 12, 1994). That rule package included a draft of Rule 129 that permitted an application to have two submissions "considered on the merits after final rejection" under certain circumstances. *Id.* at 63964. Mr. Hyatt, who was "tremendously interested in technology and IP protection," Tr. Sept. 18, 2023 PM (131:21–22) (Hyatt), was aware of the efforts by the Japanese government to secure changes to the U.S. patent system that culminated in the enactment of the URAA, Tr. Sept. 25, 2023 (917:22–918:5) (Hyatt); *see also* Tr. Sept. 25, 2023 (912:22–913:7) (Hyatt). Additionally, Mr. Hyatt testified that he "reviewed . . . the federal register where it was published after it was signed." Tr. Sept. 19, 2023 AM (171:11–16) (Hyatt). Accordingly, the Court concludes that Mr. Hyatt was aware of the impending patent term changeover and knew of the proposed rule changes within a reasonable time after they were published.

87. The final Rule 129, issued on April 25, 1995, contained substantively identical provisions to the proposed Rule 129. *Compare* Draft Rule, 59 Fed. Reg. at 63964 *with* Final Rule, 60 Fed. Reg. at 20226–27.

88. According to Mr. Hyatt, one of the reasons why he waited so long to file his GATT Bubble applications is that the PTO did not publish its final rules until April 25, 1995. He testified that it would not have been "practicable" to file his applications earlier. Tr. Sept. 19, 2023 AM (173:15–22) (Hyatt). As a result, Mr. Hyatt had only "about six weeks" to file his applications. Tr. Sept. 18, 2023 AM (171:23–172:1) (Hyatt). This testimony is inconsistent with the file histories of his GATT Bubble applications.

89. Mr. Hyatt started filing GATT Bubble applications as early as April 6, 1995. DX253-000005. In total, he filed 36 GATT Bubble applications (one of which he later abandoned) before April 25, 1995. DX253-000005–06. At trial, Mr. Hyatt attempted to justify this inconsistency with his other testimony by explaining that Application No. 06/849,243 (#310) was about to be issued as a patent and that he needed to file continuing applications before it was issued or else lose his chain of continuity. Tr. Tr. Oct. 2, 2023 AM (1692:12–1693:14) (Hyatt). However, several of the applications Mr. Hyatt filed before April 25, 1995, were unrelated to the #310 application. Tr. Oct. 2, 2023 AM (1693:15–18) (Hyatt); Tr. Oct. 2, 2023 PM (1828:17–1829:24). Mr. Hyatt was unable to explain why he filed these applications before April 25, 1995.

90.   Mr. Hyatt filed his applications earlier when he believed it was advantageous for him to do so, for example, to preserve a chain of continuing applications. His actions belie his testimony that he needed to wait to file his GATT Bubble applications until after the PTO finalized Rule 129 or that filing earlier would have been impracticable.

### ii. Identical Preliminary Amendments

91.   Mr. Hyatt filed his GATT Bubble applications as photocopies of approximately 11 ancestor applications. Tr. Sept. 18, 2023 AM (58:19–23) (Hyatt). Mr. Hyatt's photocopied claim sets were placeholders, and he did not intend for the PTO to examine them. Tr. Sept. 25, 2023 (936:25–937:7) (Hyatt); DX2165-000097:21–98:4. Instead, he intended to file preliminary amendments later that would differentiate the claim sets in his applications. Tr. Sept. 25, 2023 (937:14–22) (Hyatt); DX167-000016. Mr. Hyatt could have filed preliminary amendments contemporaneously with his GATT Bubble applications but did not do so. Tr. Oct. 4, 2023 PM (2231:23–2233:14) (Morse); *see also* Tr. Sept. 19, 2023 AM (186:20–21) (Hyatt).

92.   Mr. Hyatt inferred from the PTO's Official Gazette that he had approximately 20 months to file preliminary amendments before the PTO would begin examining his GATT Bubble applications. Tr. Sept. 19, 2023 PM (231:13–232:12) (Hyatt). However, due to the age of Mr. Hyatt's applications in light of their claimed effective filing dates, the PTO began examinations within weeks, not the months that Mr. Hyatt had expected. Tr. Sept 19, 2023 PM (234:7–13) (Hyatt) (testimony that Mr. Hyatt began receiving final office actions in his applications shortly after filing and before he had submitted new claim sets); DX152-000002 (petition decision explaining that the PTO considered "effective filing dates" in determining the order of examination) (emphasis in original). Although Mr. Hyatt characterized the PTO as examining his applications "out of turn," Tr. Sept. 25, 2023 (937:20–22) (Hyatt), Director Godici contemporaneously explained that the PTO considers the claimed priority date in selecting applications for examination. DX152-000002. For example, in one application that claimed an October 17, 1984 priority date, Director Godici noted that "[t]he subject matter ha[d] been before the Office for eleven years," and therefore, it was "certain[l]y ripe for action." DX152-000002.

93.   Once the PTO began issuing final office actions on his identical claim sets, Mr. Hyatt began filing identical preliminary amendments to stay off rejections. *E.g.*, DX120 (Application No. 08/457,211 (#708)). Mr. Hyatt filed identical amendments within his application families, meaning, his amended applications contained the same claims; the amendments did not focus his applications on distinct inventions. *E.g.*, DX1841 (documenting 51 identical claim sets filed in the 700 Family between August 11 and 14, 1995); DX1842 (documenting 48 identical claim sets filed in the 500 Family on August 23, 1995); *see also* Tr. Sept. 26, 2023 (1028:21–1029:2) (Hyatt) (testimony concerning identical preliminary amendments in the 700 Family); Tr. Sept. 19, 2023 PM (244:3–10) (Hyatt) (testimony explaining that Mr. Hyatt filed substantially similar or identical preliminary amendments in his applications).

94.    Even where Mr. Hyatt's claim amendments were not identical across applications in a given application family, they were highly similar. For example, one examiner noted that Mr. Hyatt added new claims 21–97 in approximately half of the applications in the 700 Family, and that "[t]hese new sets of claims only differed in substance from one another by which adjective was used in which independent claim to modify the type of 'information' that was being 'generated.'" DX1654-000004. Otherwise, the claims appeared to be substantially identical.

95.    In other applications, Mr. Hyatt filed identical claims back-to-back. *E.g.*, DX1311-000002–03 (identical claims 90–91 in Application No. 08/471,704 (#514)). He also filed identical preliminary amendments months apart. For example, in Application No. 08/472,062 (#524), claim 16 filed on August 23, 1995, is identical to claim 90 filed on December 29, 1995. *Compare* DX222-000003 (August 23, 1995 amendment) *with* DX223-000002 (December 29, 1995 amendment).

96.    Mr. Hyatt did not intend for the PTO to examine these duplicate-amended claim sets. Tr. Sept. 25, 2023 (944:8–11) (Hyatt). Instead, he amended his applications to avoid final rejections and buy time to prepare additional preliminary amendments that would introduce the claims he actually wanted examined. Tr. Sept. 19, 2023 PM (244:4–10) (Hyatt); Tr. Sept. 25, 2023 (944:5–7, 945:3–8) (Hyatt); *see also* PTX-004.06653. In other words, Mr. Hyatt interposed these identical preliminary amendments to delay examination and prevent the PTO from issuing final rejections before he was ready to present his claims. He did so by presenting claims that he never intended the PTO to examine.

97.    Mr. Hyatt testified that it was "improper" for the PTO to issue final office actions on the basis of his original claim sets. Tr. Sept. 25, 2023 (945:3–8) (Hyatt). However, as the MPEP explained, "[e]ach examiner will give priority to that applicant in his or her docket, whether amended or new, which has the *oldest effective U.S. filing date*. Except as rare circumstances may justify group directors in granting individual exceptions, this basic policy applies to all applications." MPEP § 708 (emphasis in original). Director Godici explained this to Mr. Hyatt contemporaneously with the PTO issuing final office actions in his unamended GATT Bubble applications. DX152-000002.

98.    Mr. Hyatt further testified that he relied on guidance from Vincent Turner and other PTO personnel that filing identical preliminary amendments would prevent the PTO from issuing final rejections in his applications. Tr. Sept. 26, 2023 (1029:4–16) (Hyatt). At the time, Mr. Turner was a PTO employee and, therefore, was prohibited from providing legal advice to applicants. Tr. Oct. 4, 2023 AM (2157:23–2158:7) (Turner). Mr. Turner credibly testified that he did not provide Mr. Hyatt with legal advice. Tr. Oct. 4, 2023 AM (2164:21–23) (Turner). At most, Mr. Turner provided Mr. Hyatt with generalized "guidance." Tr. Oct. 4, 2023 AM (2165:4–8) (Turner). Mr. Hyatt indicated that he relied on this guidance—which Mr. Turner could not confirm he had given—in formulating his plan to file identical preliminary amendments and thereby forestall examination. Tr. Sept. 19, 2023 PM (234:16–235:3) (Hyatt); Tr. Oct. 4, 2023 AM (2169:14–2170:3) (Turner).

### iii. Director Godici Meeting

99.   Mr. Hyatt met with Director Godici on October 24, 1995, to discuss his preliminary amendment practice. DX84-000001. The parties contest the content of an agreement that Mr. Hyatt and Director Godici reached during that meeting.

100.  Mr. Hyatt's contemporaneous written meeting description recorded that: "Director Godici met with the Applicant on October 24, 1995. The Applicant was asked to file supplemental preliminary amendments that better focused the claims on *a different invention in each application* in order to simplify examination and the Applicant agreed." DX84-000001–02 (emphasis added).

101.  During trial, Mr. Hyatt testified that Director Godici "wanted different inventions, not single inventions." Tr. Oct. 2, 2023 AM (1741:21–1742:4) (Hyatt). Mr. Hyatt testified that Director Godici wanted him to "focus the claims on a different invention, emphasis on different, not on a singular 'a.'" Tr. Oct. 2, 2023 AM (1747:5–8) (Hyatt). In other words, Mr. Hyatt testified that he agreed to focus his applications but only to the extent that he could still claim multiple inventions in a single application. *See* Tr. Oct. 2, 2023 AM (1741:24–1742:2) (Hyatt).

102.  The Court does not credit Mr. Hyatt's testimony that his agreement with Director Godici permitted him to claim multiple inventions in a single application. The Court finds that the plain meaning of Mr. Hyatt's contemporaneous written description, read in context, provides the substantive content for his agreement with Director Godici: a promise to focus each application on a distinct (i.e., singular) invention.

103.  Mr. Hyatt's testimony is inconsistent with his contemporaneous written meeting description. Mr. Hyatt used a singular indefinite article ("a") in his memorialization of his agreement with Director Godici. DX84-000001. The singular article indicates that Mr. Hyatt agreed to focus his claims on a singular different invention in each application. Mr. Hyatt is "very particular in the terms" he uses while prosecuting his applications. Tr. Sept. 19, 2023 PM (261:12–18). Mr. Hyatt's attempt to walk back his use of the singular indefinite article, nearly three decades after he entered that language in his prosecution file histories, is dubious at best. *Cf.* 37 C.F.R. § 1.2 (directing applicants to conduct business with the PTO in writing and wholly discounting oral promises, stipulations, and understandings as evidence of contested issues).

104.  The Court's reading of the contemporaneous written record is consistent with Mr. Hyatt's explanation for the number of GATT Bubble applications he filed. The Court has found that Mr. Hyatt filed his applications based on the number of inventions disclosed in his ancestor applications. FOF ¶ 39. For example, Mr. Hyatt testified that the 700 Family's specification disclosed "at least 100 inventions," so he "filed 100 copies of the ancestor application." Tr. Sept. 18, 2023 AM (58:24–59:3) (Hyatt). He also represented in a sworn declaration that he "filed about 100 patent applications [in the 700 Family] in 1995 because an initial count of inventions contained in the [700 Family] specification exceeded 100 inventions." DX233-000008. In other words, when

Mr. Hyatt filed his applications in 1995, he had in mind a one-to-one correspondence between his inventions and his applications—he filed the number of applications equal to his number of disclosed inventions. The Court's interpretation of the record—that Mr. Hyatt agreed to focus each application on a singular different invention—is consistent with Mr. Hyatt's intended one-to-one correspondence. Mr. Hyatt's current testimony, in contrast, is inconsistent with his longstanding explanation for the number of applications he filed because it would require that Mr. Hyatt believed in 1995 that he had more inventions than he had filed applications.[28]

105.    Mr. Hyatt's testimony is inconsistent with a later meeting summary submitted by his then-attorney, Vincent Turner. On April 30, 1997, Special Patent Examiner ("SPE") Michael Razavi called Mr. Turner to discuss Mr. Hyatt's applications. DX2203-000002. According to Mr. Turner's contemporaneous written summary, "SPE Razavi stated that examination would be simplified if the claims were focused. In particular, SPE Razavi suggests that the Applicant (1) focus *each application on a single invention*; e.g., a topographical system rather than claims directed to many different systems and (2) indicate the basis in the specification for the particular claimed invention." DX2203-000002 (emphasis added). SPE Razavi's request to Mr. Turner aligns with the Court's reading of the contemporaneous written record of the October 1995 Director Godici meeting.

106.    Mr. Hyatt's testimony is inconsistent with the general context in which Director Godici asked him to focus his application. For example, on September 28, 1995, approximately one month before he met with Director Godici, Mr. Hyatt spoke with Examiner Jeffrey Brier concerning his applications. PTX-002.01101. Examiner Brier "indicated that some of [Mr. Hyatt's] applications had claims that were directed to multiple inventions. In order to simplify the issues, the Applicant agreed to amend the claims to be more focused." PTX-002.01101; *see also* FOF ¶ 10 (identifying issues with Mr. Hyatt submitting claims directed to multiple inventions as early as 1978). If the issue with Mr. Hyatt's applications was that his claims were directed to multiple inventions, then it is unclear how Mr. Hyatt could resolve that issue and simplify examination except by focusing each application on a single different invention. Accordingly, the best interpretation of the record is that Mr. Hyatt promised Director Godici he would do so shortly after Examiner Brier put him on notice.

107.    Given the unfavorable written record, Mr. Hyatt introduced evidence that he relied on a conversation with Jessica Harrison, an examiner who was then detailed to the MPEP help desk, in which she relayed that Rule 129(b) permitted him to pursue multiple

---

[28] The Court's reading would be correct even if Mr. Hyatt's applications were divisionals drawn to non-elected species because Mr. Hyatt testified that he filed his applications based on his count of restricted *and* unclaimed inventions. Hyatt Resp. 32 (citing Tr. Sept. 18, 2023 PM (124:21–24, 140:1–9) (Hyatt) and Tr. Sept. 19, 2023 AM (172:8–174:5) (Hyatt)). Every distinct restricted and unclaimed invention should map to a single application in that scenario. The Court's interpretation of the agreement with Director Godici is consistent with that intended one-to-one correspondence. In contrast, Mr. Hyatt's proffered interpretation would mean he met with Director Godici believing he had more inventions than he had filed applications, even though the PTO largely had not yet examined his claims or identified additional distinct species. *See* PTX-895 (indicating that the PTO issued its first post-GATT restrictions in Mr. Hyatt's applications a few days before he met with Director Godici).

inventions in a single GATT Bubble application. Tr. Oct. 2, 2023 PM (1846:19–1847:4) (Harrison); *see also* Tr. Sept. 19, 2023 AM (207:4–208:11) (Hyatt); Tr. Oct. 2, 2023 AM (1740:10–23) (Hyatt). Any such conversation occurred in or after December 1995 and therefore post-dated Mr. Hyatt's meeting with Director Godici. Tr. Oct. 2, 2023 PM (1842:9–13) (Harrison). Ms. Harrison was not involved in examining Mr. Hyatt's applications and had no personal knowledge of his applications or examination history. Tr. Oct. 3, 2023 AM (1892:13–1893:7, 1900:2–12) (Harrison). Accordingly, any such conversation between Mr. Hyatt and Ms. Harrison cannot explain or clarify the specific agreement he reached with Director Godici at least one month prior. At best, Mr. Hyatt's conversation with Ms. Harrison may explain why he disregarded his agreement with Director Godici. However, Mr. Hyatt did not record his conversation with Ms. Harrison in writing, and Ms. Harrison credibly testified that she did not give Mr. Hyatt legal advice. Tr. Oct. 3, 2023 AM (1906:21–1907:4) (Harrison).

### iv.  Plan to Demarcate

108.   Mr. Hyatt admitted he lacked a "master plan" for prosecuting his GATT Bubble applications. DX2000-69 (admission by Mr. Hyatt); Tr. Oct. 11, 2017 AM (74:7–74:19) (Morse) (testimony describing Mr. Hyatt's admission).

109.   Although Mr. Hyatt later testified that he had a plan to focus his applications through preliminary amendments, *e.g.*, Tr. Sept. 19, 2023 PM (240:11–241:3) (Hyatt), Mr. Hyatt failed to timely prepare his applications for examination, *see* FOF ¶¶ 91–98, which undermines his testimony. Mr. Hyatt believed he had many more months to prepare preliminary amendments than he reasonably should have expected based on his effective filing dates, *see* FOF ¶¶ 92, 97, which suggests that when he filed his applications, he at most *intended* to develop a plan to file focusing amendments, not that he had already prepared one. Possessing the diffuse intention to focus applications in the future is not the same as possessing an operationalizable plan to demarcate them. And filing dozens of identical preliminary amendments evinces that Mr. Hyatt had formulated a reactionary plan to delay, not a plan to demarcate. Mr. Hyatt did not have a plan to demarcate during the GATT transition period.

110.   Moreover, as detailed *infra*, FOF ¶¶ 160–168, Mr. Hyatt failed to abide by his agreement with Director Godici to focus each of his applications on a single different invention, and he failed to maintain consistent lines of demarcation between his applications. Mr. Hyatt also routinely filed amendments that shifted his claims to new inventions and restarted examination. FOF ¶¶ 122–142. The Court concludes from Mr. Hyatt's lack of plan during the GATT transition period, FOF ¶ 109, and his ultimate failure to demarcate, FOF ¶¶ 122–142, 160–168, that he did not have a plan to demarcate his applications between 1995 and 2015.

### 5.  Complex Priority Chains

111.   Mr. Hyatt's applications claim priority to a large number of applications and a broad range of priority dates:

a.      The 360 Family claims priority to 36 applications, with claimed priority dates starting December 28, 1970, to August 5, 1994. PTX-1069.17624–27; *see also* FOF ¶ 46(a).

b.      The 370 Family claims priority to 29 applications, with claimed priority dates ranging from December 28, 1970, to April 27, 1990. PTX-836.6365–68; *see also* FOF ¶ 46(b).

c.      The 410 Family claims priority to 34 applications, with claimed priority dates ranging from December 28, 1970, to April 7, 1986. PTX-826.17232–34; *see also* FOF ¶ 46(c).

d.      The 450 Family claims priority to 43 applications, with claimed priority dates ranging from November 24, 1969, to April 6, 1995. DX27-000008–09; *see also* FOF ¶ 46(d). Many of those priority claims stem from the 450 Family's express priority claim to Application No. 06/504,691 (#193), which incorporated by reference another 42 applications, including Application No. 04/879,293 (#100), which was filed on November 24, 1969. PTX-828.17782–84.

e.      The 500 Family claims priority to 14 applications, with claimed priority dates ranging from February 14, 1975, to April 6, 1995. PTX-002.00897–98; *see also* FOF ¶ 46(e).

f.      The 550 Family claims priority to 10 applications, with claimed priority dates ranging from December 28, 1970, to December 27, 1989. DX158-000007; DX2204; *see also* FOF ¶ 46(f).

g.      The 600 Family claims priority to 43 applications, with claimed priority dates ranging from December 28, 1970, to September 4, 1990. DX61-000002–06; *see also* FOF ¶ 46(g).

h.      The 650 Family claims priority to 34 applications, with claimed priority dates ranging from December 28, 1970, to May 25, 1989. DX129-000006–07; *see also* FOF ¶ 46(h).

i.      The 700 Family claims priority to six applications, with claimed priority dates ranging from June 15, 1983, to December 22, 1988. PTX-001.05093–94; *see also* FOF ¶ 46(i).

j.      The 800 Family claims priority to 30 applications, with claimed priority dates ranging from December 28, 1970, to April 27, 1990. PTX-2212.2292–95; *see also* FOF ¶ 46(j).

k.   The 850 Family claims priority to 19 applications, with claimed priority dates ranging from December 28, 1970, to November 9, 1977. DX196-000008; *see also* FOF ¶ 46(k).

112.   Mr. Hyatt's applications overlap in their priority claims. For example, the 360, 370, 410, 600, 650, 800, and 850 Families all claim priority to Application 05/101,881 (#101), which Mr. Hyatt filed on December 28, 1970. PTX-1069.17624 (360 Family); PTX-836.6365 (370 Family); PTX-826.17232 (410 Family); DX61-000003 (600 Family); DX129-000006–07 (650 Family); PTX-2212.2292 (800 Family); DX196-000008 (850 Family). The #101 application "is identified as a priority parent in more than half of" Mr. Hyatt's GATT Bubble applications. Tr. Oct. 4, 2023 PM (2230:9–17) (Morse). The overlap in Mr. Hyatt's priority claims between application families indicates that they include overlapping technologies.

113.   The PTO introduced an exhibit visually representing the overlapping nature of Mr. Hyatt's applications and their priority claims. DX231. Gregory Morse prepared the exhibit using data exported from the PTO's case database, PALM. Tr. Oct. 4, 2023 PM (2267:21–2268:4) (Morse). Although Mr. Hyatt vociferously disputed the accuracy of DX231 during his testimony, *e.g.*, Tr. Sept. 21, 2023 (543:20–25) (Hyatt) (characterizing DX231 as "absolutely false and absolutely horrible"), the Court has been unable to replicate or confirm any of his claimed errors or deficiencies, *e.g.*, Tr. Sept. 21, 2023 (544:12–545:7) (Hyatt) (criticizing DX231 for connecting child applications together even though they are not connected in the exhibit). Consequently, the Court concludes that DX231 accurately represents the priority claims in Mr. Hyatt's applications and, to that extent, is a useful indicator of the complex, overlapping nature of his priority claims as defined in his specifications.

114.   The crux of Mr. Hyatt's testimony and objections to the PTO's evidence appears to be that his priority date *entitlements*—as opposed to his unvarnished priority date *claims*—are the proper objects of judicial inquiry into the reasonableness of his prosecution conduct. *See, e.g.*, Tr. Sept. 21, 2023 (524:16–19) (Hyatt) (testifying that "examiners did not have any problems" determining the priority dates to which his applications were entitled). In several applications, the PTO identified priority dates, meaning they evaluated his priority claims against his ancestor applications and determined the effective filing dates to which he was entitled. *E.g.*, PTX-1799.00003. The priority *entitlements* alleged by Mr. Hyatt (i.e., the chains of priority to which his applications are entitled) are orders of magnitude simpler than his priority *claims*.

115.   However, Mr. Hyatt's complex priority claims burdened the PTO's examination of his applications. For example, Mr. Morse credibly testified that the complexity of Mr. Hyatt's priority claims caused examiners "trouble identifying the priority date for each claim to appropriately apply art." Tr. Oct. 10, 2017 AM (77:9–10) (Morse); Tr. Oct. 10, 2017 PM (23:6–24:1) (Morse). Moreover, the wide range of Mr. Hyatt's priority date claims compounded examiners' difficulties because the rapid progression of computer technologies over even relatively short periods of time meant that examiners would need to search dramatically different prior art depending on the applicable

priority date. Tr. Oct. 10, 2017 PM (17:1–7) (Morse). The Court credits Mr. Morse's testimony that Mr. Hyatt's complex priority claims impacted the burden on examination "in terms of identifying written description support" and in "terms of identifying the correct date for application of prior art." Tr. Oct. 10, 2017 PM (34:4–7) (Morse). The file history record demonstrates that examiners routinely engaged in complicated reviews of dozens of ancestor applications to determine whether Mr. Hyatt was entitled to his claimed priority dates. *See, e.g.*, PTX-828.17286 (reviewing 42 ancestor applications); PTX-428.00003 (same); PTX-1799.0002–03 (same); *see also* PTX-1800.0003 (failing "to find support" for subject matter in ancestor applications after review); PTX-1809.0002 (same). The fact that the PTO was ultimately able to determine priority dates in some of Mr. Hyatt's applications does not mean that the process of parsing his priority claims, reviewing his ancestor applications, and making the determinations was trivial. Indeed, Stephen Kunin testified that Mr. Hyatt's complex priority claims, combined with his other prosecution conduct, made it "extremely difficult" for the PTO "to conclude prosecution and examination" of his applications. Tr. Oct. 13, 2017 AM (13:2–15:11) (Kunin).

116. Additionally, Mr. Hyatt's testimony concerning his priority claims was not credible. For example, Mr. Hyatt answered "yes" when asked on direct examination whether "all it takes to determine that true ancestor relationship [of his applications] is to look at the applications that are listed before the list of numbers" in the cross-reference to related applications section of his specifications. Tr. Sept. 21, 2023 (549:14–20) (Hyatt). Mr. Hyatt then contradicted himself on cross-examination. Tr. Sept. 28, 2023 (1468:3–5) (Hyatt) (agreeing that "[w]hether [an application] appears before the list, or in the list, . . . it's one of [his] [a]ncestor [a]pplications.").

117. In addition to contradicting himself on cross-examination, Mr. Hyatt also introduced several exhibits that identified applications as ancestors of his GATT Bubble applications even though they did not appear "before the list of numbers." Tr. Sept. 21, 2023 (549:14–20) (Hyatt); *compare, e.g.*, PTX-1830.0003 (identifying Application No. 05/844,765 (#143) as an ancestor of the 360 Family to which Mr. Hyatt claimed priority) *with* PTX-1069.17626 (containing the #143 application within "the list of numbers"). When confronted with these inconsistencies on cross-examination, Mr. Hyatt became obstinate and, by his evident shift in demeanor and substantive position based on the identity of his questioner, severely undermined the Court's faith in the accuracy of his testimony. Tr. Sept. 28, 2023 (1463:11–1466:25) (Hyatt); *see* FOF ¶ 247.

118. Mr. Hyatt's testimony that examiners determining priority dates for his application families would not consider continuation-in-part applications and would "know to stop" at the earliest identical specification also is not credible. *E.g.*, Tr. Oct. 2, 2023 AM (1754:18–23) (Hyatt) (discussing the 500 Family). Continuation-in-part applications can obtain the benefit of filing dates of earlier ancestor applications, so there is no reason why the PTO would categorically exclude them from consideration. 35 U.S.C. §§ 112, 120; MPEP § 201.11. Mr. Hyatt, in fact, included continuations-in-part in his priority charts. *E.g.* PTX-1831.0003 (370 Family). And examiners routinely

reviewed his continuation-in-part ancestors for written description support when determining priority for claims in his GATT Bubble applications. *E.g.*, PTX-828.17286.

119.   Furthermore, whether a particular patent claim is entitled to the benefit of a particular filing date is evaluated on a claim-by-claim basis. Tr. Oct. 4, 2023 PM (2229:19–22) (Morse). Accordingly, different patent claims in a single patent application may be entitled to the benefit of different filing dates. *See, e.g.*, DX2105-000007 (appeal brief submitted by Mr. Hyatt in Application No. 08/454,878 (#383) contending that claim 105 has the benefit of a June 4, 1973 priority date while claims 213 and 276 have the benefit of a December 28, 1970 priority date). There are many instances where Mr. Hyatt claimed different priority dates within the same application or application family. *E.g.*, DX2107-000021. Mr. Hyatt's testimony that examiners would "know to stop" at the earliest identical specification is inconsistent with his actual priority claims. *See* Tr. Oct. 2, 2023 AM (1754:18–23) (Hyatt).

120.   Mr. Hyatt testified that he included many priority claims because "they [were] necessary for the best mode requirement and for the avoidance of prior art in [his] earlier applications." Tr. Sept. 28, 2023 (1470:11–16) (Hyatt). This testimony is not credible because Mr. Hyatt's application families expressly claim "the benefit of the filing dates of *all* of the above-listed applications." *E.g.*, PTX-1069.17627 (360 Family) (emphasis added). None of Mr. Hyatt's applications limit the purpose of the included priority claims to meeting the best mode requirement or avoiding prior art. Mr. Hyatt was unable to direct the Court to a single piece of evidence—other than his testimony, which the Court does not credit—showing he relied on a priority claim for the best mode requirement and the avoidance of prior art only and not to claim the benefit of an earlier filing date. Mr. Hyatt included priority claims *to claim priority*—not solely to satisfy other requirements.

121.   Determining the effective filing date for Mr. Hyatt's applications is far more complicated than identifying the earliest identical specification. Examiners must compare each of Mr. Hyatt's claims to each application to which he claimed the benefit of a priority date, including continuations-in-part. Mr. Hyatt's application families contained dozens of complex, overlapping priority claims. The volume of claims burdened examination of Mr. Hyatt's applications, even though the PTO made priority date determinations in his applications. Mr. Hyatt's testimony to the contrary is not credible because it is contradictory and unsupported by the written record. Further, it is not helpful because it conflates ostensibly simple priority date *entitlements* with Mr. Hyatt's unquestionably complex and burdensome priority *claims*.

### 6.   Claim Shifting

122.   Mr. Hyatt routinely filed amendments in his GATT Bubble applications that shifted his claims to new inventions and restarted examination years after he initially filed his applications. Substantially rewriting claims effectively restarted examination because it required the PTO to perform a new written description analysis, double patenting

analysis, and prior art search. Tr. Oct. 10, 2017 PM (77:4–14, 86:5–88:15) (Morse). Mr. Hyatt filed such amendments before and after the PTO issued the 2013 Requirements. Mr. Hyatt testified that his amendments did not shift his claimed inventions and merely narrowed or conformed his claims. The Court has closely reviewed the examples raised or contested by the parties and made findings concerning nearly all of them. The Court's findings reflect its considered conclusion that Mr. Hyatt's testimony is not credible and that his claim-rewriting amendments were not routine narrowing amendments.

### i. Pre-2013 Requirements

123.  In Application No. 08/417,530 (#450), Mr. Hyatt filed an amendment on June 22, 1998, that shifted several claims and restarted examination. DX22.

124.  In Application No. 08/471,704 (#514), Mr. Hyatt filed an amendment on October 20, 1998, that shifted several claims and restarted examination. DX188.

125.  In Application No. 08/470,082 (#520), Mr. Hyatt filed an amendment on November 14, 1996, that amended several claims and restarted any pre-mailing examination that had already commenced. DX1856.

126.  In Application No. 08/472,062 (#524), Mr. Hyatt filed an amendment on October 14, 1996, that shifted claim 17 and restarted examination. PTX-002.01018–20.

127.  In Application No. 08/471,710 (#532), Mr. Hyatt filed an amendment on November 6, 1996, that amended several claims and restarted any pre-mailing examination that had already commenced. DX1858.

128.  In Application No. 08/431,639 (#601), Mr. Hyatt filed an amendment on January 16, 1996, that shifted claim 58 and restarted examination. PTX-003.01262.

129.  In Application No. 08/431,639 (#601), Mr. Hyatt filed an amendment on February 19, 1997, that shifted claim 91 and restarted examination. PTX-003.01177.

130.  In Application No. 08/431,639 (#601), Mr. Hyatt filed an amendment on August 19, 1998, that shifted claim 58 and restarted examination. DX50-000003–05.

131.  In Application No. 08/457,211 (#708), Mr. Hyatt filed an amendment on February 22, 1999, that shifted claims 125 and 128 and restarted examination. PTX-004.05869–71.

132.  In Application No. 08/456,398 (#717), Mr. Hyatt filed an amendment on January 30, 2002, that shifted claims 283 and 421 and restarted examination. DX90-000103, 114.

133.  In Application No. 08/463,823 (#758), Mr. Hyatt filed an amendment on December 21, 1996, that shifted claims 98 and 100 and restarted examination. PTX-2269.0002–05.

134.  In Application No. 08/471,553 (#783), Mr. Hyatt filed an amendment on May 11, 1999, that shifted claims 99 and 102 and restarted examination. DX1868-000005–08. Mr. Hyatt entered this amendment pursuant to Rule 129(a). PTX-2260.0299.

### ii.  Post-2013 Requirements

135.  In Application No. 08/428,737 (#361), Mr. Hyatt filed an amendment on February 23, 2015, that shifted claim 168 and restarted examination. PTX-1069.16148–49.

136.  In Application No. 08/455,320 (#380), Mr. Hyatt filed an amendment on April 27, 2017, that shifted claim 128 and restarted examination. PTX-836.3740–41.

137.  In Application No. 08/418,213 (#412), Mr. Hyatt filed an amendment on January 7, 2016, that shifted claim 10 and restarted examination. PTX-826.11437–38.

138.  In Application No. 08/417,530 (#450), Mr. Hyatt filed an amendment on August 3, 2015, that shifted several claims and restarted examination. DX25.

139.  In Application No. 08/469,580 (#789), Mr. Hyatt filed an amendment on December 10, 2015, that redesignated the claims selected for examination pursuant to the 2013 Requirements and shifted claims 175, 180, 191, 205, and 283. DX1666-000077, 79, 83–84, 90–91, 122–123. The PTO did not enter the amendment because it was shifting. *See* DX1179-000011–12; *see also* Tr. Oct. 2, 2023 PM (1791:3–9) (Hyatt).

140.  In Application No. 06/469,580 (#789), Mr. Hyatt filed an amendment on October 6, 2016, that redesignated the claims selected for examination pursuant to the 2013 Requirements, thereby shifting the claims and restarting examination. DX1180-000003.

141.  In Application No. 08/471,042 (#798), Mr. Hyatt filed an amendment on June 1, 2015, that shifted claim 95 and restarted examination. PTX-1148.35530.

142.  In Application No. 08/456,126 (#817), Mr. Hyatt filed an amendment on October 15, 2014, that shifted claims 309 through 317 and restarted examination. DX670-000110–19.

### iii.  Reliance on Rule 129(a) to Shift Claims

143.  Mr. Hyatt testified that he believed Rule 129(a) entitled him to entry and examination of a new claim set directed to different inventions than his previously examined claims. Tr. Oct. 2, 2023 AM (1716:4–12) (Hyatt); *see also* PTX-2260.0299. Mr. Hyatt based his understanding on the text of the rule and written PTO commentary. Tr. Sept. 19, 2023 AM (201:6–202:16) (Hyatt). Mr. Hyatt also testified that he spoke directly to PTO personnel, who provided him with guidance regarding his rights under the rule. *E.g.*, Tr. Oct. 2, 2023 PM (1850:4–1851:8) (Harrison). Only a subset of Mr. Hyatt's claim

shifting amendments were submitted under Rule 129(a). *E.g.*, PTX-2260.0299 (pre-2013 Requirements Rule 129(a) submission in Application No. 08/471,553 (#783)).

### 7. Specification Length

144.    A typical specification is 20 or 30 pages long. Tr. Oct. 6, 2017 PM (23:15–16) (Clarke). Mr. Hyatt's specifications, in contrast, were lengthy, complex, and incorporated upwards of dozens of earlier applications by reference. The applications in suit are illustrative:

   a.    Application No. 08/472,062 (#524) includes 238 pages of written description, PTX-002.01223–460, 40 pages of drawings, PTX-002.01183–222, and four earlier applications incorporated by reference, PTX-002.01224.

   b.    Application No. 08/431,639 (#601) includes 517 pages of written description, PTX-003.01380–896, 46 pages of drawings, PTX-003.01333–78, and 43 earlier applications incorporated by reference, PTX-003.01380–83.

   c.    Application No. 08/457,211 (#708) includes 576 pages of written description, DX121-000078–653, 66 pages of drawings, DX121-000012–77, and three earlier applications incorporated by reference, DX121-000079.

   d.    Application No. 08/456,398 (#717) includes 576 pages of written description, PTX-001.05255–830, 66 pages of drawings, PTX-001.05840–905, and three earlier applications incorporated by reference, PTX-001.05256.

145.    The applications in any given application family share the same lengthy specification. *E.g.*, DX144-000006 (700 Family). For example, all 100 applications in the 700 Family, including applications in suit #708 and #717, include 576 pages of written description, 66 pages of drawings, and three earlier applications incorporated by reference. *See* DX144-000006; FOF ¶ 144(c)–(d).

146.    The 500, 600, and 700 Families were not the only families with lengthy, complex specifications. The 360 Family specification is 251 pages long. DX200-000008. The 370 Family specification is 280 pages long. DX69-000011. The 410 Family specification is 508 pages long. DX46-000008. The 450 Family specification is 840 pages long. DX27-000011. The 550 Family specification is 171 pages long. DX158-000007. The 650 Family specification is 708 pages long. DX129-000007. The 800 Family specification is 456 pages long. DX75-000008. The 850 Family specification is 135 pages long. DX196-000009. Again, a typical specification is 20 or 30 pages long. Tr. Oct. 6, 2017 PM (23:15–16) (Clarke).

147.    The length and complexity of Mr. Hyatt's specifications burdened examination by making it more difficult for examiners to identify written description support. Tr. Oct. 10, 2017 PM (22:4–23:5) (Morse). Examiners faced significant hurdles searching Mr. Hyatt's specifications for support for claimed interconnections of elements. *See* Tr. Oct

10, 2017 PM (41:16–42:1) (Morse); Tr. Oct. 11, 2017 AM (5:2–16, 31:16–32:5) (Morse); *see also* Tr. Oct. 11, 2017 AM (6:10–23) (Morse). These difficulties were even greater before the PTO digitized its records in 2003 because, in the pre-digital era, examiners had no choice but to wade through large stacks of paper to identify written description support or search for double patenting. Tr. Oct. 10, 2017 PM (25:9–26:13) (Morse).

148.   Mr. Hyatt testified that he believed his lengthy disclosures were necessary to satisfy the best mode requirement, Tr. Sept. 18, 2023 AM (42:2–43:1, 43:12–44:2) (Hyatt), facilitate examination by the PTO, Tr. Sept. 18, 2023 AM (48:20–49:16) (Hyatt), and benefit interested members of the public, Tr. Sept. 18, 2023 PM (114:13–16) (Hyatt). According to Mr. Hyatt, his "patent applications were large" because they "were system patent applications" that made use of a top-down disclosure method that resulted in an exceptional degree of detail. *See* Tr. Sept. 18, 2023 AM (57:19–24) (Hyatt).

149.   Whatever his reasons, the Court credits the PTO's evidence that Mr. Hyatt's lengthy and complex disclosures burdened examination. Although the PTO was able to issue a patent on pre-GATT Application No. 07/763,461 (#341) (Patent No. 5,487,172), which included "something more than 800 pages for the specification," Tr. Sept. 18, 2023 PM (118:16–17) (Hyatt), as detailed *infra*, FOF ¶ 173, that application is distinguishable from Mr. Hyatt's GATT Bubble applications because it contains significantly fewer claims. That the PTO serially examined a single application with an unusually lengthy specification says nothing about the burden of examining hundreds of applications with lengthy specifications in parallel while Mr. Hyatt was routinely entering claim shifting amendments that restarted examination, FOF ¶¶ 122–142, and refusing to identify written description support for his claims, FOF ¶¶ 153–159.

### 8.  Large Number of Claims

150.   Mr. Hyatt increased the number of claims in his GATT Bubble applications through amendments. As of the 2013 Requirements, Mr. Hyatt's applications contained approximately 117,000 claims. Tr. Oct. 3, 2023 PM (2085:13–16) (Morse). This yields an average of 121 independent claims and 303.5 total claims per application. DX256-000009. Only 0.02% of applications filed between 1995 and 2013 contain more than 299 claims. DX251-000001 (providing data as of the 2013 Requirements). The large number of claims made double patenting analysis impracticable. Tr. Oct. 10, 2017 PM (50:10–20, 72:11–73:2) (Morse); *see also* DX1486-000094–95.

151.   Mr. Hyatt suggested at trial that he needed so many claims to cover the "very significant number of features and subfeatures" in his applications. *Cf.* Tr. Sept. 20, 2023 PM (455:7–9) (Hyatt). He further testified that he needed many more narrow claims to avoid prior art, Tr. Sept. 22, 2023 (697:7–15) (Hyatt), and that he filed many more dependent claims than independent claims to lessen the burden on examination, Tr. Sept. 20, 2023 AM (345:8–12) (Hyatt). Mr. Hyatt understood that there was no formal limit on the number of claims he could file, Tr. Sept. 20, 2023 AM (343:10–345:3)

(Hyatt), and that the PTO had considered but declined to promulgate a rule capping the number of claims an applicant could file in a single application, Tr. Sept. 20, 2023 AM (346:7–12) (Hyatt).

152.    The Court does not credit Mr. Hyatt's testimony that he needed many more narrow claims to avoid prior art because he has not persuasively explained why he needed to add more claims rather than amending existing ones. Additionally, approximately 40% of Mr. Hyatt's claims—or nearly 47,000 claims—are independent claims. DX256-000009. Mr. Hyatt's applications on average contain 121 independent claims. Even ignoring his dependent claims, that places Mr. Hyatt's applications in the top 0.46% of applications by number of claims. DX251-000001.

**9. Failure to Identify Written Description Support**

153.    Applicants who submit new or amended claims are expected to provide the PTO with a roadmap between their claims and supporting written description. Tr. Oct. 12, 2017 PM (5:16–23) (Kunin). This expectation comprises part of the applicant's duty of candor and good faith. *See* Tr. Oct. 13, 2017 AM (7:4–25) (Kunin).

154.    Mr. Hyatt went many years failing to identify written description support for his claims. Tr. Oct. 13, 2017 AM (9:6–18) (Kunin). The applications in suit are illustrative:

    a.    In Application No. 08/472,062 (#524), the examiner issued an office action on January 29, 1997, just under two years after filing, which noted that Mr. Hyatt "has failed to point out where in the specification support may be found for the amended and added claims." PTX-002.01009.

    b.    In Application No. 08/431,639 (#601), the examiner issued an office action on May 19, 1999, more than four years after filing, which noted that "[a]dditional support is needed to determine when and where the claimed elements were first introduced into the chain of continuations in order to verify Applicant's claim to priority." PTX-003.00963.

    c.    In Application No. 08/457,211 (#708), the examiner issued an office action on August 27, 1999, more than four years after filing, which noted that "none of the arguments presented" by Mr. Hyatt purporting to traverse the examiner's written description rejection "specifically addresses any of the rejections nor do any of the arguments specifically address any of the claims nor where the alleged support for the claims can be found in the originally filed specification." PTX-004.05785.

    d.    In Application No. 08/456,398 (#717), the examiner issued an office action on September 7, 2004, more than nine years after filing, which noted that "[t]hus far in the prosecution history, [Mr. Hyatt] has made no attempt" to identify written description support for his claims. PTX-001.04042.

155.   Mr. Hyatt failed to identify written description support in other applications, as well:

   a.   In Application No. 08/458,143 (#702), the examiner issued an office action on December 2, 2004, which noted that "to date the applicant has made absolutely no attempt to show possession of the claimed invention; despite the filing of numerous lengthy responses that generally cite case law, and specifically allege that the examiner has not made a prima facie case." PTX-220.02242. The examiner then observed that "[t]hus far in the prosecution history, [Mr. Hyatt] has made no attempt" to identify written description support for his claims. PTX-220.02242; *see also* PTX-1148.37749–50 (similar office action issued on July 15, 2005, in Application No. 08/471,042 (#798)).

   b.   In Application No. 08/456,901 (#715), the examiner issued an office action on December 21, 1999, which noted that "none of the arguments presented by applicant in these sections specifically addresses any of the rejections nor do any of the arguments specifically address any of the claims nor where the alleged support for the claims can be found in the originally filed specification." PTX-217.05311; *see also* PTX-220.01449 (similar office action issued on June 14, 2000, in Application No. 08/456,901 (#715)); PTX-826.14630 (similar office action issued on August 9, 2005, in Application No. 08/418,213 (#412)); PTX-2250.7068 (similar office action issued on September 13, 1999, in Application No. 08/471,633 (#779)).

156.   Mr. Hyatt does not persuasively contest any of these examples, contending instead that he cannot be faulted for failing to identify written description support before the Federal Circuit decided *Hyatt v. Dudas* (*Dudas I*), 492 F.3d 1365 (Fed. Cir. 2007). *See* Hyatt Resp. 101–02. Accordingly, the Court concludes that Mr. Hyatt routinely failed to identify written description support in the pre-*Dudas I* era.

157.   Mr. Hyatt presented evidence that he identified written description support in applications after the 2013 Requirements. PTX-420 (application attachment dated March 30, 2017); PTX-884 (appeal brief appendix dated August 9, 2021); PTX-885 (same); PTX-887 (same). However, the PTO disputes that these submissions to the Office adequately identified written description support for claimed interconnections of elements or were otherwise helpful to examiners. PTO Resp. 157–58. And, in Application No. 08/464,007 (#747), in an office action dated September 26, 2016, the examiner noted that "[t]hrough extensive amendment after actions subsequent to the 2013 Requirements, Applicant has demonstrated a willingness to amend his claims such that they are not meaningfully supported by the same written description in the specification as the current claims." DX143-000107. Though this language might suggest mere disagreement over the patentability of Mr. Hyatt's newly amended claims, the examiner took pains to remind Mr. Hyatt that "the USPTO *requires* [his] cooperation in . . . identifying support for all pending claims." DX143-000108 (emphasis in original). Thus, when read in its full context, the import of the examiner's exhortation is that Mr. Hyatt had entered at least some post-Requirements amendments

without identifying written description support for his newly amended claims. *See* DX143-000108.

158. Mr. Hyatt also presented evidence that the Board reversed various written description rejections in his applications, including in the applications in suit. PTX-893. But these reversals do not undermine the Court's conclusion that he routinely failed to identify written description support, since the Board in any event *affirmed* many of the examiners' rejections, and they at most establish that the Board determined there was written description support for certain of his claims, not that he adequately assisted examiners in identifying that support.

159. The Court is well aware of the complexities of identifying written description support for Mr. Hyatt's claims. *See Hyatt v. Iancu*, 332 F. Supp. 3d 83, 99 n.22 (D.D.C. 2018) (statement by this Court observing that it was able to find written description support for certain of Mr. Hyatt's claims only by "rely[ing] heavily upon the new evidence presented at trial," which included "many hours of expert testimony over many weeks"). Mr. Hyatt's failures to identify written description support for his claims exacerbated the burdens on the PTO created by his complex priority claims, FOF ¶¶ 111–121, claim-shifting amendments that restarted examination, FOF ¶¶ 122–142, lengthy specifications, FOF ¶¶ 144–149, and large number of claims, FOF ¶¶ 150–152.

## 10. Failure to Demarcate

160. Mr. Hyatt failed to demarcate his applications pursuant to his agreement with Director Godici to focus each application on a single different invention. FOF ¶¶ 99–107. Mr. Hyatt did not testify at trial that he abided by this agreement. Instead, he acknowledged that he claimed more than one invention in certain applications, Tr. Oct. 2, 2023 AM (1741:2–9) (Hyatt), but offered a competing interpretation of the meeting under which Director Godici permitted him to do so. FOF ¶ 101. The Court has already rejected that interpretation as unsupported by the contemporaneous written record of the meeting, read in context. FOF ¶ 102. The Court concludes that Mr. Hyatt's GATT Bubble applications were not focused as required by his agreement with Director Godici because he claimed more than one invention per application. Tr. Oct. 2, 2023 AM (1741:2–9) (Hyatt); *see also* Tr. Sept. 20, 2023 AM (342:15–23) (Hyatt) (indicating that the PTO determined Mr. Hyatt's applications contained more than 1500 independent and distinct inventions); Tr. Oct. 2, 2023 PM (1781:3–16) (Hyatt) (same).

161. Additionally, Mr. Hyatt's claim-shifting amendments demonstrate that instead of keeping his applications focused on single inventions (or sets of inventions), he regularly and repeatedly amended his applications to claim different inventions from the ones he had previously claimed, which restarted examination. FOF ¶¶ 122–142. Mr. Hyatt also amended his applications to contain numerous duplicate and patentably indistinct claims. *See* DX200-000014–36 (360 Family); DX69-000020–46 (370 Family); DX46-000013–29 (410 Family); DX27-000019–30 (450 Family); DX179-000016–26 (500 Family); DX158-000011–30 (550 Family); DX140-000014–18 (600 Family); DX129-000014–28 (650 Family);

DX144-000016-25 (700 Family); DX75-000014–19 (800 Family); DX196-000023–41 (850 Family); *see also* DX1654-000004–05 (detailing adjective-cycling amendments in the 700 Family). Regardless of how the Court interprets the Director Godici meeting, Mr. Hyatt's prosecution conduct demonstrates that his applications were not focused.

162. Subject matter tables prepared and filed by Mr. Hyatt further demonstrate that he did not focus his applications. Mr. Hyatt prepared tables in 1997 and 2016 that described the subject matter of applications in the 410 Family. PTX-826.16629–30 (1997 Table); PTX-826.11405 (2016 Table). Those subject matters shifted over time. Tr. Oct. 4, 2023 PM (2248:19–2252:1) (Morse). For example, Application No. 08/418,213 (#412) shifted from "FILTER" to "Multiple channel communication systems." Application No. 08/418,996 (#418) shifted from "MEDICAL DIAGNOSTIC" to "Radar and sonar control systems." Application No. 08/420,170 (#419) shifted from "MACHINE DIAGNOSTIC" to "Data link control systems." Application No. 08/420,470 (#425) shifted from "LOCATION" to "Peripheral memory controller systems." Application No. 08/423,235 (#427) shifted from "MACHINE CONTROL" to "A three dimensional processing system." Application No. 08/423,390 (#429) shifted from "UNDERWATER ACOUSTIC" to "Fourier transform communication systems." Application No. 08/426,554 (#435) shifted from "IMAGE PROCESSING" to "A solid state memory for an integrated circuit computer system." And Application No. 08/427,547 (#439) shifted from "MICROWAVE" to "An improved frequency domain processing system."

163. The tables also demonstrate that Mr. Hyatt shifted subject matter from one application to another. Tr. Oct. 4, 2023 PM (2251:10–20) (Morse). For example, in 1997, the subject matter of Application No. 08/418,213 (#412) was "FILTER." In 2016, the subject matter of Application No. 08/419,682 (#417) was "Recursive filter systems." In 1997, the subject matter of Application No. 08/417,532 (#413) was "FOURIER TRANSFORM." In 2016, the subject matter of Application No. 08/423,390 (#429) was "Fourier transform communication systems."

164. Mr. Hyatt also prepared tables in 2015 and 2020 that described the subject matter of and lines of demarcation between applications in the 700 Family. *See* DX1666-000011–13 (characterizing the subject matter descriptions within the 2015 table as "line[s] of demarcation"). These tables show significant shifting of inventions. *Compare* DX1666-000012 (2015 table) *with* PTX-2250.2004–06 (2020 table).

165. In 2016, Mr. Hyatt prepared another chart that identified 105 separate inventions that he believed were disclosed in the 700 Family specification. DX150-000026–30. Mr. Hyatt marked the corresponding 700 Family application next to 27 listed inventions. DX150-000026–27. However, he left this field blank for 77 of them. DX150-000027–30. This indicates that as of 2016, Mr. Hyatt had not yet claimed any of these 77 inventions in his 700 Family applications, or at the very least, demarcated his applications to focus on them. For the 27 inventions he marked, Mr. Hyatt indicated that any such focusing was due to amendments he had submitted on October 9, 2015.

DX150-000014–15. This demonstrates that Mr. Hyatt lacked a plan to demarcate the applications in his largest application family and had failed to do so by 2015.

166. Mr. Hyatt also prepared tables in 2016 and 2018 that described the subject matter of and lines of demarcation between applications in the 450 Family. *See* PTX-828.15173–75 (characterizing the subject matter descriptions within the 2016 table as "line[s] of demarcation"). These tables show significant shifting of inventions. *Compare* PTX-828.15173–74 (2016 table); *with* PTX-828.16365 (2018 table).

167. As another exemplary instance where Mr. Hyatt failed to demarcate his applications, on the same day that Mr. Hyatt represented to the Board that no applications other than Application No. 08/471,553 (#783) contained certain claim limitations, Mr. Hyatt filed an amendment in Application No. 08/469,580 (#789) that added those same claims limitations. Tr. Oct. 4, 2023 PM (2261:15–25, 2262:6–20) (Morse); DX1922-000080. Mr. Hyatt engaged in similar behavior in other applications. DX1922-000075–91. The Court finds unpersuasive Mr. Hyatt's argument that he demarcated the #783 and #789 applications because certain claims in the latter application include welding limitations. Hyatt Resp. 90–91. Only a subset of claims includes welding limitations, and Mr. Hyatt did not even select them for examination. The Court also finds unpersuasive his argument that he was not actually representing to the PTO that the claimed subject matter did not appear in any other of his applications.

168. Accordingly, the Court concludes that Mr. Hyatt failed to demarcate his applications. Even setting aside the details of Mr. Hyatt's agreement with Director Godici, Mr. Hyatt routinely shifted his claims, FOF ¶¶ 122–142, added duplicate and patentably indistinct claims, FOF ¶ 161, shifted the general subject matter of his claims, FOF ¶¶ 162–164, 166, failed to claim certain inventions until extremely late in prosecution, FOF ¶ 165, and failed to maintain consistent positions before the PTO regarding the focus of his claims, FOF ¶ 167. Mr. Hyatt's failure to focus his claims is the natural and probable consequence of his failure to develop a plan to focus his claims during the lifetime of his GATT Bubble applications.

## 11. Comparing Pre-GATT and GATT Bubble Applications

169. Between 1971 and 1997, Mr. Hyatt successfully prosecuted 75 patent applications to issuance as patents. PTX-569.00001–03; *see also* DX268-000001–03. During this period, Mr. Hyatt obtained an average of two to three issued patents per year.

170. Mr. Hyatt's GATT Bubble applications differ from these issued patents by the number of claims presented in them. For example, Mr. Hyatt's GATT Bubble applications averaged 303.5 claims per application as of the 2013 Requirements. DX256-000009. Mr. Hyatt's issued patents, in contrast, averaged 40.25 claims. DX268-000003.

171. They also differed by the number of co-pending applications. Mr. Hyatt filed the applications that ultimately issued as his patents between 1967 and 1995, a span of approximately 28 years. DX268-000001–03. That means, on average, he filed less than

three such applications per year. In some years, he filed only a single application that ultimately issued as a patent. The most applications he ever filed in a single year that ultimately issued as patents is nine. Mr. Hyatt's approximately 400 GATT Bubble applications, in contrast, were filed within weeks of each other, resulting in a massive number of complex co-pending applications for which he is simultaneously seeking patents. *See* FOF ¶¶ 45, 84. Mr. Hyatt escalated the number of claims in these applications through amendments, bringing his total number of claims (as of the 2013 Requirements) on which he is simultaneously seeking patents to approximately 117,000. FOF ¶ 150.

172.   Additionally, Mr. Hyatt's GATT Bubble applications include unusually complex priority chains, FOF ¶¶ 111–121, and large specifications, FOF ¶¶ 144–149. During prosecution, Mr. Hyatt repeatedly entered claim-shifting amendments that restarted examination, FOF ¶¶ 122–142, and failed to identify written description support for his claims, FOF ¶¶ 153–159. Mr. Hyatt also failed to demarcate his applications. FOF ¶¶ 160–168. Thus, Mr. Hyatt's GATT Bubble applications are materially different from the ancestor applications on which he obtained issued patents. They are also materially different from other applicant's GATT Bubble applications, which, on average, have undergone approximately three office actions; Mr. Hyatt's applications, in contrast, have undergone, on average, approximately 15 office actions. Tr. Oct. 13, 2017 AM (20:20–21:3) (Kunin); *see also* DX1486-000094.

173.   Patent No. 5,487,172 issued with 72 claims. DX268-000002. Mr. Hyatt filed the application that ultimately issued as Patent No. 5,487,172 on September 20, 1991, several years before he filed hundreds of GATT Bubble applications. DX268-000002.

### 12. *Boone* Interference Count

174.   Some applications in the 550 Family present claims regarding a single-chip microprocessor that Mr. Hyatt previously lost in an interference proceeding, namely, *Hyatt v. Boone*, 146 F.3d 1348 (Fed. Cir. 1998).

175.   Claim 186 in Application No. 08/470,879 (#554) was directed to the single-chip microprocessor Mr. Hyatt lost in *Boone*. DX1244-000002. Mr. Hyatt testified only that he added this claim inadvertently and that he cancelled it once he became aware of his error. Tr. Sept. 25, 2023 (830:6–13) (Hyatt). The #554 application is a member of the 550 Family and, therefore, claims priority to December 28, 1970, the date Mr. Hyatt lost in the interference. PTX-1835.0003; *see also* Tr. Sept. 25, 2023 (876:3–7) (Hyatt).

176.   Claim 314 in Application No. 08/470,879 (#554) was directed to the single-chip microprocessor Mr. Hyatt lost in *Boone*. DX158-000011–12; *see also* Tr. Oct. 11, 2017 PM (10:1–6) (Morse). Mr. Hyatt testified at trial that the #554 application is *entitled* to a later priority date than the lost interference count. Tr. Sept. 25, 2023 (829:8–17) (Hyatt). But the #554 application is a member of the 550 Family and, therefore, *claims* priority to December 28, 1970, the date he lost in the interference. PTX-1835.0003; *see also* Tr. Sept. 25, 2023 (876:3–7) (Hyatt).

177. Claim 180 in Application No. 08/470,671 (#558) was directed to the single-chip microprocessor Mr. Hyatt lost in *Boone*. DX1205-000002. Mr. Hyatt testified at trial that claim 180 materially differed from the *Boone* interference count because it was directed to "a system embodiment," whereas the *Boone* count was "focused on a computer." Tr. Sept. 25, 2023 (829:18–830:5) (Hyatt). This difference is not material here, and the Court does not credit this testimony. The #558 application is a member of the 550 Family and, therefore, claims priority to December 28, 1970, the date Mr. Hyatt lost in the interference. PTX-1835.0003; *see also* Tr. Sept. 25, 2023 (876:3–7) (Hyatt). Mr. Hyatt testified similarly regarding claim 155 in the #554 application (Application No. 08/470,879). Tr. Sept. 25, 2023 (829:18–830:5) (Hyatt).

178. Claim 173 in Application No. 08/471,599 (#561) was directed to the single-chip microprocessor Mr. Hyatt lost in *Boone*. DX158-000011–12; *see also* Tr. Oct. 11, 2017 PM (10:1–6) (Morse). Mr. Hyatt testified at trial that the #561 application is *entitled* to a later priority date than the lost interference count. Tr. Sept. 25, 2023 (829:8–17) (Hyatt). But the #561 application is a member of the 550 Family and, therefore, *claims* priority to December 28, 1970, the date he lost in the interference. PTX-1835.0003; *see also* Tr. Sept. 25, 2023 (876:3–7) (Hyatt).

179. Claim 155 in Application No. 08/471,547 (#565) was directed to the single-chip microprocessor Mr. Hyatt lost in *Boone*. DX1279-000002. Mr. Hyatt testified at trial that claim 155 materially differed from the *Boone* interference count because it recites "essentially a whole system," rather than just a computer, and that although "there is no single-chip limitations" in the claim, "they totally dominate the count." Tr. Oct. 3, 2023 AM (1693:19–1694:20) (Hyatt). But the Court understands this testimony to convey that claim 155 is *broader* than the count Mr. Hyatt lost in the *Boone* interference, which means he was attempting to reclaim it. *See* Tr. Oct. 4, 2023 PM (2267:15–20) (Morse); *see also* MPEP § 804(II). Mr. Hyatt further testified that claim 155 has written description support in the application to which he lost his priority claim in *Boone*. Tr. Oct. 2, 2023 AM (1694:21–1695:4) (Hyatt). Even setting aside that the #565 application is a member of the 550 Family and therefore claims priority to that date, PTX-1835.0003, Mr. Hyatt's testimony confirms that he intended as much.

180. Accordingly, the Court concludes that Mr. Hyatt attempted to reclaim the single-chip microprocessor he lost in the *Boone* interference. Indeed, in at least one context, Mr. Hyatt proceeded before the PTO as though he had not lost the *Boone* interference, providing a "description of the interference proceedings" that was "affirmatively misleading," failing to "even acknowledge that he was the losing party in that interference due to a lack of written description," and presenting "apparently identical declarations to establish the same facts that were finally decided adversely to him." DX264-000010–11. Mr. Hyatt's claims, conduct, and conflicting testimony amply support the Court's finding. And even assuming Mr. Hyatt presented these claims with the expectation that he would not ultimately be entitled to the priority date he lost in the interference, he failed to notify the PTO of this, forcing it to expend time and resources relitigating a priority claim he had already lost.

### 13. Mr. Hyatt's Cooperation with the PTO

181.   Mr. Hyatt communicated with PTO personnel at least 239 times between 1988 and 2019. PTX-897. He also met with two heads of the PTO. Tr. Sept. 25, 2023 (840:8–15) (Hyatt).

182.   Mr. Hyatt worked with PTO personnel to avoid mail room delays by having amendments hand-delivered to supervisors and examiners, Tr. Sept. 19, 2023 PM (255:1–10) (Hyatt), and by faxing amendments, *e.g.*, PTX-861.3.

183.   Mr. Hyatt provided certain materials to PTO personnel upon request. *E.g.*, PTX-002.01096 (lists of serial numbers and examinable applications); Tr. Sept. 20, 2023 PM (430:20–431:2) (Hyatt) (copies of nonpatent references).

184.   Mr. Hyatt sent drafts of amendments to the specification and figures in the 700 Family to SPE Michael Razavi. PTX-215.00003; PTX-216.00012–13.

185.   Mr. Hyatt worked with SPE Richard Hjerpe to improve the process of submitting information disclosure statements filed in multiple applications. PTX-1941.0001.

### 14. Dismissal of Section 145 Actions

186.   Mr. Hyatt failed to advance prosecution of certain Section 145 actions in district court after receiving appellate decisions from the Federal Circuit and the Supreme Court, which resulted in the presiding judge dismissing those actions.

187.   For example, in *Hyatt v. Lee*, District Judge Emmet Sullivan granted the PTO's motion to dismiss for failure to prosecute, noting that "Mr. Hyatt cannot convincingly explain away his delay before this Court and the PTO. The only explanation that reasonably emerges is that Mr. Hyatt has sought to delay prosecution in order to obtain the latest possible start date for the 17-year patent term." 232 F. Supp. 3d 148, 158 (D.D.C. 2017) (Sullivan, J.).

188.   In another case, this Court granted the PTO's motion to dismiss for failure to prosecute, noting that Mr. Hyatt's delay caused prejudice "not only to the public generally, from whom [his] inaction took three additional years of freely using the technology, but also to any companies in related industries who may have unknowingly incorporated the plaintiff's patent." *Hyatt v. Lee*, No. 03-cv-901, 2016 WL 11480814, at *5 (D.D.C. June 6, 2016) (Lamberth, J.). This Court further stated that "[i]t is unacceptable . . . for the Court to be used not as a forum for litigation but a tool in manipulation patent issuance dates." *Id.*

189.   Mr. Hyatt's explanation for failing to prosecute these cases was that he was unfamiliar with federal court proceedings and erroneously believed that he needed to wait for the appellate court to issue a mandate. Tr. Sept. 25, 2023 (828:9–23) (Hyatt). However,

Mr. Hyatt was represented by counsel in these cases. Tr. Sept. 25, 2023 (828:24–829:1) (Hyatt). The Court does not credit his explanation.

## E. Applications in Suit

### 1. Application No. 08/457,211 (#708) [05-CV-2310]

190. Mr. Hyatt filed Application No. 08/457,211 (#708) on June 1, 1995. DX121-000004. The application is a continuation of Application Nos. 06/663,094 (#303) and 07/289,355 (#321). DX112-000002; Tr. Oct. 2, 2023 PM (1808:6–19) (Hyatt). The #708 application is not a divisional, FOF ¶ 74, and is not directed to a non-elected species, FOF ¶ 82(c).

191. The PTO rejected all then-pending claims on August 27, 1999. PTX-004.05743–807. The claims were rejected based on lack of enablement under 35 U.S.C. § 112, first paragraph, PTX-004.05746–56, lack of written description under 35 U.S.C. § 112, first paragraph, PTX-004.05756–58, obviousness over prior art, PTX-004.05758–70, and obviousness-type double patenting, PTX-004.05770–72. The examiner later withdrew the double patenting rejections, while maintaining the other grounds of rejection. PTX-004.04742, 04744–906.

192. The Board affirmed the examiner's final rejection of the appealed claims, though it reversed certain non-enablement and obviousness rejections. PTX-004.00103–04. The Board denied Mr. Hyatt's request to withdraw additional rejections on rehearing. PTX-004.00024.

193. On November 18, 2005, Mr. Hyatt filed an action in this Court under 35 U.S.C. § 145, seeking issuance of a patent from the #708 application. PTX-004.00004–10.

194. The #708 application shares many delay- and burden-causing features common to Mr. Hyatt's GATT Bubble applications. For instance:

 a. Mr. Hyatt waited 12 to 16 years to present his claims. FOF ¶¶ 51, 56. The application now contains 311 claims. PTX-004.05867–963, 06389–455, 06464–65, 06866–90, 08130–39.

 b. The application includes 576 pages of written description, 66 pages of drawings, and three earlier applications incorporated by reference. FOF ¶ 144(c).

 c. Mr. Hyatt avoided final rejections and bought time by filing a preliminary amendment that was identical to other preliminary amendments he filed in the 700 Family. DX120; DX1841.

 d. Mr. Hyatt filed at least one amendment that shifted his claims and restarted examination. FOF ¶ 131.

e.     Mr. Hyatt failed to identify written description support for his claims. FOF ¶ 154(c).

## 2.   Application No. 08/456,398 (#717) [09-CV-1864]

195.   Mr. Hyatt filed Application No. 08/456,398 (#717) on June 1, 1995. PTX-001.05255. The application is a continuation of Application Nos. 06/663,094 (#303) and 07/289,355 (#321). PTX-001.05170. The #717 application is not a divisional, FOF ¶ 74, and is not directed to a non-elected species, FOF ¶ 82(d).

196.   The PTO rejected all-then pending claims on September 7, 2004. PTX-001.04025–167. The claims were rejected for lack of written description under 35 U.S.C. § 112, first paragraph, PTX-001.04029.

197.   The Board affirmed the examiner's rejections in part and entered a new ground of rejection. PTX-001.00208–424. The Board reversed certain rejections on rehearing. PTX-001.00055–110.

198.   On September 25, 2009, Mr. Hyatt filed an action in this Court under 35 U.S.C. § 145, seeking issuance of a patent from the #717 application. PTX-001.00006–10.

199.   The #717 application shares many delay- and burden-causing features common to Mr. Hyatt's GATT Bubble applications. For instance:

a.     Mr. Hyatt waited 12 to 19 years to present his claims. FOF ¶¶ 51, 56. The application now contains 350 claims. PTX-001.04268–345, 04951–81, 05011–92, 05230–54, 05907–15.

b.     The application includes 576 pages of written description, 66 pages of drawings, and three earlier applications incorporated by reference. FOF ¶ 144(d).

c.     Mr. Hyatt avoided final rejections and bought time by filing a preliminary amendment that was identical to other preliminary amendments he filed in the 700 Family. DX103; DX1841.

d.     Mr. Hyatt filed at least one amendment that shifted his claims and restarted examination. FOF ¶ 132.

e.     Mr. Hyatt failed to identify written description support for his claims. FOF ¶ 154(d).

### 3. Application No. 08/472,062 (#524) [09-CV-1869]

200. Mr. Hyatt filed Application No. 08/472,062 (#524) on June 6, 1995. PTX-002.01223. The application is a continuation-in-part of Application Nos. 07/774,159 (#344), 06/849,243 (#310), and 07/279,592 (#319), and a continuation of Application No. 08/034,627 (#349). PTX-002.01224. The #524 application is not a divisional, FOF ¶ 73, and is not directed to a non-elected species, FOF ¶ 82(a).

201. The PTO rejected all-then pending claims on October 16, 1997. PTX-002.00953–80; *see also* PTX-002.00838–39 (Advisory Action dated April 16, 1998, finalizing the October 1997 rejections). The claims were rejected based on lack of enablement under 35 U.S.C. § 112, first paragraph, PTX-002.00958–75, lack of written description under 35 U.S.C. § 112, first paragraph, PTX-002.00958–75, and obviousness-type double patenting, PTX-002.00975–78. The examiner later withdrew some rejections, while maintaining any entered under 35 U.S.C. § 112, first paragraph. PTX-002.00472.

202. The Board affirmed in part and reversed in part. PTX-002.00133–88. The Board withdrew one written description rejection on rehearing. PTX-002.00097.

203. On September 25, 2009, Mr. Hyatt filed an action in this Court under 35 U.S.C. § 145, seeking issuance of a patent from the #524 application. PTX-002.00007–11.

204. The #524 application shares many delay- and burden-causing features common to Mr. Hyatt's GATT Bubble applications. For instance:

   a. Mr. Hyatt waited 20 to 22 years to present his claims. FOF ¶¶ 51, 56. The application now contains 89 claims. PTX-002.01485, 01462–66, 01180, 01140–68.

   b. The application includes 238 pages of written description, 40 pages of drawings, and four earlier applications incorporated by reference. FOF ¶ 144(a).

   c. Mr. Hyatt avoided final rejections and bought time by filing a preliminary amendment that was identical to other preliminary amendments he filed in the 500 Family. DX222; DX1842.

   d. Mr. Hyatt filed at least one amendment that shifted his claims and restarted examination. FOF ¶ 126.

   e. Mr. Hyatt failed to identify written description support for his claims. FOF ¶ 154(a).

### 4. Application No. 08/431,639 (#601) [09-CV-1872]

205. Mr. Hyatt filed Application No. 08/431,639 (#601) on May 1, 1995. PTX-003.01379. The application is a continuation of Applications Nos. 07/279,592 (#319), 07/517,005 (#335), and 07/578,041 (#338). PTX-003.01380; Tr. Oct. 2, 2023 PM (1811:21–1812:15) (Hyatt). The #601 application is not a divisional, FOF ¶ 71, and is not directed to a non-elected species, FOF ¶ 82(b).

206. The PTO rejected all-then pending claims on May 19, 1999. PTX-003.00960–89. The claims were rejected based on lack of written description under 35 U.S.C. § 112, first paragraph, PTX-003.00963–69, and obviousness over prior art, PTX-003.00971–77.

207. The Board affirmed in part and reversed in part, placing some claims in condition for allowance. PTX-003.00292–93.

208. On September 25, 2009, Mr. Hyatt filed an action in this Court under 35 U.S.C. § 145, seeking issuance of a patent from the #601 application. PTX-003.00005–09.

209. The #601 application shares many delay- and burden-causing features common to Mr. Hyatt's GATT Bubble applications. For instance:

    a.    Mr. Hyatt waited 24 to 28 years to present his claims. FOF ¶¶ 51, 56. The application now contains 271 claims. PTX-003.00990–1115, 01170–230, 01257–305, 01314–24, 01897–939.

    b.    The application includes 517 pages of written description, 46 pages of drawings, and 43 earlier applications incorporated by reference. FOF ¶ 144(b).

    c.    Mr. Hyatt filed at least three amendments that shifted his claims and restarted examination. FOF ¶¶ 128–130.

    d.    Mr. Hyatt failed to identify written description support for his claims. FOF ¶ 154(b).

## F. PTO Conduct

210. Mr. Hyatt, through his fact witnesses, introduced significant evidence of the PTO's conduct concerning his applications. Much of this testimony was directed to issues that the Federal Circuit and this Court on remand have effectively determined are irrelevant to evaluating the PTO's prosecution laches defense. However, some of this evidence is relevant, for example, because it suggests bias on the part of testifying witnesses. To the extent that the Court makes findings concerning exhibits or testimony introduced at trial under the umbrella of "PTO conduct," it is because the Court finds it relevant to the credibility of witnesses or the specific questions before it on remand. The Court has refrained from making findings where it has determined that such evidence is not relevant, material, or helpful given the scope of remand or the legal elements of laches.

1. **Pre-Requirements Consolidation**

211. Edward Kazenske was Deputy Assistant Commissioner of Patents from 1994 to 1997. Tr. Sept. 29, 2023 (1611:7–14, 1612:3–5) (Kazenske). At trial, he testified that he ordered group directors to stop issuing patents to Mr. Hyatt until the PTO could consolidate his applications for examination and "issues related to them could be fully coordinated and resolved." Tr. Sept. 29, 2023 (1625:3–6) (Kazenske); *see also* Sept. 29, 2023 Tr. (1623:21–25) (Kazenske).[29] Mr. Kazenske explained that this consolidation was "no different than the current structure of the PTO: You form a unit around similar subject matter, and you put a group of examiners having expertise in that subject matter to examine those applications in that technology." Tr. Sept. 29, 2023 (1624:3–6) (Kazenske); *see also* Sept. 29, 2023 (1602:11–20, 1604:18–25, 1624:18–1625:15) (Kazenske). Mr. Kazenske explained that without consolidation, it would have been difficult to assure examination quality and efficiency. Tr. Sept. 29, 2023 (1624:22–1625:2) (Kazenske); *see also* Tr. Sept. 29, 2023 (1624:14–17) (Kazenske).

212. Mr. Kazenske sought to place Mr. Hyatt's applications in "a common unit" of "examiners familiar with this technology." Tr. Sept. 29, 2023 (1624:1–9) (Kazenske). The PTO created the unit sometime in early 1997 and moved all of Mr. Hyatt's applications to it for examination. Tr. Sept. 29, 2023 (1625:7–24, 1632:4–7) (Kazenske); *see also* Tr. Sept. 29, 2023 (1605:1–5) (Kazenske). Mr. Kazenske testified that consolidating Mr. Hyatt's applications into one unit would "help with the efficiency" and "help with the integrity of the examination" and allow the PTO to "get a handle on all of his applications." Tr. Sept. 29, 2023 (1624:10–17) (Kazenske); *see also* Tr. Sept. 29, 2023 (1602:11–20, 1604:18–25, 1624:18–1625:15) (Kazenske). Consolidation was not an attempt to halt the examination of Mr. Hyatt's applications. Tr. Sept. 29, 2023 (1632:16–1633:2) (Kazenske). As Mr. Kazenske explained, his order to stop issuing patents to Mr. Hyatt "lasted only until [his] patent applications could be consolidated for further examination." Tr. Sept. 29, 2023 (1623:21–25) (Kazenske). Indeed, examination continued after early 1997. *E.g.*, PTX-1799 (1999 office action).

213. Around the same time, the PTO withdrew certain of Mr. Hyatt's applications from issuance as patents. These withdrawals occurred contemporaneously with Mr. Kazenske centralizing examination of Mr. Hyatt's applications to "help with the integrity of the examination." Tr. Sept. 29, 2023 (1624:10–13) (Kazenske). The PTO has the authority to withdraw an application from issuance, including for "[u]npatentability of one or more claims." 37 C.F.R. § 1.313.

214. Mr. Hyatt's applications were later placed in the Sensitive Application Warning System ("SAWS"), which was a process by which the PTO flagged sensitive or unusual applications for review by senior personnel before they could issue as patents. PTX-1266.00001–02; PTX-1314.00001. The purpose of SAWS was to "notify upper

---

[29] Mr. Kazenske also testified that the PTO was concerned that issuing a patent to Mr. Hyatt around that time would undermine Congress's willingness to pass certain pending litigation. Tr. Sept. 29, 2023 (1600:20–1601:6) (Kazenske).

management when there was a potentially problematic application." Tr. Sept. 28, 2023 (1419:8–18) (LeGuyader). However, SAWS-flagged applications could and often did issue as patents. Tr. Sept. 28, 2023 (1420:9–11, 1422:2–5) (LeGuyader); *see also* PTX-1266.00002; PTX-1314.00001. The SAWS program was not an attempt to halt the examination of Mr. Hyatt's applications or implement a PTO policy to never issue Mr. Hyatt another patent. *See* Tr. Sept. 28, 2023 (1422:21–1423:9) (LeGuyader) (fact witness failing to recall any instances where SAWS was used to prevent one of Mr. Hyatt's applications from issuing as a patent).

215.   Mr. Kazenske's order, the consolidation of Mr. Hyatt's applications into a single examination unit, and the inclusion of Mr. Hyatt's applications in SAWS were direct consequences of Mr. Hyatt's prosecution conduct and were attempts by the PTO to get a handle on his applications. Although Mr. Hyatt testified that the PTO had a policy never to issue him another patent, that testimony is belied by his own fact witnesses. That the PTO has not issued Mr. Hyatt a patent since 1997 or has withdrawn a handful of allowed applications from issuance does not establish a policy never to issue Mr. Hyatt another patent. As the Court has already determined, Mr. Hyatt's applications and approach to prosecution had many unique and highly burdensome characteristics. *See* FOF ¶¶ 45–189 (describing Mr. Hyatt's GATT Bubble applications). Those characteristics largely explain the PTO's treatment of his applications.

216.   Mr. Hyatt argues that Stephen Kunin's testimony is not credible because he is biased against him, as evidenced by his alleged involvement in SAWS and Mr. Kazenske's decision to stop issuing patents to Mr. Hyatt pending consolidation. Hyatt Proposal 241. However, the Court generally finds Mr. Kunin credible. His testimony is consistent with the file history record, and Mr. Hyatt has not persuasively substantiated his charges of bias.

## 2.   AU 2615

217.   After the Supreme Court's decision in *Kappos v. Hyatt*, 566 U.S. 431 (2012), the PTO created art unit 2615 ("AU 2615") to complete examination of Mr. Hyatt's applications. PTX-141.00004; Tr. Oct. 11, 2017 AM (28:8–22) (Morse).

218.   Gregory Morse became the SPE of AU 2615 in early 2013, about six months after its establishment. Tr. Oct. 10, 2017 AM (74:22–24, 75:14–19) (Morse). When Mr. Morse took over AU 2615, the 12 examiners assigned to it had already begun to write comprehensive office actions in some of Mr. Hyatt's applications. Tr. Oct. 10, 2017 AM (75:20–25) (Morse). The resulting twelve office action drafts spanned approximately 600 pages each, ranging from 500 to 1000 pages. Tr. Oct. 10, 2017 AM (75:24–76:2, 76:8–12) (Morse). Normally, office actions are about ten pages. Tr. Oct. 10, 2017 AM (76:3–7) (Morse). Each draft took approximately six months to write. Tr. Oct. 10, 2017 AM (76:13–16) (Morse). At that pace, completing examination of Mr. Hyatt's applications would have taken approximately 600 years of examiner time. Tr. Oct. 10, 2017 AM (76:17–25) (Morse). Normally, a typical examination of an entire

case takes about 20 hours of examiner time. Tr. Oct. 11, 2017 AM (30:24–31:2) (Morse).

219. The AU 2615 examiners faced numerous problems in examining Mr. Hyatt's applications, including "the number of claims, the interrelationship of the applications, . . . the range of claim priority dates, . . . the identification of written description support" and that "it was impractical to identify all of the double patenting issues." Tr. Oct. 11, 2017 AM (17:3–12) (Morse). After mailing the first set of office actions, the AU 2615 examiners began working on a second round of applications and "ran into the same issues in the second application they ran into in the first one." Tr. Oct. 10, 2017 AM (77:1–7) (Morse). The issues included that there was no "clear identification of written description support[,] . . . [t]hey had trouble identifying the priority date for each claim to appropriately apply art[,] . . . there were serious double patenting issues where the same invention was being claimed in different [applications]" and there was no discernable line of demarcation between the applications. Tr. Oct. 10, 2017 AM (77:1–15) (Morse). With those issues, there "was no way to complete examination of all of these applications within anyone's lifetime or certainly anyone's career." Tr. Oct. 11, 2017 AM (32:6–16) (Morse).

220. Mr. Hyatt's applications presented other issues as well. To "efficiently find examples of double patenting in Mr. Hyatt's applications," the examiners in AU 2615 used a "Microsoft Word and Excel combination, a phrase finder macro to try to find similar to identical claims." Tr. Oct. 3, 2023 PM (2083:22–2084:2) (Morse). Mr. Morse testified that "[t]hat's not something that an examiner would normally do, but it was something we had to do to try and" identify double patenting issues. Tr. Oct. 3, 2023 PM (2083:24–2084:2) (Morse). Mr. Morse also testified that Mr. Hyatt's applications presented unique issues, such as "issues related to correction of the spec[ification]" and "issues relating to written description rejections for amended claims that are atypical for most examiners." Tr. Oct. 3, 2023 PM (2084:2–7) (Morse).

221. Examiners typically work on a production system akin to a quota for the number of applications they are expected to examine in a particular period. Tr. Oct. 4, 2023 PM (2263:18–2264:17) (Morse). On the production system, examiners are assigned cases, and each case is expected to take a certain number of hours. Tr. Oct 4, 2023 PM (2264:5–6) (Morse). For example, if an examiner had 60 hours of examining time, and each case was expected to take 30 hours, they would be expected to examine two cases to achieve 100% production. Tr. Oct. 4, 2023 PM (2264:6–10) (Morse). If they examined three cases, that would be 150%, Tr. Oct. 4, 2023 PM (2264:10–11) (Morse), and if they examined one case, that would be 50%, Tr. Oct. 4, 2023 PM (2264:11–12) (Morse). Examiners are then evaluated on the percentage of the expectancy they achieved over a fiscal year. *See* Tr. Oct. 4, 2023 PM (2264:13–17) (Morse).

222. Because of the unique characteristics of Mr. Hyatt's applications, examiners in AU 2615 are not evaluated based on their production. Tr. Oct. 4, 2023 PM (2264:18–2265:4) (Morse). In effect, Mr. Hyatt's applications are so far outside the norm that evaluating examiners who work on his applications based on their production

as though they were typical examiners would not accurately reflect the work they had done. *See* Tr. Oct. 4, 2023 PM (2265:2–4) (Morse).

223. There were approximately 13 examiners in AU 2615. Tr. Oct. 4, 2023 PM (2266:1–8) (Morse). They are GS-15 examiners with yearly salaries between $130,000 and $180,000. Tr. Oct. 4, 2023 PM (2266:9–16) (Morse). Thirteen (13) examiners at an average salary of $155,000 per year means that, on average, the PTO pays the examiners working on Mr. Hyatt's applications about $2 million per year. Over the course of ten years, that totals about $20 million that the PTO has spent examining Mr. Hyatt's applications in examiner salaries alone.

224. In Technology Center 2600, where Mr. Hyatt's cases are being examined, the average primary examiner examined approximately 78 applications in Fiscal Year 2012. PTX-141.00004. If Mr. Hyatt's applications were average applications, the examiners in AU 2615 would have been able to complete examination of "more than double the number of pending Hyatt applications" in a single year. PTX-141.00004. However, "[d]ue to the number of claims, the variety of continuing relationships, the complex procedural history of these applications, the number of issued patents directed to the same specifications, the apparent presence of new matter, and the unwillingness of Mr. Hyatt to identify written description support, progress [was] very slow." PTX-141.00005.

225. Due to those issues with Mr. Hyatt's applications, in ten years the examiners in AU 2615 have examined 330 of Mr. Hyatt's applications. Tr. Oct. 4, 2023 AM (2125:1–10) (Morse). At a rate of 78 applications per year, in the ten years that AU 2615 has existed a primary examiner would be expected to examine 780 applications. Tr. Oct. 4, 2023 AM (2123:16–19) (Morse). In other words, a single primary examiner would have been expected to examine more than double the number of applications that all of AU 2615 has examined in the past ten years. With 13 examiners, an art unit of primary examiners working on typical applications would be expected to examine about 10,140 applications, about 30 times the number that AU 2615 examined. Tr. Oct. 4, 2023 AM (2123:20–2124:1) (Morse). In the amount of time that the PTO estimated would have been needed to examine Mr. Hyatt's applications without the 2013 Requirements, the examiners in AU 2615 could have examined approximately 41,496 typical applications. DX27-000031.

226. Altogether, the experience of AU 2615 illustrates that Mr. Hyatt's conduct has significantly burdened the PTO as it has sought to examine Mr. Hyatt's applications.

227. Mr. Hyatt argues that Mr. Morse's testimony is not credible because he is biased against him, as evidenced by incidents involving AU 2615 that occurred under his supervision. For example, an examiner in the art unit created an unflattering and unprofessional "wrestler chokehold" meme depicting Mr. Hyatt, PTX-760, and circulated a news article describing Mr. Hyatt's divorce, PTX-642. However, the Court generally finds Mr. Morse credible. His testimony is consistent with the file history record, and Mr. Hyatt has not presented persuasive evidence that such incidents tainted the PTO's

examination of his applications. Although the Court finds the relevant incidents inappropriate, they do not cast a negating pall over Mr. Morse's testimony. Mr. Morse testified credibly concerning the unique characteristics of Mr. Hyatt's applications and the difficulties these created for the PTO. That Mr. Morse could have better managed his team's (or his own) evident frustrations with Mr. Hyatt's applications does not obviate his testimony's truthfulness or general import. And Mr. Hyatt's internal recommendation that the PTO issue a patent on certain of Mr. Hyatt's claims persuasively rebuts the charge that he was biased against Mr. Hyatt and had no intention of ever issuing him another patent. *See* PTX-1364 (memo prepared by Mr. Morse identifying certain claims as allowable); Tr. Oct. 4, 2023 AM (2131:16–24) (Morse) (describing the same and noting that had the Office of Patent Legal Administration agreed, "[w]e probably would have issued the application").

### 3. 2013 Requirements

228.   After determining in 2013 that it could not examine Mr. Hyatt's applications effectively, AU 2615 issued Requirements to "requir[e] Mr. Hyatt to help" the PTO examine his applications. Tr. Oct. 11, 2017 AM (33:1–3) (Morse). The goal of the Requirements was "to allow effective examination" and "to narrow the issues that were in front of [the PTO] to get anywhere." Tr. Oct. 11, 2017 AM (33:4–9) (Morse). The Requirements provided an overview of issues with Mr. Hyatt's applications, including the large number of applications and claims, extended and complicated priority chains, and the lack of written description support. *E.g.*, DX27-000004–05. The Requirements concluded that the PTO "has been unable to efficiently examine these applications" and "develop a clear prosecution record that adequately notifies the public as to [Mr. Hyatt's] invention." DX27-000005. Accordingly, the Requirements further concluded that "it does not appear that the USPTO's expense and effort in writing actions on every claim presented is leading to identification of either patentable subject matter or specific and focused issues in dispute." DX27-000005.

229.   The Requirements detailed the applications to which they applied and generally addressed applications that "share a common specification." *E.g.*, DX27-000005–07. The Requirements all followed a similar structure, describing the challenges created by Mr. Hyatt's applications, including complex priority chains, unusually lengthy specifications, the proliferation of claims, and the proliferation of duplicate and patentably indistinct claims. *See generally* DX200 (360 Family); DX69 (370 Family); DX46 (410 Family); DX27 (450 Family); DX179 (500 Family); DX158 (550 Family); DX140 (600 Family); DX129 (650 Family); DX144 (700 Family); DX75 (800 Family); DX196 (850 Family). The Requirements required Mr. Hyatt to take steps to further examination, including (1) selecting a reasonable number of claims for examination, with no more than 600 total claims selected per family, *e.g.*, DX27-000033–34; (2) identifying the earliest priority date for each selected claim and where the claimed embodiment appears in the priority applications, *e.g.*, DX27-000034–35; and (3) providing a complete copy of the claims in each application, *e.g.*, DX27-000035–36.

230. The PTO issued the 2013 Requirements in response to Mr. Hyatt's unique and highly burdensome prosecution conduct; they were an attempt by the PTO to get examination back on track. Although Mr. Hyatt testified that the Requirements were error-ridden, the file history record belies his testimony. Indeed, there is ample record support for the Requirements' characterization of Mr. Hyatt's applications. The Court finds that the Requirements were generally accurate and fairly described Mr. Hyatt's applications as of when they were issued. The Court only wishes the PTO had issued them sooner. *See Hyatt I*, 332 F. Supp. 3d at 133 (criticizing the PTO not earlier recognizing that "Mr. Hyatt's GATT Bubble applications required it to employ and embrace atypical procedures for addressing the challenge before them").

231. After the Requirements, Mr. Hyatt filed amendments that rewrote his claims, shifted his claimed inventions, and effectively restarted examination. FOF ¶¶ 135–142. These amendments were particularly burdensome because they required the PTO to redo its double patenting analysis. *See* Tr. Oct. 11, 2017 AM (71:4–12) (Morse); Tr. Oct. 4, 2023 PM (2233:24–2235:23) (Morse). Mr. Hyatt also entered at least some post-Requirements amendments without identifying written description support for his newly amended claims. FOF ¶ 157. Although the PTO labeled many of his amendments "bona fide," this indicates that Mr. Hyatt had made "a reasonable attempt to respond to what was required" by the PTO, something "good enough" to continue prosecution. Tr. Oct. 4, 2023 PM (2247:21–2248:11) (Morse). It did not constitute an endorsement of Mr. Hyatt's practice of filing amendments that rewrote his claims and restarted examination. *See* Tr. Oct. 4, 2023 PM (2248:13–18) (Morse).

### 4. Continued PTO Examination After Board Decisions

232. Mr. Hyatt testified that the PTO "recycled" his applications by reopening examination after the Board reversed the examiners' rejections. Tr. Sept. 20, 2023 PM Tr. (426:20–427:23) (Hyatt). Mr. Hyatt's testimony consisted of his recollection of a meeting with Technology Center Director Andrew Christensen. PTX-54.00001. According to Mr. Hyatt, Mr. Christensen told him that the PTO would "recycle" his applications if he prevailed before the Board. Tr. Sept. 20, 2023 PM (427:4–6) (Hyatt). The Court does not credit Mr. Hyatt's testimony that Mr. Christensen himself characterized the PTO as having a "recycling" policy. It is clear on the face of Mr. Hyatt's meeting conference record that Mr. Hyatt, not Mr. Christensen, used the "recycling" label, which for Mr. Hyatt is a pejorative term. PTX-54.00001. Mr. Christensen apparently "confirmed" that the PTO had reopened prosecution of two of Mr. Hyatt's applications after reversals by the Board. PTX-54.00001. However, it does not follow that Mr. Christensen used the "recycling" label, characterized it as problematic, or stated that the PTO had a policy of reopening prosecution every time Mr. Hyatt prevailed before the Board, regardless of whether such action was merited. *See* PTX-54.00001.

233. Indeed, when the PTO reopened prosecution of applications after reversals by the Board, it did so to ensure the patentability of Mr. Hyatt's claimed inventions. For example, the PTO reopened prosecution of Application No. 07/289,355 (#321) after

the Board issued a decision in which it reversed the examiner's rejections, PTX-1046.17994–8035, but left "it to the examiner to decide whether to make an anticipation rejection based on" a prior art reference, PTX-1046.18022 n.2. Additionally, one of the concurring patent judges observed that certain claims limitations had written description issues. PTX-1046.18025, 18030–32. The PTO reopened prosecution and mailed an office action entering additional rejections under MPEP § 1214.04, which permits the examiner to reopen prosecution and enter a new rejection after obtaining group director approval. MPEP § 1214.04; PTX-1046.17990 (showing the examiner obtained group director approval); *see also* 37 C.F.R. § 1.198; MPEP § 1002.02(c). In other words, the PTO reopened prosecution not because it intended to delay the examination or issuance of Mr. Hyatt's application but because it needed to consider other possible grounds for rejection identified by the Board. Reopening prosecution furthered the PTO's goal of issuing valid patents.

### 5. Suspension Period

234.    Between approximately 2003 and 2012, the PTO largely suspended examination of Mr. Hyatt's applications. PTX-009; *see also* Tr. Oct. 11, 2017 PM (46:19–47:2) (Morse). The PTO sent Mr. Hyatt documents that explained the suspensions by reference to pending court decisions. *E.g.*, PTX-003.00050; *see also* PTX-009 (identifying where suspension-related communications appear in the file history record). During this period, Mr. Hyatt had three significant cases moving through the courts: *Dudas I*, 492 F.3d 1365; *Hyatt v. Dudas* (*Dudas II*), 551 F.3d 1307 (Fed. Cir. 2008); and *Kappos*, 566 U.S. 431. These cases had the potential to affect the PTO's handling of his applications. *See generally* Tr. Oct. 11, 2017 AM (17:23–26:17) (Morse).

235.    In at least some Section 145 cases filed in this District, Mr. Hyatt represented that he was taking steps with the PTO to stay examination of related applications. *E.g.*, *Hyatt v. Dudas*, No. 04-cv-1138 (HHK), Compl. ¶ 9, ECF No. 4 (D.D.C. July 1, 2004). However, during the suspension period, Mr. Hyatt filed more than 1000 petitions seeking action on his applications or updates concerning their status. PTX-10 (2005 petitions); PTX-37 (example 2005 petition for action on the merits); PTX-12 (2007 petitions); PTX-36 (example 2007 petition for action on the merits); PTX-13 (requests for status updates). Thus, Mr. Hyatt largely opposed the PTO's decision to broadly stay his applications and sought to have the stays lifted.

## G. Public Availability of Specifications

236.    Certain of Mr. Hyatt's specifications—identical to the specifications of his GATT Bubble applications—have been publicly available for years or decades.

237.    The 360 Family claims priority to a patent whose specification has been publicly available for over 38 years. PTX-1830.0003 (claiming priority to Application No. 05/844,765 (#143), which issued as Patent No. 4,523,290); DX268-000001 (showing that Patent No. 4,523,290 issued on June 11, 1985, meaning the specification of that patent has been publicly available since that date). That patent expired in 2002.

238.   The 370 Family claims priority to a patent whose specification has been publicly available for over 47 years. PTX-1831.0003 (claiming priority to Application No. 05/366,714 (#118), which issued as Patent No. 3,986,022); DX268-000001 (showing that Patent No. 3,986,022 issued on October 12, 1976, meaning the specification of that patent has been publicly available since that date). That patent expired in 1993.

239.   The 410 Family claims priority to a patent whose specification has been publicly available for over 43 years. PTX-1832.0003 (claiming priority to Application No. 05/550,231 (#128), which issued as Patent No. 4,209,843); DX268-000001 (showing that Patent No. 4,209,843 issued on June 24, 1980, meaning the specification of that patent has been publicly available since that date). That patent expired in 1997.

240.   The 500 Family claims priority to a patent whose specification has been publicly available for over 27 years. PTX-1834.0003 (claiming priority to Application No. 08/034,627 (#349), which issued as Patent No. 5,584,032); DX268-000003 (showing that Patent No. 5,584,032 issued on December 10, 1996, meaning the specification of that patent has been publicly available since that date). That patent expired in 2013.

241.   The 550 Family claims priority to a patent whose specification has been publicly available for over 35 years. PTX-1835.0003 (claiming priority to Application No. 05/402,520 (#122), which issued as Patent No. 4,825,364); DX268-000001 (showing that Patent No. 4,825,364 issued on April 25, 1989, meaning the specification of that patent has been publicly available since that date). That patent expired in 2006.

242.   The 600 Family claims priority to a patent whose specification has been publicly available for over 28 years. PTX-1836.0003 (claiming priority to Application No. 07/279,592 (#319), which issued as Patent No. 5,459,846); DX268-000002 (showing that Patent No. 5,459,846 issued on October 17, 1995, meaning the specification of that patent has been publicly available since that date). That patent expired in 2012.

243.   The 650 Family claims priority to a patent whose specification has been publicly available for over 47 years. PTX-1837.0003 (claiming priority to Application No. 05/366,714 (#118), which issued as Patent No. 3,986,022); DX268-000001 (showing that Patent No. 3,986,022 issued on October 12, 1976, meaning the specification of that patent has been publicly available since that date). That patent expired in 1993.

244.   The 800 Family claims priority to a patent whose specification has been publicly available for over 47 years. PTX-1839.0003 (claiming priority to Application No. 05/366,714 (#118), which issued as Patent No. 3,986,022); DX268-000001 (showing that Patent No. 3,986,022 issued on October 12, 1976, meaning the specification of that patent has been publicly available since that date). That patent expired in 1993.

245.   Mr. Hyatt tailored the claims of his applications to cover emerging technologies. DX241-000033–34 (in response to the defendant's interrogatory as to "why [he] maintain[s] that rewriting [his] claims to cover a different invention was not

unreasonable," Mr. Hyatt responded that "in the decades in which the PTO delayed the issuance of patents on these applications, the technology changed and Plaintiff amended the claims to focus on other inventive features").

## H. Gilbert P. Hyatt Testimony

246. Mr. Hyatt's testimony is not credible in important respects. The Court has noted several instances where it found Mr. Hyatt's testimony not credible, inconsistent with the file history record, inconsistent with other witness testimony, or contradicted by Mr. Hyatt's prior statements or actions. FOF ¶¶ 16, 27, 35–38, 41–42, 58, 81, 88, 102–106, 113, 116–122, 152, 177, 189, 232. It has also made several broad swaths of factual findings, grounded in the file history record and other witness testimony, that directly contradict critical aspects of his testimony or reflect the Court's adverse assessment of his credibility. *See, e.g.*, FOF ¶¶ 18–39 (ancestor restriction finality and alignment with number of GATT Bubble applications), 58–83 (whether Mr. Hyatt's GATT Bubble applications are divisionals filed in response to restriction requirements), 99–107 (Director Godici meeting), 111–121 (complex priority claims), 122–142 (claim shifting), 150–152 (large number of claims), 153–159 (failure to identify written description support), 108–110 (plan to demarcate), 160–168 (failure to demarcate), 174–180 (*Boone* interference count).

247. Even setting aside inconsistencies with the file history record and other witness testimony, Mr. Hyatt undermined his credibility with the Court through his general demeanor and answers to certain questions. *E.g.*, Tr. Sept. 25, 2023 (905:13–907:7, 929:10–25) (Hyatt); Tr. Sept. 28, 2023 (1463:11–1466:25) (Hyatt). Although the Court appreciates the strain imposed by testifying over many days, Mr. Hyatt's testimony often exhibited unhelpful evasiveness, as well as occasional bouts of hyperbole and exaggeration. Given that Mr. Hyatt's other witnesses largely did not exhibit these issues, and much of Mr. Hyatt's testimony is in direct tension with the file history record or directed to matters outside his knowledge or control, the Court is confident that its credibility determinations and assessments of the evidence give Mr. Hyatt his fair due. The Court has treated his testimony with the utmost respect and seriousness. However, the Court cannot credit it at the expense of ignoring the entire record.

## IV.   CONCLUSIONS OF LAW

The Court's conclusions of law apply the analytical structure of *Hyatt II*. *See* 998 F.3d at 1366–1371. The Court begins by analyzing whether Mr. Hyatt unreasonably and inexplicably delayed prosecuting his GATT Bubble applications. The Court starts with Mr. Hyatt's pre-filing delay, which it finds inexcusable and of sufficient magnitude to trigger a presumption of intervening rights, before turning to Mr. Hyatt's post-filing prosecution conduct, which the Court

finds constituted a clear abuse of the patent examination system. The Court then addresses both forms of prejudice, finding that Mr. Hyatt has failed to rebut the presumption of intervening rights and that the Court's conclusions regarding "clear abuse" establish that Mr. Hyatt materially prejudiced the PTO. The Court analyzes Mr. Hyatt's burdens of persuasion as they arise in context, concluding that Mr. Hyatt has failed to meet each of them.

## A.  Unreasonable and Inexcusable Delay

The Court considers Mr. Hyatt's pre-filing delay separately from his post-filing prosecution conduct because finding in the PTO's favor on either issue will have distinct implications for prejudice. *See id.* at 1369–70. The former triggers a presumption of intervening rights. *Id.* at 1370. The latter, if it amounts to a clear abuse of the patent examination system, "can alone suffice to prove prejudice." *Id.*

### 1.  Pre-Filing Delay

The Court found that Mr. Hyatt delayed filing his GATT Bubble applications for 12 to 26 years. FOF ¶ 51. Even if the Court were to credit his claimed priority dates, that would mean he delayed filing for 6 to 24 years, or 11 to 24 years, excluding the applications in his 600 Family. *Id.* Mr. Hyatt further delayed by amending his applications late in prosecution to present new claims for examination. FOF ¶ 56. For instance, in certain of his applications, Mr. Hyatt delayed 46 years before presenting new claims through amendments. *Id.* Even crediting his claimed priority dates in those cases, he delayed presenting new claims for 32 to 44 years. *Id.*

"[T]hese quantities of time are enough to trigger prosecution laches" and raise a presumption of intervening rights. *Hyatt II*, 998 F.3d at 1368, 1370. The only remaining question is whether Mr. Hyatt has sufficiently rehabilitated the record that was before the Federal Circuit in *Hyatt II* and, as a result, established "a legitimate, affirmative reason for his delay." *Id.*

at 1371–72. The Court concludes that he has not, and therefore, has failed to meet one of his burdens on remand.

Mr. Hyatt principally advanced two arguments during the 2023 phase of trial that his pre-filing delay was justified. First, he argued that he prosecuted his applications in a manner consistent with then-prevailing serial prosecution norms. *See* Hyatt Proposal 247. Second, he argued that his GATT Bubble applications were divisional applications filed in response to restriction requirements issued in his ancestor applications. *See* Hyatt Proposal 267. Both arguments are legally and factually untenable.

### i.  Serial Prosecution Norms

A common practice when Mr. Hyatt filed his ancestor applications was for applicants to pursue continuing applications serially. FOF ¶ 13. Under this serial prosecution norm, even if the applicant knew they needed to file dozens of continuing applications that claimed priority to a single parent, they would file their continuing applications serially, one at a time, so they never had more than one pending child application. FOF ¶ 14. Once that child application neared allowance, abandonment, or termination, the applicant would file a second child application and conclude prosecution on the first. *Id.* They would then prosecute the second child application until it neared allowance, abandonment, or termination, and then file the third. And so on.

Mr. Hyatt contends that he filed his applications serially until the GATT transition forced him to simultaneously file hundreds of applications to cover his remaining unprotected inventions. FOF ¶ 14. Mr. Hyatt's position seems to be that complying with the serial prosecution norm during the pre-GATT period justifies any resulting delay in presenting his GATT Bubble applications for examination, mainly because he alleges the PTO was unwilling to engage in parallel examination—simultaneous examination of multiple co-pending child applications—during the

pre-GATT period. *Id.* Put differently, Mr. Hyatt claims that filing his applications earlier would have been futile.

As a factual matter, it is doubtful that a serial prosecution norm or PTO policy constrained Mr. Hyatt from filing his GATT Bubble applications earlier. As this Court has observed, Mr. Hyatt specifically argued to the Board in 2020 that he had prosecuted many of his applications in parallel during the pre-GATT period; he lodged this position to rebut the charge that he had delayed filing his applications. FOF ¶ 16. The record confirms that Mr. Hyatt prosecuted many of his ancestor applications in parallel. FOF ¶ 17. These facts severely undermine his argument that the PTO or then-prevailing norms *compelled* him to prosecute his applications serially. At best, his serial prosecution practice was consistent with what other patent applicants commonly were doing at the time. That falls far short of justifying decades of resulting delay. *See Personalized Media*, 57 F.4th at 1354. And it says nothing about Mr. Hyatt's delay in belatedly presenting new claims through post-filing amendments.

More to the point, regardless of then-prevailing prosecution norms, it was facially unreasonable for Mr. Hyatt to serially prosecute the number of applications he believed he was entitled to file based on the number of inventions disclosed in his specifications. *See Hyatt II*, 998 F.3d at 1366, 1369. Mr. Hyatt gave the specific example of the 700 Family, in which he filed 100 GATT Bubble applications because he had counted 100 inventions in that family's specification. FOF ¶ 14. As this Court found, the necessary implication of Mr. Hyatt's articulation of the serial prosecution norm is that he would have prosecuted each of the 100 applications in his 700 Family serially had the GATT transition not occurred. *Id.* Assuming it would have taken two years to prosecute each child application serially, it would have taken Mr. Hyatt 200 years to complete prosecuting all the inventions disclosed in that family. *Id.* Put another way, Mr. Hyatt

apparently believed that, but for the GATT transition, he and his successors-in-interest reasonably could have presented claims for examination nearly two centuries after he originally disclosed them. *Id.* No inventor could have reasonably believed that then-prevailing prosecution norms entitled them to a de facto monopoly on inventive technology limited only by the number of successive continuing applications they could plausibly justify given their specification's length and complexity. Such a belief is nakedly at odds with the beneficent aims of the patent system.

Moreover, if Mr. Hyatt is correct that serial prosecution was the then-prevailing norm and that abiding by contemporary prosecution norms suffices to excuse pre-filing delay, then it is hard to imagine how dilatory pre-GATT serial prosecution practices could *ever* trigger prosecution laches. That is obviously in tension with the Federal Circuit's decisions in *Symbol II* and *Bogese*, which confirmed that at least some lawful pre-GATT serial continuation chains—i.e., even those conforming to legal norms—could trigger prosecution laches. *See Symbol Techs., Inc. v. Lemelson Med., Educ. & Rsch. Found.* (*Symbol II*), 422 F.3d 1378, 1386 (Fed. Cir. 2005); *Bogese*, 303 F.3d at 1369; *see also Hyatt II*, 998 F.3d at 1366, 1369.

Furthermore, the Federal Circuit has taken pains to distinguish reasonable from unreasonable dilatory prosecution practices. *See Hyatt II*, 998 F.3d at 1361–62 (citing *Symbol II*, 422 F.3d at 1385) (enumerating examples). The Federal Circuit's careful circumscription of these categories makes no sense if all it takes to excuse pre-filing delay is to have conformed to a common practice or prevailing prosecution norm. *See id.* Indeed, the Federal Circuit's analysis does not even reference prevailing norms. *Id.* Thus, even if Mr. Hyatt is correct that many other applicants delayed the presentation of their claims during the ancestor period, that, standing alone, does nothing to excuse his delays or justify his prosecution conduct. Mr. Hyatt must go further and affirmatively show that *his* dilatory conduct was reasonable—for example, by proving that he filed

divisional applications in response to restriction arguments. *See id.* As detailed *infra*, Part IV.A.1.ii, the facts fail to support Mr. Hyatt's only meaningful attempt to make that showing.

Finally, Mr. Hyatt's argument that he delayed his GATT Bubble applications because he was prosecuting them serially ultimately reduces to the contention, already rejected by the Federal Circuit, that his pre-filing delay was justified because he filed his applications to protect the number of inventions he believed he had made. *See id.* at 1371. The Court understands Mr. Hyatt's explanation for his delay to be that he had a certain number of inventions he needed to protect and that the serial prosecution norm required (or justified) serializing the filing of applications to protect those inventions. FOF ¶ 14. Because Mr. Hyatt had many inventions to protect, by the time the GATT transition rolled around, he still had many more applications to file—these became his GATT Bubble applications. In other words, Mr. Hyatt's beliefs concerning how many inventions he had made are part and parcel of his norm-based justification for his pre-filing delay.[30] But the Federal Circuit has already made itself clear—the number of inventions Mr. Hyatt believed he had made *cannot* justify his delay. *Hyatt II*, 998 F.3d at 1371.

### ii.  Divisional Applications

Recall the Court's observation that the Federal Circuit has already developed examples of reasonable and unreasonable pre-filing delay. *See supra* Part IV.A.1.i. One example of reasonable pre-filing delay is "filing a divisional application in response to a restriction requirement, even if the filing occurs immediately before issuance of the parent application." *Hyatt II*, 998 F.3d at 1361–62 (citing *Symbol II*, 422 F.3d at 1385). At trial, Mr. Hyatt attempted to justify his pre-filing delay by arguing that his GATT Bubble applications were divisional applications filed in

---

[30] Consider the scenario where Mr. Hyatt believed he had only disclosed a handful of inventions. Even with serial prosecution, it is hard to imagine Mr. Hyatt having any remaining applications to file by the time of the GATT transition. Mr. Hyatt's argument only works by combining the number of inventions he believed he had made with the alleged requirement or norm that he prosecute them serially.

response to restriction requirements in his ancestor applications. FOF ¶ 18. The Court's factual findings, however, entirely foreclose this argument.

As this Court found, when Mr. Hyatt filed his GATT Bubble applications, it was generally understood that the terms "continuation," "continuation-in-part," and "divisional" referred to distinct application types. FOF ¶ 65. Although these application types are immaterial to rights under 35 U.S.C. § 120, they claim different things and are used in different contexts. *Id.* Quite revealingly, Mr. Hyatt's applications self-identify as continuations, continuations-in-part, or "continuing applications" but never as divisionals. FOF ¶¶ 70–75. Mr. Hyatt's applications in suit are not directed to non-elected species from his ancestor applications, as would be expected if his applications were, in fact, divisionals. FOF ¶ 82. Mr. Hyatt's difficulties preparing preliminary amendments indicate that his GATT Bubble applications are not divisionals. FOF ¶ 80. And Mr. Hyatt has consistently represented to this Court and the Federal Circuit that his applications are continuations. FOF ¶ 77; *see also* FOF ¶¶ 78–79. Thus, Mr. Hyatt's GATT Bubble applications are not divisionals.

Moreover, if Mr. Hyatt really filed his GATT Bubble applications as divisionals directed to non-elected species, then the number of applications he filed should correspond to the number of restricted species in his ancestor applications. However, the number of applications he filed (approximately 400) and the number of non-elected restricted species (157) are incommensurable, which fatally undermines his argument. FOF ¶ 31. Mr. Hyatt's only explanation for this incommensurability is that he filed many more applications than he had restricted species because he also wanted to cover unclaimed inventions and because he anticipated receiving additional restrictions. FOF ¶¶ 37–38. But that gives up the game; it confirms that Mr. Hyatt filed his GATT Bubble applications for purposes significantly broader than claiming restricted species—namely,

to pursue new claims, as in continuation and continuation-in-part applications, and to get ahead of possible adverse office actions. In any event, the Court did not credit these shifting explanations and found that Mr. Hyatt filed his GATT Bubble applications based on the number of inventions he believed he disclosed, regardless of whether they were restricted. FOF ¶ 39. Mr. Hyatt's prosecution approach flatly contradicts his claim that he filed divisionals.

Perhaps seeing the writing on the wall, Mr. Hyatt argues in his reply brief that the specific label used in his applications, and by implication, their incommensurability with and lack of conformance to his restricted species, is immaterial. *See* Hyatt Reply 75–76.[31] All that matters is that Mr. Hyatt had restriction requirements in his ancestor applications and filed GATT Bubble applications in response. He claims that this brings his applications within the spirit, if not the letter of the Federal Circuit's examples of reasonable delay. But the "divisional" label matters, given that the Federal Circuit used it, and Mr. Hyatt's applications hardly fit within the definition of divisional applications or the Circuit's other examples of reasonable delay. *See Hyatt II*, 998 F.3d at 1361–62; *see also* MPEP § 201.06. In any event, it is hard to see how Mr. Hyatt's ancestor restrictions on their own could explain his delay, as virtually all of them became final well before 1995, meaning he could have filed his continuing applications much earlier than he did. FOF ¶¶ 19–28.

\* \* \*

Mr. Hyatt's other arguments concerning his pre-filing delay are either unsupported by the Court's factual findings or insufficient to justify or excuse his delay. Accordingly, the Court

---

[31] Mr. Hyatt also stated in his reply brief that the "PTO simply contends that [Mr.] Hyatt's transitional applications are not divisionals, without any indication of why that would matter in the laches analysis." Hyatt Reply 76. Mr. Hyatt introduced this issue to the Court. Mr. Hyatt dedicated a substantial portion of his case-in-chief to arguing that his applications were divisionals. The Court has understood all along that this argument is important because it goes to whether Mr. Hyatt's applications fall under the Federal Circuit's divisional-based example of reasonable delay. To disclaim this argument now, as though it did not originate with Mr. Hyatt, is stunning.

concludes that Mr. Hyatt delayed filing his GATT Bubble applications by a magnitude of time sufficient to trigger prosecution laches, *see Hyatt II*, 998 F.3d at 1368, and has failed to meet his burden of excusing or justifying his delay, *see id.* at 1371–72. Under the prejudice prong of prosecution laches, Mr. Hyatt bears the burden of disproving intervening rights. *Id.* at 1370.

### 2. Post-Filing Prosecution Conduct

After considering the totality of the circumstances with a focus on Mr. Hyatt's conduct, the Court concludes, consistent with the standard announced in *Hyatt II*, that Mr. Hyatt engaged in a clear abuse of the patent examination system. *See id.* at 1369.

Mr. Hyatt has failed to meet his burden on remand of justifying (a) his decision to ignore Director Godici's instruction to demarcate his applications in 1995, (b) his decision to adopt the specific prosecution approach that he did, and (c) his failure to develop a plan for demarcating his applications. *See id.* at 1372. Mr. Hyatt has not persuasively rebutted the PTO's evidence establishing the nature and consequence of his actions or omissions. He has not introduced evidence of PTO conduct that adequately explains or justifies *his* conduct or establishes that prejudice to the PTO is traceable to its independent decision-making. And, even on a complete record, the Court is persuaded that Mr. Hyatt "adopted an approach to prosecution that all but guaranteed indefinite prosecution delay." *Id.* at 1368

The Court will begin with Mr. Hyatt's 1995 meeting with Director Godici and proceed through each aspect of Mr. Hyatt's post-filing prosecution conduct that the Federal Circuit thought significant in *Hyatt II*. *See id.* at 1368–69. The Court will also address the sufficiency of Mr. Hyatt's proffered justifications for his conduct and his strained attempts at absolution from the burden he placed on the PTO.

### i.  Director Godici Meeting

The Federal Circuit held that Mr. Hyatt must "justify [his] decision to ignore Director Godici's instruction to demarcate his applications in 1995." *Id.* at 1372. Mr. Hyatt did not attempt to justify his decision to ignore Director Godici. Instead, he argued that the PTO misconstrued his 1995 meeting with the Director and that he followed all his instructions. *See* Hyatt Proposal 97–99. Mr. Hyatt's argument can only succeed if the Court credits his testimony concerning his meeting with Director Godici over his contemporaneous written record of it. *See* FOF ¶ 99.

According to his testimony, Mr. Hyatt entered an agreement with Director Godici that required him to focus his claims but permitted him to claim multiple inventions in a single application. FOF ¶ 101. According to his written record, Mr. Hyatt entered an agreement that required him to focus his claims "on a different invention in each application." FOF ¶ 100. The Court has already resolved this credibility-driven fact dispute, finding, contrary to Mr. Hyatt's testimony, that he promised Director Godici that he would focus each GATT Bubble application on a distinct (i.e., singular) invention. FOF ¶ 102; *see also* FOF ¶¶ 103–107. There is no question that Mr. Hyatt claims more than one invention per application. FOF ¶ 160. Thus, Mr. Hyatt ignored Director Godici's instructions. *Id.; see also* FOF ¶¶ 161, 168. Mr. Hyatt has not offered any other justification or explanation for his decision to ignore Director Godici, and the Court can discern none from the record. Mr. Hyatt has failed to meet another of his burdens on remand. *See Hyatt II*, 998 F.3d at 1372.

### ii.  Specific Prosecution Approach

The Federal Circuit further held that Mr. Hyatt must "justify his decision to adopt the specific prosecution approach that he did—unique in its scope and nature—as detailed in the PTO's Requirements." *Id.* at 1372. The Court will address the characteristics of Mr. Hyatt's

applications and prosecution approach that the Federal Circuit specifically discussed in *Hyatt II*. For instance, his complex priority claims, *id.* at 1368, lengthy specifications, *id.*, amendment practice, *id.*, and specific exemplary actions such as filing claims he had previously lost in an interference proceeding, *id.* at 1368–69. The Court will address some related issues as well.

### a.  Complex Priority Claims

Mr. Hyatt's GATT Bubble applications claim priority to a large number of ancestor applications and a broad range of priority dates. FOF ¶ 111. Mr. Hyatt's applications substantially overlap in their priority claims, which is well illustrated by the evidence adduced by the PTO at trial and which Mr. Hyatt has failed to persuasively rebut. FOF ¶¶ 112–113. Indeed, the Court found Mr. Hyatt's testimony concerning his priority claims—and his heated attacks on the PTO's evidence—largely incredible. FOF ¶¶ 113, 116–121.

As a consequence of Mr. Hyatt's complex priority claims, examiners had "trouble identifying the priority date for each claim to appropriately apply art." FOF ¶ 115. The wide range of Mr. Hyatt's priority date claims exacerbated these issues because even relatively small changes in the applicable priority date can cause significant changes in the relevant prior art. *Id.* Examiners further faced issues identifying written description support for Mr. Hyatt's claims and, in some cases, searched dozens of ancestor applications for written description support. *Id.* Mr. Hyatt's priority claims, combined with other aspects of his prosecution conduct, made it "extremely difficult" for the PTO to examine his applications. *Id.*; *see also* FOF ¶ 121.

Through his testimony, Mr. Hyatt lodged several responses and objections to the PTO's evidence concerning his priority claims. The Court has made factual findings adverse to each of his arguments. FOF ¶¶ 113–121. Besides lacking evidentiary support, Mr. Hyatt's arguments fall short because they attempt to shift the Court's focus from his priority *claims* to his priority date

*entitlements*. FOF ¶ 114. The Court has already found that the complexity of Mr. Hyatt's priority claims burdened examination. FOF ¶ 115. The simplicity of his alleged priority entitlements does not mitigate that fact. *Id.* Mr. Hyatt's examples where examiners were ultimately able to determine priority dates do not mean that parsing his priority claims, reviewing his ancestor applications, and making the determinations was trivial. *Id.* The record amply confirms that Mr. Hyatt's complex priority claims drove examiners to undertake onerous searches for prior art and written description support. *Id.*

Thus, as should be apparent from the Court's findings of fact, Mr. Hyatt has not persuasively rebutted the PTO's evidence that his applications contained complex, overlapping priority claims that significantly burdened examination.

### b.  Specification Length

Mr. Hyatt's GATT Bubble applications contained lengthy, complex specifications and incorporated upwards of dozens of earlier applications by reference. FOF ¶¶ 144, 146. All of Mr. Hyatt's co-pending applications in a given application family share the same lengthy specification. FOF ¶ 145.

As a consequence of Mr. Hyatt's complex and lengthy specifications, it was more difficult for examiners to identify written description support for Mr. Hyatt's claims. FOF ¶ 147. For example, it was difficult for examiners to identify support for claimed interconnections of claim elements. *Id.* These difficulties were particularly acute during the pre-digital era because examiners had to wade through massive stacks of paper and could not conduct digital searches or double-patenting analyses. *Id.* Mr. Hyatt worsened the burden on the PTO by going many years without identifying written description support for his claims, despite his duty of candor and good faith requiring him to do so. FOF ¶¶ 153–156. Even after the 2013 Requirements, Mr. Hyatt

provided only questionable assistance to the PTO. FOF ¶ 157. This Court has direct experience identifying written description support for Mr. Hyatt's claims and is well aware of its complexity and onerousness. FOF ¶ 159. Mr. Hyatt's proffered reasons for his complex specifications are not sufficient to "operate to excuse [him] from responsibility for the sizable undue administrative burden that his applications have placed on the PTO." *See Hyatt II*, 998 F.3d at 1372.

Additionally, although Mr. Hyatt has successfully prosecuted applications with lengthy specifications to issuance, at that time he never had the number of claims and complex co-pending applications he has now. FOF ¶ 149, 169–173. Thus, the Court is not persuaded that Mr. Hyatt's past success in prosecuting applications with complex specifications indicates the reasonableness of his conduct; if anything, it indicates how unreasonable his prosecution approach became after the GATT Bubble. *Cf. Personalized Media*, 57 F.4th at 1356.

### c. Claim Amendments

Mr. Hyatt's claim amendment practice has been highly unusual and burdensome on the PTO. In addition to filing identical preliminary amendments across his applications shortly after the GATT transition to delay examination, FOF ¶¶ 91–96, Mr. Hyatt routinely filed amendments that dramatically escalated his number of claims, FOF ¶¶ 150–152, entirely rewrote existing claims, FOF ¶¶ 122–142, and shifted existing claims to new inventions, *id.* This conduct had broad ramifications for the PTO's ability to examine Mr. Hyatt's applications.

Shortly after the GATT transition, the PTO began examining Mr. Hyatt's applications based on their claimed priority dates. FOF ¶ 92. Mr. Hyatt's applications were indistinguishable from the ancestor applications they copied, so the PTO began rejecting them. FOF ¶ 91. Mr. Hyatt responded by filing identical preliminary amendments to stay off rejections. FOF ¶ 93–95. However, Mr. Hyatt did not intend for the PTO to examine his amended claim sets. FOF ¶ 96.

Instead, he amended his applications to avoid final rejections and buy time to prepare additional preliminary amendments that would introduce the claims he actually wanted examined. *Id.* It was unreasonable for Mr. Hyatt to intentionally delay the examination of his applications in order to overcome a crisis of his own making—his failure to create a reasonable plan or organized approach for focusing his GATT Bubble applications after filing. FOF ¶¶ 108–110.

Then, after Mr. Hyatt began filing amendments directed to examinable claims, he dramatically escalated the total number of claims in his GATT Bubble applications to more than 117,000. FOF ¶ 150. That yielded an average of 121 independent claims and 303.5 total claims per application, placing Mr. Hyatt's GATT Bubble applications, on average, in the top 0.02% of applications filed between 1995 and 2013 by claim count. *Id.* This extremely unusual proliferation of claims made double patenting analysis impracticable, *id.*, which was especially problematic for the PTO because so many of Mr. Hyatt's claims were duplicates or patentably indistinct. FOF ¶ 161. Mr. Hyatt's explanations for his claim escalation are not credible. FOF ¶¶ 151–152. Even if his explanations were credible, they would be legally insufficient to excuse his conduct because they reflect little more than his desire to avoid prior art. *See Hyatt II*, 998 F.3d at 1369. Mr. Hyatt's other attempts at justifying his claim count—for example, noting that many of his claims are dependent claims—still render his applications extreme outliers. FOF ¶ 152.

Mr. Hyatt also entirely rewrote claims midway through examination or shifted them to claim new inventions. FOF ¶¶ 122–142. This practice, before and after the Requirements, forced the PTO to perform new written description analyses, double patenting analyses, and prior art searches. FOF ¶ 122. Mr. Hyatt disputed that his amendments shifted his claims to new inventions. *Id.* However, the Court has reviewed the exemplary amendments discussed by the parties and found that Mr. Hyatt shifted his claims in nearly all of them. *Id.*; *see also* FOF ¶¶ 123–142. Mr.

Hyatt did not otherwise attempt to rationalize his claim shifting, nor did he rebut the PTO's evidence that rewriting his claims restarted examination and burdened the PTO.

Mr. Hyatt entered some of his claim amendments under Rule 129(a), 37 C.F.R. § 1.129(a), which he believed entitled him to the entry and examination of new claim sets, FOF ¶ 143. However, the fact that PTO regulations permitted certain conduct, including claim shifting amendments, does not preclude a finding of prosecution laches. *See Hyatt II*, 998 F.3d at 1369; *Personalized Media*, 57 F.4th at 1354. If lawful conduct unreasonably delayed prosecution or burdened the PTO, as Mr. Hyatt's claim shifting amendments indeed did, then that conduct can (and here does) support a finding of prosecution laches.[32]

### d.  Specific Exemplary Actions

Certain "exemplary acts during prosecution" of Mr. Hyatt's GATT Bubble applications "were patently unreasonable" and further show "that his prosecution approach had overwhelmed even his own ability to manage his applications and claims." *Hyatt II*, 998 F.3d at 1368–69. For instance, Mr. Hyatt attempted to reclaim the single-chip microprocessor count he had lost in the *Boone* interference proceeding. FOF ¶ 174. The Court's factual findings, based on the complete record adduced at trial, confirm that Mr. Hyatt presented claims for examination directed to this previously lost count. FOF ¶¶ 175–179. It was unreasonable for Mr. Hyatt to seek to reclaim a count he had lost in an interference proceeding. FOF ¶ 180. And it was unreasonable not to tell the PTO that the interference meant he could only receive the benefit of a later priority date. *Id.* His

---

[32] For this reason, the Court is unpersuaded by Mr. Hyatt's arguments that Rule 129 or guidance from PTO officials made his delay- or burden-causing prosecution conduct reasonable. For example, Mr. Hyatt suggested that Rule 129(b) permitted him to claim multiple inventions in a single application and that Jessica Harrison and other PTO personnel confirmed this understanding. But that directly contradicts his agreement with Director Godici, *see supra* Part IV.A.2.i, and fails to explain or justify his applications' total lack of demarcation, *see infra* Part IV.A.2.iii.

failure to do so forced the PTO to needlessly expend examination time and resources relitigating a priority claim he had already lost. *Id.*

* * *

Mr. Hyatt's specific prosecution approach cumulatively made it "extremely difficult" for the PTO "to conclude prosecution and examination" of his applications. FOF ¶ 115. The PTO faced significant burdens in searching for prior art, identifying written description support, and conducting double-patenting analyses. *E.g.*, FOF ¶¶ 115, 147, 150. The sheer number of claims Mr. Hyatt presented for examination, FOF ¶ 150, the length of his specifications, FOF ¶¶ 144–147, the complex and overlapping nature of his priority claims, FOF ¶¶ 111–113, 115, 121, his refusal to identify written description support, FOF ¶¶ 154–159, and his claim rewriting and shifting amendments that repeatedly restarted examination compounded these burdens, FOF ¶¶ 122–142. Mr. Hyatt's applications in suit notably share many of these features. FOF ¶¶ 194, 199, 204, 209.

Mr. Hyatt's purported justifications or explanations for his specific prosecution approach are factually and legally untenable. Thus, Mr. Hyatt has failed to meet another of his burdens on remand. *See Hyatt II*, 998 F.3d at 1372.

### iii.  Failure to Demarcate

Finally, the Federal Circuit held that Mr. Hyatt must "justify his failure to develop a plan for demarcating his applications over at least the 20 year period from 1995 to 2015." *Id*. Mr. Hyatt did not attempt to justify his failure to develop a plan. Instead, he argued that he actually developed a plan and succeeded in demarcating his applications. *See* Hyatt Proposal 97–99.

The Court concluded in its factual findings that Mr. Hyatt did not have a plan to demarcate his applications during the GATT transition period, as evidenced by his failure to timely prepare his applications for examination. FOF ¶¶ 108–109. The Court further concluded that Mr. Hyatt

ultimately failed to demarcate his applications and that this fact, combined with his lack of plan during the GATT transition period, demonstrated that Mr. Hyatt did not have a plan to demarcate his applications between 1995 and 2015. FOF ¶ 110.

As this Court has already concluded, Mr. Hyatt failed to demarcate his applications pursuant to his agreement with Director Godici. *See supra* Part IV.A.2.i; *see also* FOF ¶ 160. However, regardless of how the Court interprets the Director Godici meeting, the record demonstrates that Mr. Hyatt's applications are not focused or demarcated. FOF ¶¶ 161–168. The Court found that Mr. Hyatt routinely shifted his claims, FOF ¶¶ 122–142, added duplicate and patentably indistinct claims, FOF ¶ 161, shifted the general subject matter of his claims, FOF ¶¶ 162–164, 166, failed to claim certain inventions until extremely late in prosecution, FOF ¶ 165, and failed to maintain consistent positions before the PTO regarding the focus of his claims, FOF ¶ 167. Mr. Hyatt has not provided persuasive justifications for these aspects of his applications and prosecution approach; he has only provided alternative histories that this Court has definitively rejected. Mr. Hyatt has failed to meet the last of his specific burdens on remand. *See Hyatt II*, 998 F.3d at 1372.

### iv.  Impact on the PTO

Mr. Hyatt's prosecution approach had an extraordinary impact on the PTO. The period immediately before, during, and after the issuance of the 2013 Requirements is instructive.

After the Supreme Court's 2012 decision in *Kappos*, 566 U.S. 431, the PTO created a dedicated art unit, AU 2615, to complete the examination of his applications, FOF ¶ 217. The art unit, which consisted of 13 examiners, FOF ¶ 223, picked up examination after the end of the 2003 to 2012 suspension period, FOF ¶¶ 234–235, and expended considerable time, effort, and financial

resources examining Mr. Hyatt's applications, FOF ¶¶ 218–225. The experience of AU 2615 demonstrates that Mr. Hyatt's conduct has significantly burdened the PTO. FOF ¶ 226.

For instance, the art unit's first round of office actions ranged from 500 to 1000 pages in length. FOF ¶ 218. Normally, office actions are about ten pages. *Id.* These drafts took approximately six months to write. *Id.* At that pace, it would have taken approximately 600 years of examiner time to complete examination of Mr. Hyatt's applications, even though an application typically takes only about 20 hours of examiner time to complete. *Id.* Examiners took considerable time to prepare these office actions because of the myriad burdensome features of Mr. Hyatt's applications, including the extremely high number of claims, multitude of complex overlapping priority claims, difficulty identifying written description support, double-patenting issues, and lack of discernable lines of demarcation between applications. FOF ¶ 219.

In light of these issues, the PTO went to unusual lengths to ensure its examiners could not only complete their work in a relatively timely manner but receive appropriate credit for it, too. For example, because it was impracticable for examiners to identify double patenting issues using ordinary means, the PTO developed a specialized tool using Microsoft Word and Excel, "a phrase finder macro," that could locate similar or identical claims. FOF ¶ 220. Examiners normally do not need such bespoke tools. *Id.* The PTO also took its examiners off of its production quota system because it was not giving examiners sufficient credit for their work examining Mr. Hyatt's applications. FOF ¶¶ 221–222. Mr. Hyatt's applications were so far outside the norm that evaluating AU 2615 examiners as though they were working on typical applications—holding them to the same productivity measures as other examiners—would severely understate the extent and quality of their work. FOF ¶ 222.

In 2013, the PTO determined it could not effectively examine Mr. Hyatt's applications using ordinary means and issued the 2013 Requirements. FOF ¶ 228. The 2013 Requirements surveyed the issues with Mr. Hyatt's applications, directed him to assist with examination, and created special procedures for obtaining his assistance. FOF ¶ 229. In the ten years after their issuance, AU 2615's examiners completed examination of 330 of Mr. Hyatt's applications. FOF ¶ 225. However, each examiner in AU 2615's technology center would ordinarily be expected to complete the examination of 78 applications in a single year. FOF ¶ 224. At that rate, AU 2615's thirteen examiners could have examined 10,140 applications in the amount of time it took them to examine 330 of Mr. Hyatt's applications (or roughly 30 times the number of applications that AU 2615 actually examined). FOF ¶ 225.[33] The PTO estimated that in the time it would have taken to examine Mr. Hyatt's applications without the 2013 Requirements, the examiners in AU 2615 could have examined approximately 41,496 typical applications. *Id.*

Since its formation, the PTO has spent approximately $20 million on AU 2615 examiner salaries. FOF ¶ 223. That sum ordinarily buys the PTO many more completed applications than its examiners were able to deliver. *See* FOF ¶ 223–225. Again, this costly inefficiency is attributable to Mr. Hyatt's burdensome prosecution conduct.

Mr. Hyatt's only response is to argue that the PTO completed examination of most of his applications by the mid-2000s using ordinary compact prosecution methods, Hyatt Proposal 121–125, that the PTO's decision to resume examination in 2012 after it had already completed examining his applications was an independent PTO decision not attributable to Mr. Hyatt, Hyatt Proposal 222–223, and to attack the veracity of the 2013 Requirements, Hyatt

---

[33] Thirteen (13) examiners, times 78 applications per year, times ten years, equals 10,140 applications over the approximately ten-year period that AU 2615 has been examining Mr. Hyatt's applications.

Proposal 150–159. Mr. Hyatt here attempts to recharacterize the record—specifically, to take the PTO's decision to *suspend* examination in 2003 and transform it into examination reaching its natural end-state after years of business-as-usual prosecution. If correct, Mr. Hyatt can arguably absolve himself from responsibility for the burdens he created on the PTO through AU 2615 and the 2013 Requirements. If the PTO really "completed" examination of his applications by the mid-2000s using ordinary examination methods, it cannot blame him for the costs of needlessly reopening examination. However, these arguments are unpersuasive.

*First*, Mr. Hyatt's arguments concerning the alleged completion of examination in the mid-2000s stretch the record too far. Although examination stopped in the mid-2000s, it does not follow that the PTO had completed examination in the ordinary course. In fact, this Court previously faulted the PTO for insisting on following compact prosecution procedures even though they made it "*impossible* to complete examination." *See Hyatt I*, 332 F. Supp. 3d at 128, 132–34 (emphasis added). The PTO clearly did not know what to do with Mr. Hyatt's extraordinary applications in the pre-Requirements era and came to believe its examination approach was failing to identify "patentable subject matter or specific and focused issues in dispute." FOF ¶ 228. So, it started suspending examination around 2003 under cover of ongoing litigation. FOF ¶¶ 234–235. However much the Court might dislike that the PTO suspended examination, it cannot pretend that Mr. Hyatt's applications were ordinary or that their features—which the Court has now discussed at length—did not unduly burden the PTO before 2003 or contribute to the suspension period.

*Second*, the Court has already considered Mr. Hyatt's attacks on the 2013 Requirements and determined that they are unfounded. FOF ¶ 230. As this Court has now held, the 2013 Requirements were a direct response to Mr. Hyatt's unique and highly burdensome prosecution conduct, which started as early as 1995. *Id.* They were not something the PTO generated in a

vacuum in 2013 out of the desire to punish Mr. Hyatt; they were an attempt by the PTO to get examination back on track. *Id.* In other words, Mr. Hyatt caused the PTO to issue the 2013 Requirements by prosecuting his applications unreasonably before 2003. The PTO is not to blame.

Moreover, at all times, Mr. Hyatt bore the burden of conducting himself equitably before the PTO. *See Hyatt II*, 998 F.3d at 1366. Thus, even if the Requirements were baseless, Mr. Hyatt would still be responsible for the burden he created through his prosecution conduct after the Requirements, which exhibited claim shifting, FOF ¶¶ 135–142, deficient identification of written description support, FOF ¶ 157, shifting subject matter, FOF ¶¶ 164–167, and other issues that predate the Requirements.

Thus, Mr. Hyatt's strained attempt to recharacterize the record in his favor fails. The 2013 Requirements and the burden on the PTO, illustrated by the experiences of AU 2615, are directly attributable to Mr. Hyatt's conduct, and any consequent prejudice was caused by Mr. Hyatt and not the PTO's independent choices. At bottom, the exemplary figures and evidence that the Federal Circuit cited as substantiating Mr. Hyatt's extraordinary burden on the PTO remain intact.

### v.  Other Matters

Before wrapping up, the Court will briefly consider other matters raised by Mr. Hyatt.

Mr. Hyatt alleges that the PTO had a policy never to issue him another patent. Hyatt Proposal 125–138. Mr. Hyatt argues that because the PTO had no intention of ever issuing him another patent, his prosecution conduct could not have effectively "guaranteed indefinite prosecution delay." *Hyatt II*, 998 F.3d at 1368. Put differently, Mr. Hyatt believes that prosecution would never advance no matter what he did, so he is not responsible for his dilatory conduct. As a matter of law, this argument is doubtful. Whether an "approach to prosecution" guarantees delay depends principally on the nature of that approach and its probable impact on examination, not

hidden PTO policies that applied to that applicant. *See id* at 1365–66, 1368. An applicant plausibly can still abuse the patent examination system even though the PTO no longer intended to issue that applicant patents—for example, by consuming an inordinate amount of PTO resources at the expense of other applicants. *See id.* at 1370 (referring to prosecution conduct that "effectively taxes everyone using the system").

In any event, the Court concludes that no such policy existed. FOF ¶ 215. At most, Mr. Hyatt has shown that there was a temporary order not to issue him patents while his applications were undergoing consolidation in the late 1990s. FOF ¶¶ 211–212. However, that consolidation order was intended to streamline and improve examination quality. *Id.* The PTO terminated the "no patents" order once it completed the consolidation. FOF ¶ 212. Mr. Hyatt's other pertinent evidence, which addresses topics such as SAWS and certain withdrawals from allowance, again does not evince that there was any such policy. FOF ¶¶ 213–214. At most, Mr. Hyatt's evidence describes procedures the PTO reasonably put in place in connection with examining his highly unusual applications—i.e., mechanisms the PTO deployed to ensure it would not issue him an invalid patent while trying to get a handle on his applications. FOF ¶ 215. Although it appears that Mr. Hyatt was singled out for many of these procedures, the PTO understandably regarded his applications as *sui generis*. The Court cannot stretch Mr. Hyatt's meager evidence of an indefinite "no patents" policy to absolve him from responsibility for how he prosecuted his applications.

The Court finds that in light of the overwhelming evidence of Mr. Hyatt's unreasonable post-filing prosecution conduct, the fact that Mr. Hyatt successfully obtained 75 other patents, FOF ¶ 12, frequently communicated with the PTO, FOF ¶ 181, personally provided materials to PTO personnel, FOF ¶ 183, and pre-cleared certain amendments and filings with SPEs Razavi and Hjerpe, FOF ¶¶ 184–185, cannot "operate to excuse [Mr.] Hyatt from responsibility for the sizable

undue administrative burden that his applications have placed on the PTO," *see Hyatt II*, 998 F.3d at 1372. Mr. Hyatt's other arguments concerning his post-filing prosecution conduct are either unsupported by the Court's factual findings or insufficient to justify or excuse his conduct.

\* \* \*

Accordingly, the Court concludes that Mr. Hyatt's post-filing prosecution conduct constituted a clear abuse of the patent examination system. *See id.* at 1369–71 ("[Mr.] Hyatt's conduct—including his delay in presenting claims, his creation of an overwhelming, duplicative web of applications and claims, and his failure to cooperate with the PTO—was a clear abuse of the patent system, even if it did not literally violate regulations or statutory provisions."); *see also supra* Part IV.A.1 (addressing his significant delay in presenting claims). The Court further concludes that Mr. Hyatt has failed to excuse or justify his abusive prosecution conduct or meet any of his specific burdens of persuasion. *See id.* at 1371–72.

"[W]here a patent applicant has committed a clear abuse of the PTO's patent examination system, the applicant's abuse and its effects meet the prejudice requirement of prosecution laches." *Id.* at 1370. As discussed *infra*, Part IV.B.2, the Court's conclusion that Mr. Hyatt clearly abused the patent examination system suffices to establish prejudice for prosecution laches purposes.

## B. Prejudice

A finding in the PTO's favor on either prejudice prong will establish that the PTO has prevailed on the issue of prosecution laches. *See Hyatt II*, 998 F.3d at 1370. The Court will consider each prong in turn, though both favor the PTO.

### 1. Intervening Rights

Because Mr. Hyatt unreasonably and inexcusably delayed filing his GATT Bubble applications by more than six years, a presumption of intervening rights applies. *Id.* Mr. Hyatt, therefore, bears the burden of proving a lack of intervening rights. *Id.* He has not done so.

As far as the Court is aware, Mr. Hyatt did not introduce any evidence directed to rebutting the presumption of intervening rights. The Court is also unaware of any evidence that indirectly rebuts this presumption. The PTO, on the other hand, has introduced evidence that Mr. Hyatt's specifications have been publicly available for decades. FOF ¶ 236–245. Although not necessary given the operative evidentiary presumption, this evidence indicates the difficulties and prejudice the public likely faces determining patentable subject matters while Mr. Hyatt's applications are pending. In any event, because the presumption of intervening rights applies, and Mr. Hyatt has not averred any evidentiary or legal basis for rebutting it, the Court finds that the intervening rights requirement is satisfied. *See Hyatt II*, 998 F.3d at 1370. The PTO has established prejudice and, therefore, is entitled to judgment on the issue of prosecution laches.

### 2. Clear Abuse of the Patent Examination System

Mr. Hyatt's prosecution conduct clearly abused the patent examination system, *see supra* Part IV.A, and materially prejudiced the PTO, *see Hyatt II*, 998 F.3d at 1370–72.

The exemplary figures discussed *supra*, Part IV.A.2.iv, stand unrebutted. Notably, the Federal Circuit found them sufficient, "combined with the details surrounding [Mr.] Hyatt's pattern of prosecution conduct, [to] show that the PTO ha[d] carried its burden of proving that [Mr.] Hyatt's prosecution of his applications clearly abused the PTO's patent examination system and . . . contributed to the delay that occurred with respect to the four applications at issue." *Hyatt II*, 998 F.3d at 1371. This combination alone suffices to establish prejudice for prosecution laches

purposes. *Id.* at 1370–71. Thus, because that same combination of facts is present here, following *Hyatt II*, the Court concludes that Mr. Hyatt's abusive prosecution conduct created a material burden on the PTO that itself suffices to establish prejudice for prosecution laches purposes. *See id.* Again, the PTO is entitled to judgment on the issue of prosecution laches.

* * *

The PTO has shown to this Court's satisfaction that Mr. Hyatt unreasonably and inexcusably delayed filing his GATT Bubble applications and engaged in prosecution conduct that constituted a clear abuse of the patent examination system. As a result, Mr. Hyatt prejudiced the PTO and third parties. Additionally, Mr. Hyatt has failed to meet his specific burdens on remand as detailed by the Federal Circuit. Accordingly, the Court will enter judgment for the PTO on the issue of prosecution laches.

To be clear, the Court takes no pleasure in this result. The Court once castigated the PTO for its "chutzpah" in chafing against Mr. Hyatt's efforts to vindicate his rights under Section 145 and for falling well short of how this Court believes government agencies should engage with zealous members of the public who seek to vindicate their rights. *Hyatt I*, 332 F. Supp. 3d at 133 n.14. Nevertheless, *Hyatt II* is clear. Given the scope of remand and binding case law, the facts this Court has found based on the complete trial record require a singular result—judgment for the PTO. No other result is even colorable. The Court recognizes that this ruling may significantly impact Mr. Hyatt's other pending applications. But Mr. Hyatt has now at last received a full and fair hearing on prosecution laches.

A separate order consistent with this memorandum opinion shall issue.

Date: May **4**, 2024

Royce C. Lamberth
United States District Judge